UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Duxbury Trucking, Inc., )<br>)<br>　　　　　Plaintiff, )<br>)<br>　　v. )<br>)<br>Massachusetts Highway Department, et al., )<br>)<br>　　　　　Defendants. )<br>) | Civil Action No. 04-12118-NG |

## PLAINTIFF'S OPPOSITION TO DEFENDANT MASSACHUSETTS TURNPIKE AUTHORITY'S MOTION TO DISMISS

NOW COMES Duxbury Trucking, Inc. ("Plaintiff"), by and through counsel, Shaheen & Gordon, P.A., and opposes the Massachusetts Turnpike Authority's Motion to Dismiss.[1] In support thereof, Plaintiff states the following:

I.  FACTS

The Massachusetts Turnpike Authority ("MTA") as a recipient of federal highway funds is subject to federal anti-discrimination laws pursuant to Title VI of the Civil Rights Act of 1964, 23 U.S.C. § 324, and the statute's implementing regulations at 49 C.F.R. § 21 and 23 C.F.R. § 200. Pl's Cmplt. at ¶ 21. Those regulations require that the Massachusetts Highway Department ("MHD"), the MTA, their sub-recipients, agents, and any contractors who receive federal highway money cannot discriminate on the basis of race, color or national origin, or sex, pursuant to 23 U.S.C. § 324 and 23 C.F.R.

---

[1]     Plaintiff intends to respectfully request permission to amend her complaint to name various individuals within the MTA and MHD who either carried out or were directly responsible for these discriminatory acts. Some discovery will need to be completed by Plaintiff to name the responsible individuals.

200.9(a)(2).  Id.  The same implementing regulations further require the MTA to oversee compliance with the anti-discrimination provisions on the basis of sex, stating at 23 C.F.R. 200.9(a)(4), "the State program area officials and Title VI Specialist shall conduct annual reviews of all pertinent program areas to determine the effectiveness of program area activities at all levels."  Pl's Cmplt. at ¶ 23.  The MTA subjected itself to these federal regulations it undertook the management of the Central Artery/Tunnel ("CA/T") Project, otherwise known as the Big Dig, in Boston, Massachusetts.  Pl's Cmplt. at ¶ 21.

      The MTA, as a recipient of federal highway funds, was also required to oversee compliance with the state prevailing wage laws.  Pl's Cmplt. at ¶58.  Massachusetts' prevailing wage laws, M.G.L. ch. 149 §§ 26-27, state the required hourly wages for truckers hauling gravel for the CA/T Project.  Pl's Cmplt. at ¶ 24.  The prevailing wage law also states that the office of the Massachusetts Attorney General will enforce these laws and that anyone aggrieved by violations of the law may institute a civil action against his employer.  Id.  However, the Massachusetts House of Representatives' Post Audit and Oversight Bureau found in 1997 that these statutory provisions were not sufficient to ensure compliance with the prevailing wage laws.  Id.  The House committee found specifically that, "[t]he current system of prevailing wage enforcement is burdensome and in large part unenforceable….[and under] the current scheme, enforcement is especially difficult where large construction contractor and multiple contracting entities are involved."  Id.  The MTA also entered into a contract with Bechtel/Parsons-Brinkeroff in 1989 known as the PLA where it promised to be responsible for the management of the CA/T Project.  Pl's Cmplt. at ¶ 25.  All contractors

2

at the CA/T Project were bound by the PLA and, therefore, required to pay wages in compliance with the prevailing wage laws. Id.

Plaintiff was able to secure hauling contracts with various contractors at the CA/T Project. Pl's Cmplt. at ¶¶ 29-32, 41. However, Plaintiff suffered the harmful effects of discrimination based on sex as a result of the MTA's failure to properly conduct reviews of the Title VI program and oversee prevailing wage laws as set out in the above federal regulations. Pl's Cmplt. at ¶¶ 33-37. Plaintiff was a certified woman-owned business (WBE) as of April 1, 1998, having applied for certification almost a year earlier. Pl's Cmplt. at ¶ 28. Plaintiff could not continue to operate her trucking business because she was unwilling to break the prevailing wage laws and subject herself to criminal penalties. Pl's Cmplt. at ¶ 57. Even after entering into the "Uplift Agreement" meant to reinvigorate the MTA's enforcement of prevailing wage laws, the MTA continued to violate 49 C.F.R. § 21, Appendix C(a)(2)(v) by discriminating against Plaintiff on the basis of her sex when the MTA failed to conduct mandated reviews of Title VI programs. Pl's Cmplt. at ¶58. Those regulatory violations occurred between June 1996 and June 1998 and had a disproportionate effect on WBEs, including Plaintiff's business. Pl's Cmplt. at ¶60. Because the MTA did not adequately review the Title VI program and oversee the prevailing wage laws, certain classes of truckers, which included a higher percentage of women, suffered discrimination as a result of the MTA's actions because they did not receive statutorily mandated wages. Id. Plaintiff was in this class of haulers, and as a result of this discrimination, in 1999, Plaintiff lost her trucks and equipment lease options, business start-up costs, corporate income, and interest and loan payment credit. Pl's Cmplt. at ¶¶ 41, 61.

To remedy this discrimination, Plaintiff filed a pro se complaint alleging discrimination based on sex with the Federal Highway Administration ("FHWA") on September 27, 2000. Pl's Cmplt. at ¶74. The FHWA considered the complaint timely filed because it alleged ongoing violations. Pl's Cmplt. at ¶ 42. The FHWA generated an initial report, finding that discrimination had occurred at the CA/T Project.[2] Pl's Cmplt. at ¶ 75. The initial report found specifically that the MHD, and by extension, the MTA, did not take corrective action when contractors failed to pay wages in accordance with the prevailing wage laws. See U.S. Dept. of Transportation Investigative Report 8-27 at 14-16, 45, 111 attached as Exhibit B. The report also found systemic discrimination[3] against minority and women-owned businesses working on the CA/T Project who had entered trucking contracts in good faith. Id. at 15. More specifically, the report stated that Plaintiff lost her contracts as a result of discrimination. Id. at 45. The total damages owed Plaintiff as a result of discrimination amounted to over $1.1 million. Id. at 111.

---

[2] Plaintiff respectfully requests that the Court take judicial notice of an email from David Pales, FHWA Civil Rights Specialist, to defendant Edward Morris, dated June 23, 2003, attached as Exhibit A. The email discusses a DBE that experienced discrimination. Pales states, "This is a case of willful violation and gross and possibly willful neglect on the part of the MTA and MHD. My tact has been to expose and 'support' the MTA action in areas it should have been monitoring for several years. The truth is that no one wants to be bothered unless they get caught. Clearly, absolutely no one wants to think about systemic consequences…."

[3] Plaintiff respectfully requests that the Court take judicial notice of the United States Commission on Civil Rights report Ten-Year Check-Up: Have Federal Agencies Responded to Civil Rights Recommendations? Volume II: An Evaluation of the Departments of Justice, Labor and Transportation (2002) on efforts by the federal government to enforce Title VI attached as Exhibit C; an episode of Indianapolis, Indiana's Channel 8 WISH-TV series "Highway Robbery" reports (http://www.wishtv.com/Global/category.asp?C=61999&nav=LymHVxAE) attached as Exhibit D, and a report filed by the FHWA's Western Resource Center, Portland Office, Office of Civil Rights in October 1998, finding widespread discriminatory effects as a result of Caltrans' management of its DBE program attached as Exhibit E.

These examples from across the country illustrate that discrimination against women and minority-owned businesses is widespread and harmful, both to the victims and to the public at large. The initial investigative report where the federal investigator found systemic discrimination against Plaintiff and other women-owned trucking companies at the CA/T Project appears to be part of a nation-wide failure of federal and state agencies, including the defendants herein, in enforcing federal and state laws passed specifically to provide Plaintiff and other similarly situated women an opportunity to work on public highway projects.

During this time, defendant Edward Morris urged Plaintiff to "bear with" the process, promising that he would make a finding of discrimination, and that an appropriate remedy would be forthcoming. Pl's Cmplt. at ¶ 75. However, the final report, issued in March 2003, almost two and a half years after the complaint, found that no discrimination had occurred. Pl's Cmplt. at ¶76. Plaintiff filed a request for reconsideration of the FHWA's decision, which was subsequently denied. Id. Determined to resolve her claims of discrimination, Plaintiff then filed a complaint with the Department of Justice on June 17, 2003, describing the defendants' discriminatory acts.[4] Plaintiff then attempted to gather information about her FHWA complaint by requesting FHWA documents pursuant 5 U.S.C. § 552 et seq. ("The Freedom of Information Act" or "FOIA"). Pl's Cmplt. at ¶ 50. The Department of Justice later responded to Plaintiff's complaint in December 2003, stating that, despite its mandate to enforce federal laws and protect persons against violations of such laws, they would not review the FHWA's decision. Plaintiff, after repeated efforts, finally received materials responsive to her FOIA request in April 2004. Pl's Cmplt. at ¶52. This information from the FOIA request was critical to the claims that Plaintiff pursues in this action. The materials, finally produced, had information to support Plaintiff's discrimination claims against the MTA and MHD, including detailed timelines showing that the defendants were placed on notice of irregularities in truckers' wages and payroll requirements, and that prime contractors were ignoring directives to pay prevailing wages and continued their discriminatory practices in the face of those directives. Pl's Cmplt. at ¶ 52.

---

[4] Plaintiff respectfully requests that the Court take judicial notice of the DOJ complaint attached as Exhibit F.

5

II.     STANDARD OF REVIEW

Defendants have moved to dismiss Plaintiff's complaint pursuant to Fed. R. Civ. P. 12(b)(6).  The issue when considering a motion to dismiss is not whether the plaintiff will ultimately prevail, but whether the claimant is entitled to offer evidence to support his claims.  Swierkiewicz v. Sorema N.A., 534 U.S. 506, 511 (2002).  Dismissal is only appropriate when the plaintiff is not entitled to any relief on any set of facts that he could prove.  See Conley v. Gibson, 355 U.S. 41, 45-46 (1957).  Therefore, in making such a determination, the court accepts the well-pleaded facts of the plaintiff's complaint as true and draws every reasonable inference in the plaintiff's favor.  See Berezin v. Regency Sav. Bank, 234 F.3d 68, 70 (1st Cir. 2000).

III.    ARGUMENT

1. Plaintiff may enforce her Title VI claim acting as a private attorney general

Plaintiff may enforce her claim of sex-based discrimination as a private attorney general in the absence of any other enforcement authority.  Massachusetts recognizes the necessity of an enforcement action by a private party when public resources either cannot or will not enforce a law that supports an important public policy.  See Pearson v. Board of Health of Chicopee, 402 Mass. 797, 799-800 (1988) (Court held that private enforcement of open meeting law was appropriate because the law was meant to uphold an important public policy and the overworked district attorney's office did not have the resources to prosecute violations).  The First Circuit has also recognized that a private party may vindicate the rights of the public when the public at large benefits from that enforcement.  See Gay Officers Action League v. Commonwealth of Puerto Rico, 247

F.3d 288, 295 (1st Cir. 2001) (Court fount that private enforcement of discriminatory law benefited plaintiffs and public as a whole).

      Plaintiff may enforce this action as a private attorney general both because vindicating the Title VI claim serves the important public policy of recognizing sex discrimination and preventing further instances of it, and because the authorities charged with enforcing the federal discrimination regulations did not do so.[5]  That discrimination occurred is clear from the initial report; the U.S. Department of Transportation ("U.S.D.O.T.") found that Plaintiff had suffered the ill effects of discrimination at the hands of the MHD, the MTA, and their prime contractors for their failures to uphold the prevailing wage law and to review Title VI programs.

      As a result of the discrimination, the Plaintiff tried several avenues within the enforcement framework and met with resistance at every turn.  She learned as early as 1997 that the Massachusetts House of Representatives found the prevailing wage laws to be virtually unenforceable.  Further, had she blindly followed the prevailing wage law's dictate that she enforce her claims for unpaid wages against her employer-contractor, she would have placed herself in the untenable position of suing her boss, a decision that would have made her a pariah among hauling contractors and assured her business of an

---

[5]     The Plaintiff respectfully requests that the Court take judicial notice of a Boston Globe article concerning Governor Mitt Romney's attempt to remove MTA chairman Matthew J. Amorello from his position.  Raphael Lewis and Sean P. Murphy, AG probes Big Dig firms; Romney rips Amorello, Boston Globe, March 16, 2005, attached as Exhibit G.  This very recent article, stating that Romney is concerned about mismanagement of the CA/T Project and that the MTA blocked a leading engineer's access to records and data about the tunnel's flaws, in addition to the sources named in note 3, supra, shows that the MTA has failed to uphold its duty to the public.  Not only has it misled the other offices within state government, but its acts and omissions have resulted in discrimination that harmed hard-working citizens and the public at large.  Therefore, in the wake of the governor's announcement that he seeks Amorello's removal, Plaintiff must necessarily step forward as a private attorney general to remedy this discrimination in the face of the MTA's pervasive institutional obfuscation and opacity.  This is Plaintiff's only remaining remedy because the defendants represented to Plaintiff that placing her trust in the FHWA and its administrative process would yield favorable results.  They may not now, in the face of widespread, public exposure of their shortcomings, hide behind the statute of limitations and argue that Plaintiff squandered her one chance to vindicate her rights and air her claim of discrimination.

even earlier death. Plaintiff then filed a complaint with the FHWA alleging discrimination in 2000, and there was an initial finding of discrimination. The FHWA later reversed that decision, finding two and a half years later that no discrimination had occurred. Only when Plaintiff filed a FOIA request, and received documents responsive to her request in April 2004 did she have information that supported her claims of discrimination based on violations of the prevailing wage law. During this time, Plaintiff also established contact with the Department of Justice, asking for reconsideration of her FHWA complaint. This too was ultimately unsuccessful as the Department of Justice refused to review FHWA's decision.

The MTA attempts to knock out Plaintiff's claim with a single blow, stating that Plaintiff could not bring a discrimination claim that is only alleging a discriminatory effect, without discriminatory intent. See Def's Memo. at 8-9. Plaintiff acknowledges that Alexander v. Sandoval, 532 U.S. 275 (2001) only allows for private enforcement of Title VI claims that allege intentional discrimination. However, Sandoval is distinguishable from the case at bar because Plaintiff claims that the MTA's lack of adherence to the regulation caused a discriminatory result.[6] The Plaintiff does not seek to prove that the regulations as written caused a discriminatory effect, as the class of plaintiffs in Sandoval did. Id. at 279. Furthermore, even if Plaintiff's complaint were read as an impermissible private enforcement action of the regulations promulgated under Title VI, the agencies charged with enforcing these regulations have not enforced them.

---

[6] The other cases that the MTA cites to support its argument are also distinguishable from the case at bar. Harris v. City of Boston, 479 F. Supp. 996 (D. Mass. 1979), like Sandoval, addresses discrimination by operation of law, not that the various defendants acted in contravention of the law. Harris, 479 F. Supp. at 1005. Furthermore, unlike Plaintiff, the pro se plaintiff in Phillips v. The Sage Colleges, 83 Fed. Appx. 340 (2nd Cir. 2003) failed to identify the protected class to which he belonged, and failed to allege any discriminatory acts by the defendants. In this case, Plaintiff has clearly stated in her complaint that her WBE suffered discrimination as a result of the MTA's failure to conduct required reviews of Title VI programs and the MTA's failure to oversee prevailing wage laws.

8

Id. at 293.  Therefore, Plaintiff acts as a private attorney general to rectify the state and federal governments' inability to enforce their own rules and regulations.

    2.  <u>Plaintiff has successfully stated a due process claim.</u>

Plaintiff has satisfactorily alleged that her right to due process as guaranteed by the Fourteenth Amendment was abridged by the MTA.  For a claim under 42 U.S.C. § 1983 to be successful, the plaintiff must allege that the conduct complained of was committed by a person acting under the color of state law, and that the conduct deprived the plaintiff of rights, privileges or immunities secured by the Constitution or laws of the United States.  <u>Parratt v. Taylor</u>, 451 U.S. 527, 535 (1981).  In this case, Plaintiff has clearly pleaded that the MTA and its employees are state actors, and that she suffered injury as a result of the defendants' denial of her right to due process.

Plaintiff has suffered a denial of her due process rights.  The First Circuit has recognized a deprivation of property without due process of law when a businessman loses his property as a result of an unlawful government act.  See <u>Roy v. City of Augusta</u>, 712 F.2d 1517 (1st Cir. 1983).  The court found that when the Maine Supreme Judicial Court ordered the city council to issue the plaintiff a license to operate his pool hall, and they gave him a useless expired license, the plaintiff lost his property without due process of law.  <u>Id.</u> at 1523.  "Arguably, this amounted to the taking of his property (the license) without due process, since…the defendants simply flouted the mandate of the state court…." <u>Id.</u>  Like the businessman in <u>Roy</u>, Plaintiff has suffered injury as a result of the failure of the MTA to follow federal anti-discrimination laws.  Like the town council acting in contravention of the court order, the MTA failed to carry out the reviews and

9

oversight that were mandated by law. Therefore, Plaintiff's due process rights were violated.[7]

A court will also find a violation of due process when the government fails to uphold its own standards of fairness regarding a government contract. Ervin and Associates, Inc. v. Dunlap, 33 F. Supp. 2d 1, 9 (D.D.C. 1997). "[The plaintiff] does not claim a constitutionally protected interest in winning certain contract awards, but a protected interest in participating in a procurement process that meets certain standards of fairness." Id. at 8-9. When a government official interfered with the procurement process of a government contract to which the contractor was entitled, the court found that the government contractor had been deprived of due process of law. Id. As in Ervin, the Plaintiff has a right to have her hauling contracts be subject to applicable laws such that her company's effort to participate in a federally financed project is not subverted by the acts of the government official and agency charged with federal enforcement.

    a)  <u>Plaintiff has a property interest in her status as a WBE.</u>

It is beyond contention that a benefit from the government can form the basis of a protected property interest. Board of Regents v. Roth, 408 U.S. 564, 577 (1972). That protected interest is secured not by the Constitution itself, but by independent sources, such as state law. Id. Because the Commonwealth of Massachusetts certified Plaintiff as a WBE in April 1998, state law secured her status as a WBE.

---

[7] The MTA likens Plaintiff's claims to those made by the plaintiffs in PFZ Properties, Inc. v. Rodriguez, 928 F.2d 28 (1st Cir. 1991). However, that case is distinguishable because those plaintiffs never even alleged discrimination in their complaint. Id. at 30. Furthermore, that court found that unlike the facts in the case at bar, where there was virtually no post-deprivation process, the plaintiffs' post-deprivation process was adequate. Id. at 31. Lastly, the plaintiffs only alleged that the officials violated state law, and as such, the failure to provide pre-deprivation process was not a violation of the due process clause. Id. In the case at bar, Plaintiff alleges that the MTA as a recipient of federal funding failed to uphold federal laws in place to prevent discrimination.

Plaintiff states a successful claim for a violation of her right to due process because she had a protected property interest in her status as a certified WBE and she was deprived of that status by government action without due process of law. Baja Contractors, Inc. v. The City of Chicago, 830 F.2d 667 (7th Cir. 1987) (Holding that MBE could show that it had a protected property interest when city had conferred a benefit upon it by initially certifying it as an MBE, and then denied it further certification). As in Baja, Plaintiff has a protected property interest in her status as a WBE because the government conferred a benefit to her when she began work on the various hauling contracts. She was denied that benefit when, by 1999, she could no longer operate her certified WBE hauling company.

The property interest in her status as a WBE was not contingent upon an expectation of future benefit, as the MTA argues. As in Baja, when Plaintiff secured contracts as a WBE and benefited from them, her status as a WBE was no longer a contingency – it was an entitlement that formed a property interest.[8]

The MTA attempts to analogize Plaintiff's status as a WBE to an "ordinary commercial contract" where such interests would not receive constitutional protection. See S + D Maintenance Co., Inc. v. Goldin, 844 F.2d 962, 966-67 (2nd Cir. 1988). However, unlike the plaintiffs in S + D Maintenance, Plaintiff does not assert an ordinary breach of contract claim that could be as easily brought in state court. Plaintiff obtained contracts that created a protected government interest, and she was denied due process of

---

[8] The MTA cites to S + D Maintenance Co., Inc. v. Goldin, 844 F.2d 962, 966-67 (2nd Cir. 1988) to argue that Plaintiff does not have an entitlement to her contracts. However, S + D supports Plaintiff's claim that her WBE status is an entitlement. The Second Circuit states that procedural protections are appropriate when the state revokes a status that it conferred upon the benefited party. Id. at 966. Plaintiff's status as a WBE is precisely the type of benefit that requires procedural protection.

law when she was not able to complete those contracts that she had obtained as a result of her status as a WBE when the MTA failed both to review Title VI programs and to oversee prevailing wage laws on the CA/T Project.[9]  The MTA has cited to numerous cases, all of which attempt to paint Plaintiff's claim as one of a simple breach of contract with a party who happens to be the government.  See Def's Memo. at 12.  However, all of those cases are readily distinguishable because they describe a breach of contract between a private party and a government – they do not discuss the ramifications of the loss of a benefit conferred by the government as a result of the government's acts.

        b.    <u>Plaintiff has alleged a causal connection between the MTA's discriminatory acts and her injury.</u>

The MTA attempts to mischaracterize Plaintiff's claim by arguing that Plaintiff wishes the MTA had created a different trucking market where she could have been more successful.  See Def's Memo. at 13.  This ignores the fact that there is a direct causal connection between the MTA's actions and Plaintiff's injuries.  Plaintiff has clearly stated in her Complaint that the MTA's failure to conduct reviews of the Title VI programs, as well as its failure to oversee the Commonwealth's prevailing wage laws as required by the PLA and the "Uplift Agreement" presented Plaintiff with a Hobson's choice: either break the prevailing wage laws and expose herself to criminal penalties, or lose her business because she was not being paid prevailing wage amounts and therefore could not afford to run her business.

---

[9]     The MTA wrongly relies on the fact that Plaintiff contracted with private contractors and not directly with the government as the foundation for its argument that Plaintiff does not have a protected property interest.  Regardless of the names on the contracts, the federal funding for the CA/T Project bound all the parties, the state agencies, the prime contractors, and all their sub-contractors, to adhere to federal anti-discrimination laws.  Therefore, it is futile for the MTA to argue that Plaintiff's hauling contracts were merely "garden variety commercial contract[s]" such as a contract to administer a city's landfill.  See Wehran-Puerto Rico, Inc. v. Municipality of Arecibo, 106 F. Supp. 2d 276, 288 (D.P.R. 2000).

12

The MTA relies on the case D.T. v. Independent School District No. 16, 894 F.2d 1176 (10th Cir. 1990) to argue that there is no causal connection between the MTA's actions and Plaintiff's claims. However, that case is easily distinguishable from the case at bar. In D.T., the court found that the school district did not violate a student's right to due process when a teacher in its employ molested the student during summer break. Id. at 1189. The court found that there was no causal connection between the teacher's actions and the school district, when the school district had no control over the teacher while on summer break, the teacher performed no duties on behalf of the district over the summer break, and the district did not sponsor the activity where the teacher had contact with the student. Id. at 1187. The case at bar is distinguishable since the MTA clearly exerted control over its own ability to enforce the prevailing wage law and review Title VI programs. Furthermore, unlike the plaintiff in D.T., Plaintiff has shown a documented causal connection in the initial U.S.D.O.T. report between the MTA's failure to follow federal law and the injuries Plaintiff suffered.

    3.    <u>Equitable principles allow Plaintiff to pursue her claim.</u>

Plaintiff suffered the ill effects of discrimination as she worked on CA/T Project contracts through 1998, and lost her business in 1999. She filed her FHWA complaint in September 2000 and the agency considered it timely filed because it alleged ongoing discrimination. She then waited another two and a half years for a final determination that discrimination had not occurred at the CA/T Project, despite the U.S.D.O.T.'s initial finding that discrimination had occurred. During the two and a half year period, defendant Morris dissuaded Plaintiff from filing suit, telling her that a favorable finding was forthcoming. Then, after the finding of discrimination, Plaintiff necessarily waited

13

for the reconsideration of that finding.  She waited a total of 33 months to finally learn that her FHWA complaint would not go forward.  She then made requests pursuant to FOIA for FHWA documents to find the documents underlying the denial of her complaint.  Plaintiff made such requests to insure that she could in good faith file a federal court complaint with claims supported by documentation, and not speculation and rumor.  Forty-two months after she filed her FHWA complaint, Plaintiff finally had documents in her possession that would support her claims of discrimination.  During this time, Plaintiff delayed pursuing her claims of discrimination in this forum based on repeated assurances from defendant Morris.  Furthermore, she did not receive some of the documents necessary to support her claims of discrimination by the defendant Massachusetts agencies until very recently.  As a result, Plaintiff could not file this suit until September 2004.

   Equitable estoppel will preserve Plaintiff's claim.  A court will grant equitable estoppel when the defendant made representations that it knew or should have known could induce Plaintiff to delay bringing a suit, that Plaintiff did delay the suit in reliance on those representations, and Plaintiff's reliance on those representations was reasonable.  Kozikowski v. Toll Brothers, Inc., 354 F.3d 16, 24 (1st Cir. 2003).  Plaintiff easily meets the first prong of the test because defendant Morris repeatedly told Plaintiff not to file suit, to be patient, and that a remedy would be forthcoming.  "Promises or assurances in such communications must be specific in order to constitute 'representations.'"  Kozikowski, 354 F.3d at 24 (citations omitted).  The plaintiffs in Kozikowski did not successfully meet this first prong of the test because they presented letters from the defendant stating that the plaintiffs would be treated fairly, as well as the fact that

14

defendants scheduled repairs on plaintiffs' house, as assurances to support their decision not to file suit. Id. The court found these communications were not specific enough to be representations that would induce the plaintiffs to delay filing suit. Id. In the case at bar, however, defendant Morris repeatedly and personally assured Plaintiff that filing suit would not be necessary since he would soon make a finding of discrimination and craft a remedy accordingly. Yet his actions ultimately prejudiced Plaintiff by preventing her from gathering needed information about her discrimination claims in a more timely fashion.[10]

Plaintiff also meets the second prong of the test because she did rely on defendant Morris's representations in delaying her suit. Plaintiff clearly demonstrates that she relied on defendant Morris because the U.S.D.O.T. had already made a preliminary finding of discrimination, and defendant Morris's words and actions supported that finding, until after considerable delay and obfuscation, he found that discrimination had not occurred. This is distinguishable from the plaintiffs in Kozikowski, who had long believed the defendants to be unreliable. Id. at 24-25. Based on that knowledge, the court refused to find that the plaintiffs could honestly rely on the defendants' representations. Id. at 24-25.

Plaintiff meets the third prong of the test because her reliance on defendant Morris's assurances was reasonable. The court in Kozikowski found the plaintiffs' reliance on the defendants' assurances to be unreasonable based on both the defendants' behavior and the plaintiffs' threats directed toward the defendants. Id. at 25. The defendants continually failed to satisfy the plaintiffs' demands, and the plaintiffs

---

[10] The United States Supreme Court has found that statutes of limitations should be equitably tolled based on concerns for fairness when a government agency violates federal regulations to prejudice claimants. Bowen v. City of New York, 476 U.S. 467, 480-81 (1986).

threatened the defendants with legal action.  Id.  Again, this is distinguishable from the case at bar because Plaintiff received a preliminary finding of discrimination, followed by numerous assurances that a final finding of discrimination would soon be forthcoming. Plaintiff understandably had confidence in defendant Morris, based on the preliminary finding of discrimination and his frequent assurances.  This is distinguishable from the plaintiffs in Kozikowski because they only harbored distrust toward the defendants. During that period, Plaintiff waited patiently for what she believed would be justice, without threatening or coercive behavior.  Plaintiff should therefore be permitted to pursue her claims of discrimination based on equitable estoppel since defendant Morris's actions prevented her from pursuing her discrimination claims in a more timely fashion.

In this case, Plaintiff's time period to file this claim in this forum would have started when she lost her business in 1999 as a result of systemic discrimination.  See LeGoff v. Trustees of Boston University, 23 F. Supp. 2d 120, 127-28 (D. Mass. 1998) (Court found that Title IX claim was not time-barred, even when plaintiff filed her complaint over five years from the date she first experienced discrimination because the discrimination was ongoing, creating a continuing violation of her rights, over two years after the initial instance of discrimination).  That Plaintiff suffered the effects of discrimination as early as 1996 is only evidence of the systemic nature of the discrimination.

Plaintiff's complaint is timely filed because the defendants are equitably estopped from claiming that the three-year statute of limitations continued to run during the pendency of the FHWA complaint and its resolution as they delayed and hindered Plaintiff's pursuit of her legal claims.  Plaintiff reasonably relied on defendant Morris's

assurances that a finding of discrimination would be forthcoming, causing equitable estoppel to toll the statute of limitations.  Furthermore, the ensuing FOIA request and its resolution by April 2004 caused equitable estoppel to toll the statute of limitations because Plaintiff relied on the defendants to respond to her requests for documents in a prompt and timely fashion.  However, Plaintiff did not acquire the documents necessary to pursue her claims of discrimination in good faith until April 2004.  Therefore, this complaint was timely filed in this Court in September 2004.

IV. CONCLUSION

Plaintiff opposes the MTA's motion to dismiss because Plaintiff is acting as a private attorney general, pursuing these claims of discrimination when there are no other avenues of enforcement.  Furthermore, Plaintiff has sufficiently stated a claim under 42 U.S.C. § 1983 to allege a violation of her procedural due process rights, both because she has a protected property interest in her status as a WBE and because there was a direct causal connection between the MTA's actions and the effects of discrimination that Plaintiff experiences.  Finally, the defendants are equitably estopped from claiming that the statute of limitations has run and Plaintiff's claims are time-barred.

WHEREFORE the Plaintiff Duxbury Trucking respectfully requests that this honorable Court:

    a) Deny Defendant MTA's Motion to Dismiss; and

    b) Grant Plaintiff any other relief that it deems proper and just.

|  |  |
|---|---|
|  | Respectfully submitted, |
|  | Duxbury Trucking, Inc.<br>By Its Attorneys:<br>SHAHEEN & GORDON, P.A. |
| DATED:  March 17, 2005 | /s/ Arpiar G. Saunders, Jr._____<br>Arpiar G. Saunders, Jr.<br>Bar No. 442860<br>107 Storrs Street<br>P.O. Box 2703<br>Concord, NH 03302-2703<br>(603) 225-7262<br>asaunders@shaheengordon.com |

*F:\Data\clients\Duxbury Trucking Company, Inc\Opposition to MTA's motion to dismiss.doc*