**Ten-Year Check-Up: Have Federal Agencies Responded to Civil Rights Recommendations?**

*Volume II: An Evaluation of the Departments of Justice, Labor, and Transportation*

## Chapter 4

## Department of Transportation

The Commission's Office of Civil Rights Evaluation previously reviewed the Department of Transportation (DOT) in a 1993 report that evaluated selected aspects of civil rights enforcement by DOT and the Department of Labor (DOL)[1] and in a 1996 report that reviewed how effective DOT's Office of the Secretary (OST) and most of its operating administrations (OAs) were in fulfilling their civil rights enforcement responsibilities within financial assistance programs. The OAs reviewed included the Federal Aviation Administration (FAA), the Federal Highway Administration (FHWA), the Federal Railroad Administration (FRA), the Federal Transit Administration (FTA), the National Highway Traffic Safety Administration (NHTSA), the Research and Special Program Administration (RSPA), and the U.S. Coast Guard (USCG).[2] There were 96 recommendations, eight in the 1993 report and 88 in the 1996 report.

The statutes for which DOT has external civil rights responsibilities include Section 504 of the Rehabilitation Act of 1973, as amended, Title II of the Americans with Disabilities Act (ADA) of 1990, the Age Discrimination Act of 1975, and Title VI of the Civil Rights Act of 1964. In addition, DOT has civil rights responsibilities arising from the executive order on environmental justice and the Disadvantaged Business Enterprise (DBE) program.[3] The Commission's 1993 and 1996 reports focused on Title VI and the DBE program.[4] The Commission revisited OST and the OAs in the present study to determine whether there had been improvement and progress relative to recommendations previously made.

> *Department of Transportation Components Reviewed:*
>
> - Office of the Secretary (OST)
>
> - Federal Aviation Administration (FAA)
>
> - Federal Highway Administration (FHWA)
>
> - Federal Railroad Administration (FRA)
>
> - Federal Transit Administration (FTA)
>
> - National Highway Traffic Safety Administration (NHTSA)
>
> - Research and Special Program Administration (RSPA)

- U.S. Coast Guard (USCG)

At the time of this evaluation, the Department of Transportation consists of the Office of the Secretary and 11 OAs. In addition to those studied in the Commission's 1996 report and the Maritime Administration, the Department now includes the Bureau of Transportation Statistics, Federal Motor Carrier Safety Administration, and Saint Lawrence Seaway Development Corporation.[5] DOT regulations delegate the authority of the Secretary to the OAs to carry out and enforce Title VI programs, including conducting reviews and complaint investigations, under the general policy guidance of the Office of the Secretary Office of Civil Rights (DOCR).[6] As a consequence, DOCR has an important oversight role.

## OVERVIEW

The Commission's 1993 report found that the then Secretary of Transportation failed to monitor and assess aspects of civil rights enforcement. DOCR had not established procedures to ensure OAs were implementing effective DBE programs. Thus, civil rights enforcement was not a priority and not integral to DOT's primary mission planning. In 1996, the existing organizational structure in several OAs' offices of civil rights was not conducive to effective enforcement of civil rights. The director of the FRA Office of Civil Rights (FRA/OCR) did not report to the administrator of FRA. Equally important, several OAs acutely lacked funding and staffing, which affected their ability to enforce civil rights. The FHWA Office of Civil Rights' (FHWA/OCR's) increasing workload in other civil rights areas reduced staff resources available for Title VI compliance and enforcement. Most civil rights implementation plans (CRIPs) did not conform to Department of Justice (DOJ) guidelines. The offices of civil rights of NHTSA, FRA, and USCG did not have in place regulations, guidelines, policies, or procedures for Title VI. Findings on compliance reviews were not reassuring either. The FRA Office of Civil Rights' (FRA/OCR's) post-award reviews were not focused on the broad issues covered by Title VI.

Civil rights enforcement has shown improvement in 2002, but must be further strengthened. On a positive note, the priority of civil rights has generally advanced. One indication is that DOCR now plays an important role in DOT's DBE program. It sits on the DOT DBE committee that helps develop and issue policy guidance and interpretation of the law on DBE issues. Organizationally, there has been progress as well. NHTSA and FRA have followed the Commission's advice and the civil rights directors now report to the administrator of the agencies. At the same time, Congress did not approve funding to OST for consolidation of its external civil rights program. The Commission is concerned to find many OAs still badly handicapped by a lack of funding and staffing for civil rights enforcement. The RSPA Office of Civil Rights (RSPA/OCR) has two staff members who are responsible for eight functional program areas. On the other hand, DOCR has sufficient resources for civil rights enforcement. Four of the eight CRIPs now conform to DOJ guidelines, but three OAs still do not have them. As to compliance reviews, the Commission is heartened by NHTSA/OCR's progress. In the area of policy guidance, there has been improvement. DOCR has made appropriate changes to its regulations to conform to the *Cureton* decision[7] and FAA/OCR has prepared a draft revised FAA Order 5100.30 for review. However, FTA/OCR and NHTSA/OCR still need to develop and issue manuals for pre-award and post-award compliance reviews. Finally, there is clear evidence of coordination, collaboration, and community involvement.

## PREVIOUS FINDINGS AND RECOMMENDATIONS TO THE DEPARTMENT OF TRANSPORTATION

### Priority of Civil Rights

The 1993 report found that the then Secretary of Transportation, despite having oversight responsibility, had failed to monitor and assess aspects of civil rights enforcement such as budget and compliance reviews. As a direct consequence, civil rights enforcement at the departmental level and within at least one OA, FAA, was grossly underfunded. Furthermore, DOCR had not established procedures to ensure OAs implement effective DBE programs. Clearly, civil rights enforcement was not a top priority and not an integral part of DOT's primary mission planning.[8]

In addition to responsible oversight, organizational structures of civil rights offices and their directors' reporting line also have bearing on the priority of civil rights. The 1996 study found several deficiencies in some organizational structures. The structure of OST's external civil rights program did not provide adequate control over Title VI enforcement. The Commission recommended that OST continue to request funding for consolidation of the external civil rights office. The consolidated office, it said, should consist of a headquarters office responsible for coordination and oversight of external civil rights activities with regional offices charged with day-to-day civil rights enforcement. Additionally, the headquarters office should have a policy development unit, program planning and data analysis office, and an oversight office. Regional offices should have separate offices for external civil rights compliance and enforcement activities.[9]

The Commission noted that FAA/OCR did not have a separate unit devoted to external civil rights enforcement activities, including Title VI. As a result, resources for Title VI enforcement had declined as other civil rights enforcement activities, such as DBE, took precedence. Furthermore, regional staff that carried out most of the day-to-day civil rights enforcement activities did not report to the director of FAA/OCR. Finally, regional staff members were not specialized, and thus none was able to develop expertise and focus sufficient attention to Title VI matters. As a result, the Commission recommended that FAA restructure so that all staff engaged in civil rights enforcement activities report to the director of FAA/OCR. Furthermore, FAA/OCR should be separated into four units: internal civil rights enforcement, external civil rights enforcement, the disadvantaged business program, and the historically black colleges program.[10]

In 1996, the Commission recommended that FHWA/OCR restructure to improve civil rights enforcement. The office, the Commission said, should be separated into four distinct units: internal civil rights enforcement, external civil rights enforcement, DBE, and historically black colleges program, each with its own policy and operational components.[11] To ensure priority attention to civil rights enforcement, the director of the Office of Civil Rights should report to the FHWA administrator. Regional and field division civil rights staff should report to the director and specialize in either internal or external civil rights functions, resources permitting.[12]

FTA/OCR did not have a separate unit with separate supervisory staff responsible for external civil rights enforcement. Furthermore, none of the civil rights staff specialized in civil rights enforcement. The Commission recommended that FTA/OCR reorganize into three areas: external civil rights, internal civil rights, and other civil rights. All civil rights staff should specialize in specific civil rights functions. [13]

Further, directors of the offices of civil rights at FRA, NHTSA, and USCG should report to their respective agency administrator.[14]

**Resources—Funding and Staffing**

Neither DOCR nor OAs had sufficient resources to fully meet their civil rights enforcement responsibilities. During the 1993 and 1996 reviews, funding and staffing for civil rights implementation,

enforcement, and compliance in DOT were inadequate. The 1993 report recommended that DOCR hire additional compliance officers to oversee enforcement activities; still, in 1996, only one person was assigned to external civil rights compliance and enforcement activities.[15] Among OAs, FAA/OCR had only one person assigned to the external civil rights program; FHWA/OCR's increasing workload in other civil rights areas reduced staff resources available for Title VI enforcement; FRA/OCR's workload increased but its resources remained unchanged; FTA/OCR's workload also increased but staffing was reduced; NHTSA/OCR's resources had been reduced to pre-1970 levels; RSPA/OCR drew heavily on staff untrained in civil rights enforcement to ensure compliance with Title VI; and USCG/OCR had just two staff members assigned to Title VI enforcement.[16]

As a result, the Commission recommended that DOT, FAA, FRA, FTA, and USCG develop management systems to track expenditures and workload separately for each civil rights statute and for different types of civil rights activities. Moreover, they should retrieve and use the data to conduct workload analyses. In addition, the findings should be used to document the existence of a workload-resource gap, support the need for additional resources, and prepare budget requests.[17] FHWA/OCR, the Commission said, should use its existing information management system for the same purposes.[18] Because the office already had the ability to track expenditures separately for the statutes it enforced, but the ability did not extend to regional and field units, the Commission said, tracking must be expanded.[19] The Commission also recommended that NHTSA/OCR and RSPA assign additional staff to program and policy development and an adequate number to operational responsibilities.[20]

**Planning**

The Commission found that RSPA did not prepare a CRIP, while DOCR and the other six OAs had CRIPs that were not in conformance with Department of Justice guidelines.[21] Thus, RSPA/OCR must prepare a CRIP while DOCR and the other OAs should revise their CRIPs to fully conform to Department of Justice guidelines. Finally, the Commission said that all should use the CRIP as a management tool. Some of the 1996 findings on DOCR's CRIP are telling. DOCR's CRIP, submitted for the first time in several years, did not provide sufficient information for DOJ or the public to gain an understanding of DOT's civil rights enforcement program. Its goals and objectives were vague, and DOCR did not use it as a management tool.[22]

**Policy Guidance**

Different situations prevailed at OST and OAs in regard to policy guidance, according to the Commission's 1996 report. FHWA had an inclusive set of regulations, guidelines, policies, and procedures that formed a sound basis for its Title VI program.[23] OST, on the other hand, had adequate but outdated Title VI regulations for its compliance and enforcement program. And except for issuing a few general civil rights directives, DOCR had failed to fulfill its policy development role. Thus, the Commission recommended that the office update Title VI regulations to reflect recent changes in legislation, and that civil rights standards and policies be developed and issued. Furthermore, DOCR should have a unit focused solely on policy development and issuance.[24]

FAA Order 5100.30 detailed the responsibilities of FAA components and recipients and laid out the procedures for conducting post-award reviews. However, the Commission found that it had language limiting FAA's jurisdiction under Title VI to airport operators that was inconsistent with Title VI as clarified by the Civil Rights Restoration Act of 1987. Moreover, the order did not clearly indicate the extent of FAA's jurisdiction over employment discrimination under Title VI. Thus, the Commission recommended that the order be revised.[25] And, since FAA had not issued the Title VI guidelines DOJ required, it needed to develop detailed guidelines for each of its federally assisted programs.[26]

FTA/OCR and USCG/OCR had Title VI guidelines, but neither had issued policy statements.[27] The Commission therefore recommended that they regularly issue Title VI policy statements to expand, update, and clarify Title VI policies and guidelines. On the other hand, NHTSA/OCR, RSPA/OCR, and FRA did not have Title VI regulations, guidelines, policies, or procedures for conducting civil rights enforcement activities.[28] Thus, the Commission recommended that they develop these items. Furthermore, RSPA should assign an additional person to RSPA/OCR to develop regulations, guidelines, policies, and procedures for Title VI.[29]

At the same time, the Commission said FTA/OCR and NHTSA/OCR should develop and issue a procedures manual for handling complaint investigations and conducting pre-award and post-award compliance reviews.[30]

## Technical Assistance

FHWA/OCR had a good technical assistance program that could serve as a model.[31] Both DOCR and FTA/OCR, however, provided technical assistance only on request.[32] As to FAA/OCR and USCG/OCR, technical assistance was generally provided during infrequent on-site compliance reviews. FRA/OCR provided little technical assistance, while RSPA/OCR's technical assistance was limited to program personnel helping applicants and recipients submit Title VI assurances.[33] Finally, NHTSA/OCR did not provide any technical assistance.[34]

Thus, the Commission recommended that technical assistance be provided regularly, on request, and when circumstances warrant it. In addition, FHWA/OCR's technical assistance program could be further strengthened through use of an information system to track and plan technical assistance activities.[35] DOCR needed to regularly provide technical assistance during oversight and monitoring reviews of OAs' Title VI programs; FTA/OCR should incorporate technical assistance during pre-award and post-award compliance reviews; FAA/OCR must expand its technical assistance program; and FRA/OCR should adopt, with appropriate modification, FHWA's model.[36] Finally, NHTSA/OCR must implement an effective monitoring system that included technical assistance and training.[37]

## Education and Outreach

FTA, FRA, and NHTSA did not perform any education and outreach activities.[38] DOCR, FAA/OCR, USCG/OCR offered these activities on a limited basis.[39] RSPA/OCR delegated the responsibility to RSPA's program offices.[40]

Accordingly, the Commission recommended that FTA, FRA, and NHTSA develop and implement thorough education and outreach programs on Title VI.[41] This would help ensure that recipients and program participants and beneficiaries understand their rights and responsibilities under Title VI. On the other hand, DOCR, FAA/OCR, and USCG/OCR needed to implement expanded and active programs, and RSPA/OCR needed to assume full responsibility for education and outreach.[42]

## Compliance Reviews

A central theme in the Commission's 1996 report was ensuring compliance. The Commission's previous examination of OST revealed that state recipients carried out many Title VI compliance functions, but DOCR did not have a significant role in monitoring the states' Title VI programs. The Commission advised DOCR to take a more active role in monitoring the Title VI activities of DOT's state recipients. [43] Although DOCR had chief responsibility for overseeing OAs, it had not overseen their Title VI programs or coordinated its own Title VI program with those of the OAs. Thus, DOCR also should

actively carry out its coordination and oversight role. In addition, DOCR should require OAs to submit annual Title VI self-assessments for review and evaluation. Finally, regular on-site monitoring and evaluation of the OAs was necessary.[44]

The Commission found that while FAA had a detailed memorandum on pre-award procedures, FAA/OCR conducted very few pre-award reviews. Thus, the Commission recommended that regional civil rights staff conduct in-depth pre-award reviews of all applicants that received major amounts of FAA funding and that FAA/OCR monitor the quality of the reviews. Equally disconcerting, FAA/OCR did not conduct post-award desk-audit reviews.[45] As a result the Commission recommended that the office conduct post-award desk-audit reviews and require recipients to submit annual Title VI self-assessments. FAA/OCR also had not conducted any on-site compliance reviews in recent years. Thus, it should develop procedures for selecting recipients for review, set a target number of reviews to be conducted by the regional offices annually, monitor the quality of the reviews, and provide technical assistance to regional staff where necessary.[46] In regard to state recipients, the Commission found that FAA/OCR evaluated just one state in FAA's block grant program. It also did not require state recipients to submit Title VI self-assessments for review. Consequently, FAA/OCR should develop its Title VI guidelines using FHWA as a model, require states to submit annual self-assessments for review, and conduct periodic on-site evaluation reviews of states' Title VI compliance programs.[47]

Limited resources clearly affected FHWA's ability to fulfill its compliance responsibilities. The Commission found that FHWA's regional offices did not conduct as many compliance reviews as were needed. FHWA should commit additional resources to the regional offices to increase the number of on-site compliance reviews.[48] At the same time, the Commission was somewhat heartened to learn that despite legislated formulas for allocation of state highway aid, FHWA was still able to impose administrative sanctions on recipients, such as fund deferral and suspension, that provided a means to compel compliance.[49] However, limited staff and transformation of federal assistance into block grant programs prevented full use of sanctions. Thus, FHWA/OCR should request additional resources to enhance the use of sanctions and develop ways of using them in block grant programs. Furthermore, the Commission directed FHWA to inform Congress and DOJ of the complexities of Title VI enforcement in block grants though it did not specify a timeframe.[50]

FRA/OCR conducted pre-award reviews when new applicants applied for funding.[51] Unfortunately, the Commission found that its post-award reviews were not focused on the broader issues covered by Title VI, but limited to Section 905 recipients and the fulfillment of their equal employment and affirmative action responsibilities. As a result, FRA/OCR must broaden the focus of on-site compliance reviews and develop a procedures manual for pre-award and post-award compliance reviews and complaint investigations.[52] Furthermore, since austere budgets seriously handicapped FRA/OCR's on-site reviews of state recipients, FRA must provide the office with adequate resources for periodic on-site compliance reviews of state recipients.[53]

FTA's regional staff conducted pre-award reviews of all FTA grantees and also attempted to carry out post-award reviews of each recipient once every three years.[54] However, most of the post-award reviews were desk audits. At the same time, FTA was planning to increase the number of on-site reviews conducted through use of contractors. As a result, the Commission recommended that outside contractors for on-site reviews be selected carefully, contractor-prepared manuals be examined closely, and contractors' performance of on-site compliance reviews be monitored carefully.[55] FTA delegated considerable responsibilities to state recipients to ensure Title VI compliance of its subrecipients. However, FTA did not oversee states' Title VI compliance programs. As a result, FTA/OCR needed to allocate resources to oversee states' Title VI compliance programs, review documents submitted by their liaison officers, and conduct on-site reviews of their programs.[56]

The Commission found that NHTSA/OCR did not have an operational program on Title VI enforcement and did not conduct pre-award or post-award reviews, or process complaints. Further, it did not require recipients to report on their Title VI compliance. NHTSA/OCR needed to implement an operational Title VI enforcement program. It should conduct pre-award and post-award desk-audit reviews and select recipients for on-site compliance reviews.[57] Moreover, NHTSA's recipients, which were all state agencies, did not understand their Title VI compliance responsibilities and NHTSA/OCR did not monitor and oversee their Title VI compliance programs. As a result, the Commission said NHTSA/OCR should implement an effective system for monitoring states' Title VI responsibilities.[58]

RSPA/OCR staff conducted cursory pre-award reviews of funding applicants. Thus, the Commission recommended that the office develop pre-award review procedures and require applicants to submit sufficient data for desk audits of their programs.[59] The Commission further recommended that RSPA/OCR supplement the work of RSPA program personnel by instituting its own post-award reviews, to be conducted for all recipients. In addition, RSPA should conduct on-site reviews of recipients. Finally, state and university recipients of continuing grants needed to be reviewed periodically, while others needed to be selected for on-site review when post-award desk audits revealed potential problems.[60]

Despite the requirements stated in USCG guidelines, the Commission found that USCG/OCR only conducted cursory pre-award reviews of all applicants and did not conduct periodic post-award reviews. Thus, it recommended that in-depth pre-award reviews be conducted on all applicants and that all recipients undergo annual post-award desk audits. In addition, periodic on-site reviews should be conducted to ensure accuracy of the data the recipients submitted, and on selected recipients when a desk audit suggested possible problems.[61]

**Staff Training**

Comprehensive training for civil rights staff is necessary, including that which addresses the applicability of Title VI to DOT's federally assisted programs. Periodic update training is equally important to deepen and refresh understanding of Title VI and address emerging Title VI issues. Unfortunately, the Commission's study found that FRA/OCR, USCG/OCR, and NHTSA/OCR did not provide staff training on Title VI nor had not done so in recent years.[62] Finally, FAA/OCR and RSPA/OCR offered little or inadequate training to civil rights staff.[63]

Thus, the Commission recommended that FRA/OCR, USCG/OCR, and NHTSA/OCR develop and implement a staff-training program to provide regular as well as refresher training on Title VI and other civil rights statutes to civil rights staff engaged in Title VI activities and recipients with significant Title VI responsibilities.[64] NHTSA/OCR, in particular, should seek experienced staff. FAA/OCR and RSPA/OCR must provide appropriate staff training on a regular basis.[65] Further, FAA/OCR should collaborate with DOCR in developing formal staff training modules.[66]

**Oversight and Quality Assurance**

Although DOCR incorporated data collection, reporting, and analysis in its internal order, DOT 1000.12, the Commission found that it did not ensure OAs collect or analyze the data, nor did it use data in evaluating the OAs' Title VI programs. DOCR, therefore, must ensure OAs incorporate data-reporting and -analysis requirements into their Title VI programs. Further, DOCR should periodically assess OAs' data collection systems. In addition, DOCR should require OAs to include in their annual Title VI self-assessments analyses of the data provided by recipients on program participants. Moreover, DOCR needed to review the analyses.[67]

At the same time, FAA/OCR, NHTSA/OCR, and RSPA/OCR did not have a system for collecting and analyzing data on program participants submitted by recipients.[68] NHTSA and RSPA/OCR did not even have reporting requirements for their recipients, while FRA/OCR did not have an adequate data collection and analysis system.[69]

Thus, the Commission directed FAA/OCR, NHTSA/OCR, and RSPA/OCR to each implement data collection systems to gather sufficient information from recipients with which to conduct post-award desk-audit reviews and general analyses to ascertain if all individuals have an equal opportunity to participate.[70] Reporting requirements should be included in Title VI guidelines and, in the case of RSPA/OCR, data requirements for state recipients and universities receiving research grants should be different. FRA/OCR needed to require recipients to collect data on program participants, program applicants, and eligible populations by demographic characteristics. Furthermore, recipients receiving funds for large projects should provide demographic analyses on the affected communities to be included as a standard part of the Title VI enforcement process.[71]

### Coordination

The Commission 1993 report found that the failure of DOT, the Department of Labor (DOL), and the city and county of Denver in 1993 to formulate a memorandum of understanding (MOU) to coordinate and share information when conducting compliance reviews hampered civil rights enforcement efforts. [72] As a result, the Commission recommended that DOT and DOL update a December 1979 memorandum of understanding, initiate and monitor coordinated enforcement activities, and determine if community groups and organizations represented at the Commission's 1991 forum continued to have difficulty obtaining contracts or employment. Further, DOT and DOL should establish a joint-review and information-sharing agreement between DOL's Office of Federal Contract Compliance Programs' (OFCCP) regional office and the city and county of Denver, and encourage such coordinated actions elsewhere. Finally, OST must take immediate action to assess the impact the Intermodal Surface Transportation Act (ISTEA) would have on the civil rights programs of the OAs.[73]

## DEPARTMENT OF TRANSPORTATION'S RESPONSE TO THE RECOMMENDATIONS

### Priority of Civil Rights

DOCR has made significant progress in its oversight of DOT's DBE program. It currently has an active role on the DOT DBE committee that helps develop and issue policy guidance, guidelines, and interpretation of the law on DBE matters.[74] It has developed and maintains DOT's database, XTRAK, to track the status and disposition of DBE and Title VI complaints and ascertain trends and patterns. Further, DOT's DBE program has undergone extensive review and modification throughout DOT following the Supreme Court's *Adarand*[75] decision. In 2001, the Court upheld DOT's program.[76]

Only some of the 1996 recommendations on restructuring the offices of civil rights to improve priority given to civil rights enforcement have been implemented. The directors of FRA/OCR, NHTSA/ OCR, and USCG/OCR now report directly to their respective administrators. FAA/OCR's regional offices report to the FAA/OCRE director.[77] On the other hand, OST has not consolidated its external civil rights program because Congress did not approve funding. FHWA/OCR's current structure is not consistent with the Commission's 1996 recommendation.[78]

### Resources—Funding and Staffing

Funding and staffing for civil rights enforcement remain a serious problem for a majority of OAs.

FAA/OCR's headquarters two-member external program was assigned an additional position in 2001, but it remains unfilled due to budget restraints.[79] The headquarters external program is now operating with just two staff members; although the entire external program has 11 members, nine of whom are assigned to regional offices.[80] Past studies on FHWA/OCR's resource needs, conducted internally and by DOCR and DOJ, have documented staffing inadequacy.[81] Despite this, FHWA has failed to sufficiently increase the number of civil rights staff. The gravity of the situation is seen in the use of project teams, whose members are drawn from different FHWA divisions, to fulfill some of the responsibilities of FHWA/OCR.[82] FRA/OCR remains woefully lacking in resources. Its staff of only three members has responsibility for all equal employment programs, as well as the minority-owned and women-owned business enterprise programs, and the diversity program.[83] RSPA/OCR's two staff members have responsibility for eight functional program areas,[84] and repeated requests for additional resources have been unsuccessful.[85] The office's recent budget requests have been premised on a limited Title VI program.[86] USCG/OCR claims that it has sufficient resources even though it has just one staff dedicated to civil rights enforcement.[87] Finally, FTA/OCR simply states guardedly that the resource needs of the office are duly considered when resource allocations are made.[88]

On the other hand, DOCR officials maintain the office has been allocated sufficient funding and staffing for civil rights enforcement. DOCR's budgets for fiscal years 1995 through 2003 showed a generally upward trend. Budgets for fiscal year 2002 ($8.5 million) and 2003 ($9.2 million) are higher than budgets for previous fiscal years.[89] NHTSA/OCR officials claim sufficient funding and resources have been allocated for civil rights enforcement in the current fiscal year.[90] An examination of its budget over a period of years finds that the office's budget for fiscal year 2002 is $637,463.[91] However, further analysis of the budget establishes that resources for these offices have not kept up with inflation.

**Planning**

A current review of the status of civil rights implementation plans (CRIPs) finds four CRIPs conforming to Department of Justice guidelines and one still under internal review. Three OAs do not have a CRIP. Specifically, DOCR, FAA/OCR, FHWA/OCR, and NHTSA/OCR have developed CRIPs that conform to the Department of Justice guidelines and use them as a management tool.[92] Additionally, FHWA/OCR has a set of civil rights initiatives and the resource centers' and division offices' staff members have prepared civil rights work plans.[93] However, the FHWA administrative manual, which addresses FHWA/OCR's civil rights compliance and enforcement responsibilities, does not address the civil rights responsibilities of the state-level division offices, which have compliance and enforcement as one of their primary functions.[94] RSPA/OCR has an implementation plan that was developed in 1996 in response to an EEOC audit, but it is still under consideration in RSPA. The office provides input to DOT's annual report to DOJ, which, in effect, serves as RSPA/OCR's implementation plan.[95]

FRA/OCR does not have a CRIP, but intends to develop one that will incorporate the office's current action plan within the next year.[96] FTA/OCR also does not have a CRIP, but it annually produces several documents that identify specific civil rights activities to be undertaken.[97] At the same time, FTA has developed a strategic plan with performance goals, performance measures, and an assessment of accomplishments to carry out civil rights activities.[98] Each civil rights program is included in the plan, and accomplishments are reported quarterly. In addition, FTA's ADA and Title VI/environmental justice program areas are included in DOT's strategic plan.[99] The FTA strategic plan is developed in consultation with community and advocacy groups and stakeholders, such as the NAACP and the Environmental Defense Fund.[100] USCG/OCR no longer has a CRIP, but provides input for inclusion in DOJ's CRIP.[101] USCG has a business plan that addresses the agency's program activities, including the Title VI program. USCG/OCR plans to incorporate civil rights performance goals, performance measures, and assessments of accomplishments into the business plan.[102]

**Policy Guidance**

DOCR has made appropriate changes to its regulations, including changes to comply with the *Cureton* decision under the guidance of the Department of Justice. Additionally, interim procedures for processing external complaints have been developed and guidance on limited English proficiency published.[103] DOCR does not have a unit focused on policy development and issuance; it depends on its External Policy Program Development Division to develop policy and provide guidance.[104]

FAA/OCR has issued Title VI enforcement guidelines and procedures for the federally assisted programs for which the office is responsible, such as DBE, environmental justice, and the ADA.[105] It has revised FAA Order 5100.30 and is seeking comments from FAA and DOT. A final order is expected to be ready soon.[106] Similarly, FRA/OCR has developed and issued policy guidance relating to Title VI and ADA.[107] FRA/OCR officials state that as a rule, new internal and external policies and procedural guidance are developed when changes occur and when administrations change.[108] FRA/OCR has also issued a complaint resolution manual.[109] Although the process of monitoring state recipients has not changed, FTA/OCR is now revising the assessment tools used to conduct Title VI compliance reviews and has commissioned a panel to review and revise a circular that addresses the process for monitoring state recipients.[110] RSPA/OCR has developed Title VI guidelines modeled after FTA's guidelines. According to the office, the guidelines specify the relative responsibility of RSPA and its state recipients. RSPA/OCR officials also claim DOT's Title VI regulations and DOT Order 1000.12 cover this area sufficiently.[111] USCG/OCR has developed and issued new internal guidelines and procedures.[112] It has collaborated with DOT, the USCG Boating Safety Office, and USCG funding recipients on external guidance to provide special language services to those with limited English proficiency.[113] NHTSA claims that it has not identified a need for Title VI regulations and guidelines beyond those of DOT and DOJ. The office has developed procedures for conducting pre-award reviews and prepared an internal procedures manual for investigating complaints.[114]

**Technical Assistance**

There has been improvement in technical assistance to funding recipients. DOCR currently provides standard guidance, resource materials, and technical assistance for implementing civil rights programs to OAs, and reviews the proposed guidance materials they developed.[115] DOCR's External Policy and Program Development Division trains OA staff in policies and procedures relating to their external civil rights program responsibilities.[116]

FAA/OCR, FHWA's Resource Center, FRA/ OCR, FTA/OCR, RSPA/OCR, and USCG now provide technical assistance on a regular basis and when new circumstances warrant.[117] This is usually combined with conference participation, workshops, and/or written memoranda. FTA/OCR and FHWA have collaborated on an Environmental Justice Summit for FTA recipients and community groups. FHWA still has no particular systems in place to capture the nature and scope of the technical assistance they provide.

**Education and Outreach**

For the most part, the OST and OAs have shown improvement in education and outreach, but some are clearly further along than the others. FTA and FHWA have collaborated on education and outreach.

The education and outreach programs of OST, FTA, NHTSA, and RSPA are more advanced than the FAA, FRA, and USCG programs. DOCR has shown improvement in its education and outreach program. Activities have included distributing informational leaflets, publishing the limited English

proficiency (LEP) regulation, and developing DOT's Indian policy order. Further, DOCR representatives often make presentations on civil rights issues at regional and national transportation conferences. The office also maintains a public, readily accessible Web site. Finally, since September 11, DOCR has been actively working with Muslim, Sikh, and Arab American advocacy and education groups on anti-scapegoating activities.[118]

FTA/OCR generally plans outreach activities based on requests from advocacy and community groups, specific compliance concerns in a geographic area, and requests from transit industry groups. It has a Title VI education and outreach program and has worked with FHWA to make a Title VI/environmental justice brochure available in Spanish.[119] All documents prepared by FTA/OCR are available on FTA's Web site with links to other federal agencies' civil rights information. Moreover, it offers daily informal guidance on ADA to lawyers, advocacy groups, and people with disabilities, as well as transit staff.[120]

NHTSA/OCR has a particularly strong education and outreach program to disseminate information in different formats, and in English and other languages, such as Spanish and Chinese. Multilingual and multicultural materials are readily accessible to the public through a multicultural Web site. In addition, NHTSA's program offices also conduct education and outreach activities and create products for the public that address the needs of people of color.[121] NHTSA/OCR also has developed a complaint brochure that describes Title VI and its complaint process.[122]

RSPA/OCR provides interpreters to assist Indian tribes and limited-English-proficient persons with the grant application process. Moreover, a Spanish language video is used in training sessions on awareness and familiarization of the risks associated with hazardous materials.[123]

FAA/OCR's education and outreach activities include Title VI training and issuance of posters on Title VI requirements in Spanish.[124] FRA/OCR integrates information received from DOCR on limited English proficiency, environmental justice, ADA, or any other legislative changes, or White House initiatives into training updates and makes them available to FRA employees.[125] Issuance of information on Title VI civil rights enforcement has been scheduled for fiscal year 2002, while use of external resources, such as census information, to design outreach activities has been set for fiscal year 2003.[126] Finally, USCG/OCR relies on grant recipients for education and outreach.[127]

**Compliance Reviews**

An examination of OST and OAs on compliance reviews yields mixed results. NHTSA/OCR has made remarkable progress, and DOCR has made significant progress, while others, such as USCG/OCR, need further improvement.

OAs have responsibility for ensuring that recipients'—including state recipients'—Title VI programs are in compliance, usually through compliance reviews and/or desk audits.[128] DOCR, on the other hand, aids OAs in their Title VI compliance activities through its Data and Evaluation Division and the XTRAK complaint system.[129] DOCR also requires OAs to provide guidance to states on their Title VI compliance responsibilities through DOT Order 1000.12.[130] DOCR's Data and Evaluation Division, created in 1995, monitors and evaluates OAs on a case-by-case basis. A formal review of FAA's Eastern region has been conducted.[131] DOCR also now requires OAs to submit annual self-assessments on civil rights enforcement through the individual annual reports on civil rights compliance efforts under Executive Order 12,250 and the Age Discrimination Act.[132] OAs' civil rights enforcement is coordinated daily through development of cross-modal initiatives such as the Environmental Justice Order, the Indian Policy Order, Section 508 Policy, and the LEP Guidance. In

addition, DOCR holds monthly directors of civil rights meetings to address concerns and discuss major civil rights issues with OAs' OCR directors.[133]

Some FAA/OCR regional offices have conducted pre-award reviews, and FAA/OCR monitors the quality of pre-award reviews.[134] The office has conducted post-award on-site compliance reviews of some recipients and periodically reviews the quality.[135] FAA's Performance Management Standards addresses the selection of recipients for on-site compliance reviews, and other guidance instructs regional offices to conduct on-site visits as necessary to make certain that any issue involving ADA or the Rehabilitation Act is resolved.[136] FAA/OCR has a skeletal program for oversight of state recipients. It has not developed guidelines that specify the responsibilities of FAA/OCR and its state recipients and does not regularly conduct reviews of Title VI compliance policies and activities of states. [137]

FHWA/OCR considers "post-award reviews" a meaningless concept in the context of federal highway aid. States do not have to apply for highway grants because congressionally mandated formulas allocate highway funds to them for appropriate use.[138] Nonetheless, today, within FHWA's existing structure, state-level FHWA division offices are responsible for on-site reviews.[139] FHWA/OCR is considering establishing an interdisciplinary team to review individual states. Team members will be drawn from the division offices with Resource Center involvement.[140]

FRA/OCR, unfortunately, still has not developed a procedures manual for conducting pre-award and post-award compliance reviews and investigations.[141] In fact, the complaint processing and investigation procedures that were developed several years ago have yet to be approved by DOCR. FRA/OCR indicated that it would follow-up on this.[142] At the present, FRA/OCR merely requires funding applicants to sign assurance statements indicating that they will comply with federal laws and statutes.[143] FRA/OCR has not conducted any post-award compliance reviews because of its small staff.[144] It does not plan to develop guidelines specifying the relative responsibilities of its office and the states for block grant programs until 2004.[145]

FTA officials report that staff review manuals prepared by contractors before they are finalized. Contractors are required to inform headquarters staff of pending on-site compliance reviews and reporting of preliminary findings. In most cases, FTA/OCR staff attends the opening and exit conferences of the contractors and recipients. On completion of the compliance review, FTA/OCR staff works with the contractors in report preparation and follow-up until corrective actions are completed. Finally, biweekly conference calls with the contractor are conducted to ensure a smooth working relationship and effective results.[146] FTA/OCR requires state recipients to document how they intend to comply with Title VI in their responses to the requirements in FTA's circular on state oversight. The office reviews each state recipient once every three years.[147] In addition, FTA/OCR is participating in joint compliance review efforts with the Federal Highway Administration.[148]

NHTSA/OCR has implemented a pre-award review system and post-award desk-audit program.[149] Before awarding a grant, background checks are made on applicants to ensure there are no outstanding complaints.[150] NHTSA/OCR monitors the quality of pre-award reviews.[151] NHTSA/OCR's program for post-award compliance reviews includes not just desk audits but on-site compliance reviews.[152] Recipients are selected to receive compliance reviews according to the number of ADA and Title VI complaints received.[153] For oversight of state recipients, NHTSA/OCR is currently conducting on-site reviews in the 50 states.[154] Guidance to states on their Title VI responsibilities is provided through findings and recommendations included in the compliance review reports.[155] To ensure that recommendations are followed through, NHTSA enters into a voluntary compliance agreement with the state and requests follow-up reports on complaints and remedial efforts.[156]

RSPA/OCR has developed informal procedures for a pre-award system and monitors the quality of pre-award reviews.[157] It does not, however, conduct post-award reviews as the Commission recommended for civil rights enforcement. At best, post-award reviews are conducted randomly. When a RSPA/OCR staff member is in the field conducting civil rights work and a recipient is in the vicinity, the staff takes advantage of the situation and reviews that recipient.[158] Clearly, this approach to post-award review invariably results in RSPA/OCR missing some noncompliant recipients.[159]

USCG/OCR now works with USCG's Office of Boating Safety to conduct pre-award reviews. The process involves review of grant applications, civil rights checklists, and supporting documents that indicate recipient compliance with relevant federal civil rights laws.[160] The Commission is concerned that USCG/OCR does not conduct post-award reviews because its program is very small (about $59 million a year), similar from year to year, limited in scope, and receives no complaints. Furthermore, the office depends on recipients' assurances and checklists to make a determination about their Title VI compliance. Unfortunately, USCG/OCR does not see a need to go beyond this system.[161] For oversight of state recipients, USCG/OCR again relies on self-certifications and information from state recipients to determine their Title VI compliance. Only in the event of questions or doubts, does USCG/OCR engage in discussions with the relevant state recipients.[162]

**Staff Training**

NHTSA's staff training program has shown the most improvement, while other OAs programs need further strengthening. NHTSA and USCG have collaborated with other federal agencies to provide staff training.

NHTSA/OCR provides enforcement staff with annual training on internal procedures for civil rights enforcement activities and semiannual training on applicable civil rights statues and policies. Several staff members have attended training given by DOJ that was coordinated through DOCR. NHTSA/OCR states it would benefit from DOT coordinating civil rights enforcement training for all OAs.[163]

FAA, FRA, RSPA, and USCG do not have a fully developed program to train civil rights staff. FAA/OCR provides training for civil rights enforcement staff once a year when there is adequate funding. Staff, however, attend conferences and training provided by FHWA and DOJ.[164] FRA/OCR has a training program on Title VI and ADA, but enforcement training is nonexistent. FRA/OCR's fiscal year 2002 plan places emphasis on training, and the office is working with another operating administration to provide cross training to staff.[165] In regard to FTA/OCR, civil rights training is offered through annual conferences for headquarters and regional staff, weekly calls from headquarters staff to individual regional civil rights officers, and circulation of updates and overviews of different civil rights subject areas.[166] RSPA/OCR still does not have regular or formalized staff training; although discussions about developing Title VI training within RSPA have occurred.[167] Currently, USCG/OCR staff receives training sponsored by DOJ and DOT.[168]

**Oversight and Quality Assurance**

DOCR indicates it ensures OAs incorporate data collection, reporting, and analysis on their funding applicants and recipients into their Title VI programs. However, DOCR has not required OAs to incorporate analyses of the data on program participants they receive from their funding recipients in their annual Title VI self-assessments. Finally, DOCR evaluates OAs through analyses of the annual data they provide.[169]

FAA/OCR has implemented a data collection system to collect information from funding recipients for

post-award desk-audit reviews.[170] On the other hand, FRA recipients have to sign assurances that include data collection requirements. At the same time, FRA/OCR states Amtrak and Union Station in Washington, D.C., have provided information on program participants. However, the office has not required recipients that receive large amounts of funding to provide demographic analyses on affected communities.[171]

On the other hand, RSPA/OCR has not ensured all funding recipients incorporate data collection, reporting, and analysis on their program participants into their Title VI programs.[172] And, it imposes no data-reporting requirements on funding recipients.[173]

## Coordination

DOT has not updated the December 1979 memorandum of understanding (MOU) because it only applied to FHWA.[174] FHWA is developing an MOU on on-the-job training with DOL.[175] DOCR is participating in DOT's Surface Transportation Reauthorization efforts to help ensure coverage of civil rights and equal opportunity matters. At the same time, OAs' offices of civil rights have an ongoing assessment of the civil rights impacts of transportation legislation.[176] NHTSA/OCR and USCG/OCR have worked with offices within their respective OAs. The NHTSA/OCR director and the Office of the Chief Counsel jointly develop and issue civil rights policies and procedures, while USCG/OCR cooperates with the USCG Office of Boating Safety to conduct pre-award reviews.[177] FTA/OCR has collaborated with FHWA to provide technical assistance.[178]

## Community Involvement

DOCR and some OAs engage with community groups in their civil rights activities. The FTA's strategic plan is developed in consultation with the NAACP and the Environmental Defense Fund.[179] Since September 11, DOCR has been working actively with Muslim, Sikh, and Arab American community groups on anti-scapegoating activities.[180] Further, it participated with DOT's Office of Small and Disadvantaged Business Utilization as part of its national outreach effort to the small business community, including minority and disadvantaged businesses.[181]

---

[1] U.S. Commission on Civil Rights, *Enforcement of Equal Opportunity Laws and Programs Relating to Federally Assisted Transportation Project*, January 1993 (hereafter cited as USCCR, *Enforcement of Equal Opportunity Laws and Programs*).

[2] U.S. Commission on Civil Rights, *Federal Title VI Enforcement to Ensure Nondiscrimination in Federally Assisted Programs*, June 1996 (hereafter cited as USCCR, *Federal Title VI Enforcement*).

[3] U.S. Department of Transportation, Office of the Secretary, "External Policy & Program Development Division," n.d., <http://www.dot.gov/ost/dpcr/about/externalpolicy.html>.

[4] The DBE program provides federal grants or contracts to small business concerns that are at least 51 percent owned by one or more socially and economically disadvantaged individuals, specifically women and people of color, and whose management and business operations are controlled by one or more of these same individuals. DOT has established policies and guidelines under DBE for entities that administer programs awarding federal funds. *See* USCCR, *Enforcement of Equal Opportunity Laws and Programs*, p. 3.

[5] U.S. Department of Transportation, Office of the Secretary, "U.S. Department of Transportation," n.d., <http://www.dot.gov/chart.html>.

[6] 49 CFR Part 1.45(a)(10). *See* Department of Transportation's Interrogatory Response to the United States Commission on

Civil Rights' Ten-Year Review of Civil Rights Enforcement, Office of the Secretary, Mar. 22, 2002, p. 1 (hereafter cited as DOT/OST, Interrogatory Response).

[7] Cureton v. NCAA, 198 F.3d 107 (3d Cir. 1999). In 1997, Trial Lawyers for Public Justice filed a class-action lawsuit against the National Collegiate Athletic Association (NCAA), alleging that the organization discriminated against black athletes because of its eligibility requirements. The lawsuit was filed on behalf of two black students who were barred from competing as freshmen at Division I colleges because they failed to meet eligibility requirements. Eligibility was based on a formula combining the student's GPA and SAT scores. Cureton v. NCAA, 198 F.3d 107 (3d Cir. 1999). The NCAA appealed and in May 2001, the U.S. Court of Appeals for the Third Circuit ruled in favor of the NCAA, overturning the district court decision that NCAA's freshman-eligibility standards discriminated against black athletes. Judge Buckwalter later rejected an attempt by lawyers for the plaintiffs to amend *Cureton* by adding a claim of intentional discrimination. The Third Circuit affirmed Judge Buckwalter's ruling. Cureton v. NCAA, 252 F.3d 67 (3d Cir. 2001). *See* Karla Haworth, "Lawsuit Says NCAA's Eligibility Standards are Racially Biased," *The Chronicle of Higher Education*, Jan. 17, 1997, p. A46. Welch Suggs, "NCAA Warns Members Not to Interpret Judge's Ruling on Standards Too Freely," *The Chronicle of Higher Education*, Apr. 2, 1999, p. A48.

[8] USCCR, *Enforcement of Equal Opportunity Laws and Programs*, p. 13.

[9] USCCR, *Federal Title VI Enforcement*, pp. 517–18.

[10] Ibid., p. 536.

[11] Ibid., p. 555.

[12] Ibid.

[13] Ibid., p. 580.

[14] Ibid., pp. 564, 590, 607.

[15] USCCR, *Enforcement of Equal Opportunity Laws and Programs*, p. 14; USCCR, *Federal Title VI Enforcement*, p. 518.

[16] USCCR, *Federal Title VI Enforcement*, pp. 537, 555, 565–66, 580–81, 584, 590, 598, 602.

[17] Ibid., pp. 518, 537, 580–81, 564–65, 607–08.

[18] Ibid., p. 555.

[19] Ibid.

[20] Ibid., pp. 584, 590, 598.

[21] Ibid., pp. 609–10.

[22] Ibid., p. 520. For the Commission's comments on FAA, FHWA, FRA, FTA, NHTSA, RSPA, and USCG, *see* ibid., pp. 539–40, 557, 567, 582–83, 592, 600, 609–10.

[23] USCCR, *Federal Title VI Enforcement*, pp. 555–56.

[24] Ibid., pp. 518–19.

[25] Ibid., p. 537.

[26] Ibid., p. 538.

[27] Ibid., pp. 581, 608.

[28] Ibid., pp. 590–91, 565.

[29] Ibid., p. 590.

[30] Ibid., pp. 581, 590–91.

[31] Ibid., p. 556.

[32] Ibid., pp. 519, 582.

[33] Ibid., pp. 566, 599.

[34] Ibid., pp. 587, 591.

[35] Ibid., p. 556.

[36] Ibid., pp. 519, 582, 539, 566.

[37] Ibid., pp. 587, 591.

[38] Ibid., pp. 581–82, 566, 591.

[39] Ibid., pp. 519, 538, 608–09.

[40] Ibid., p. 599.

[41] Ibid., pp. 581–82, 566, 591.

[42] Ibid., pp. 519, 538, 599.

[43] Ibid., p. 520.

[44] Ibid., pp. 519–20.

[45] Ibid., p. 538.

[46] Ibid.

[47] Ibid., p. 539.

[48] Ibid., pp. 555–56.

[49] FHWA had no direct role in allocating funds for its recipients, all state transportation agencies. Funds were allocated based on a legislated formula and state transportation agencies had legislated contracting authority to distribute funds for their programs. *See* USCCR, *Federal Title VI Enforcement*, pp. 543, 548.

[50] USCCR, *Federal Title VI Enforcement*, p. 556.

[51] Ibid., p. 560.

[52] Ibid., p. 565.

[53] Ibid., p. 566.

[54] Ibid., p. 573.

[55] Ibid., p. 581.

[56] Ibid., p. 582.

[57] Ibid., p. 591.

[58] Ibid.

[59] Ibid., p. 598.

[60] Ibid., pp. 598–99.

[61] Ibid., p. 608.

[62] Ibid., pp. 566, 591.

[63] Ibid., pp. 539, 599.

[64] Ibid., pp. 566, 591.

[65] Ibid., pp. 539, 599.

[66] Ibid., p. 539.

[67] Ibid., p. 520.

[68] Ibid., pp. 538, 591, 600.

[69] Ibid., p. 566.

[70] Ibid., pp. 538, 591, 600.

[71] Ibid., pp. 566–67.

[72] USCCR, *Enforcement of Equal Opportunity Laws and Programs*, p. 13.

[73] Ibid., p. 14. The Intermodal Surface Transportation Act (ISTEA) of 1991 includes the DBE program, which promotes the "goal that not less than 10 percent of authorized highway and transit funds be expended with DBEs." This act was reauthorized in 1998 as the Transportation Equity Act for the 21st Century (TEA-21). TEA-21 continues the DBE program. *See* U.S. Department of Transportation, Office of Small and Disadvantaged Business Utilization, "Transportation Link," *ISTEA Updates*, 1998, <http://osdbuweb.dot.gov/translink/jan 98/isteaupd.html>; U.S. Department of Transportation, Federal Highway Administration, "TEA-21—Transportation Equity Act for the 21st Century: Moving Americans into the 21st Century," *A Summary—Rebuilding America's Infrastructure*, 1998, <http://www.fhwa.dot.gov.gov/tea21/suminfra.htm#dbe>.

[74] DOT/OST, Interrogatory Response, p. 9.

[75] Adarand v. Pena, 515 U.S. 200 (1995). The Supreme Court ruled that federal affirmative action programs using race as a basis for selection must be subjected to strict judicial scrutiny and that such programs must serve a compelling governmental interest and be narrowly tailored to serve that interest. In Adarand v. Mineta, 534 U.S. 103 (2001), the Supreme Court announced that it would review an appeals court decision rejecting the plaintiff's equal protection challenge to a federal

program. On November 27, 2001, the justices unanimously decided not to hear the case because of procedural and technical flaws. *See* Lyle Denniston, "High Court Declines to Rule on Race-based Government Programs," *The Boston Globe*, Nov. 28, 2001, p. A2.

[76] DOT/OST, Interrogatory Response, pp. 2–3.

[77] Department of Transportation's Interrogatory Response to the United States Commission on Civil Rights' Ten-Year Review of Civil Rights Enforcement, Federal Railroad Administration, Mar. 22, 2002, p. 2 (hereafter cited as DOT/FRA, Interrogatory Response); Department of Transportation's Interrogatory Response to the United States Commission on Civil Rights' Ten-Year Review of Civil Rights Enforcement, National Highway Traffic Administration, Mar. 22, 2002, pp. 1–2 (hereafter cited as DOT/NHTSA, Interrogatory Response); Department of Transportation's Interrogatory Response to the United States Commission on Civil Rights' Ten-Year Review of Civil Rights Enforcement, Research and Special Programs Administration, Apr. 12, 2002, p. 2 (hereafter cited as DOT/RSPA, Interrogatory Response); Department of Transportation's Interrogatory Response to the United States Commission on Civil Rights' Ten-Year Review of Civil Rights Enforcement, Federal Aviation Administration, Mar. 22, 2002, p. 2 (hereafter cited as DOT/FAA, Interrogatory Response).

[78] Department of Transportation's Interrogatory Response to the United States Commission on Civil Rights' Ten-Year Review of Civil Rights Enforcement, Federal Highway Administration, Apr. 12, 2002, pp. 1–2 (hereafter cited as DOT/FHWA, Interrogatory Response).

[79] DOT/FAA, Interrogatory Response, p. 2.

[80] Kathleen Connon, national external program manager, Office of Civil Rights, DOT/FAA; Wilbur Barham, external program manager, Office of Civil Rights, DOT/FAA, telephone interview, Apr. 4, 2002. Marc Brenman, senior policy advisor, DOT/OST, e-mail to Sock-Foon MacDougall, social scientist, USCCR, July 11, 2002.

[81] DOT/FHWA Interrogatory Response, p. 3.

[82] Ed Morris, Jr., director, Office of Civil Rights, DOT/FHWA, telephone interview, Apr. 24, 2002.

[83] Carl Ruiz, director, Office of Civil Rights, DOT/FRA, letter to Debra A. Carr, deputy general counsel, USCCR, Mar. 29, 2002.

[84] DOT/RSPA, Interrogatory Response, p. 2. These included the EEO program and Title VI for RSPA recipients of federal financial assistance (including RSPA Alternative Dispute Resolution Program, Diversity Program, Disability Program, Random and Pre-Employment Drug Testing Program, Graduate Internship Program, and RSPA's Educational Initiatives Program). *See* RSPA/OCR's "introduction" to DOT/RSPA, Interrogatory Response. It also coordinates and oversees all civil rights enforcement in RSPA's Hazardous Materials and Pipeline Safety Offices as well as the Volpe Center and the TSI training center. *See* DOT/RSPA, Interrogatory Response, p. 2.

[85] DOT/RSPA, Interrogatory Response, pp. 1–2. RSPA/OCR had access to a part-time contractor and may call upon the services of attorneys from the RSPA/Chief Counsel's Office, as well as DOCR. It should be noted that after the September 11 attacks, RSPA staff, including the director of RSPA/OCR, had been called away to work on high-priority issues relating to, for example, national pipeline security. *See* DOT/RSPA, Interrogatory Response, p. 3.

[86] *See* DOT/RSPA, Interrogatory Response, p. 4.

[87] Walter Somerville, assistant commandant, Office of Civil Rights, DOT/USCG; Yvonne Deaver, chief, civil rights resource management staff, Office of Civil Rights, DOT/USCG; Michael Freilich, compliance manager, external civil rights compliance and outreach programs, Office of Civil Rights, DOT/USCG; Tina Calvert, director, external civil rights compliance and outreach programs, Office of Civil Rights, DOT/USCG; Matt Glomb, deputy chief, Office of General Law, DOT/USCG, telephone interview, Apr. 22, 2002 (hereafter cited as Somerville et al. interview).

[88] Department of Transportation's Interrogatory Response to the United States Commission on Civil Rights' Ten-Year Review of Civil Rights Enforcement, Federal Transportation Administration, Apr. 12, 2002), p. 1 (hereafter cited as DOT/FTA, Interrogatory Response).

[89] DOT/OST, Interrogatory Response, pp. 1–2.

[90] DOT/NHTSA, Interrogatory Response, p. 1.

[91] George Quick, director of civil rights, DOT/NHTSA, letter to Sock-Foon MacDougall, social scientist, USCCR, Apr. 26, 2002 (hereafter cited as Quick letter).

[92] DOT/OST, Interrogatory Response, p. 5; DOT/FAA Interrogatory Response, pp. 4–5; DOT/FHWA, Interrogatory Response, p. 7; DOT/NHTSA Interrogatory Response, p. 2.

[93] DOT/FHWA, Interrogatory Response, p. 7.

[94] Ibid., p. 5.

[95] DOT/RSPA, Interrogatory Response, p. 4.

[96] Carl Ruiz, director, Office of Civil Rights, DOT/FRA, and Rhonda Dews, telephone interview, Apr. 26, 2002 (hereafter cited as Ruiz and Dews interview).

[97] DOT/FTA, Interrogatory Response, 7.

[98] Ibid., p. 9.

[99] Ibid., p. 7; John Day, legislative analyst, Office of Civil Rights, DOT/FTA, e-mail to Sock-Foon MacDougall, social scientist, USCCR, Apr. 23, 2002 (hereafter cited as Day e-mail).

[100] DOT/FTA, Interrogatory Response, p. 10; Day e-mail.

[101] Department of Transportation's Interrogatory Response to the United States Commission on Civil Rights' Ten-Year Review of Civil Rights Enforcement, U.S. Coast Guard, Apr. 16, 2002, p. 2 (hereafter cited as DOT/USCG, Interrogatory Response).

[102] Somerville et al. interview.

[103] DOT/OST, Interrogatory Response, pp. 8–9.

[104] Ibid., p. 2.

[105] DOT/FAA, Interrogatory Response, p. 8.

[106] Ibid., p. 8.

[107] DOT/FRA, Interrogatory Response, p. 5.

[108] Ibid.

[109] Day e-mail.

[110] FTA Circular 4702.1, "Title VI Program Guideline for FTA Recipients"; Day e-mail.

[111] DOT/RSPA, Interrogatory Response, p. 11.

[112] DOT/USCG, Interrogatory Response, p. 4, referring to COMDTINST 5350.20, which is now in the process of being updated. It addresses civil rights compliance by recipients of federal financial assistance from the Coast Guard.

[113] Michael Freilich, compliance manager, external civil rights compliance and outreach programs, DOT/USCG, e-mail to Sock-Foon MacDougall, social scientist, USCCR, Apr. 29, 2002 (hereafter cited as Freilich e-mail).

[114] DOT/NHTSA, Interrogatory Response, pp. 5, 6.

[115] DOT/OST, Interrogatory Response, p. 4.

[116] Ibid., p. 7. This is sometimes done through coordination with DOJ's Civil Rights Division/Coordination and Review Section. DOCR is now planning training for all OAs' external civil rights staff. It will include Title VI complaint investigation, ADA, Sections 504 and 508, DBE, and other civil rights programmatic areas.

[117] DOT/FAA, Interrogatory Response, pp. 6–7; DOT/FHWA, Interrogatory Response, p. 13; DOT/FRA, Interrogatory Response, p. 4; DOT/FTA, Interrogatory Response, pp. 14–15; DOT/RSPA, Interrogatory Response, p. 6; DOT/USCG, Interrogatory Response, p. 3.

[118] DOT/OST, Interrogatory Response, pp. 7–8.

[119] DOT/FTA, Interrogatory Response, p. 15.

[120] Ibid., p. 19.

[121] NHTSA/OCR Reference, Tabs 4, 5, 8, Apr. 26, 2002.

[122] Ibid., Tab 12.

[123] DOT/RSPA, Interrogatory Response, pp. 6–8.

[124] DOT/FAA, Interrogatory Response, p. 7.

[125] DOT/FRA, Interrogatory Response, p. 5.

[126] Ibid.

[127] Somerville et al. interview.

[128] DOT/OST, Interrogatory Response, p. 11.

[129] Ibid.

[130] Ibid., pp. 11–12.

[131] The Commission found that the FAA report is under review. The review was prompted internally, i.e., within the agency, and motivated by an interest in evaluating the civil rights program's operation, organization, staff, and effectiveness. *See* the transcript of the telephone interview with Jeremy Wu, director, Office of Civil Rights, DOT/OST; Joseph Austin, chief, external policy and program development division, Office of Civil Rights, DOT/OST; Marc Brenman, senior policy advisor, Office of Civil Rights DOT/OST; Mary N. Whigham Jones, deputy director, Office of Civil Rights, DOT/OST; Debra Rosen, attorney, Office of General Counsel, DOT/OST, Apr. 8, 2002.

[132] DOT/OST, Interrogatory Response, p. 4.

[133] Ibid.

[134] DOT/FAA, Interrogatory Response, p. 10.

[135] Ibid.

[136] Ibid., citing FAA Order 1400.9.

[137] DOT/FAA, Interrogatory Response, pp. 12–13.

[138] DOT/FHWA, Interrogatory Response, pp. 17–18. By the same argument, pre-award reviews would also not be meaningful.

[139] DOT/FHWA, Interrogatory Response, pp. 16–17.

[140] Ibid., pp. 17–18.

[141] DOT/FRA, Interrogatory Response, p. 6.

[142] Ibid., p. 7.

[143] Ibid., p. 6.

[144] Ibid.

[145] Ibid., p. 8.

[146] DOT/FTA, Interrogatory Response, pp. 21–22.

[147] Ibid., p. 25.

[148] Ibid., p. 23, citing FTA Circular 4702.1.

[149] DOT/NHTSA, Interrogatory Response, p. 6.

[150] Quick letter.

[151] DOT/NHTSA, Interrogatory Response, p. 6.

[152] Ibid.

[153] Ibid.

[154] Quick letter.

[155] DOT/NHTSA, Interrogatory Response, pp. 7–9.

[156] Quick letter.

[157] DOT/RSPA, Interrogatory Response, p. 9.

[158] Helen Hagin, director, Office of Civil Rights, DOT/RSPA; Paul Sanchez, attorney, DOT/RSPA, telephone interview, Apr. 25, 2002.

[159] Ibid.

[160] Freilich e-mail.

[161] Somerville et al. interview.

[162] Ibid.

[163] Quick letter.

[164] DOT/FAA, Interrogatory Response, p. 15.

[165] DOT/FRA, Interrogatory Response, p. 9.

[166] DOT/FTA, Interrogatory Response, p. 29.

[167] DOT/RSPA, Interrogatory Response, p. 14.

[168] Somerville et al. interview.

[169] DOT/OST, Interrogatory Response, pp. 10–11.

[170] DOT/FAA, Interrogatory Response, p. 10.

[171] Carl Ruiz, director, Office of Civil Rights, DOT/FRA, telephone interview, May 6, 2002.

[172] DOT/RSPA, Interrogatory Response, p. 11.

[173] Somerville et al. interview.

[174] DOT/OST, Interrogatory Response, p. 8.

[175] Ibid., p. 3.

[176] Ibid.

[177] Quick letter; Freilich e-mail.

[178] DOT/FTA, Interrogatory Response, pp. 14–15.

[179] Ibid., p. 10; Day e-mail.

[180] DOT/OST, Interrogatory Response, p. 8.

[181] Ibid., p. 3.