**Ten-Year Check-Up: Have Federal Agencies Responded to Civil Rights Recommendations?**

*Volume II: An Evaluation of the Departments of Justice, Labor, and Transportation*

**Chapter 5**

**Findings and Recommendations**

## 1. INTRODUCTION

**Finding 1.1:** Prior to 1986, the U.S. Commission on Civil Rights had a separate office with a $1 million budget and more than 20 staff members who monitored and evaluated the federal civil rights enforcement effort. The office monitored the work of the agencies daily by meeting with staffs of enforcement offices, reviewing their plans and programs, assessing their progress made on implementing recommendations, and preparing regular evaluations and reports on agencies' progress or need for improvement. Because of budget reductions, the monitoring office was abolished and the Commission's monitoring efforts diminished significantly. During some years, the function was eliminated completely because of competition for scarce resources. Monitoring remains an important responsibility of the Commission and, moreover, safeguards the public investment in civil rights enforcement.

**Recommendation 1.1:** Congress should appropriate sufficient resources to enable the Commission to return its monitoring program to its pre-1986 level.

## 2. DEPARTMENT OF JUSTICE

**Resources—Funding and Staffing**

**Finding 2.1:** There is a strong need for uniform, consistent, and comprehensive information about the resources and activities for civil rights enforcement at the Department of Justice. In its 2002 review, the Commission finds that except for the Department of Justice's Civil Rights Division, which prepares budget submissions every fiscal year, there is very little information about the Department's civil rights resources (funding and staffing) or civil rights activities and performance. In the Department's 2002 and 2003 budget summaries, there is no civil rights category or breakdown that gives the resources for civil rights functions. In the Department's 2002–2003 budget summaries, civil rights functions (including the Civil Rights Division) are included under "Litigating Divisions," which covers much more than civil rights. In the FBI's budget reports, there is no civil rights category or heading, rendering it difficult to assess the adequacy of resources for civil rights enforcement within the Department.

**Recommendation 2.1:** The Department of Justice should include a separate civil rights category or heading in its annual budget summaries, and require all its components with civil rights responsibilities to submit to the Department a civil rights "report" on funding and staffing that would be included in the final departmental budget document.

**Finding 2.2:** Previous Commission funding reports concluded that the Civil Rights Division's resources were not commensurate with its many civil rights responsibilities. The Division appeared not to have enough resources for its 10 program sections to carry out their responsibilities effectively, particularly when the budget numbers were adjusted for inflation. In addition, over the years, the Division's responsibilities have expanded and the workload increased, particularly for the two sections under this review.

CRD's resources, especially when adjusted for inflation, are still not adequate to meet all of its responsibilities. In addition, there is always the likelihood that the Division's responsibilities will increase. For example, there is a proposal to place the Office of Justice Programs' Office for Civil Rights in the Division. This will certainly create the need for additional resources.

**Recommendation 2.2:** The Department of Justice, particularly the Civil Rights Division, should conduct annual assessments of the Division's responsibilities and workload, especially if it receives additional civil rights enforcement responsibilities.

**Planning**

**Finding 2.3:** The Civil Rights Division's budget submissions, which are prepared every fiscal year, are useful documents that present detailed information on the Division's civil rights resources and activities. The budget submissions include the previous, current, and projected funding, staffing, workload, activities, priorities, and performance indicators for each of the Division's sections. The document can be analyzed for actual and expected appropriations and expenditures, as well as trends in budget and staffing, over periods of time and reviewed for changes in workload and outcomes. This civil rights information allows for an assessment of not only the Division's civil rights resources and workload, but also of each of its 10 program sections.

**Recommendation 2.3:** The Department of Justice should require all its components with civil rights responsibilities to prepare and distribute civil rights information in a document that is closely modeled after the Civil Rights Division's fiscal year budget submissions. These documents should include previous, current, and projected funding, staffing, activities, priorities, workload, and performance indicators. These reports should be compiled and included in the final Department's budget summaries under a separate civil rights category.

## COORDINATION AND REVIEW SECTION

### Resources—Funding and Staffing

**Finding 2.4:** Since the Commission's 1996 report, CORS' enforcement and coordinating responsibilities have increased with two additional executive orders relative to ensuring the benefits of federal funds to many groups of people. CORS' increased responsibilities have not adversely affected its enforcement of Title VI. In the Title VI report, the Commission determined that CORS' resources were inadequate for effective Title VI enforcement. Since the report, CORS' resources have increased each fiscal year, and its staff includes additional attorneys, investigators, coordinators, and a program specialist. CORS also has received funding to travel and provide training on Title VI. CORS' assessment of its resources is that funding and the number of staff are adequate to carry out its current responsibilities.

**Recommendation 2.4:** While CORS' current resources may be adequate to meet its current responsibilities, it should assess its resources regularly so that new challenges and responsibilities can be

met effectively.

**Technical Assistance**

**Finding 2.5:** Perhaps the strongest improvement of CORS' work since the 1996 study has been the technical assistance and information now provided on Title VI. CORS has established a formal technical assistance program that includes Title VI guidance, technical assistance brochures, and legal and investigative manuals for federal Title VI agencies and their recipients. All are available on its Web site. The Section also has developed a training course that provides participants with information about Title VI and delivers shorter presentations that provide an overview of Title VI and the regulations. In the 2002 budget, CORS requested additional funds to conduct "technical assistance reviews" of federal agencies' civil rights programs. As a result, it initiated the Title VI Technical Assistance Review (TAR) program, which is an assessment of selected aspects, functions, and/or issues concerning an agency's compliance with and enforcement of Title VI. It is designed to strengthen and improve an agency's Title VI enforcement.

**Recommendation 2.5:** CORS' technical assistance initiatives implemented since the 1996 review are commendable, and it should continue its technical assistance programs and produce additional informational documents as needed.

**Coordination**

**Finding 2.6:** The Department of Justice requires annual reporting of Title VI activities by the affected agencies. The agencies' civil rights implementation plan is the major tool to measure Title VI performance. In the Title VI report, the Commission found the information in the civil rights implementation plans to be inadequate for effective evaluation of Title VI performance. In this review, the Commission finds that CORS revised the guidelines and requires "more succinct" information in the document. Each plan is reviewed and, if deficiencies are found, CORS communicates them to the appropriate agency. However, it takes approximately three to six months after receipt of a civil rights implementation plan for CORS to review the document and write a letter to the agency asking for it to be improved. The Commission's assessment is that three to six months after a plan has been submitted is too long a period for feedback. In some instances, the agency is continuing the same efforts and beginning its work on the next plan. Thus, inadequacies would not be corrected in a timely fashion.

**Recommendation 2.6:** In order to expedite reviews and responses to agencies, CORS should provide feedback to the Title VI agencies more quickly or conduct interim reviews. These responses could be informal contacts to address any concerns before the next formal review.

**Finding 2.7:** In 1996, CORS' monitoring and coordination of federal agencies' Title VI activities were seriously flawed. Since the review, CORS has established a variety of measures to ensure the accountability of and the effective coordination among the federal agencies that provide financial assistance: requiring improved implementation plans, conducting formal and regular technical assistance programs and reviews, preparing guidance and other materials to assist agencies in Title VI enforcement, conducting investigations, and providing investigative assistance to agencies.

**Recommendation 2.7:** CORS' improvement of its Title VI monitoring and coordination efforts is commendable, and it should continue to enhance these activities to ensure that federal agencies and their recipients are in compliance with the law. CORS also should develop methods to assess the effectiveness of its monitoring and coordination of Title VI through surveys and meetings, as examples, with recipients and stakeholders.

# OFFICE OF JUSTICE PROGRAMS

**Priority of Civil Rights**

**Finding 2.8:** In the 1996 Title VI report, the Commission recommended that OJP initiate a new organizational structure that would strengthen the Office for Civil Rights' (OCR) external enforcement and coordination roles with respect to its funding recipients. In fiscal year 1997, Congress also directed OJP to develop a new organizational structure that would streamline and coordinate agency programs and strengthen its coordination activities. In fiscal year 1999, Congress and the previous administration approved OJP's reorganization plan. The plan had definitive civil rights components. However, OJP never implemented the plan, and the present administration is proposing another reorganization plan (as well as a revised strategic plan). Because the 1999 approved reorganization plan was never implemented and the 2002 plan is not complete, OJP's organizational structure has not significantly changed since the Commission's 1996 review. At the time of this report, neither the proposed strategic plan nor the reorganization plan had been finalized.

**Recommendation 2.8:** OJP's final strategic plan and reorganization plan should include a strong civil rights enforcement component with goals, objectives, and performance indicators that address the many civil rights responsibilities of a Title VI agency and consider the Commission's 1996 and 2002 recommendations.

**Finding 2.9:** For the past two years, there has not been a permanent director in OJP's Office for Civil Rights and there may be an acting director indefinitely. The lack of a permanent civil rights leader with authority is a strong sign that civil rights is not a priority at the agency, and is detrimental to the enforcement of civil rights.

**Recommendation 2.9:** OJP should begin the process of hiring a permanent director in OCR immediately. He or she should have the authority to initiate civil rights policy and authority to enforce civil rights laws.

**Finding 2.10:** OJP officials are beginning to address the issue of OCR's structure and have three proposals: OCR could remain an office at OJP with a permanent director; it may be merged into the OJP's Office of the General Counsel; or it could become a part of the Civil Rights Division. There is no indication as to how any of these proposals would be implemented.

**Recommendation 2.10:** Under no circumstance does the Commission support that OCR be merged or consolidated as a division with staff in the OJP's Office of the General Counsel or any other OJP office or bureau. The civil rights component is already weak at OJP, and any efforts to lower OCR from an office status would make civil rights weaker in priority and authority. The Commission recommends that with all of its civil rights responsibilities, OCR should remain an office at OJP with a permanent director who has the authority to enforce Title VI and other civil rights laws. The director should be a major part of the OJP management team and included in policy and decision-making initiatives at OJP. If the final decision is to place OCR in the Civil Rights Division, it should be another program-related section, headed by a section chief, with the support for activities, authority, and resources afforded to the other Division sections.

**Resources—Funding and Staffing**

**Finding 2.11:** In 1996, the Commission concluded that OCR did not receive adequate resources to carry out its external civil rights responsibilities. Since 1996, OCR's funding has increased significantly, and

in 2002, OJP/OCR states that based on the increase, it has the appropriate funding and staff to implement its responsibilities under the present law and existing departmental policy. However, OCR's increase in appropriations and staff is misleading, as the number of federal financial assistance recipients also has increased significantly during this period. The increase in funding and staffing is not commensurate with OCR's external civil rights responsibilities and workload.

**Recommendation 2.11:** OJP should conduct an analysis of OCR's resources to evaluate whether they are commensurate with OCR's responsibilities and workload, and a desk audit of OCR staff to assess their responsibilities and workload. Resources should address the findings.

**Finding 2.12:** Currently, OCR has 10 staff members. However, six attorneys and one legal technician are primarily responsible for external civil rights activities. They carry out responsibilities that usually warrant numerous staff members with various job classifications and expertise, such as program managers, coordinators, compliance officers, civil rights analysts, and investigators.

**Recommendation 2.12:** Congress should provide OCR with additional funds to increase the number of employees who have different backgrounds and expertise. Until funds are made available to hire such staff, the Department of Justice should detail staff from other components with the expertise and/or make arrangements with Title VI agencies to have appropriate staff members detailed to OCR.

**Policy Guidance**

**Finding 2.13:** OCR has not prepared regulations or guidance since the Commission's Title VI report. OCR states that in January 2001, a "moratorium" was placed on the publication of new regulations until the President named new leadership at OJP. In September 2001, a new assistant attorney general was appointed at OJP.

**Recommendation 2.13:** OJP should vigorously enforce civil rights by hiring a director of OCR and assigning appropriate staff or task forces to begin moving OJP toward Title VI enforcement by promulgating relevant guidance, updated regulations, and procedures for implementing the law.

**Technical Assistance**

**Finding 2.14:** OCR's technical assistance program has improved since the Commission's last review. In 1996, technical assistance was limited to publishing several documents. In 1998, OCR designed a "comprehensive" technical assistance program for the administrative staff of state agencies and subgrantees. Since the 1996 assessment, OCR also developed a brochure that provides a general overview of civil rights protections for employees and beneficiaries of OJP programs and posted public information on a Web site. It has also made presentations to different advocacy groups on civil rights enforcement issues. However, to date, OCR has not developed any formal selection criteria for identifying states for technical assistance. There also is no mechanism in place to evaluate the effectiveness of the technical assistance program and activities.

**Recommendation 2.14:** OCR should develop a formal technical assistance program with selection criteria and mechanisms to evaluate the effectiveness of the program and activities.

**Compliance Reviews**

**Finding 2.15:** OCR's civil rights compliance efforts have not improved significantly over the decade. OCR focuses the majority of its efforts on employment programs. When the number of recipients is

considered, OCR has conducted very few pre-award and post-award reviews. In fiscal year 1999, OCR reported one pre-award on-site review and 291 desk audits. It reported only one post-award review. Although OCR states it has received sufficient funding to conduct three or four on-site compliance reviews, the review of recipients' equal employment opportunity plans (EEOPs) is the major form of a pre-award review. This review addresses recipients' employment practices and does not address discrimination in services. And even with the review of more than 1,000 EEOPs, OCR has "minimum standards" for an acceptable EEOP.

The Civil Rights Division and OJP have a memorandum of understanding (MOU) whereby some Division sections, including CORS, handle some of OJP's complaints. In 1996, the Commission was concerned that the MOU concerning CORS' involvement could create a conflict of interest for CORS in carrying out its Title VI responsibilities. However, the conflict of interest concern has been addressed. In 2002, CORS' involvement in OCR's caseload is an indicator that OCR cannot meet its Title VI workload effectively.

**Recommendation 2.15:** OJP should provide support for external civil rights enforcement at the agency. The Commission stresses the need for OJP to conduct desk audits or staff analysis of the OCR staff to assess its workload and responsibilities and provide for a study performed by outside consultants (in the Department or from other Title VI federal agencies) on developing effective methods for conducting civil rights compliance activities that can address the thousands of federal financial assistance recipients at OJP. Rather than a memorandum of understanding with CORS on assisting in OCR's workload, CORS could be better used as a resource for assisting OCR in training, communicating and coordinating with other Title VI agencies that have the same recipients, and providing OCR with guidance on how to carry out its Title VI responsibilities more effectively.

**Staff Training**

**Finding 2.16:** Because OCR's staff is so small, the office lacks expertise in some civil rights enforcement areas. OCR relies heavily on in-house training and assistance from other Department components to carry out its work.

**Recommendation 2.16:** Until OCR receives the resources to expand its staff and to hire personnel with different expertise, OCR, in addition to utilizing CORS for training of some staff and assistance in its Title VI work, should contact other Title VI agencies' civil rights offices to receive training in different areas and to study some of the different and similar techniques used in external civil rights enforcement.

**Coordination**

**Finding 2.17:** In 1996, OCR did not monitor and oversee the recipients' Title VI activities. In 2002, the Commission finds that OCR still does not have a formal monitoring and oversight program in place. OCR views its technical assistance program as an "informal method" for monitoring and overseeing compliance of state and local governments and subrecipients. However, technical assistance is provided, usually on request, to recipients concerning information about their responsibilities in implementing the law and what the law encompasses. It is a means of correcting known flaws in a recipient's program and planning in anticipation of problems. It is not a tool to monitor and evaluate how well recipients carry out their responsibilities. Technical assistance is also made available so that flaws that have already been identified can be corrected.

**Recommendation 2.17:** OCR should develop formal guidelines and procedures for monitoring and overseeing its recipients and beneficiaries. The guidance and procedures should be shared with program

and financial managers. OCR should contact CORS and other Title VI agencies for guidance on how to develop such guidelines and procedures.

## DISABILITY RIGHTS SECTION

### Resources—Funding and Staffing

**Finding 2.18:** DRS' authority and responsibility for the Americans with Disabilities Act (ADA) have remained the same since the Commission's 1998 report. In fiscal year 2002, DRS received more than $15 million in appropriations and nearly 100 staff members to carry out its responsibilities. DRS claims that its current resources are sufficient to fulfill its civil rights responsibilities. However, ADA law is ever evolving and many additional issues could surface in the future, causing a need for more resources.

**Recommendation 2.18:** Because of the potential change in DRS' workload, annual assessments of DRS' resources should be conducted by the Department, the Civil Rights Division, and DRS so that DRS' resources can keep pace with new ADA issues.

### Technical Assistance

**Finding 2.19:** Technical assistance remains a major part of DRS' ADA responsibilities. Since 1998, DRS has expanded its technical assistance program and, today, the program has become a model for other components in the Department.

**Recommendation 2.19:** DRS should expand its technical assistance program as new ADA issues arise and help other ADA agencies develop their technical assistance programs.

### Complaint Processing

**Finding 2.20:** In 1998, the Commission applauded the use of mediation in the enforcement of the ADA. In 2002, DRS reports that its enforcement plan is based on a variety of approaches, including mediation and litigation, and using criteria that result in the best outcomes for individuals and the most return for resources invested. DRS officials state that the "multifaceted" approach in enforcement is effective. To illustrate, over the past four fiscal years (1998–2001) the Section participated in 168 cases and achieved successful results in 100 cases; of the individual complaints investigated, DRS obtained favorable outcomes in the resolution of 1,147 complaints; and DRS achieved successful results in 583 of the 757 completed mediations. As a result of its success, particularly in the use of mediation, DRS' enforcement program has become a model in the Department.

**Recommendation 2.20:** DRS' enforcement program should become a model for other federal agencies that seek to incorporate mediation and litigation into their enforcement efforts.

### Coordination

**Finding 2.21:** In the 1998 assessment, the Commission found that the Section had not assigned staff to coordinate and monitor the enforcement efforts of the other designated federal agencies with ADA responsibilities, mainly because of a lack of resources. In 2002, DRS reports that 11 staff members spend "most of their time on interagency coordination." Other staff members participate in coordination as needed. DRS attributes the improvement in its coordination activities to its increase in resources.

**Recommendation 2.21:** DRS should develop formal coordination procedures and a review process of

activities and agencies' feedback and concerns.

**Community Involvement**

**Finding 2.22:** In the ADA report, the Commission found that DRS developed its policy guidance and other initiatives without consulting the disability community and minority advocacy groups about their concerns, and strongly recommended that DRS contact such organizations about policy initiatives in the future. In 2002, DRS reports that it maintains ongoing dialogue with several disability and minority groups about their concerns.

**Recommendation 2.22:** DRS should establish a formal program for communicating with the public, particularly people with disabilities and their advocacy groups, about ADA concerns and issues. Perhaps, a survey could be posted on DRS' Web site to solicit information from the public. DRS could consider the survey responses when developing policy.

**FEDERAL BUREAU OF INVESTIGATION**

**Priority of Civil Rights**

**Finding 2.23:** Although the Department of Justice, including the FBI, supports the need for hate crime data in enforcing laws against such offenses, the collection and reporting of hate crimes is a separate, disconnected function from the prosecution and investigation of hate crimes, which are civil rights enforcement responsibilities. The collection and reporting of hate crime data at the FBI is treated as additional crime information rather than as a civil rights function. The reporting and collecting of hate crime data is a civil rights function that should not be separated from other hate crime enforcement activities.

**Recommendation 2.23:** Congress should amend the Hate Crimes Statistics Act so that hate crime reporting is implemented as a civil rights function and connected with other federal hate crime enforcement activities.

**Finding 2.24:** Hate crimes are underreported. One major factor is that Congress did not provide provisions to make reporting of hate crimes mandatory or provide for specific resources and accountability provisions for collecting and reporting such information.

**Recommendation 2.24:** Congress should amend the Hate Crimes Statistics Act to include provisions that make the reporting a required function of every state and police department; and provide the Department of Justice with resources to implement community and police training and outreach programs for identifying and reporting such offenses. Congress should require the Department to report past and current data on hate crimes so that trends can be analyzed over a period of time.

**Resources—Funding and Staffing**

**Finding 2.25:** Although the Commission requested information on the FBI's hate crime resources, the agency did not provide it. Thus, the Commission cannot determine whether the FBI has sufficient funding and staffing to carry out its hate crime data collection responsibilities effectively.

**Recommendation 2.25:** The FBI should develop a budget report closely modeled after the Civil Rights Division's fiscal year budget submissions, including previous, current, and projected civil rights resource needs, as well as staffing and workload information that can be provided on request.

**Policy Guidance**

**Finding 2.26:** Since the Commission's 1992 report, the FBI has revised its guidelines and training documents for the implementation of the Hate Crimes Statistics Act. The guidelines minimize the importance of the information and the resources necessary for the effort. In addition, the FBI's technical assistance and training do not reflect a changing, diverse society since the 1990s, or the complexity in identifying and analyzing hate crimes today.

**Recommendation 2.26:** The FBI should revise the guidelines and training manual again to stress the importance of reporting hate crime information, and include updated indicators and different examples of hate crimes that do not reflect obvious hate crime incidents or indicators.

**Technical Assistance**

**Finding 2.27:** The FBI's technical assistance and training activities are still targeted mainly to police departments. However, many police departments have not received adequate training on how to identify and analyze hate crimes.

**Recommendation 2.27:** Because Congress mandated that the Department of Justice take responsibility for hate crime reporting and enforcement, the Department must improve and implement hate crime technical assistance programs and training. The Commission reiterates its 1992 recommendation that the Department of Justice initiate a comprehensive, nationwide training program to assist police departments and other local entities on how to identify and report hate crimes.

**Community Involvement**

**Finding 2.28:** In 1992, the Commission recognized the need to involve state and local entities, including police departments, schools, organizations, churches, and victims in hate crime reporting. There is very little evidence that the FBI networks to a great degree with other state and local entities, such as advocacy groups, schools and churches, and victims to encourage reporting of hate crimes.

**Recommendation 2.28:** In addition to training police officers, the Department of Justice should develop an extensive education and outreach program about hate crimes for the public that can be monitored and reviewed, and encourage the participation of such groups in reporting hate crimes to police departments and the FBI. The FBI should solicit the assistance of hate crime advocacy groups in the development and participation in hate crime information programs. Efforts to solicit and encourage reporting of hate crime statistics from the community should be made through the media, on the Web site, and through telephone hot lines.

### 3. DEPARTMENT OF LABOR

### THE CIVIL RIGHTS CENTER

**Resources—Funding and Staffing**

**Finding 3.1:** Regional staff still does not perform Title VI enforcement functions, and there are no plans to place external civil rights enforcement staff in regional offices.

**Recommendation 3.1:** Staffing and resource levels should be evaluated to determine the extent to which additional staff and resources are needed to implement a comprehensive Title VI enforcement

program. In submitting its budget request, the Center needs to be more forceful in requesting and documenting its need for additional funding. It should document the full range of civil rights enforcement activities it is obligated to perform, including conducting pre- and post-award reviews of all funding recipients and providing technical assistance, outreach, and education. It should tie its current resources to the activities it performs and compare that with its obligations in terms of enforcement activities, federally assisted programs, and applicable civil rights statutes.

**Planning**

**Finding 3.2:** In its January 2002 implementation plan, the Center failed to describe letters of finding, settlement agreements, and other resolutions of complaint investigations or compliance reviews issued since the previous year's submission. In addition, it listed only five activities and/or objectives that it would be conducting to enforce Title VI of the Civil Rights Act of 1964, Section 504 of the Rehabilitation Act of 1973, and similar statutes covered by Executive Order 12,250. The Center did not perform any pre-award or post-award reviews in fiscal year 2001.

**Recommendation 3.2:** The Center's civil rights implementation plan should be updated every three months and allow for changes due to increases and decreases in actual compliance activities and responsibilities and new or developing civil rights enforcement issues.

**Policy Guidance**

**Finding 3.3:** Work began on the development of Title VI regulations immediately after the Commission issued its 1996 report. However, before completion, resources for legislative/regulatory issues were diverted to other pressing tasks, such as the development of legislation to replace the Job Training Partnership Act (JTPA); regulations implementing WIA and its nondiscrimination and equal opportunity provisions; training and written guidance on the new legislation; and regulations, guidance, and training on new welfare-to-work legislation. As a result, the work on the Title VI appendix will have to begin anew.

**Recommendation 3.3:** The Center should add an appendix to its Title VI regulations specifying the types of financial assistance programs the Department of Labor administers. Since work began on developing the Title VI appendix several years ago, the Center should salvage as much of the previous work as possible so that it is able to complete the appendix expeditiously.

**Finding 3.4:** The Title VI compliance and complaint manuals have not been updated since the Commission's 1996 report was issued. The Center does have a methods of administration training manual.

The Center has not developed policies specific to Title VI. Instead, regulations and policies have been developed for the nondiscrimination and equal opportunity provisions of the Workforce Investment Act (WIA), which prohibits discrimination based on Title VI and nine other bases. Since the passage of WIA, the Center's attention has been focused on providing guidance to the Center's staff and DOL recipients as to the compliance issues associated with WIA and its nondiscrimination and equal opportunity provisions.

**Recommendation 3.4:** The Center should promulgate uniform Title VI enforcement procedures for its civil rights enforcement staff and funding recipients, including step-by-step instructions for implementing Title VI, from the application and pre-award process through compliance review and complaint processing, in each type of program DOL sponsors. The Center should expeditiously

complete its work on its compliance and complaint manuals.

**Technical Assistance**

**Finding 3.5:** Currently, the Center is developing a number of publications that will be widely disseminated to beneficiaries and potential beneficiaries and the public. The publications will be available in English and several other languages, but until those publications are available the Center will continue to use the Department of Justice's generic publications, such as its Title VI brochure.

**Recommendation 3.5:** The Center should expeditiously complete its development of publications in other languages. As the population shifts from being predominately English speaking to one that is more multilingual, those individuals who do not speak English are not being reached, and as a result, are not aware of their rights and responsibilities under Title VI.

**Finding 3.6:** In developing certain policies, guidance, training syllabuses, and enforcement tools, comments and suggestions from affected communities and funding recipients are considered. For example, in developing the guidance on limited English proficiency, the Center solicited comments and suggestions from affected communities and funding recipients. However, in planning and conducting education and outreach, the Center has not strategically planned and designed an outreach plan that uses 2000 Census data and other labor market or demographic data to target groups that may be victims of discrimination.

**Recommendation 3.6:** Each time a new census is conducted, the Center should use the most current census figures in developing policies, guidance, training syllabuses, and seeking comments and suggestions from affected communities and funding recipients. The current census indicates that the minority population of the United States is becoming the majority, and the Hispanic population is now equal to that of African Americans.

**Complaint Processing**

**Finding 3.7:** The number of Title VI complaints the Center receives has continued to decline since the Commission published its 1996 report. Between fiscal years 1997 and 2001, the number of Title VI complaints decreased by 76 percent, from 107 in 1997 to 26 in 2001. Very few Title VI complaints are received because most of them are resolved at the state level. The Center has increased its public education about Title VI nondiscrimination requirements through several training modules.

**Recommendation 3.7:** The Center should expand on its public education by ensuring that all information pertaining to Title VI is in languages other than English and that this information is reaching all potential victims.

**Compliance Reviews**

**Finding 3.8:** In fiscal year 2001, the Center did not conduct any pre- or post-award reviews or have any legal administrative enforcement. In fiscal year 2000, the Center conducted 76 pre-award reviews (desk audits) but no post-award reviews. The last time the Center conducted a post-award review was in fiscal year 1998, when it completed 84.

Since the Commission's 1996 review, the Center has conducted on-site compliance reviews, but staff resources do not allow for an extensive annual compliance review schedule. To best utilize resources, compliance reviews are initiated based on congressional request, the nature and frequency of

complaints, and strategic planning goals.

**Recommendation 3.8:** As was recommended in 1996 to meet the Department of Justice requirement that agencies establish a post-award compliance review process, the Center should utilize post-award desk-audit reviews to ensure continuing compliance with Title VI among all recipients. Since the Center has full and complete access to the Department's grant office's information system and is able to access and sort data fields over any period of time, it should rely on this asset to reach a large number of recipients in desk-audit reviews. In addition, the Center needs to conduct compliance reviews other than upon congressional request.

DOL should also delegate the responsibility for ensuring civil rights compliance among its secondary recipients to its primary recipients and establish an oversight system for reviewing the civil rights enforcement activities of its primary recipients. Thus, primary recipients should impose reporting requirements on the subrecipients so that desk audits can be performed on the secondary recipients. The primary recipients should use the desk audits to identify secondary recipients with questionable practices or policies, conduct on-site compliance reviews, and provide technical assistance to ensure that they comply with civil rights statutes. For more information on the type of data secondary recipients should report, on how that data are to be reviewed in desk audits, on how subrecipients should be selected to receive on-site reviews, and on how DOL should design an oversight system for its primary recipients, see volume I, chapter 2, of this report.

**Staff Training**

**Finding 3.9:** DOL supports and encourages life-long learning for staff, and the Center's staff training continues to be among the best offered by federal agencies. However, the Center does not conduct training specifically on Title VI.

**Recommendation 3.9:** The Center needs to hold regular Title VI training in areas such as instruction on conducting enforcement procedures; the nexus between Title VI and other civil rights enforcement provisions relevant to ensuring nondiscrimination in federally funded activities; Title VI nondiscrimination requirements in particular types of DOL programs; and the nexus between Title VI and a particular funding program's objectives and administration.

**OFFICE OF FEDERAL CONTRACT COMPLIANCE PROGRAMS**

**Coordination**

**Finding 3.10:** The Department of Labor still has not updated its December 1979 memorandum of understanding with the Department of Transportation to reflect the interim agreement to exchange information. However, operating procedures are in effect whereby OFCCP regional and district offices work with the local Federal Highway Administration (FHWA) and state DOT officials to exchange information on major construction projects underway in their respective geographic areas.

**Recommendation 3.10:** As was recommended in 1993, DOT and DOL should update their December 1979 memorandum of understanding and include, among other things, operating procedures that will create coordinated civil rights enforcement activities and thus avoid confusion over responsibilities and duplicated efforts.

**Finding 3.11:** OFCCP's contacts with community groups during compliance reviews are inadequate. These contacts are needed to gauge whether contractors are making good-faith efforts to recruit women

and minorities and to identify contractors that are alleged discriminators. Today, OFCCP still does not solicit involvement from the community in selecting companies for compliance reviews.

**Recommendation 3.11:** When OFCCP contacts the EEOC district office, the state and local Fair Employment Practices Agencies, and other pertinent agencies prior to a scheduled compliance evaluation, DOL officials should also contact affected communities and advocacy groups to get feedback on whether local contractors working on federally funded transportation projects are employing racial and ethnic minorities and women.

**Finding 3.12:** The Commission recommended that the Secretary of Labor investigate existing training apprenticeship programs to determine whether they conform to federal affirmative action guidelines, ensure that training and apprenticeship programs are mandatory for federal and federally assisted construction contractors, and direct a national effort to develop and implement training and apprenticeship programs.

Current OFCCP regulations require federal and federally assisted construction contractors to develop on-the-job training opportunities and/or participate in training programs that expressly include minorities and women.

**Recommendation 3.12:** The Center should conduct a study of all federal contractors to determine whether the money set aside for on-the-job training and apprenticeship programs is being used for its intended purpose. The study should collect information on the number of minorities and women receiving on-the-job training and apprenticeships under this program and determine whether contractors are complying with civil rights laws. To the extent that construction contractors are funded by the Department of Transportation, OFCCP should coordinate this study with that agency.

The Center should impose any necessary reporting requirements on federal contractors to collect this information as required for such a study, involving the Department of Justice's guidelines for Title VI enforcement of civil rights enforcement to do so.

If federal construction contractors are not in compliance with civil rights statutes in on-the-job training and apprenticeship programs, DOL should develop and implement technical assistance programs to inform them of their deficiencies, obtain their voluntary agreement to comply, and monitor their future compliance. In short, DOL should develop and implement a full-fledged Title VI civil rights enforcement program and apply it to the on-the-job training and apprenticeship programs that federal construction contractors are required to operate. (For further details on the elements necessary to implement a successful enforcement program see volume I of this report).

## 4. DEPARTMENT OF TRANSPORTATION

### Priority of Civil Rights

**Finding 4.1:** The Office of the Secretary Office of Civil Rights (DOCR) has made significant progress in its oversight of the Disadvantaged Business Enterprise (DBE) program. It currently has an active role on the Department of Transportation (DOT) DBE committee that helps develop and issue policy guidance, guidelines, and interpretation of the law on DBE issues. Additionally, DOCR now has the ability to track the status and disposition of DBE and Title VI complaints to ascertain trends and patterns.

**Recommendation 4.1:** DOCR should annually analyze the collected data to discern recurring areas of

complaints in the DBE and Title VI programs and draw implications for improvement. The analysis should be shared with the operating administrations for implementation where appropriate.

**Finding 4.2:** The Office of the Secretary (OST) is not able to consolidate its external civil rights activities because Congress did not approve DOT's request for funding in 1994. DOCR's current structure bears some resemblance to the one proposed in 1996. The office now consists of an External Policy and Program Development Division, Internal Policy and Program Development, a Data and Evaluation Division, Compliance Operations Division, and six regional offices.

**Recommendation 4.2:** DOCR's regional offices should have separate offices for external civil rights compliance and enforcement activities.

**Finding 4.3:** Within the Federal Aviation Administration Office of Civil Rights (FAA/OCR), external civil rights and internal civil rights are generally separately managed, while the DBE program falls under the former. The headquarters external program is responsible for ensuring compliance with Title VI and other civil rights statutes.

**Recommendation 4.3:** FAA/OCR should make external civil rights, internal civil rights, and DBE into distinct entities. Within the external civil rights program, policy and regulatory development and issuance responsibilities should be separated from operational responsibilities.

**Finding 4.4:** The director of the Federal Highway Administration Office of Civil Rights (FHWA/OCR) still reports to the executive director of FHWA. Furthermore, only the 12 civil rights staff members in the headquarters office report to the director of FHWA/OCR. Finally, most civil rights staff members have not specialized in specific civil rights areas.

**Recommendation 4.4:** The director of FHWA/OCR should report to the FHWA administrator in order to ensure priority attention to civil rights enforcement. All civil rights staff should report to the director and specialize in either internal or external civil rights functions.

**Finding 4.5:** The Federal Railroad Administration (FRA) is not subjected to DOT's DBE regulations because there is no DBE program statute that is parallel to those covering the FAA, FTA, or FHWA.

**Recommendation 4.5:** The FRA administrator should take necessary steps to develop a DBE program statute for FRA's incorporation into DOT's DBE regulations.

**Finding 4.6:** The Federal Transit Administration Office of Civil Rights (FTA/OCR) is in the process of being restructured.

**Recommendation 4.6:** FTA/OCR should be organized into separate units with separate supervisory staff for external civil rights, including Title VI and DBE activities.

### Resources—Funding and Staffing

**Finding 4.7:** Resources for civil rights enforcement remain inadequate for most of the operating administrations (OAs).

**Recommendation 4.7:** The DOT Secretary and the OA administrators should request, and Congress approve, additional resources for civil rights enforcement throughout the Department of Transportation.

**Finding 4.8:** The National Highway Traffic Safety Administration Office of Civil Rights' (NHTSA/OCR's) budget for fiscal year 2002 is $637,463, the highest amount for the years 1995 through 2002, and represents a 52 percent increase over fiscal year 2001.

**Recommendation 4.8:** NHTSA/OCR should conduct regular workload analyses to ensure that adequate resources remain available for civil rights activities and share the findings with the administrator.

**Planning**

**Finding 4.9:** DOCR and three OAs have civil rights implementation plans (CRIPs) that conform to the Department of Justice guidelines, one agency's CRIP is still under review, and the remaining three did not have CRIPs. At the same time, FHWA's administrative manual does not address the civil rights enforcement responsibilities of state-level division offices.

**Recommendation 4.9:** FRA, FTA, the Research and Special Program Administration (RSPA), and U.S. Coast Guard (USCG) should prepare CRIPs that conform to Department of Justice guidelines. Further, FHWA's administrative manual should be revised to cover the civil rights responsibilities of state-level division offices.

**Policy Guidance**

**Finding 4.10:** FRA/OCR has not developed a procedures manual for conducting pre-award and post-award compliance reviews and investigations.

**Recommendation 4.10:** FRA/OCR should develop a procedures manual for pre-award and post-award compliance reviews and investigations as soon as possible. The post-award procedures should state that post-award reviews focus on the broader issues covered by Title VI and not be limited to Section 905 recipients.

**Technical Assistance**

**Finding 4.11:** DOCR and the OA offices of civil rights have generally shown improvement in providing technical assistance to funding recipients. Technical assistance programs can be strengthened with the development and implementation of a system capable of capturing the nature and extent of technical assistance provided to recipients.

**Recommendation 4.11:** DOCR and OA offices of civil rights should develop such a system. They should regularly review the data and use the findings to improve technical assistance programs. Furthermore, DOCR and the OA offices of civil rights should find ways to collaborate to maximize limited resources. Finally, they should develop the capability to deliver technical assistance in languages other than English in the event of need.

**Education and Outreach**

**Finding 4.12:** Some OAs have shown improvement in education and outreach. NHTSA is much further along than others, such as USCG. Of note is a joint effort between FTA and FHWA. Education and outreach programs can be strengthened with the development and implementation of a system capable of capturing the nature and extent of education and outreach.

**Recommendation 4.12:** DOCR and OA offices of civil rights should develop such a system. They

should regularly review the data and use the findings to improve education and outreach programs. Moreover, DOCR and OA offices of civil rights should collaborate to maximize limited resources. Education and outreach information should be available in languages appropriate to recipients and in a variety of formats, such as brochures, workshops, and videos.

**Finding 4.13:** FTA/OCR offers education and outreach on request, while FAA/OCR and FRA/OCR do not have comprehensive programs, and USCG/OCR relies on grant recipients to provide education and outreach.

**Recommendation 4.13:** FTA/OCR should be proactive and conduct education and outreach on a regular basis and when situations warrant. FAA/OCR, FRA/OCR, and USCG/OCR should review and strengthen their respective programs. Finally, USCG/OCR should immediately assume responsibility for education and outreach.

**Compliance Reviews**

**Finding 4.14:** Examination of the compliance review efforts of DOCR and OA offices of civil rights yields mixed results. FAA/OCR's conducted some limited pre-award reviews and did not carry out post-award on-site compliance reviews of all recipients. Further, the office has a skeletal program for oversight of state recipients.

**Recommendation 4.14:** FAA should make available additional resources to FAA/OCR for thorough pre-award and post-award reviews of applicants and funding recipients. FAA/OCR should review and strengthen its program for oversight of state recipients.

**Finding 4.15:** FHWA/OCR considers "post-award reviews" a meaningless concept in the federal highway aid program. States do not have to apply for highway grants because congressionally mandated formulas allocate highway funds to them for appropriate use. FHWA/OCR is considering establishing an interdisciplinary team to review individual states.

**Recommendation 4.15:** FHWA/OCR should give priority to establishing the interdisciplinary review team.

**Finding 4.16:** FRA/OCR still has not developed a procedures manual for conducting pre-award and post-award compliance reviews and investigations. It has not conducted any post-award compliance reviews.

**Recommendation 4.16:** FRA/OCR should immediately develop a procedures manual for conducting pre-award and post-award compliance reviews and investigations. The office should begin to conduct post-award compliance reviews.

**Finding 4.17:** RSPA/OCR does not have the resources to conduct thorough post-award reviews for civil rights enforcement. Furthermore, compliance reviews are done randomly.

**Recommendation 4.17:** RSPA should make available adequate resources to RSPA/OCR to enable thorough pre-award, post-award, and on-site compliance views.

**Finding 4.18:** USCG/OCR works with USCG's Office of Boating Safety to conduct pre-award reviews. However, USCG/OCR does not conduct post-award reviews. The office does not see a need to go beyond this approach. For oversight of state recipients, USCG/OCR again relies on self-certifications

and information from state recipients to determine their Title VI compliance.

**Recommendation 4.18:** USCG/OCR should implement immediately a comprehensive pre-award, post-award, and on-site compliance review program. The office should bear the responsibility for determining the compliance status of funding recipients.

**Staff Training**

**Finding 4.19:** There has been some improvement in staff training, but further improvement is needed.

**Recommendation 4.19:** Where feasible and appropriate, DOCR and OA offices of civil rights should collaborate on staff training to maximize resources. Furthermore, OAs are encouraged to work with OST to develop formal training modules for civil rights enforcement.

**Finding 4.20:** FAA, FRA, RSPA, and USCG do not have staff training programs offering regular and thorough training for civil rights staff.

**Recommendation 4.20:** FAA, FRA, RSPA, and USCG should provide comprehensive civil rights training and periodic update training to civil rights staff. In addition, RSPA/OCR must provide appropriate training to RSPA program personnel involved in civil rights enforcement.

**Oversight and Quality Assurance**

**Finding 4.21:** Oversight and quality assurance are generally weak. DOCR has not required OAs to incorporate an analysis of the data they receive from their funding recipients in annual Title VI self-assessments. FRA/OCR has not required recipients that receive large amounts of funding to provide demographic analyses on affected communities. RSPA/OCR still does not have a data-reporting requirement system in place for determination of recipient compliance with Title VI. Finally, USCG/OCR imposes no data-reporting requirements on funding recipients.

**Recommendation 4.21:** DOCR should work with all OAs to find ways to ensure responsible oversight and quality assurance in civil rights enforcement.

**Coordination**

**Finding 4.22:** DOCR is involved in DOT's Surface Transportation Reauthorization efforts to help ensure coverage of civil rights and equal opportunity matters. It is developing a departmentwide civil rights council. Among OAs, FHWA is developing an MOU covering on-the-job training with DOL. NHTSA/OCR and USCG/OCR have collaborated with offices in their respective agencies to facilitate civil rights activities. The NHTSA/OCR director works with the Office of the Chief Counsel to develop and issue civil rights policies and procedures, while USCG/OCR works with the USCG Office of Boating Safety to conduct pre-award reviews. FTA/OCR has worked with FHWA to provide technical assistance.

**Recommendation 4.22:** OST and OAs are encouraged to explore ways to increase coordination of civil rights enforcement to maximize limited resources.

**Community Involvement**

**Finding 4.23:** Involvement of community and advocacy groups in civil rights planning and policy

development is uneven and inconsistent across DOCR and the OAs.

**Recommendation 4.23:** DOCR and OA offices of civil rights should consistently engage community and advocacy groups in civil rights planning and policy development. Furthermore, the involvement with groups should be interactive, meaningful, and not limited to inclusion of organizations on mailing lists.