**ISSUE # 2 - ENSURANCES OF CONTRACTOR COMPLIANCE**

**2. Did the Massachusetts Highway Department take those actions necessary to ensure that CA/T Project Prime Contractors were complying in 1996 with their Equal Employment Opportunity Clause and CA/T Contract Provisions, as both relate to Trucking and Labor Requirements?**

**AREA (S) OF CONSIDERATION # 2 – EFFECTIVE COMPLIANCE MONITORING OF CONTRACTORS**

Did MHD take those actions necessary to ensure CA/T Project Contractor Compliance?

A.) The Equal Employment Opportunity Section 6. Personnel Actions (Sub-sections a. b. c. and d.)

1.) **All** CA/T Prime Contractors with Contracts requiring the Hauling of Materials, knew of their non-compliance with their CA/T Project Contract provisions related to Labor Requirement; CA/T Labor Agreement; Union Agreement; Massachusetts Labor Department Requirements; Violations of Massachusetts State Law; and the concentration of DME and WBE Contractors in an area with an elevated number Complaints.
(See: Charts A., B., D., E., and F.)(See: Attachments E.1., E.2.,E.3 and E.4.)

2.) Did MHD have a specific history and reasons to be concerned about Trucking Industry and CA/T Prime Contractors possible non-compliance with their Contract Non-discrimination Clause:

a.) Current Formal and Informal Complaint from CA/T Project Truck Drivers. (See: Attachments E. 2. and F.2.)

b.) A 1993 letter from the Teamsters Union that advised of the need to address Prevailing Rate Issues. (See: Attachment E.4.)

c.) The traditional treatment of Truck Drivers by Prime Contractors. (See: Attachments F.1.)

d.) A history of Contractors not paying required Truck Driver Hourly Health/Welfare and Pension Accounts. (See: Attachment E.2.)

e.) Knowledge of a concentration of DBE and WBE Contractors in an area with elevated Complaints. (See: Charts A., B., C. D. and E.)

Note:

MHD and CA/T Project Representative have used effectively the fact (confirmed) that the CA/T DBE Project Goal of 10% was exceeded an is at the time of the Complaint the Actual CA/T DBE Accomplishment Rate was 11%. They go on to explain that the specifically in CA/T Trucking that the Rate of actual DBE Goal Accomplishment was 30%. With that level of accomplishment, MHD explains, discrimination can not exist. MHD fails to take into consideration the following factors:

i.) The unmistakable concentration of DBE/WBE Contractors in specifically A, B and C Material Hauling. (See: Chart B. and Chart F.)

ii.) The fact that almost all of the relatively few "Complaints" came from the A, B, C Hauling Area. (See: Attachment E. 3.)

iii.) The 1993 Teamsters Union advisement as to the failure of CA/T Contractors Compliance with Prevailing Rate Law specifically in the A, B, C Hauling Area. (See: Attachment E.4.)

iv.) CA/T Prime Contractor's refusal to provide acceptable Truck Driver "Certified Payrolls". (See: Attachment D.11.)

v.) The "traditional" treatment of A, B, C Haulers by the Prime Contractors.

vi.) MHD election not to conduct Contractor Compliance Reviews in the A, B, C Material Hauling Area.

B.) The terms and conditions of the CA/T Project Labor Agreement.

(See: Items # 2. A.1.; 2. A. 2. f. and g. above)

C.) The terms and conditions of the Massachusetts Heavy Construction Agreement, International Brotherhood of Teamsters, AFL-CIO – Local No. 379.

(See: Items # 2. A. 1.; #2.A.2. b. and g. above)

24

D.) The requirements to pay Truck Drivers the established and agreed Hourly Prevailing Rate as per Massachusetts General Law 149 Section 26 "Prevailing Wage Law".

(See: Items # 2. A. 1.; #2.A.2. b. c. f. and g. above)

E.) The requirement to report on compliance with documents that confirm by individual "Covered Employee" actual Hourly Pay Rate; Health Account Hourly Payments; and Pension Account Hourly Payments.

1.) The Prime Contractor must include in their bid the cost to pay the posted Prevailing Rate. They further are required to provide certified payrolls that Confirm that these rates are honored. Not only are those responsibilities a part of the CA/T labor Agreement but they are further required by Massachusetts General Law 149 at Section 27B.   (See: Attachment B.14.)

2.) Not only did MHD not ensure compliance with MGL-149 Section B, but MHD requested "**Amnesty**" from the State Attorney General's Office to exempt the Contractors (CA/T Prime Contractors) from correcting the problems they created (See Attachment B. 6.). Regardless of the request, the State Attorney General's Office did taken against four CA/T Project Trucking Sub-Contractors in 1997 based on reported violations of Massachusetts Prevailing Rate Law. (See: Attachment H.4.)  But action was not taken against the Prime Contractors who force the Sub-contractors into a position which required the violation of the Law to stay in business. (See:  Chart W.)

f. The Prime Contractors understood and took step which including legal action not to comply with their "Contractual Obligations" as they relate to A, B,C Material Haulers. (See: Attachments B.15., D.6. and D.7.)

g. The Prime Contractors advised their Directed Sub-contracting A, B, C Small Trucking Companies not to forward required "Certified Payrolls", they knew of the non-compliance and supported the underpayments A, B, C Truck Drivers.

5.) Further the use of "Owner/Operator" argument appears to be an attempt to confuse the matter of Prevailing Rate Coverage and Required Reporting. The "Owner/Operator" Group had only had **58** members or 16.1% of all CA/T Truck Drivers but 84.5% of these "Owner/Operators" were further concentrated in the A, B, C Material Hauling. (See: Charts N.; O.; P. and Q)  CA/T Prime Contractor's position was that regardless of their signed agreement to comply with the CA/T Labor Agreement, Teamsters Union Agreement, CA/T Labor Division, Massachusetts Department of Labor and Legal Findings, that they would not cover "Owner/Operators" under the required Prevailing Rate Law.

25

(See: Attachment B.16.) Their position and implementation process appears to be neutral practice based on their <u>traditional treatment</u> "Owner/Operators". The Prime Contractors then grouped all of the other **326** A, B and C Material Hauling Truck Drivers as "Owner/Operators" and implemented their Strategic Plan. The Plan was clearly a combination of systemic processes that were specifically focused to discriminate against A, B, C Material Haulers. The election of MHD not to conduct the required monitoring to ensure non-discrimination and failure to execute enforcement actions, cooperated with and validated the Prime Contractor's policies, practices and operating procedures.

h.) The "Owner/Operators" question was satisfied in 1973, affirmed in 1989, 1993 and 1994. Further the 1991 CA/T Contract Provisions by reference reaffirmed their protected group status. Additionally the Teamsters Union Agreement integrated them specifically under the A, B, and C Material Hauling Category. (See: Attachment E. 1.) The Category was affirmed again in 1997 by the Massachusetts Attorney General Office and then again by the 1997 "Up Lift Fund" Program (See: Attachment B.2.) which again affirmed that regardless of tradition, that this category was covered by the CA/T Contract Provisions.

i.) MHD failed to enforce the 1973, 1993 and 1994 "Owner/Operator" position on the question of coverage; 1991-1997 Prime Contractor Contract Provisions; the CA/T Labor Agreement; the Teamsters Union Agreement; and Prevailing Rate Law. They failed to ensure compliance even after the 1993 Notice from the Teamsters Union raised concerns about the A, B, C Materials Hauling Area. (See: Attachment E.4.)

J. Concerns about MHD Management's "Commitment" to their Title VI Assurances:

1.) The 1997 Agreement again affirmed that "Own/Operators" did fall under Prevailing Law but why wasn't there a corresponding action to release and/or return to individual Truck Drivers the difference between paid and the Prevailing Wage Minimum. That underpayment from 1991 to 1997 amount to an estimated $ 12,466,625.00. (See: Chart T. and Chart U.)

2.) Likewise action was not take to release and/or return the withheld Hourly Health and Welfare Account Payments. Those withholding now amount to an estimated $ 5,851,537.00. (See: Chart T. and Chart U.)

3.) The dilemma over Truck Driver Pensions had two problems that were not addressed -

a.) The failure to release and/or return an amount now estimated at $ 4,455,228.00 in withheld Pension Funds. (See: Chart T. and Chart U.)

b.) The failure to obtain full back Retirement Credit for each Truck that did not get this guaranteed CA/T Covered Worker Benefit.

4.) MHD had properly "loaded" CA/T Project Contracts (See: Chart U.) but in place of enforcing that fact and requiring Prime Contractors to provide the services that were paid for, MHD elected to obtain additional Massachusetts Public Funds to pay a second time over $ 11,000,000.00 to correct this intentional underpayment. (See: Chart T. and Chart U.)

5.) This inquiry was not able to show that MHD took those actions necessary obtain reimbursements from CA/T Prime Contractors for A, B C Hauling Contracted Expenses that were not experienced because of intentional violations of their CA/T Contracts; Massachusetts General Law; and Title VI of the 1964 Civil Rights Act. Those estimated Prime Contractor savings amount to $18,169,442.00.

6.) MHD had suggested in the 1997 "Central Artery/Tunnel Project Memorandum of Agreement on Trucking Issues" that Contractors be released from obligations to correct "improper payment of truck rates or trucker wages and/or benefits". Although true, that agreement applies only to actions taken by Teamsters Local 379 and does not apply to the violations of CA/T Prime Contract Provisions, Massachusetts State Law or Title VI of the 1964 Civil Rights Act. (See: Attachment B.6.) MHD has suggested that this clause of the MOA applies to everyone, so as per the MOA, there are no continuing issues. This is just another attempt by MHD Management to avoid their responsibilities.

7.) Although MHD did take aggressive action to address these issues, the problems remain as this inquiry determined after reviewing a limited sampling of New Project Labor Reports. The "Certified Payrolls" from the Route # 3 Project determined that there were continuing violations of in the A, B, C Material Hauling Area. The sampling that included only 21 Company Reports showed 7 (33.3%) that clearly violated a combination of Paying Below Required Minimums; Failure to Pay Hourly Health and Welfare Accounts; and the Failure to Hourly Pay Pension Accounts. The other 14 (66.7%) Reports suggest that follow-up action was needed to determine why ever Truck Driver (regardless of Company) received the "same" above the Required Hourly Rates of Pay. Finally the Project Engineers advised that only "Owner/Operators" Truck Drivers are Hauling and they do not have protection under the Prevailing Rate Law. But the Certified Payrolls confirmed that a limited number of Truck Driving Employees are working along with their "Owner/Operator" Bosses. The Project Engineers were advised of their misinterpretation. They were further asked about their briefing on learning from the CA/T Project. They advised of no briefing or sharing of this type of information.

8.) MHD Management failed to share leaning from the CA/T Project of areas of discrimination that it is reasonable to believe that the same "traditions" if not checked would reoccur in like MHD Projects. They further failed to provide the basic training to Project Monitoring Officials that would be required to detect and quick address Contract Labor, Equal Access and Equal Employment Violations.

9.) MHD Management requested that Modern Continental establish a Financial Agreement with Duxbury Trucking that would allow them to return to Hauling on the CA/T Project. MHD had "Up Lift Funds" to cover those type of expenses but the record does not show that those resources were made available. Further both MHD and Modern Continental had current information showing that A, B, C Hauling Companies needed between $ 65.00 to $ 114.00 Per Hour to cover their Operating Expenses. Modern Continental's Agreement Required an Hourly Payback of $10.00 per Hour which translated into a 15.4% Actual reduction in Duxbury's Gross Income. Further the Agreement placed Duxbury in position of having a Below Market Requirement Hourly Rate of $ 55.00 per hour. MHD Management took no action remedy this "known problem" and allowed Small Trucking Company that surfaced these issues to go bankrupt.

E.) Massachusetts General Law 149 Section 27B Reporting

See: Items # 2. A. 1., 2., 3. and 4.

F.) Insurance of non-discrimination

MHD failed to take conclusive action as required by the provisions of 49 CFR Part 23 Subchapter C. Civil Rights, Part 200 Title VI Program and Related Statues - Implementation and Review Procedures, 200.9 State highway agency responsibilities, which require:

"(d) State actions.

(3) Develop procedures for prompt processing and disposition of Title VI and Title VII complaints received directly by the State and not by FHWA

(4) Develop procedures of the collection of statistical data (race, color, sex, religion and national origin) of participants in and beneficiaries of State highway programs....

(14) Establishing procedures to identify and eliminate discrimination when found to exist."

**ISSUE # 3 – PRIME CONTRACTOR POLICIES AND PROCUDERS**

3. **Did Duxbury Trucking ("Certified" WBE Contractor) and other CA/T Project Trucking WBE/DBE Contractors experience CA/T Prime Contractor discriminatory policies, practices and operating procedures?**

**AREA(S) OF CONSIDERATION # 3 – POSSIBLE DISCRIMINATION (PRIME CONTRACTORS)**

A.) Was there a concentration of WBE/DBE Contractors associated with CA/T Project Trucking Contracting ?

There is a concentration of WBE and DBE in the CA/T's Trucking Sub-Contracting area. That concentration is further enhanced in the "Hauling of A,B,C Materials" Sub-Contracting Area, which is the area that includes Duxbury Trucking, Inc. (See: Charts A., B., C., D., E. and F.)

B.) Did CA/T Project Prime Contractors have policies, practices and operating procedures that mandated a "CA/T Project Market Hourly Trucking Rate" ?

CA/T Project Prime Contractors with A, B, C Material Hauling factors in there contracts fixed and mandated a "CA/T Project Market Hourly Trucking Rate". That Rate from 1991 to 1997 moved from $ 45.00 to $ 50.00 to $ 55.00 Market Hourly Trucking Rate for A, B, C Material Hauling for Tri-Axle Trucks. In 1997 with the "Up Lift Fund" the Fixed Rate was moved to $65.00 (Tri-Axle Truck) Per Hour. The review of MHD analysis of the fixed rate for 1997 did have provisions for the A,B,C Material Hauling Small Trucking Companies to make a reasonable profit. (See: Attachments B.6; B.7. and D.4.)

The inquiry also determined that the Prime Contractor violated their own standard by either set and continued A, B, C Hourly Trucking Rates below their established "Market Hourly Rate." (See: Attachment B.6.a.; B.6.e. and D. 4.)

C.) Did the 1991 to 1997 "Market Hourly Rate" take into consideration standard business cost information that the Prime Contractors knew or should have known regarding the actual Hourly Operating Costs to run A,B,C Trucking on the CA/T Project ?

The Pre-1997 Rate was based on what was "traditionally" paid to Small Trucking Companies for the Short Haul of A, B, C Materials. The Rate did not take into consideration the actual costs for Short Haul of A, B, C Materials on the CA/T Project.

29

The Massachusetts Heavy Construction Agreement also requires at Article 4 Page 8, the following requirements:

" Article 4   Hours

A. The regular work day shall consist of eight (8) hours between the hours of 7:00 and 5:00 p.m.

B. The regular work week shall be forty (40) hours, eight (8) hours each day, Monday through Friday.

C. All other hours worked except in the case of shifts as hereinafter provided shall be paid at the rate of time and one-half, except that work Performed on Sundays shall be paid at the rate of Double Time."

Based on the fact that from 1991 to 1997 Prime Contractors only paid the Market Trucking Rate and further that there is no evidence showing that consideration was given to for either "Over Time or Shift Work". There is reason to believe that the Union Agreement and Prevailing Rate Law was violated in this area. (See: Attachment E.1.)

**D.)** Did CA/T Project Prime Contractors know or should have known that their mandated "Market Hourly Trucking Rate" could have an adverse impact on an area with a concentration of WBE and DBE Contractors ?

CA/T Prime Contractors knew or should have known based their internal A,B,C Material Hauling and/or related heavy equipment operating experience, that the mandated Hourly Trucking Rate was below operating costs.

The Prime Contractors were also very much aware that 81.8% of all of their A, B, C Material Hauling Direct Sub-contracts when WBE, MBE and DBE Contractors. (See: Chart B. and Chart F.)

The above two factors suggest that the Prime Contractors were well aware that their focused discrimination would have an adverse impact on a concentration of WBE, MBE and DBE Contractors.

**E.)** If it is determined that the "Market Hourly Trucking Rate" was below the actual Cost of A, B, C Material Hauling, then how could Small Trucking Companies address this issue ?

30

1.) If it can be shown that expenses had not been considered in the Bid, then the Prime could have requested a "Change Order" to cover those new or additional expenses. Although their was an attempt by a Prime Contractor to obtain additional profit and costs (See: Attachment D.5.) to correct the "Trucking Problem", no Change Order came forward requesting additional Funds from FHWA.

> Note: No "change order" were requested between 1991 to 1997 to cover the required Prevailing Rates for A, B, C Material Hauling Truckers because those expenses were already included in the Prime Contractor's Contract.

2.) MHD did requested the FHWA Massachusetts Division to provide additional Funds to cover the Correction of the Truck Drivers Hourly Wage Rate, Payments to the Truck Driver's Health/Welfare Fund and Payments to the Truck Driver's Pension Fund.

The FHWA Massachusetts Division advised MHD that the FHWA Contract was fully loaded and that the Funding level had already taken into consideration all the points raised in the MHD Verbal Request.

The message was very clear, there would be no FHWA second Payment.

**F.)** Did the Prime Contractors have appropriate practices in 1996 to accept information from Small Trucking Companies in order to process "Certified Payrolls" for Truck Drivers ?

The Prime Contractor's system was not in compliance with their Contractual Obligations or Legal Responsibilities. (See: Item #3. G. below)
( See: Attachments B. 21.; B. 22. and B.23.)

Further that based on the elected MHD breakdown in ensure compliance, the CA/T Prime Contractors took this opportunity with a clear intent not to comply with their "Specific Equal Employment Opportunity Responsibilities Section 6" (*Personnel Actions* - Subsections a. b. c. and d.). Those responsibilities include:

"a. The contractor will conduct periodic inspections of project sites to insure that working conditions and employee facilities do not indicate discriminatory treatment of project site personnel.

b. The contractor will periodically evaluate the spread of wages paid within each classification to determine any evidence of discriminatory wage practices.

31

c. The contractor will periodically review selected personnel actions in depth to determine whether there is evidence of discrimination. Where evidence is found, the contractor will promptly take corrective action. If the review indicates that the discrimination may extend beyond the actions reviewed, such corrective actins shall include all affected persons.

d. The contractor will promptly investigate all complaints of alleged discrimination made to the contractor in connection with his obligations under this contract, will attempt to resolve such complaints, and will take appropriate corrective action within a reasonable time. If the investigation indicates that the discrimination may affect persons other than the complainant, such corrective action shall include such other persons......"

**G.)** If "Certified Payrolls" were not provided, how did the Prime Contractors comply with Massachusetts General Law, Chapter 49, Section B which required the reporting of specific individual employee information by employee name ?

1.) The information requested and reported by the Prime Contractors was based on the entire Hourly Trucking Rate ($ 45 to $ 55 Per Hour) with the Truck Driver's Name; Type of Truck; Days Worked; and Hours Worked.

2.) The information did not comply with their Contractual or Legal Requirements.

3.) The process failed to not provide the required information as to the specific Hourly Rate Paid to the Truck Driver; Rate Paid Per Hour to the Truck Driver's Health/Welfare Account; Rate Paid Per Hour to the Truck Driver's Pension Account; Over Time and/or Shift Differential.

(See: Attachment B.2.)

**H.)** Did the Prime Contractors establish processes in 1996 to pay or insure the payment of required individual Truck Driver Health/Welfare Union Fund ?

1.) A process was in place before 1997 that allowed **all** "Qualified" Prime Contractor Truck Drivers (6) and 12.2% (29 of 238) of all other "Qualified" CA/T Truck Drivers to receive Paid Union Benefits. (See: Chart L.)

2.) The four (4) "Non-Qualified" Prime Contractor Truck Driver Employees did not have their required Hourly Benefits Paid to their Union Account. Further this inquiry could not confirm that these direct Prime Contractor Truck Drivers were paid the required Hourly Minimums or directly paid the cash for payments not made to their Union Accounts to cover their Benefits. (See: Chart J. and Chart K.)

3.) Although the tradition was not to cover the Union Benefits for "Owner/Operator" Truck Drivers, there was one exception. That

32

covered  Direct Sub-contractor was allowed to obtain and maintain
Hourly Union Benefit Coverage.
(See: Chart N and Chart R.)

**I.)**   Did the Prime Contractors establish processes in 1996 to pay or insure the payment
of required individual Truck Driver Pension Union Funds ?

> No.  (See: Attachments B.1 and B.2)

**J.)**   Determine those areas where CA/T Contractors have failed to honor their
Responsibility as per the Labor Agreement and Union Agreement(s) to pay
Employee Health Benefits ?

> See Attachment B.4. for a listing of all CA/T Truck Drivers and Confirmation
> of non-Payments to their Health and Welfare Accounts.
> (See: Chart T. and Chart U.)

**K.)**   Determine those areas where CA/T Contractors have failed to honor their
responsibility as per the Labor Agreement and Union Agreement(s) to pay
Employee Pension Benefits ?

> See Attachment B.4. for listing of all CA/T Truck Drivers and Confirmation
> of the failure to Pay Pension Benefits. (See: Chart T. and  Chart U.)

**L.)**   Did if CA/T Prime Contractors know or should have known that their failure
to pay or insure the payment of  Truck Driver Union Benefits would have an
adverse impact on WBE and DBE ?

> 1.)  The CA/T Prime Contractor knew or should have known that the
> Market Trucking Hourly Rate ($45 - $55)  was well below Actual
> A, B, C Hauling Operating Costs.  Further they didn't require nor
> support the  wide spread payment of Required Truck Driver Benefits.
> In the few cases of paid Union Benefits (35),  that action demonstrated
> that they understood their responsibility.

>> Note:  The Record also shows consistent underpayment of the
>>         Market Hourly Rate.  (See: Attachment B.6.a. and B.6.b.)

>> The Record fails to confirm compliance with required
>> Over Time and Shift Differential Hourly Rates.
>> (See: Attachment E.1.)

2.) The Prime Contractors clearly understood that 93.7% of all Truck Work were in the A, B, C Materials Hauling Area . (See: Chart F.)  They knew that WBE/MBE/DBE Direct Sub-Contractors made up 89.0% of the actual A, B, C Hauling Contracted Hours. (See: Chart F.)

3.) It was further understood that WBE/MBE/DBE Truck Drivers represented 88.6%  (209 of 236) of the "known" Truck Driver Workforce.(See: Chart F.)

**M.)** Did the Truck Drivers who worked directly for Prime Contractors experience any difference in Hourly Pay, Health Benefits or Pension Account Payments ?

If it was determined by the Prime Contractor that their employee would "Qualify" for Union Benefits, then unlike almost all like "Qualified" WBE/DBE Truck Drivers, they would receive Payments to their Health and Welfare Account.  This Inquiry could not confirm if they also received payments to their Pension Accounts.

(See: Items # 3. D. and  3. H. 3. above)
(See: Charts L., R. and Chart S.)

34

**ISSUE # 4 – MHD POLICIES AND PROCUDERS**

**4. Did Duxbury Trucking and other WBE/DBE Contractors experience Massachusetts Highway Department discriminatory policies, practices and operating procedures?**

**AREA (S) OF CONSIDERATION # 4 – POSSIBLE MHD DISCRIMINATION**

**A.)** Did MHD conduct a reasonable and standard study to assure non-discrimination in the formation and implementation of the "CA/T Project's Wide Hourly Trucking Company Unit Pricing Policy" ?

    **1.)** MDH documents suggest that the "Market Hourly Trucking Rate" represents a fair rate which is driven by market driven market conditions.
(See: Attachment B.20.)

    2.) There is no evidence establishing that MHD had taken action to evaluate the Prime Contractor fixed and mandated "Market Hourly Rate for Trucking" before the 1997 Complaint.

    3.) There is no evidence to establish that MHD had conducted a study to determine how the below cost of doing business "Market Hourly Trucking Rate" was accomplished by A, B, C Small Trucking Companies.

    4.) MHD knew or should have known that the "Market Hourly Rate" was regularly violated based on their review of adjusted Certified Payroll Report which provided information on Trucking Hours and the Actual Hourly Trucking Rate Paid to each Small Trucking Company.

    5.) MHD knew or should have known that standard over time and $2^{nd}/3^{rd}$ Shift Differentials Hourly Rate Requirements for Truck Drivers specifically were were being violated on a massive scale between 1991 to 1997.

    6.) The inquiry did confirm that a Market Hourly Rate Analysis was conducted by MHD in 1997. That Study was conducted in order to better understand and address the issues that caused the 1997 Trucker's Demonstration in May 1997. That Study determined: (See: Attachments B.5., B.5.a., B.8.a., B.8.b. and B.9.)

        a.) The mandated A, B, C Material Hauling Rate was well below actual operating costs of Small Trucking Companies.

        b.) That Small Trucking Companies had to pay their Truck Drivers at Hourly Rates below the required Minimum just to stay in business.

35

c.) MHD confirmed that the Mandatory Trucking Rate should for
Tri-Axle Short Hauling of A, B, C Materials should not be less
then $65.00 Per Hour.

d.) MHD provided a special "Up Lift Fund" to bring <u>all continuing</u>
A, B, C Small Trucking Contracts to the new minimums.

Note: That Rate for Tri-Axle Short Hauling of A, B, C
Materials moved the Rate from $ 55.00 to $ 65.00
Per Hour Rate.

There was no consideration given to the Small Trucking
Companies that were driven out of business because of
of the use of outdated rates that were mandated by the
Prime Contractors and not evaluated by MHD.

e.) MHD obtained agreements from the CA/T Prime Contracts to move
all future A, B, C Material Hauling Small Trucking Contracts to the
newly established Market Trucking Hourly Rate.

7.) Although the CA/T Prime Contractors provided information for the 1997 Study
and agreed to its implementation, the records show: (See: Attachment B.5.a.
B.8.a. and B.8.b.)

a.) CA/T Prime Contractors regularly established Work Agreements
with A,B,C Small Trucking Companies that paid Hourly Trucking
well below their past Market Hourly Rates.(See: Attachment B.6.)

b.) Although agreeing to pay the new Market Hourly Rates, MHD
Monitoring found most Prime Contractor violations of that agreement.

c.) Even after MHD advised CA/T Prime Contractors of the apparent
violations of the $ 65.00 Per Hour Market Hourly Trucking Rate,
found it hard to get them to comply with their agreement.
(See: Attachment B.10)

**B.)** Did MHD allow and accept Hourly Trucking Rate Reports to take the place of
required "Certified Payroll Reports" ?

The CA/T Hourly Trucking Rate was used in place of require Employee
Information. (See Attachment B.3.) From 1991 to 1997 the required Standard
Certified Payrolls for A, B, C Material Hauling Truck Drivers was not collected.
This was a clear violation of Contract Provisions and State Prevailing Rate Law.

36

Note:  MHD acceptance to this revised reporting system, made it
administratively impossible for them to monitor compliance
with Prevailing Rate Law in and area the MHD knew their
were past problems.

MHD in 1997 required the correction of Certified Payroll
Reports for A,B, C Material Hauling.  (See: Attachment B.3.)

**C.)** If a "Certified Payroll Report" process was not used, how did MHD determine
actual Hourly Rates Pay, Payroll Deductions, Health/Welfare Payments and Pension
Payments?

CA/T Prime Contractors refused to provide acceptable "Certified Payroll Reports".
MHD only obtained CA/T Trucking Hourly and the Number of Hours Worked
by individual truck.  This general information did not allow for the monitoring of:

i.) Each Truck Driver's Correct Hourly Wage.
ii.) Confirmation of Payments Hourly to Required Union Accounts.
iii.) Confirmation that required deductions have been made from
each employees pay.

The inquiry confirmed that MDH knew in 1973, 1989 and 1994 of the history of
Prime Contractors not honoring because of tradition, A, B, C, Material Hauling
Prevailing Rates for Truck Drivers.  (See: Attachments B. 21; B.22; B.23 and F.4)

The record further shows no attempt by MHD between 1991 and 1997 to monitor
this specific area of known past traditional treatment which violates CA/T Contract
Provisions, Massachusetts State Law and Title VI of the Civil Rights Action of
1964.  (See: Attachment E. 2. and F. 1.)

**D.)** If "Certified Payroll Reports" were not provided, how did Massachusetts Highway
Department insure compliance with the provisions of Massachusetts General Law,
Chapter 149. Section 27B, which required specific information by employee?

See: Items # 4. B. and C. above

**E.)** Did MHD use the limited issue of "Owner/Operator" to put in place policies and
procedures that resulted in the denial of regular Truck Drivers equal protection under
under FHWA Contact Provisions; Massachusetts' Prevailing Rate; and access to
Union Benefits (Health/Welfare and Pension) as required by the Project Labor
Agreement?

37

1.) The "Owner/Operator" Prevailing Rate subject again became a Legal Issue driven by CA/T Prime Contractors and their refusal to place the Law above tradition. (See: Attachment G.1.)

2.) The Legal Issue has been addressed by the United States District Court, Massachusetts Attorney General's Office and MHD Counsel's Office. (See: Attachments B.14.; B.15.; B.16. and B.20.)

3.) While the Legal Issue festered (1991 to 1997) the 58 "Owner/Operators" lost Wages, Benefits and Equal Protection as provided for under the CA/T Labor Agreement.

4.) With the affirmative Legal Finding, no action was document regarding the returned of Lost Wages to these 58 Truck Driving - "Owner/Operators".

5.) CA/T Prime Contractors appeared to have elected to in include in this "Owner/Operator" general category an additional 238 regular "qualified" Truck Driving Employees who were fully eligible (under Prime Contractor Standards) to receive Union Benefits. (See: Charts N.; O.; P. and Q.)

6.) As reported at Item # 3 above, while the Legal Issue festered (1991 to 1997) not only did the 58 "Owner/Operators" loss Wages and Benefits but the "qualified" regard employee Truck Drivers also lost Wages and Benefits.

7.) With the Legal Resolution in hand, no action was taken to return the lost Hourly Wages and Benefits Payment from 1991 to 1997.

8.) The 1997 "Up Lift Fund" Program did included a Memorandum Of Agreement (MOA) which confirmed that "Owner/Operator" Drivers have protection under the Project Labor Agreement; Prevailing Rate Coverage; and Rights to Union Benefits.(See: Attachment B.5.)

> Note: A 1998 MHD Progress Report, which was requested to confirm actual payments of Benefits showed that of the 209 "Qualified" Truck Driver that should have enjoyed access to Benefits, only 153 (73.2%) received these privileges. (See: Attachment B.18.)

**F.)** Did the MHD Management verbal policy that advised, "all truck Drivers are treated equal and therefore there is no discrimination" have an impact on the ability of MHD to conduct appropriate inquiries?

1.) The statement is not true. All CA/T Truck Drivers were not "treated equally". (Chart L and Attachment B.3.)

14.)The "Equal Treatment" arguments like other MHD positions ("Fairness of the
Market Hourly Trucking Rate" and "Owner/Operator Image") placed MHD
Managers in the position of knowing or should have known, the risk of
making bold statements without verification in the face of notorious and
discriminatory traditions could and in this case did deny "Classes" the right to
equal access to benefits as required by Massachusetts State Law General Law 149,
FHWA Contract Provisions and Title VI of the Civil Rights Act of 1964.

**ISSUE # 5 – TIMENESS OF DUXBURY NOTICES**

5. **Did Duxbury Trucking notify appropriate officials in a timely and continuing manner about alleged violations of the CA/T Labor Agreements, Teamsters Union Agreement and Massachusetts Prevailing Rate Law?**

**AREA (S) OF CONSIDERATION # 5 – TIMELY OF REPORTING OF ISSUES TO RESPONSIBLE PRIME CONTRACTOR AND STATE/FEDERAL AGENCIES**

A.) Does Duxbury Trucking and the other Small Trucking Company fall under the requirements to supply Certified Payroll Information in accordance with Massachusetts General Law, Chapter 149, Section 27 of the Massachusetts Prevailing Rate Law?

All of the CA/T Projects Trucking Contractors specifically related to A, B, C Hauling are required to provide information to ensure compliance with the Massachusetts Prevailing Rate Law. Those responsibilities include:

    1.) Subcontractors-

        Each Contractor has responsible to pay and document the payment of the established Prevailing Rate for covered Job and Employee. The Contractor is required to forward a "Certified Payroll" each pay period with information that includes:

            a.) Company Name
            b.) Project Name
            c.) Awarding Authority
            d.) Work Week Ending
            e.) Prime Contractor
            f.) Subcontractor
            g.) Name, Title and Signature of Individual Completing the form
            h.) Name of Employee
            i.) Home Address
            j.) Minority Code
            k.) Type of Truck
            l.) Employee's Social Security Number
            m.) Hours (Overtime – Straight)
            n.) Truck Number
            o.) Number of Hours and Type of Hours Worked Each Day
            p.) Total Pay Period Hours (Overtime – Straight)
            q.) Hourly Base Rate (Overtime – Straight)
            r.) Health & Welfare Fund Per Hour Rate
            s.) Pension Fund Hourly Rate
            t.) Hours Total Wage (Overtime – Straight)

40

u.) Weekly Total Wage
v.) Statement of Compliance

"do hereby state that this copy of my record is a true and
accurate record, showing the name, address, occupational
classification of each such employee on said works, and
the hours worked by, and wages paid to, each such employee,
including payments to health and welfare funds, pension funds,
supplementary unemployment benefit plans, or the equivalent
payment in wages."

w.) Name of Signatory Party
x.) Title
y.) Subcontractor and Address
z.) Signature and Title

"Signed under the penalties of perjury."

2.) Prime Contactor

In addition to reporting the same information as each Subcontractor,
(See: Item # 5. A. 1. above) each Prime Contractor has responsible to
coordinate all of the Subcontractor Certified Payrolls. In the case of the
CA/T Project, each Prime has the responsibility to pay Union Benefits.

**B.)** When did Duxbury Trucking start to work on CA/T Project(s) Contracts?

Duxbury Trucking, a Small WBE Trucking Company on May 28,1996 started to haul
A, B, C Materials under an Agreement with Willie F. Jones Contracting Company.
Willie Jones was a Direct MBE Sub-contractor to Perini, Kiwit, Cashman who in turn
was a Prime Contractor on the CA/T Project. The record shows that Duxbury Trucking
worked an average of 104.35 hours per week at a Hourly Trucking Rate of $ 44.00 Per
Hour. Further Willie Jones Contracting Company did not require that "Certified
Payroll" information. Duxbury stopped working with Willie Jones on July 2, 1996
because of issues related to Duxbury's Legal Requirements as required by
Massachusetts Prevailing Rate Law. (See: Attachment I. 6.) The same issues
developed with Duxbury on three other CA/T Direct Sub-contractors in 1996, which
caused Duxbury Trucking to remove their Truck from this entire Federally Funded
Project from September 7, 1996. Duxbury took this action because of their
understand of the Law that placed their Corporation at a point of greatest exposure to
both civil and criminal actions if a State Audit or Complaint Inquire confirmed the
Violations. Duxbury attempted to informally resolve what they considered to be clear
Violations of State Prevailing Rate Law with authorities that included: CA/T Project

41

- Correct the Market Hourly Trucking Rate
- Purchase Health and Welfare Benefits
- Empower MHD to Enforce the CA/T Contract
- Authorize Compliance with Prevailing Rate Law

**H.)** What action did Duxbury Trucking take after corrective action took place?

After a year of attempting to get the Prevailing Rate Issue resolved, Duxbury found them in a position of financial hardship. With the assistance of Bechtel/Parsons, Brinckerhoff (CA/T Consulting Firm) an agreement was worked out with Modern Continental. That Agreement included three (3) loans which totaled with interest to $ 61,078.00 to would bring their "Parked Truck" Lease Payments back into current status. The Agreement place Duxbury in a position that required a $ 10.00 each hour work per week. That translated into an actual 15.4% reduction in Duxbury's Earning Power. The payments were taken immediately out of the Invoice by Modern Continental who also charged them an 8.0% Interest Rate for this "controlled" loan. It should be also noted that the Hourly Trucking Rate was moved to $65.00 per hour that included **no** consideration for profit. Duxbury was now back in a position of having a Contract that required them to work at an Hourly Operating Loss. Duxbury in "good faith" entered the Agreement, not knowing even to this day how the Agreement, was stacked against them. After one year Duxbury found themselves bankrupt while having a lot of Available Work and an excellent payback record which showed an average $1,533.55 month to Modern Continental.

| Contracted Full Payment | Amount Due | Payments Made |
|---|---|---|
| | | 12 – 1997  $ 9,927.50 |
| | | 6 – 1998     8,475.00 |
| | | |
| | | Payments  $ 18,402.50 |
| 1st - March 23, 1999 | $ 20,000.00 | |
| 2nd – August 17, 1999 | 15,600.00 | |

Note: Duxbury did allege that Site Line Supervisors had issues
as "trouble makers" which translated into reductions Regular
Hours, Loss of Overtime and elimination of 2nd Shift Hours.
Those reduction in opportunity Duxbury alleges was the basis
for them going out of business.

The Record fails to show that to be true.

44

The record shows is that every hour worked, caused Duxbury to loss either invested corporate asset values or actual cash assets. Although there appeared to be a flow of cash, the image of health was false. Every Trucking Hour drove Duxbury deeper financial hardship. Even 2nd Shift Work which sounds like a winning situation, was a concealed loss because of the lack of coverage for the 2nd Shift Differential ( $10.59 Per Hour Additional) which was required by the Truck Driver working that 2nd Shift. The access to additional hours was not the reason for the financial failure of Duxbury Trucking, it was the discriminatory position that they were placed in by Modern Continental and MHD.

( See : Attachments I.1; I.2. and I.3)

i.) The 1997 Market Rate for Trucking was moved by the "Up Lift Fund" to $ 65.00 Per Hour.  The inquiry showed that Modern Continental understood that CA/T Tri-Axle Trucks needed to have a range from $ 65 to $ 105 an hour to stay in business. Modern Continental knew that the "per hour draw down" of $10.00 per hour and the MHD required Hourly Rate of $65.00 per hour would combine in a way to burn all of Duxbury's capital and put them out of business regardless of the hours they worked.

ii.) Modern Continental knew that the main force who damaged the tradition against A, B, C Trucking was now locked in the position of either joining the tradition or going bankrupt.

iii.) Duxbury honored their Agreements and refused to allow themselves to be set up in a position to be found guilty of violating what they fought to protect. They lost their Trucks because of the lack of capital in 1999.

45

**ISSUE # 6 - DAMAGES CONSIDERATIONS**

**6.) Were there losses experienced as a result of the alleged violations of CA/T Contract by CA/T Prime Contractors and the alleged lack of contract enforcement by the Massachusetts Highway Department ?**

**AREA(S) OF CONSIDERATION # 6. A. – ARE THERE TRUCK DRIVER DAMAGES**

What if any losses did individual Truck Drivers experience as it relates to:

A.) Is there a difference between actual Hourly Rates Paid and the Required Prevailing Rate ?

Based on the fact that MHD did not collect the required Certified Payrolls from 1991 to 1997, our ability to confirm the difference between the required Prevailing Rate and the actual Wage Per Hour Paid to Truck Driver could no be conducted.

Newspaper articles and limited interviews suggest that the underpayment were in the range of 25% - 35% below the required minimum.

Further there is reason to believe that Over Time and Shift Differential Standard Requirements were not honored.

B.) Were Health and Welfare Union Accounts paid Hourly for each Truck Driver ?

Only 9.7% of the 361 known Truck Drivers on the CA/T Project experienced payments to Health and Welfare Account Funds while 90.3% failed to receive required Payments to their Union Accounts from 1991 to 1997. (See: Chart K and Attachment B.4.)

The 1997 "Up Lift Fund" Program addressed this issue and provided 209 "Qualified" Truck Drivers with immediate Health Coverage. The cost was $ 620,730.00 of Massachusetts State Funds. ($ 4.50 X 660 Hours X 209)

Note: There are allegations that the Market Hourly Trucking Rate force many Small Trucking Companies off the CA/T Project before the 1997 "Up Lift Fund Program" provided relief. That the relief in actuality then benefited a number of new CA/T Truck Drivers who received Health Coverage immediately, while those who paid for Benefits continued without Health Benefits or any other form of Relief.

46

C.) If Health and Welfare Benefits were paid, were the Benefits available ?

The are no Complaints relating to the fact that after Benefit Payment were sent to the Union and the Truck Driver satisfied all other standard Union Agreement Requirements, of any Truck Driver in this area Complaining about the lack of coverage.

The file did show a number of Complaints were Filed because after taking the funds form the Truck Driver, the Prime Contractors failed to forward the contribution to the Truck Driver's Health and Welfare Account.

Note: The limited review of current records (Route #3 Project)
        showed a continuing problem in this area.

D.) Were Pension Union Accounts paid Hourly for each Truck Driver?

Although 9.7% of the Truck Drivers **may** have received "Benefit" contributions to their Union Pension Account Payments from 1991 to 1997, the lack of Certified Payrolls and/or some other sustaining documentation makes it impossible to make a determination as to if this small group did have their full Pension Account Payments.

The remaining 90.3% of the A,B,C Material Hauling Truck Drivers did not receive the required Hourly Pension Account Payments between 1991 to 1997.

The 1997 "Up Lift Fund Program" did again reaffirmed Pension Coverage for A,B,C Truck Drivers (See: E.10.) but failed to implement a corrective action program to address these lost wage/benefits from 1991 to 1997. (See: Attachment B.1. and B.2.)

Note: The limited review of current records (Route #3 Project)
        showed a continuing problem in this area.

E.) Were there issues around Truck Driver Union Membership or Union Dues?

Union Officials were very aggressive in ensuring that **all** CA/T A,B,C Truck Drivers paid their $ 400.00 for their Union Book and Membership as well as their monthly $ 40.00 Dues. Although the Union did take action by giving notice of violations (See: Attachment E.1., E.2. E.3. and E.4) they were restricted in their actions. The inquiry found it interesting that although the Union did raise Benefit Issues, that nothing was highlighted about the failure to Pay Minimum Rates; Overtime Rates; Shift Differentials or Holiday Pay to A,B,C Truck Drivers, their Membership, who were experiencing these meaningful losses.

47

**AREA(S) OF CONSIDERATION # 6. B. – ARE THERE SMALL TRUCKING COMPANY DAMAGES**

Did other Small Trucking Companies elected to discontinue or not enter agreements to provide Trucking Services to the CA/T Project because of alleged discrimination; forced violations Have the Law; and/or lack of MHD Contractor monitoring/enforcement?

Based on the wide spread nature of the findings of this inquiry and the fact that MHD elected not to address the issues of Small Trucking Companies and their employees until after 1997, it was determined that follow-up action would have to be taken to identify any Small Trucking Company that lost equal opportunity to participate in CA/T Project Contracts from 1991 to 1997.

The inquiry determined that based on reviewed files and interviews that Duxbury Trucking was the only Company that actually "Parked their Trucks" and directed all energies toward the resolution of the CA/T Project Trucking Problem.

Other A, B, C Small Trucking Companies experienced losses as a result of the intentional failure of the CA/T Prime Contractors to Set Hourly Hauling Rate Agreements at or above the Market Hourly Trucking Rate.

48

## AREA (S) OF CONSIDERATION # 6. C. – ARE THERE DUXBURY TRUCKING DAMAGES

What losses did Duxbury Trucking experience?

A.) Loss of Equipment and/of Lease Options: **$ 130,260.00**

| ITEM | LEASE DATE | VALUE | REQUIRED PURCHASE |
|------|-----------|-------|-------------------|
| Tri-Axle Truck | 5-22-96 | $97,500.00 | YES |
| Ford F-260 Truck | 5-22-96 | 26,235.00 | YES |
| Tri-Axle Plow | 10-96 | 1,675.00 | YES |
| Tri-Axle Sander | 4-15-97 | 4,000.00 | YES |
| Tri-Axle Front End | | 850.00 | YES |
| Support Equipment | | -------------- | |
| | | $ 130,260.00 | |

B.) Loss of Cash related to Business Start-up: **$ 37,045.00**

C.) Loss related to administrative processes to bring matter to closure: **$ 37,760.00**

1.) Hall for Truck Driver Meetings 4 x $800.00 = $ 3,200.00

2.) Monthly Telephone Bill at $450.00 per month for 60 months = $ 27,000.00

3.) Transportation Cost to attend meetings:

360 miles per month @ .35 per for 60 months = $7,560.00

D.) Loss Corporate Income: **$ 225,000.00**

$ 45,000.00 per year X 5 years = $ 225,000.00

E.) Loss of Income due to Below Market Rate Hourly Pricing: **$ 6,484.00**

$ 55.00 - $ 44.00 = $ 11.00 Per Hour x 266 Hours    = $ 2,926.00
$ 55.00 - $ 44.00 = $ 11.00 Per Hour x 277.25 Hours =   3,050.00
$ 55.00 - $ 48.00 = $  7.00 Per Hour x  72.5 Hours  =    508.00
                                                     ------------
                                                     $ 6,484.00

F.) Legal Fees: **$ 3,500.00**

49

G.) Interest: **$143,016.00**

6.5% X 5 Years X $ 440,049.00 = $143,016.00

H.) Loan Payment Credit: **$ 18,402.00**

(See: ISSUE # 5. H.)

I.)  Total Loss:  **$ 601,467.00**

$ 440,049.00 + 143,016.00 + 18,402.00 = $ 601,467.00