**ISSUE # 7 – 1997 "UP LIFT FUND" AND RELATED POLICIES AND
PROCEDURES**

7.  Did the corrective actions taken Massachusetts Highway Department in 1997 to conclude
the CA/T Project Site Truck Driver's Strike, resolve all of the A, B, C Material Hauling
"Trucking Problems" ?

**AREA (S) OF CONSIDERATION # 7 – UNDERSTAND AND EVALUATE THE
SUCCESS OF MHD'S CORRECTIVE
ACTIONS OF 1997**

A.)  Confirm the existence of the "Up Lift Fund".

MHD provided $ 15,000,000.00 of Massachusetts State Funds with another $ 5,000,000.00
for a total of $20,000,000.00.

B.) Determine what other supportive actions were included in the "Up Lift" Program.

   1.)  MHD Policies, Practices and Operating Procedures that included specifically
a "Certified Payroll" Process; a Notification to Comply with Massachusetts
General Law Chapter 149; Implementation of Memorandum of Agreement
dated September 30, 1997; Contractor Compliance Reviews; Enforcement.
(See Attachment B.3.)

   2.)  Immediate Health and Welfare Coverage for 600 Truck Drivers which
Cost $ 413,100.00 with supporting Policies, Practices and Operating
Procedure as identified in the MOA, MOU and H/W Fund Agreement.
(See: Attachment B.5.)

   3.)  Reconfirmation of Truck Driver Pension Eligibility but the failure to
address this issue. (See: Attachment B.5.)

   4.)  The movement of the Market Hourly Trucking Hourly Rate to $60-$75
per hour and the pay out of $ 11,379,270.00 (See: Attachment B.7.)
Action was also taken by MHD to Monitor the Rate and take the require
steps when below Rate Issues were discovered.

C.) Determine if the "Up Lift Fund" included Federal Funds.

CA/T Project Counselor clearly stated that the "Up Lift Fund Strategy" used **no**
Federal Funds.  The entire corrective action was funded using Massachusetts
Funding.

D.) Determine the effectiveness of the "Up Lift" Program.

The program was very effective in correcting polices, practices and operating procedures in support of Prevailing Rate Law, Contract Compliance and the elimination of discrimination in the Trucking Industry on the CA/T Project.

E.) Determine if there are continuing issues:

15.)The strategy failed to consider remedies in the following areas which covered a time period between 1991 to 1997:

a. Health and Welfare Withholding were never paid back to individual Truck Drivers.

b. Pension Withholdings were never paid to the individual Truck Driver or Credit to their Union Pension Account.

c. Minimum Hourly Wages Underpayment Obligations were not paid to the affected individual Truck Drivers.

d. Underpayments of "Overtime and Shift Differential" were not paid to the affected individual Truck Drivers.

e. Small Trucking Companies that incurred a loss as a result of the lack of equal contracting access and equal employment opportunity.

f. Specific damages to Duxbury Trucking and their Employee(s).

F.) Are there continuing issues that need to be addressed:

a.) There appears to be continuing problems in the following areas

1.) Enforcing Prevailing Rates for Truck Drivers on other MHD Contracts.

2.) Failure to establish "fairly weighted" Market Trucking Hourly Rates on other MHD Contracts

3.) Failure to address the lack of payment of required Health and Welfare Fund Payments or Payments to the Individual Truck Driver if Union Membership is not in question.

4.) Failure to address the lack of payment of required Pension Fund Payments or Payments to the Individual Truck Driver if Union Membership is not in question.

5.) Failure to address Overtime and Shift Differential Truck Driver considerations.

6.) Failure to address the damages to Duxbury Trucking and their Employee form 1997 to 2001.

**ISSUE # 8 – QUESTIONS REGARDING POST-1997 CONTINUING TRUCKING/PREVAILING RATE ISSUES**

8. **What were the corrective actions taken Massachusetts Highway Department in 1997 to resolve the "CA/T Trucking Problems" and did those actions effectively address each issue?**

**AREA(S) OF CONSIDERATION # 8 – DETERMINE IF THERE ARE CONTINUING SMALL TRUCKING COMPANY AND/OR TRUCK DRIVER BENENFIT PROBLEMS**

1. Market Pricing

   a.) Conversations with other Small Trucking Companies continue to alleged that some of the CA/T Prime Contractors are now Prime Contractors on other MHD Projects such as Route 3 and 295 Projects. These same Prime Contractors are forcing a "Market Hourly Trucking Rate" of $ 55.00 per Hour. The mandated A, B, C Material Hauling Rate is alleged to below the actual cost for doing business on a Hourly Basis. The Prime Contractors are allegedly compelling Small Trucking Companies to falsify records and violate Prevailing Rate Law.

   b.) On July 11, 2001 a meeting was held in the Office of Ms. Patricia O'Brien from Massachusetts Highway Department. The meeting was held to sample records from their new Route 3 Project to insure Compliance with their non-discrimination requirements. The meeting determined that the Route 3 Prime Contractors had established a $ 55 - $ 65 Market Hourly Trucking Rate. No action was taken by the responsible Contractor Engineering Manager to Determine the appropriateness of that rate. No action was taken by MHD to Share leanings from the CA/T Project. No action was taken to share CA/T Prime Contractor information, from the same contractors that have not set the $ 55 -$ 65 Market Rate that in this Area in 1997/98 that the Hourly Trucking Cost were in the $ 65 - $ 105 Range. (See Attachment B.6.)

2. Prevailing Hourly Rate

   a.) The July 11, 2001 meeting was successful in obtaining for review a sampling of records from their new Route 3 Project to insure Compliance with their "Certified Payroll" Requirements. The review "Certified Payrolls" found on 33% of the documents review, confirmed the failure to pay Truck Drivers the minimum required Prevailing Hourly Rate; failure to pay required Health/Welfare Fund Accounts; failure to pay required Pension Fund Accounts; failure to evaluate the mandated (by Prime Contractor), $ 55.00 Market Hourly Trucking Rate.

   b.) Route 3 Project Officials also advised that the Trucking Contracts had been Authorize specifically and exclusively to "Owner/Operators" who did not require

clear documentation as to their Hourly Rate of Pay. Further that the only Truck Drivers are actual Small Trucking Company Owners who are not "covered" by Prevailing Rate Law or requirements to pay Union Benefits. It was found that clearly almost all of the Truck Drivers were Owners, not all of the Truck Drivers were Small Trucking Company Owners. In regards to Prevailing Rate and Benefits Question, the fact is that "Owner/Operators" are a covered group which who require formal confirmation of the minimum Wage Per Hour and specific Benefit Fund Payments. Further that Employee Truck Drivers enjoy the same protect as above stated for the "Owner/Operators".

c.) Project Officials  requested the groups assistance in the correction of the problems identified during our meeting and advised that they had no interest in discriminating against anyone.

d.) MHD Officials who coordinated and attended this meeting advised at several times during the meeting that concerns pointed out during the meeting were "simple contractor reporting errors"; "false impressions that the on the Certified Payrolls because of contractor reporting errors"; " that the FHWA Investigator had simply confused Project Officials regarding their presentation their Certified Payroll Report because of contractor reporting errors".

3.  Heath and Welfare Fund

The July 11, 2001  review "Certified Payrolls" found that in 33% of the documents Review clear documentation of the election no to Required Hourly Payments to each Truck Driver's Health and Welfare Funds Union Account.

4.  Pension Fund

The July 11, 2001  review "Certified Payrolls" found that in 33% of the documents Review clear documentation of the election no to Required Hourly Payments to each Truck Driver's Pension Funds Union Account.

5. MHD Monitoring/Enforcement

(See: Items # 1. c.;  # 2. a. b. c.; # 3.; and # 4. above)

6. Certified Payrolls

(See: Items # 2.a. b.; # 3.; and # 4. above)

## ISSUE # 9 – SUGGESTED AND RECOMMENDATIONS

9. **What actions are needed, if any, to resolve the alleged current Trucking Problem in Massachusetts ?**

    A.  Addressing the Damage Issues:

        1. )  Action is needed to conduct an appropriate in order to set "fairly weighted" Market Hourly Rates for Small Trucking Companies.

        2.)  Action is needed to correct the lost in Hourly Wage Issue from 1991 to 1997.

                i.  Failure to pay job required minimum Hourly Rates of Pay.

                ii.  Failure to pay Health/Welfare Fund Account Payments.

                iii.  Failure to pay Pension Fund Account Payments.

                iv.  Loss of Wages of Duxbury Trucking Employee.

        3.)  Action is needed to correct damages to Small Trucking Companies.

                a.)  Loss of equal opportunity to access of CA/T Project Contracts clear of discrimination.

                c.)  Loss due to the failure to Pay the Market Hourly Rate to A, B, C Material Hauling Companies.

                b.)  Losses of Duxbury Trucking, Inc.

    K. Prime Contractor Accountability:

        1.)  In accordance with the Terms and Conditions of the CA/T Project Agreements, each Prime Contractor has the responsibility to resolve their Contract Based Issues raised at Item # 9. A. 1., 2. and 3. above.

        2.)  Each Prime Contractor with A, B, C Material Hauling Trucking requirements should be held accountable to fix their Contract Labor Issue. (See Charts T. and U.)

## VI. INVESTIGATIVE FINDINGS AND RECOMMENDATIONS

### A. Overview

Action was taken The Massachusetts Highway Department's Turnpike Authority's Central Artery/Tunnel Project (CA/T Project) in order to resolve a CA/T Project Work Site Strike (May 28 and 29, 1997) which was caused by the failure to address the long standing "Trucking Problem". The Leadership of the Striking CA/T Truck Drivers included Duxbury Trucking. The process led to MHD developing, reaching concurrence on and then issuing the following Agreements:

1.) The Central Artery/Tunnel Project Memorandum of Agreement on Trucking Issues (Attachment # B.5.)

2.) Memorandum of Understanding as to Teamster Benefits (MOU) in accordance with the Central Artery/Tunnel (CA/T) Project Memorandum of Agreement on Trucking Issues (MOA). (Attachment# B.5.)

3.) Pension Fund Agreement as to Eligibility for Benefits (Attachment # B.5.)

In addition to the above agreements, Massachusetts added $15 Million (plus) in State Funds to "Lift-Up" Small Trucking Contractor Hourly Pay Rates; To make "Up-Front" Payment of 600 Hours so that 153 of 361 known CA/T Project Truck Driver could immediately get Health and Welfare Benefits; and related administrative support issues.

The combination of the above Agreements, Administrative Processes and the "Up lift Fund" did resolve most of the adverse policies, practices and operating procedures which Caused the creation of the CA/T Project's Trucking Problem.

### B. FINDINGS AND RECOMMENDATION

The specific Finding and Recommendations have been attached in the following Section.

1.) MHD be given formal notice of these Finding and the potential for formal Sanction if the violations of their equal opportunity contract requirements are not corrected in a timely manner.

2.) After due consideration is given to their response, that a determination be made as to the compliance status of MHD regarding violations of Title VI of the Civil Rights Act of 1964.

3.) That those FHWA Representatives that have had active involvement in the assessment of Duxbury's passed Compliant(s), not be involved in the evaluation of these Findings.

# DUXBURY TRUCKING, INC.
# COMPLAINT INVESTIGATON

# FINDINGS AND RECOMMENDATIONS

ISSUE # 1 – ASSURANCES OF NON-DISCRIMINATION

1. Did the Massachusetts Highway Department (MHD) have a 1996 Federal Aid Recipient Responsibility to assure non-discrimination in the administration of their Projects ?

## GENERAL FINDING # 1 – ASSURANCES ON NON-DISCRIMINATION

A. That the Massachusetts Highway Department (MHD) had and continues to have a responsibility under the 23 Code of Federal Regulation, Chapter I Federal Highway Administration, Department of Transportation, Subchapter C – Civil Rights, Part 200 Title VI program and related statutes – implementation and review procedures, Section 200.9(a)(1) State highway agency responsibilities to:

" State assurances in accordance with Title VI of the Civil Rights Act of 1964…that no person in the United States shall, on the grounds of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be otherwise subject to discrimination under any program or activity for which the recipient receives Federal assistance from the Department of Transportation, including the Federal Highway Administration."

"The FHWA considers all assurances heretofore received to have been amended to include a prohibition against discrimination on the grounds of sex."

B. Further that MHD had and has the responsibilities under the provisions of Part 230 – External Programs, Subpart B – Supportive Services for Minority, Disadvantaged, and Women Business Enterprises at Section 230.204(g) that affirms that in order for States to obtain this type of funding:

" The nondiscrimination provisions required by Title VI of the Civil Rights Act of 1964 as set forth in Form FHWA 1273, Required Contract Provisions, Federal-Aid Construction Contracts, and a statement of nondiscrimination in employment…"

C. Finally that MHD had and continues to have the responsibility to assure that their contractors are informed of and complying with all contract provisions and their Part 230, Subpart A, Appendix A - Specific Equal Employment Opportunity Responsibilities. Those provisions include "Section 6 *Personnel Actions*" states that "Wages, working conditions, and employee benefits shall be established and administered…….without regard to race, color, religion, sex or national origin"

58

## ISSUE # 2 – ENSURANCES OF CONTRACTOR COMPLIANCE

2. Did the Massachusetts Highway Department take those actions necessary to ensure that CA/T Project Prime Contractors were complying in 1996 with their Equal Employment Opportunity Clause and CA/T Contract Provisions, as both relate to Trucking and Labor Requirements ?

**GENERAL FINDING # 2 – ENSURANCES OF CONTACTOR COMPLIANCE**

MHD was found to have failed to take those necessary action to ensure that in 1996 that CA/T Prime Contractors were complying with their Equal Employment Opportunity Clause. It was further found that MHD elected not to enforce their CA/T Project Contract Provisions related to the CA/T Project Labor Agreement or the Massachusetts Heavy Construction, International Brotherhood of Teamster Agreement. This inquiry found that MHD did take corrective action in August 1997 to settle a Truck Driver Strike but that remedy was not decisive in bringing the internal change necessary to allow the effective engagement of the following :

* Damage Resolution related to Truck Driver Past Discrimination.

* Effective monitoring in known areas of Discrimination.

* Requiring Prime Contractors to Adherence to MHD Contracts Provisions.

* Conformity with Massachusetts Prevailing Rate General Law.

* Compliance with Non-Discrimination Agreements.

## ISSUE # 3 – CLASS DISCRIMINATION (PRIME CONTRACTORS)

3. Did Duxbury Trucking ("Certified" WBE Contractor) and other CA/T Project Trucking WBE/DBE Contractors experience CA/T Prime Contractors discriminatory policies, practices and operating procedures?

**GENERAL FINDING # 3 - CLASS DISCRIMINATION (PRIME CONTRACTORS)**

The basis of the Duxbury Trucking Complaint is that there are policies, practices and Operating procedures that discrimination against Small Trucking Companies on the CA/T Project. This investigation found reason to believe that systemic discrimination did take place by CA/T Prime Contractor against an area of the workforce that had a concentration of DBE/WBE Contractors. That Finding is based on the following:

A.) There is a concentration of DBE/WBE Contractors that worked specifically on the removal of "Schedule A, B and C" materials using Tri-Axle and Trailer Trucks from and to CA/T Project Sites.

B.) CA/T Prime Contractors had direct experience with heavy equipment operating costs, including direct experience with running their own trucks both in the CA/T Project Area as well as on the CA/T Project specifically, and knew or should have known the actual operating costs and provisions for a reasonable profit to operate specifically Tri-Axle and Trailer Trucks on CA/T Project was far above their mandated "Hourly Trucking Rate".

C.) CA/T Prime Contractors intentionally failed to collect or provide "Certified Payrolls" for Small Trucker Employees because they knew that their Small Trucking Companies Sub-contractor were violating the "Massachusetts Prevailing Rate Law" by not paying their Truck Drivers the CA/T Project Contracted Rate of pay per hour just to stay in business.

D.) CA/T Prime Contractors had and continue to have the responsibility to pay each Small Trucking Company's Employee Hourly Health and Welfare Benefit to the Massachusetts Heavy Construction, International Brotherhood of Teamster, Union Account by failed to do so from 1991 to 1997.

E.) CA/T Prime Contractors had and continue to have the responsibility to pay each Small Trucking Company's Employee Hourly Pension Benefit to the Massachusetts Heavy Construction, International Brotherhood of Teamster, Union Account by failed to do so from 1991 to 1997.

60

## ISSUE # 4 – CLASS DISCRIMINATION (MHD)

4. Did Duxbury Trucking and other WBE/DBE Small Trucking Companies experience Massachusetts Highway Department discriminatory policies, practices and operating Procedures?

**GENERAL FINDING # 4 – CLASS DISCRIMINATION**
**(MASSACHUSETTS HIGHWAY DEPARTMENT)**

The basis of the Duxbury Trucking Complaint is that there are policies, practices and Operating procedures that discrimination against Small Trucking Companies on the CA/T Project. This investigation found reason to believe that systemic discrimination did take place by CA/T Prime Contractor and that it was supported by the Massachusetts Highway Department against an area of the workforce that had a concentration of DBE/WBE Contractors. That Finding is based on General Finding # 1, 2 and 3 as well as the following Additional Findings:

A.) MHD did not conduct or request a reasonable and standard study to assure non-discrimination in the formation and implementation of the "CA/T Project's Hourly Trucking Company Unit Pricing Policy" which was a major part of the entire CA/T Mega Project.

B.) MHD allowed the violation of the Massachusetts General Law 149 Section B and CA/T Project Contract Provisions by not obtaining "Certified Payroll Reports" for Trucking from 1991 to 1997.

C.) MHD was notified in 1993 by the Teamsters Union of problems by allowing the none payment of specifically and exclusively Truck Driver Health and Welfare Benefits until 1997.

D.) MHD was notified in 1993 by the Teamsters Union of problems regarding the none payment of both Health/Welfare and Pension Account Payments but failed to take specific action to investigate and/or monitor Contractor Compliance in this area.

E.) MHD had information showing violations of "Over Time and Shift Differential" based on the Market Hourly Rate Payment Sheets but failed to enforce these required Minimum Hourly Wage Payments.

F.) MHD used effectively the "Owner/Operator"; "Equal Treatment of All Truckers"; "Exceeding of DBE Goals"; "No Concentration of WBE/DBE Contractors"; "Small Trucking Company Poor Resource Management Skills"; and "All Rights Have Been Waived" strategies as the basis for not to address the loss of Wages and Benefits of A,B,C Truck Drivers.

61



## ISSUE # 5 – TIMELY NOTICE

5. Did Duxbury Trucking notify appropriate officials in a timely and continuing manner about alleged violations of the CA/T Labor Agreements, Teamsters Union Agreement and Massachusetts Prevailing Rate Law ?

## GENERAL FINDING # 5 – TIMELY NOTICE

Duxbury Trucking was found to have taken reasonable and timely action to notice representatives from four (4) Contractor Group, CA/T Project and the Massachusetts Highway Department of alleged violations of  Teamsters Union Agreement and Prevailing Rate Law.

## ISSUE # 6 - DAMAGES

6. Were there losses experienced as a result of the alleged violations of CA/T Contract by CA/T Prime Contractors and the alleged lack of contract enforcement by the Massachusetts Highway Department ?

## GENERAL FINDING # 6 – DAMAGES

CA/T Prime Contractors were found to have mandated Project-wide policies, practices and operating procedures that discriminated against A, B, C Material Haulers and their employees. That discrimination caused the loss of Wages, Benefits and Equal Access to Contracting Opportunities.

Further that the failure of the Massachusetts Highway Department to enforce CA/T Contract Provisions relating to Non-Discrimination and Labor Requirements; the CA/T Project Labor Agreement; the Massachusetts Heavy Construction Agreement, International Brotherhood of Teamsters; Massachusetts Labor Department Requirements; and Massachusetts General Law, Chapter 149 "Prevailing Rate Law" fortified the initial Prime Contractor discriminatory action.

These discriminatory actions caused the creation of the following damaged Classes:

1.) Loss of Hourly Wages due to the failure to Pay Required Prevailing Rate Minimums to A,B,C Material Hauling Truck Drivers .

2.) Loss of Health and Welfare Benefits due to the failure to make Required Payments For each hour worked to each A,B,C Material Hauling Truck Driver's Union Account.

3.) Loss of Pension due to the failure to make Required Payments for each hour worked to Each A, B, C Material Hauling Truck Driver's Union Account.

4.) Loss of Equal Contracting Access due to discriminatory contracting conditions against A, B, C Material Hauling Trucking Companies.

5.) Loss of a Fair Trucking Company Hourly Compensation Rate due to the failure to honor the "Market Hourly Rate for A, B, C Material Hauling".

**6.A. DAMAGES (TRUCK DRIVERS)**

## A.) Hourly Wages Loss : ( $ 12,467,786.00 )

1. ) <u>Total number A,B and C Trucking Hours</u> : (1,178,320)

   As presented by MHD, these are the total Contracted Trucking
   Hours for the period covering 1991 to 1997. (See: Chart F)

2.) <u>Estimated Average Per Hour Pay Below Minimum</u> : ( $ 6.05)

   This rate was determined by taking the 1996 Minimum Wage for
   Zone A for Tri-Axle because it represented the average Rate when
   Considering Contract Time and Volume of actual Hauling.

   The June 1, 1996 Minimum Hourly Rate of $20.17 Per was used as the
   average Wage for the period of 1991 to 1997.  Further because of the lack
   of Certified Payrolls for this period, this analysis used newspaper reports that
   suggested rates from 25-35% below the required Minimum Prevailing Rate
   Wage.  Using these two representative factors the Estimated Below Require
   Minimum Rate was established at 30% below minimum or -$ 6.05.

3.) <u>Total Potential Below Minimum Withholdings</u> : ( $ 7,128,836.00)

   This Rate was determined by multiplying Item A. 1. and Item A. 2. above.

4.) <u>Estimated Total Number of Drivers Not Paid the Minimum</u> : ( 90.3%)

   This represents the estimated number of  A, B and C Truck Drivers
   who failed to receive their Minimum Hourly Wage.   (See: Chart G)

5.) <u>Estimated Prime Contractor Liability</u> : ( $ 6,437,338.00)

   This amount represents the estimated savings that the Prime Contractors
   achieved by forcing their Subcontractors to negotiate Hourly Wage Rates
   below the required Prevailing Rate Minimum for Truck Drivers.

This Savings was determined by multiplying Item A. 3. and Item A. 4. above.

6.) <u>Estimated Over Time and Shift Differential Liability</u> : ($ 3,031,282.00)

An estimated 25% of all A,B,C Material Hauling Hours was done either on a Over Time, 2nd Shift, 3rd Shift or Holiday Basis. The standard and in this case the required Over Time Rate was time and a half. The actual 1996 Hourly Rate was (Zone A – Tri-Axle) $ 20.17. Therefore the Over Time Rate was ($20.17 x 0.5 = $ 10.09 + 20.17 = $ 30.26) $ 30.26 Per Over Time Hour. The estimated liability was then established by using The following formula –

1,178,320 Total ABC Hours  x 25% =  294,580

294,580 x  $ 10.09 Lost Over Time Rate =  $ 2,972,312.00

7.) <u>Interest</u> : ( $ 3,058,136.00)

Based on the fact that the Prime Contractor's actions were intentional, Interest to correct this extended past the three year normal period, to a five (5) period at the rate of 6.5% per year.

$ 6,437,338.00  + 2,972,312.00 =  9,409,650.00  x (6.5% x 5)  = $ 3,058,136.00

8.) <u>Estimated Cost to Correct Lost Driver Wages</u> : ( $ 12,757,397.00)

$ 6,437,338.00  + 2,972,312.00 + 3,058,136.00 = $ 12,467,786.00

## B.) Loss of Health and Welfare (H/W) Funds : ( $ 5,851,515.00) 

1. ) <u>Total number A,B and C Trucking Hours</u> : (1,178,320)

   As presented by MHD, these are the total Contracted Trucking
   Hours for the period covering 1991 to 1997. (See: Chart F)

2.) <u>Required Hourly Payments into Each Driver's H/W Fund</u> : ( $ 4.50)

   This rate was determined by taking the 1996 H/W Required Payment
   for all members of the Massachusetts Heavy Contraction Agreement.
   The 1996 Rate use specifically selected because it represented the average
   Rate when considering Contract Time and Volume of actual Hauling.

3.) <u>Total Potential H/W Fund Obligation</u> : ( $ 5,302,440.00)

   This Rate was determined by multiplying Item A. 1. and Item A. 2. above.

4.) <u>Estimated  Number of H/W Driver Accounts not Paid</u> : ( 90.3%)

   This represents the estimated number of  A, B and C Truck Drivers
   who failed to receive their required H/W Account Payments.
   (See: Chart  G)

5.) <u>Estimated Prime Contractor H/W Fund Liability</u> : ( $ 4,788,103.00)

   This amount represents the estimated savings that the Prime Contractors
   achieved by not paying the required Hourly A, B and C Material
   Hauling Truck Driver's H/W Account.

   This liability was determined by multiplying Item A. 3. and Item A. 4.
   above.

6.) <u>"Up Lift Fund" Corrective Action Credit</u> :  ( - $ 371,790.00.00 )

   In 1997 244 A, B, C Material Hauling Truck Drivers were provide H/W
   Account Payments so that they could immediately obtain their Benefits.
   This evaluation determined that 35 of those 244 were already receiving
   Benefits, so the corrective action effected 209 A, B C Material Hauling
   Truck Drivers.  But only 153 Truck Drivers were given credit.
   (See: Attachment B. 18.)

The Benefit cost MHD  $ 413,100.00. The formula which was used to
Determine cost for this Benefit, which should have been paid by the
Prime Contractors, was the following-

600 Hours X 153 Truck Drivers X $ 4.50 Per Hour H/W Cost = $413,100.00

Drivers have complained that because these payments were restricted
to only "active" Drivers on the CA/T Project, that some new Drivers
got immediate Benefits at the cost of old Drivers who actually failed to
receive their original H/W Payment and now lost the corrective action
which provided Benefit Coverage.

In order to provide for this Group, 10% of the "Up Lift Fund" Credit
Has been set a side for this group:

$ 413,100.00.00  -  41,310.00 = $ 371,790.00


7.) Estimated Corrected Non-Payment to H/W Accounts : ( $ 4,416,213.00)

This Rate was determined by subtracting Item B. 5. and Item B. 6. above.

$ 4,788,103.00 - 371,790.00 = $ 4,416,313.00

8.) Interest : ( $ 1, 435,302.00)

Based on the fact that the Prime Contractor's actions were intentional,
Interest to correct this extended past the three year normal period, to
A five (5) period at the rate of 6.5% per year.


8.) Estimated Cost to Correct Lost H/W  : ( $ 5,405,988.00)

This Rate was determined by adding Item B. 7. and Item B. 8. above.

$ 4,416,213.00  +  1,435,302.00  = $ 5,851,515.00

## C.) Loss of Pension Funds : ( $ 4,455,065.00 )

1. ) <u>Total number A,B and C Trucking Hours</u> :  (1,178,320)

   As presented by MHD, these are the total Contracted Trucking
   Hours for the period covering 1991 to 1997.
   (See: Chart F)

2. ) <u>Required Hourly Payments into Each Driver's Pension Fund</u> : ( $ 3.16)

   This rate was determined by taking the 1996 H/W Required Payment
   for all members of the Massachusetts Heavy Contraction Agreement.
   The 1996 Rate use specifically selected because it represented the average Rate
   when Considering Contract Time and Volume of actual Hauling.

3. ) <u>Total Hourly Pension Fund Obligations</u> :  ( $ 3,723,491.00)

   This Rate was determined by multiplying Item A. 1. and Item A. 2. above.

4. ) <u>Estimated  Number of H/W Driver Accounts not Paid</u> : ( 90.3%)

   This represents the estimated number of  A, B and C Truck Drivers
   who failed to receive their required Pension Account Payments.
   (See: Chart  G)

5. ) <u>Estimated Prime Contractor Liability</u> :  ( $ 3,362,313.00)

   This amount represents the estimated savings that the Prime Contractors
   achieved by not paying the required Hourly A, B and C Material
   Hauling Truck Driver's H/W Account.

   This Savings was determined by multiplying Item A. 3. and Item A. 4.
   above.

6. ) <u>"Up Lift Fund"</u> Corrective Action Credit :  ( - $ 00.00 )

   In 1997 244 A, B, C Material Hauling Truck Drivers were provided
   Benefit Account Payments so that they could immediately obtain their
   Benefits.

A, B and C Truck Drivers were specifically approved for Pension
Account Fund Contributions but these payments were never made.

7.) <u>Estimated Non-Payment to Pension Accounts</u> : ( $ 3,362,313.00)

This Rate was determined by subtracting Item C. 5. and Item C. 6. above.

8.) <u>Interest</u> : ( $ 1092,752.00)

Based on the fact that the Prime Contractor's actions were intentional,
Interest to correct this extended past the three year normal period, to
A five (5) period at the rate of 6.5% per year.

9.) <u>Estimated Cost to Correct Lost H/W</u> : ( $ 4,455,065.00)

This Rate was determined by adding Item C. 7. and Item C. 8. above.

69

## D. – DAMAGES (SMALL TRUCKING COMPANIES)

Because of the discriminatory policies, practices and operating procedures against A,B,C Hauling Small Trucking Companies and the election of MHD not to address these issues until 1997, it was determined that follow-up action would have to be taken to identify any Small A,B,C Trucking Company that lost equal opportunity to participate in CA/T Project Subcontracting from 1991 to 1997.

Those Small A,B,C Trucking Companies who can demonstrate that they had the Ability to Perform; Interest in Performing; and Opportunity to Perform but elected not to as a result of the conditions and requirement that included:

1.) Having to pay their Truck Driving Employees at Hourly Rates less then the required Job Minimum.

2.) Having to refuse their Truck Driving Employees the required Health and Welfare Union Benefits.

3.) Having to refuse their Truck Driving Employees the required Pension Union Benefits.

4.) Having to accept a CA/T Project-wide mandatory "A,B,C Hourly Trucking Rate" that failed to consider actual expenses that thereby requiring the Small A,B,C Trucking Company to function under adverse business conditions.

Those A,B,C Trucking Companies that can show Loss as a result of Discrimination in Public Contraction should be reimbursed for those losses. The following formula was used to establish base Funding for this Group:

Total Number of A,B,C "Owner/Operators" Contractors          58
Projection of Trucking Companies able to demonstrate          9
     (58 x 15 % = 8.7 = 9)

Determining possible Income

### Projection with Two Trucks

a.) The Number of Trucking Hours in Year ( 2080 x .85 = 1768)
b.) 1st Shift Hours (1768 x 2 Trucks = 3536)
c.) 2nd Shift Hours ( 1768 x 85% of Time = 1503 x 2 Trucks = 3006)
d.) Margin Per Truck ($ 65.00 Truck Rate x 10 % = $6.50 X 2 Trucks = $13.00)
e.) Formula

3536 + 3006 = 6,542 Hours x $ 13.00 = $ 85,046.00  x  5 Years  =  $ 425,230.00

$ 425,230.00 x  9 Projected Contracts = $ 3,827,070.00

70

The election of CA/T Prime Contractors to communicate to MHD one Market Hourly
Rate for A, B, C Material Hauling, then to Set a different Hourly Rate with the Small Trucking
Companies suggests a problem.  Further the Prime Contractors knew or should
have known that any Hourly Rates below $ 65.00  for Tri-Axle Short Distance Hauling
A, B, C Materials was unrealistic.  Most of the Under Payment of the Market Hourly
Rate was address in regards to the Truck Driver Wage, H/W  and Pension Payments.  To address
the Issue of the Small Company Under Payment, the following formula was used:

| | |
|---|---|
| Total A, B, C, Hauling Hours (1991 to 1997) | 1,178,320 |
| Average Hourly Trucking Company Profit | x    2.50 |
| | $ 2,945,800.00 |

$ 45.00 Rate  + $ 55.00 Rate = Averaged to $50.00 Per Hour
$ 50.00 Per Hour x 0.05 % Margin = $2.50

The failure to honor the Market Hourly Trucking clear forced the Small Trucking Companies
to reduce individual Truck Driver Wages.  Corrective Actions have been Recommended to
resolve the Truck Driver Lost of Wages   further action is
judged not necessary.

71

## E. DAMAGES (DUXBURY TRUCKING, INC.)

1.) Loss of Equipment and/of Lease Options :  $ 130,260.00

| ITEM | LEASE DATE | VALUE | REQUIRED PURCHASE |
|------|-----------|-------|-------------------|
| Tri-Axle Truck | 5-22-96 | $97,500.00 | YES |
| Ford F-260 Truck | 5-22-96 | 26,235.00 | YES |
| Tri-Axle Plow | 10-96 | 1,675.00 | YES |
| Tri-Axle Sander | 4-15-97 | 4,000.00 | YES |
| Tri-Axle Front End Support Equipment | | 850.00 | YES |
| | | -------------- | |
| | | $ 130,260.00 | |

2.) Loss of Cash related to Business Start-up :  $ 37,045.00

3.) Loss related to administrative processes to bring matter to closure : $27,200.00

   Hall for Truck Driver Meetings  4  x $800.00 = $ 3,200.00

   Monthly Telephone Bill at $400.00 per month for 60 months = $ 24,000.00

4.) Loss of Profit reasonable Corporate Income: $ 225,000.00

   $ 45,000.00 per year  x  5 years =  $ 225,000.00

5.) Legal Fees : $ 3,500.00

6.) Interest on Loss :  $ 137,477.00

   6.5 %   x  5  Years x $ 423,005 = $137,477.00

7.) Duxbury should be paid back their payments to Modern Continental   $ 18,402.50

   The entire Loan the Entire Loan should be covered by the "Up Lift Fund".
   The entire Loan was for $ 61,078.00 including interest.

## 8.) COMPAMY DAMAGES                            $ 578,884.00

## F. DAMAGES (DUXBURY TRUCKING EMPLOYEE)

**1.) Loss Wages :**                                           **$ 401,926.00**

    a.)  Administrative Work Year                    2080

    b.)  Outside Construction Work Year            1768
       ( 85% of Administrative Year)

    c.)  Tri-Axle "Fully Loaded" Hourly Rate        29.58

    d.)  Annual Tri-Axle Trucker Driver Income      $ 98,115.00

      ( 1768 Hours  X  $ 29.58  Regular Hourly Rate =  $  52,297.00)
      (1768 X 25% Over Time  =  442 Hours x 10.29 = $ 45,818.00)
      ( $ 52,297.00 + 45,818.00 =  $ 98,115.00)

    e.)  Four Years of liability                   $ 392,460.00
       (1996-1997; 1998-99; 99-00; 00-01)
       ( $ 98,115.00 Annual Income X  4 Years = $ 392,460.00)

    f.)  Two week vacation as per Union             $   9,466.00
       Agreement for four years

      ( $ 29.58 x 80 =  $ 2,366.00  x  4  = $ 9,466.00)

    g.)  Total Lost Income $401,926.00)

      ( $ 392,460.00 + $ 9,466.00 =  $ 401,926.00)

**2.) Less $ 600.00 paid into Health and Welfare Fund in 1997**        **- 600.00**

    $ 401,926.00  -   600.00  =  $ 401,326.00

**3.) Interest on lost Income**                                **$ 104,345 .00**

    $ 401,326.00 X   6.5%   X  4 Years = $ 104,345.00

## 4.) INDIVIDUAL DAMAGES                              $ 505,671.00

    $ 401,326  +  104,345.00  =  $ 505,671.00

# D. CHARTS

**D**

VII. CHARTS:                                                              73 - 74

  A. ALL TRUCKING CLASSIFICATIONS AND                             75
     WBE/DBE REPRESENTATION

  B. TRUCKING CONTRACTS AND WBE/DBE                                 76
     REPRESENTATION

  C. ALL CONTRACTED TRUCKING HOURS AND                              77 - 78
     "ACKNOWLEDGED" UNPAID BENEFITES

  D. LISTING OF ALL HAZARDOUS MATERIALS                             79
     HAULING CONTRACTS

  E. LISTING OF ALL COMBINATION HAZARDOUS/A,B,C                     80
     MATERIAL HAULING CONTRACTS

  F. ALL A, B, C MATERIAL HAULING CONTRACTS                         81 - 82

  G. ALL TRUCKING CONTRACTS BY CONTRACTOR                          83 - 84
     STATUS AND TRUCK DRIVER BENEFIT COVERAGE

  H. HAULING CLASSIFICATIONS BY CONTRACTOR                          85
     STATUS AND TRUCK DRIVER GROUPINGS

  I. ALL CONTRACTED TRUCKING HOURS AND GROUPINGS                    86
     OF UNPAID TRUCK DRIVER BENEFITS

  J. LISTING BY CONTRACTOR STATUS OF ALL KNOWN TRUCK                87
     DRIVER BENEFIT GROUPS

  K. TRUCK DRIVER ELIGIBLITY RANKING BY CONTRACTOR                  88
     STATUS

  L. TRUCK DRIVER WITHIN GROUP REPRESENTATION BY                    89
     CONTRACTOR STATUS

  M. MISSING CONTRACTOR INFORMATION                                90 – 92

# D.  CHARTS (continued)

R.  "OWNER/OPERATORS" AND BENEFITS — 93

S.  "OWNER/OPERATOR" REPRESENTATION — 94

T.  ALL TRUCKING CONTRACTS AND "OWNER/OPERATORS" — 95 - 96

U.  "OWNER/OPERATORS" AND BENEFIT COVERAGE BY CONTRACT — 97 - 98

R.  "ACKNOWLEDGED" TRUCK DRIVERS WITH BENEFITS BY CONTRACTOR STATUS — 99

S.  "ACKNOWLEDGED" TRUCK DRIVERS WITHOUT BENEFITS BY CONTRACTOR STATUS — 100

T.  A, B, C HAULING CONTRACTOR ESTIMATED DAMAGES BY CONTRACT — 101 - 105

U.  A, B, C PRIME CONTRACTOR GROUPED ESTIMATED DAMAGES — 106 - 107

V.  CONTRACT PRICING ANALYSIS — 108

W.  LISTING OF 1997 CA/T CONTRACTORS FOUND IN VIOLATION OF MASSACHUSETTS PREVAILING RATE LAW AFTER STRIKE — 109

X.  SUMMARY OF ESTIMATED SETTLEMENT COSTS — 110

Y.  ESTIMATED SETTLEMENT COSTS (DUXBURY TRUCKING) — 111

Z.  ESTIMATED SETTLEMENT COSTS (DUXBURY EMPLOYEE) — 112

AA.  ESTIMATED SETTLEMENT COST (LOST WAGES CLASS) — 113

BB.  ESTIMATED SETTLEMENT COST(LOST HEALTH/WELFARE CLASS) (LOST HEALTH/WELFARE CLASS) — 114

CC.  ESTIMATED SETTLEMENT COST (LOST PENSION CLASS) — 115

DD.  ESTIMATED SETTLEMENT COST (LOST OF EQUAL ACCESS CLASS) — 116

EE.  BELOW MARKET PRICING — 117

# CHART A.

## ALL TRUCKING CLASSIFICATIONS
## AND
## WBE/DBE REPRESENTATION

### (UNTIL 1997 AGREEMENT)

| TRUCKING CLASSIFICATIONS | TOTAL CONTRACTORS | TOTAL WBE | TOTAL MBE,WBE,DBE |
|---|---|---|---|
| Hazardous Materials | 128 | 11 ( 8.6%) | 14 (10.9%) |
| Hauling A, B, C Materials | 108 | 19 (17.6%) | 57 (52.8%) |
| Total Contractors | 236 | 30 (12.7%) | 71 (30.1%) |
| | | | |
| CA/T Project Goal | | --- 10.0% --- | |
| CA/T Project Accomplishment | | --- 11.0% --- | |

# CHART B.

## TRUCKING CONTRACTS
## AND
## WBE/DBE TRUCKING REPRESENTATION

## (BEFORE 1997 AGREEMENT)

| | TOTAL TRUCKING | DIRECT SUB-CONTRACTOR | |
| | | | TOTAL |
| CLASSIFICATIONS | CONTRACTS | WBE | WBE, MBE ,DBE |
|---|---|---|---|
| HAZARDOUS MATERIALS | 6 | 2 (33.3%) | 4 (66.7%) |
| A, B, C, MATERIALS | 22 | 6 (27.2%) | 18 (81.8%) |
| COMBINATION HAZ./ABC | 2 | 2 (100.0%) | 2 (100.0%) |
| | ------- | -------------- | ---------------- |
| | 30 | 10 (33.3%) | 24 (80.0%) |

# CHART C.

# ALL CONTRACTED TRUCKING HOURS
# AND
# "ACKNOWLEDGED" UNPAID BENEFITS

## (BEFORE 1997 AGREEMENT)

| #<br>CONTRACT | TOTAL # OF<br>TRUCK DRIVERS | TOTAL #<br>TRUCKING HOURS | TOTAL # UNPAID<br>TRUCKER BENEFITS |
|---|---|---|---|
| CO1A2 | 2 | 1,000 | 2 |
| CO1A3 | 11 | 107,500 | 6 |
| CO4A1 | - | 2,560 | - |
| CO5A1 | - | 44,830 | - |
| CO7D2 | 24 | 29,000 | 24 |
| CO9A4 | 9 | 143,000 | 5 |
| CO9A7 | 5 | 70,000 | 0 |
| CO9A8 | 9 | 23,000 | 9 |
| CO9B1 | - | 34,000 | - |
| CO9B3 | 101 | 25,000 | 96 |
| CO9C1 | 2 | 18,000 | 2 |
| C11A1 | 27 | 210,500 | 18 |
| C12A3 | 12 | 45,000 | 10 |
| C14A1 | - | 5,890 | - |
| C14C1 | 5 | 16,000 | 5 |
| C14C4 | 2 | 1,140 | 2 |

PAGE 1 OF 2

# CHART C.
**(continued)**

## ALL CONTRACTED TRUCKING HOURS
## AND
## "ACKNOWLEDGED" UNPAID BENEFITS

### (BEFORE 1997 AGREEMENT)

| # CONTRACT | TOTAL # OF TRUCK DRIVERS | TOTAL # TRUCKING HOURS | TOTAL # UNPAID TRUCKER BENEFITS |
|---|---|---|---|
| C15A1 | - | 178,000 | - |
| C15A3 | 1 | 41,390 | - |
| C17A1 | - | 100,000 | - |
| C17A2 | 13 | 36,000 | 13 |
| C17A3 | 2 | 7,940 | 1 |
| C17A9 | 14 | 100,000 | 14 |
| C19B7 | 5 | 500 | 2 |
| C19B8 | - | 7,000 | - |
| C19D7 | - | 3,000 | - |
| C21A2 | 1 | 4,780 | 0 |
| C21AB | - | 2,790 | - |
| | 244 | 1,257,820 | 209 (85.7%) |

- = Information not available in reviewed CA/T Project Files.

Page 2 of 2