UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____
DUXBURY TRUCKING, INC.,            )
                                   )
        Plaintiff,                 )
                                   )
    v.                             )
                                   )
MASSACHUSETTS HIGHWAY DEPARTMENT,  )
MASSACHUSETTS TURNPIKE AUTHORITY,  )
EDWARD W. MORRIS, JR., Federal     )
Highway Administration, (Former)   )
Associate Administrator for Civil  )    C.A. No. 04-12118
Rights, BRENDA ARMSTEAD, Federal   )
Highway Administration, Equal      )
Opportunity Specialist, ARTHUR     )
("GENE") ARMSTEAD, Federal Highway )
Administration, Civil Rights Team, )
STANLEY GEE, Federal Highway       )
Administration, District           )
Administrator, COMMONWEALTH OF     )
MASSACHUSETTS, FEDERAL HIGHWAY     )
ADMINISTRATION,                    )
        Defendants.                )
_____
GERTNER, D.J.:

**MEMORANDUM AND ORDER RE: MOTIONS TO DISMISS**
September 13, 2005

I.    **INTRODUCTION**

    Duxbury Trucking, Inc. ("Duxbury"), a certified Woman-Owned

Business Enterprise ("WBE"), was a subcontractor on the Central

Artery/Tunnel Project (the "Big Dig"), a multi-billion dollar

interstate highway project in Boston, Massachusetts.  Duxbury

brought allegations of sex discrimination and due process

violations against three categories of defendants involved in the

Big Dig:  1) officials of the Federal Highway Administration

("FHA"), which is a part of the United States Department of

Transportation ("DOT"); 2) the Massachusetts Turnpike Authority ("MTA"); and 3) the Massachusetts Highway Department ("MHD").  It has since filed a motion to amend its complaint to include officials of the MTA and the MHD as defendants [docket entry # 26].  The motion to amend is hereby **GRANTED** as to the incorporation of these officials.[1]  Plaintiff seeks damages from all defendants.

The state agencies and federal officials have filed motions to dismiss on a number of grounds described below [docket entries ## 9, 18, 22].  On June 10, 2005, a hearing (the "Hearing") was held on these motions.

All of Duxbury's claims rest on its WBE status, which has significant implications for its success as a small minority business.  As a matter of policy, the FHA aims to increase the participation of certified minority business enterprises ("MBEs"), including WBEs, in federal-aid highway contracts.  <u>See</u> <u>infra</u> note 4.  DOT regulations in effect at the time of Duxbury's work on the Big Dig required state highway agencies to implement training and assistance programs for MBEs, and recipients of financial assistance from the DOT to ensure that minority businesses have the maximum opportunity to participate in the performance of contracts financed with federal funds.  <u>See</u> <u>id.</u>

---

[1] Overall, plaintiff's motion to amend is **GRANTED** in part and **DENIED** in part.  <u>See</u> <u>infra</u> Parts III.A.2, III.B.2.a.

Even though the state defendants managed the Big Dig using federal funds, at the Hearing, they disclaimed all responsibility for enforcing any statutes or regulations on behalf of WBEs.

This Court has come to see the complexity of giving legal meaning to Duxbury's serious allegations, but refrains from dismissing the complaint entirely at this early stage.  The state agencies' motions to dismiss [docket entries ## 18, 22] are HEREBY **GRANTED** in part and **DENIED** in part, and the federal agency's motion to dismiss [docket entry # 9] is HEREBY **DENIED**. The state agencies' motions to dismiss will be granted fully, unless plaintiff can demonstrate within **60 DAYS** that equitable estoppel should apply to its state claims.  By **October 21, 2005**, plaintiff may conduct limited discovery on the equitable estoppel issues and file supplemental materials, to which defendants shall respond by **November 4, 2005**.  In addition, the federal defendants may file a supplemental brief on immunity by **October 21, 2005**, to which plaintiff shall respond by **November 4, 2005**.

## II.  <u>RELEVANT FACTS</u>[2]

Plaintiff Duxbury has been a Massachusetts trucking corporation since 1996, and a certified WBE since April 1, 1998. Duxbury claims that, while it worked as a subcontractor on the Big Dig, the MHD and the MTA, two state agencies intimately

---

[2] Pursuant to the well-established standard for deciding a motion to dismiss, I accept the allegations in Duxbury's complaint as true.  <u>See</u> <u>infra</u> Part III.

involved with the project, subjected it to sex discrimination and deprived it of its Fourteenth Amendment property right (pursuant to its WBE status) to continue work on, and compete for, contracts on the Big Dig. In addition, Duxbury alleges that, when it filed a complaint with the FHA against the MHD and the MTA, Edward Morris ("Morris"), former FHA Associate Administrator for Civil Rights, Stanley Gee ("Gee"), FHA District Administrator, Brenda Armstead ("B. Armstead"), FHA Equal Opportunity Specialist, and Gene Armstead ("G. Armstead"), former FHA Director of Civil Rights for the Eastern Resource Center, conspired by agreement to deprive it of its property rights without due process in violation of the Fifth Amendment.

### A.    The State Defendants

The MTA managed the Big Dig through a Memorandum of Understanding ("Memorandum") with the MHD, which received Federal-Aid Highway Trust Funds for the project. According to the Memorandum, the MTA was subject to the same obligations as the MHD. The MTA entered into an agreement with Bechtel/Parsons-Brinkeroff ("B/PB"), transferring overall project management responsibilities to B/PB. In November 1989, B/PB and the AFL-CIO entered into a Project Labor Agreement ("PLA"), and the MHD required all Big Dig contractors to be bound by the PLA. In turn, the PLA required all contractors working on the Big Dig to pay base hourly wage rates to their employees and to make

contributions to established employee benefit funds. At the same time, the Massachusetts Prevailing Wage Law ("Prevailing Wage Law") indicated, "laborers in the construction of public works by the commonwealth . . . shall not be [paid] less than the rate or rates of wages to be determined by the commissioner." Mass. Gen. Laws ch. 149 § 26 (West 2005).

Duxbury contracted with prime contractors and subcontractors on the Big Dig to haul sand and gravel, never contracting directly with the state.[3] It acquired the bulk of its Big Dig contracts in 1996. Under a June 1996 contract with Willie Jones Trucking ("Willie Jones"), a subcontractor of the prime contractor, Perini Corporation ("Perini"), Duxbury was paid $44/hour and was required to pay its employees a prevailing wage rate of $20.17 and a benefits package of $8. Neither Perini nor Willie Jones submitted payroll forms to the MHD, though they were required to do so under state law. In the face of the same wage rate and benefits requirements, Duxbury also entered a July 1996 contract with Mass. Gravel, earning $50/hour, and an August 1996 contract with Mary O'Donnell, earning $45/hour. Finally, Duxbury's November 1996 contract with Great Northern Site Development was cut short after a week because plaintiff refused to sign a blank prevailing wage certification form.

---

[3] Duxbury asserts that there were more WBEs working as A, B, and C Material Haulers, the trucking classification that covered Duxbury, than in any other trucking classification on the Big Dig.

Plaintiff alleges that the hourly rate ("trucking rate") set by the Big Dig prime contractors was too low for it to pay its employees the prevailing wage rate while covering operating costs, that the prime contractors failed to deposit appropriate funds for benefits, and that the state agencies did nothing about this. To conceal their inadequate pay rates, plaintiff contends that the prime contractors chose not to collect certified payroll records and/or directed WBEs to falsify payroll records so that it would appear as though the parties had met their obligations under Massachusetts law and their various contracts. Refusing to falsify its records, plaintiff was forced to "park her trucks" and stop short of completing several contracts in 1996.

In May 1997, Duxbury participated in a truck drivers' demonstration on these issues. In response, the MHD, B/PB, Department of Labor, Teamsters Local Union, and representatives of the trucking industry attempted to address the trucking rate problem by entering into an agreement ("Uplift Agreement"). The Uplift Agreement was to improve the hourly trucking rate, so that A, B, and C Material Haulers, see supra note 3, could pay their employees the prevailing hourly wage rate, and force general contractors to pay into health and pension funds as provided by the state prevailing wage statute. It increased hourly trucking rates from $40-45 to $60-65, and the MHD and B/PB agreed to monitor compliance with the Prevailing Wage Law. The B/PB had to

ensure that prime contractors required subcontractors and brokers to comply with the prevailing wage standard, and the MHD and the MTA had to oversee and objectively review the actions or inactions of B/PB and the extent to which prime contractors met their responsibilities.  The Agreement was supplemented on September 24, 1997, to ensure employer contributions to benefits packages.

Nonetheless, the MHD and the MTA allegedly continued failing to oversee prevailing wage requirements.  Duxbury entered several contracts with one prime contractor, Modern Continental, Inc. ("Modern"), after the Uplift Agreement took effect, continuing to earn less than the required hourly trucking rate, such that it could not both pay its employees the prevailing hourly wage rate and stay in business.

On September 16, 1997, plaintiff entered into a year-long contract with Modern, which paid $65/hour.  At roughly the same time, Duxbury arranged to pay back to Modern $10 for each hour that it worked, in order to repay three loans set up by the MHD for lease payments on Duxbury's parked trucks.  The payments were taken immediately out of invoices generated by Modern for completed work.  In addition, Modern exacted 8% interest on the loan.

Duxbury's year-long relationship with Modern included several written contracts dated September 16, 1997, September 19,

1997, January 17, 1998, and June 15, 1998.  The June 15 contract
was the only one that Duxbury entered *after* receiving WBE
certification from the Massachusetts State Office of Minority and
Women Business Assistance on April 1, 1998; all other contracts
preceded certification.  As of June 15, 1998, Duxbury allegedly
hauled materials for Modern on a regular basis until November 28,
1998.  Plaintiff resumed hauling for Modern on April 10, 1999,
and continued to do so until May 28, 1999, when it ceased
operations.  Though there appears to be no written contract for
this second round of hauling, plaintiff allegedly completed
projects for Modern totaling at least $56,800.55 between June 15,
1998, and May 28, 1999.

Duxbury claims that, though it had an excellent loan
repayment record with Modern, it could not continue covering
prevailing wage rates and benefits while effectively earning
$55/hour.  As a result, plaintiff ran out of capital and lost her
trucks in 1999.

### B.    **The Federal Defendants**

Since the Big Dig received substantial federal funding, the
federal government, through the FHA, was responsible for ensuring
that these funds were used responsibly and lawfully.  On or about
September 27, 2000, Duxbury filed a complaint with the FHA,
alleging that the MHD and the MTA discriminated against it as a
WBE.  Defendant Morris was assigned to handle the complaint and

-8-

the ensuing investigation.  Defendants B. Armstead, G. Armstead, and Gee contributed to the FHA's response to Duxbury's complaint. While the complaint was pending, "several of these individuals" allegedly told Duxbury to "bear with" the process because a finding of discrimination would be forthcoming and would translate into a monetary award.  The FHA even generated an initial report finding that Duxbury was the victim of discrimination as a WBE.  Nonetheless, on March 3, 2003, Morris denied the complaint and, on June 19, 2003, he denied Duxbury's request for reconsideration.

Shortly thereafter, plaintiff filed a Freedom of Information Act ("FOIA") request for the materials generated by the FHA during the investigation of its complaint.  The FHA produced some, but not all, of these documents in April 2004.  Defendants have yet to produce and provide a final report as required by applicable regulations.

**III. LEGAL ANALYSIS**

Defendants move to have plaintiff's complaint dismissed, primarily pursuant to Fed. R. Civ. P. 12(b).  In deciding motions under this rule, a court must take as true allegations of the non-moving party and resolve all factual disputes in his or her favor.  See 5B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1351 (3d ed. West 2005) [hereinafter "Wright & Miller"].

In particular, all defendants allege that plaintiff fails to state a claim upon which relief can be granted. <u>See</u> Fed. R. Civ. P. 12(b)(6). The test most often applied to determine the sufficiency of a complaint was set out by the Supreme Court in <u>Conley v. Gibson</u>:

> In appraising the sufficiency of the complaint we follow, of course, the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears *beyond doubt* that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.

355 U.S. 41, 45-46 (1957) (emphasis added); <u>see also</u> Wright & Miller § 1357.

To this end, it has been universally accepted that: 1) the complaint is to be construed in the light most favorable to the plaintiff; 2) its allegations are to be taken as true; and 3) all reasonable inferences that can be drawn from the pleading are to be drawn in favor of the pleader. <u>See</u> Wright & Miller § 1357.

The pleader is further aided by the liberal pleading requirements of Fed. R. Civ. P. 8(a)(2), which states, "[a] pleading which sets forth a claim for relief . . . [should] contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief."

### A.    The State Defendants

Duxbury contends that, in failing to enforce the Prevailing Wage Law and their various contractual obligations, and thereby forcing a WBE out of competition for Big Dig contracts, the MHD

and the MTA allegedly violated: 1) 23 U.S.C. § 324, the prohibition on sex discrimination in highway projects receiving federal assistance, as enforceable through Title VI of the Civil Rights Act of 1964 ("Title VI"), 42 U.S.C. § 2000d, and its various implementing regulations; and 2) 42 U.S.C. § 1983 and the Due Process Clause of the Fourteenth Amendment.

Both the MTA and the MHD argue that, pursuant to Fed. R. Civ. P. 12(b)(6), plaintiff has failed to state a claim upon which relief can be granted for the following reasons: 1) regarding its sex discrimination claim (Count I), plaintiff failed to allege intentional discrimination, which is a necessary element of a gender discrimination claim under 23 U.S.C. § 324; 2) regarding its due process claim (Count II), plaintiff failed a) to identify a constitutionally-protected property interest of which the MTA/MHD deprived it without due process, and b) to allege sufficiently that any actions or omissions by the MTA/MHD actually caused the loss of any such alleged property right.

If this Court does not dismiss the case on the ground of failure to state a claim, the MTA argues that it should enter a dismissal because the statute of limitations for both claims has run. In addition, the MHD alleges that: 1) plaintiff's sex discrimination count, which it deems enforceable through Title VI, fails to state a claim upon which relief can be granted because Title VI does not prohibit discrimination on the basis of

-11-

*sex*; 2) the sex discrimination claim is barred by the Eleventh Amendment; and 3) the due process claim is barred because the MHD is not a person subject to suit under § 1983.

### 1.   **Failure to State a Claim**

### a.   **Intentional Discrimination Requirement**

The complaint alleges that, as recipients of federal funds, the MHD, the MTA, its sub-recipients, agents, and contractors are subject to the provisions of 23 U.S.C. § 324, as enforceable through Title VI and its implementing regulations.[4]  In the absence of more rigorous oversight by the MTA/MHD, Duxbury asserts that the trucking rates paid to it by the prime contractors were too low for it to work profitably, and that this

---

[4] Defendants allegedly violated the following federal regulations (in some instances, I have chosen to emphasize provisions within a section, even if they are not specifically highlighted in the complaint, because they help explain federal and state obligations): 1) 49 C.F.R. § 21, which requires assurances from states that no person in the United States shall, on the grounds of race, color, or national origin, be subject to discrimination under any program or activity for which the recipient receives federal assistance from the Department of Transportation, see 49 C.F.R. § 21.7; 23 C.F.R. § 200.9(a)(1); 23 C.F.R. § 200.9(a)(2) ("The FHWA considers all assurances heretofore received to have been amended to include a prohibition against discrimination on the ground of sex"); 2) 23 C.F.R. § 200, which provides guidelines for implementing the FHA's Title VI compliance program, requiring "State program area officials and Title VI Specialist [to] conduct annual reviews of all pertinent program areas to determine the effectiveness of program area activities at all levels," 23 C.F.R. § 200.9(a)(4); 3) 23 C.F.R. § 230, which seeks to promote the FHA's policy to increase participation of minority business enterprises (including WBEs) in federal-aid highway contracts by requiring state highway agencies to implement training and assistance programs, see 23 C.F.R. §§ 230.203, 230.204; and 4) 49 C.F.R. § 23, subchapter C, which instructs that recipients of financial assistance from the Department of Transportation (or their contractors) must ensure that minority businesses have the "maximum opportunity to participate in the performance of contracts and subcontracts financed in whole or in part with Federal funds . . . ."  49 C.F.R. § 23.43(a)(2) (this subchapter was removed and reserved on February 2, 1999, but it was in effect during the time frame at issue in the complaint).

amounted to sex discrimination because the agencies' regulatory violations "had a *disproportionate effect* on women-owned businesses, including the plaintiff's business . . . [as] more WBE/DBE contractors worked as A, B, and C Material Haulers than in any other trucking classification on the CA/T [Big Dig]." Complaint ¶ 60 (emphasis added). The MTA and the MHD argue that 23 U.S.C. § 324 does not reach disparate impact claims and that plaintiff failed to allege the requisite intentional discrimination.[5]

More specifically, the MTA contends that 23 U.S.C. § 324 does not reach disparate impact claims because it is explicitly linked with Title VI, which only reaches intentional discrimination claims. Section 601 of Title VI provides that no person shall, "on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d (West 2005). Section 602 authorizes federal agencies "to effectuate the provisions of section 2000d . . . by issuing rules, regulations, or orders of general applicability . . . ." 42

---

[5] Though the standard used to evaluate a motion to dismiss for failure to state a claim is a liberal one, "general interpretation of a civil rights complaint may not supply an essential element of a claim not appearing in the complaint." Harris v. White, 479 F. Supp. 996, 1001 (D. Mass. 1979).

At the Hearing, plaintiff's counsel conceded that Duxbury does not assert intentional discrimination. June 10, 2005, Hearing Tr. at 31:14-21 [hereinafter "Hearing Tr."].

U.S.C. § 2000d-1 (West 2005).  Mirroring the language of Title

VI, 23 U.S.C. § 324 provides:

> No person shall on the ground of sex be
> excluded from participation in, be denied the
> benefits of, or be subjected to
> discrimination under any program or activity
> receiving Federal assistance under this title
> [Highways] or carried under this title.[6]
> This provision will be enforced through
> agency provisions and rules similar to those
> already established, with respect to racial
> and other discrimination, under title VI of
> the Civil Rights Act of 1964.

As the MTA asserts, § 324's adoption of Title VI language and

"agency provisions and rules similar to those already

established" would seem to extend the discrimination prohibitions

of Title VI to outlaw gender discrimination on federal highway

projects.  Accordingly, the MTA urges that this Court look to

judicial interpretations of Title VI to assess plaintiff's § 324

claim because of the "explicit link between Section 324 . . . and

Title VI."[7]  MTA's Mem. at 8 n.3.

    While the MTA is correct that § 601 of Title VI "prohibits

only intentional discrimination . . .[,] regulations promulgated

under § 602 of Title VI may validly proscribe activities that

_____

    [6] The Big Dig received substantial federal and state funding.  See
supra; Complaint ¶ 20.

    [7] However, the MHD argues that Count I, entitled "discrimination on the
basis of sex in violation of 23 U.S.C. § 324 as enforceable through Title VI
of the Civil Rights Act," fails to state a claim upon which relief can be
granted because Title VI explicitly prohibits discrimination on the basis of
race, color and national origin, but not on the basis of sex.  While I think
the phrase "enforcement through Title VI" overstates the literal meaning of §
324 language (enforcement "similar to" Title VI), it does not dictate
dismissal in and of itself.

-14-

have a disparate impact on racial groups, even though such
activities are permissible under § 601." <u>Alexander v. Sandoval</u>,
532 U.S. 275, 280-81 (2001).  But the MTA has an answer to this
as well -- even assuming that the regulations plaintiff cites
apply to the MTA, the Supreme Court in <u>Sandoval</u> held that Title
VI does not create a private right of action to enforce
regulations promulgated under § 602.  <u>See</u> <u>id.</u> at 293.  While, as
Stevens' dissent stressed, this outcome is troubling, it is
nonetheless the current law.  532 U.S. at 293-316 (Stevens,
dissenting).

     In its opposition brief, plaintiff retorts that it may still
enforce its claim "as a private attorney general in the absence
of any other enforcement authority" because the state and federal
agencies have failed in their enforcement duties.  Pl.'s Opp.
Mem. at 6.  However, plaintiff's counsel acknowledged at the
Hearing that he was "pushing the envelope" with this theory.
Hearing Tr. at 31:20.  Accordingly, the case law he cites proves
unpersuasive.

     First, plaintiff submits that the Supreme Judicial Court of
Massachusetts in <u>Pearson v. Board of Health of Chicopee</u>, 402
Mass. 797 (1988), recognized the necessity of an enforcement
action by a private party when public resources either cannot or
will not enforce a law that supports an important public policy.
However, the <u>Pearson</u> court did not grapple with the issue of

-15-

whether or not the plaintiffs, private parties bringing an action under state law, had a private right of action. The court noted that the lower court judge recognized plaintiffs' enforcement of an important public policy that would otherwise be in the hands of overburdened district attorneys. However, it refused to award the plaintiffs attorneys' fees, despite the argument that members of the public should be given such incentive to enforce public rights. The case does nothing to overcome the United States Supreme Court's conclusion that Congress has not granted private individuals a cause of action under regulations issued pursuant to Title VI. Similarly, the fact that the First Circuit in <u>Gay Officers Action League v. Puerto Rico</u>, 247 F.3d 288 (1st Cir. 2001), found that private parties to a discrimination action under § 1983 constituted prevailing parties entitled to a fee award because they "settled a significant issue whose resolution benefitted the plaintiffs and the public" also does little to further plaintiff's theory. <u>Id.</u> at 295.

Thus, under United States Supreme Court law, plaintiff does not have a private right of action pursuant to its disparate impact claim. Therefore, in alleging only disparate impact, it fails to state a claim for which relief can be granted.

Accordingly, defendants' motion to dismiss Duxbury's sex discrimination claim is **GRANTED**.[8]

### b.    Constitutionally-protected Property Interest

Plaintiff also alleges that, in failing to ensure that contractors paid sufficient funds for plaintiff to meet its employee obligations under the Prevailing Wage Law, defendants deprived plaintiff, without due process of law, of its property right to continue work on existing Big Dig contracts and to compete for additional contracts as a WBE. Thereby, defendants violated 42 U.S.C. § 1983 and the Due Process Clause of the Fourteenth Amendment.

Plaintiff appears to bring a procedural due process claim, since it attacks the procedures (or lack thereof) used to enforce the law, rather than the substance of the law.[9] See 2 Rotunda & Nowak, Treatise on Constitutional Law - Substance & Procedure § 15.4 (3d ed. West 2005) [hereinafter "Rotunda & Nowak"]. In establishing a procedural due process claim under § 1983, a plaintiff, first, must allege that it has a property interest as defined by state or federal law and, second, that the defendants, acting under color of state law, deprived it of that property

---

[8] The MHD also argues that Duxbury's sex discrimination claim is barred by the Eleventh Amendment because, while Congress explicitly abrogates sovereign immunity under Title VI, this abrogation does not apply to § 324. Since there is no private right of action for disparate impact claims under Title VI/§ 324, the sovereign immunity issue need not be reached.

[9] Although Duxbury's claim does not fit neatly within the procedural due process framework either.

interest without constitutionally adequate process.  See PFZ
Properties, Inc. v. Rodriquez, 928 F.2d 28 (1st Cir. 1991); see
also Rotunda & Nowak § 17.5.

Plaintiff insists that it has a protected property interest
in its state-certified status as a WBE because the certification
was a benefit conferred by the government (and denied when, by
1999, it could no longer operate).  While defendants argue that
Duxbury's property interest in its status was contingent upon an
expectation of future benefit, Duxbury contends that its status
became an entitlement that formed a property interest when it
secured, and benefitted from, contracts as a WBE.

Plaintiff is correct that one has a protected property
interest in specific government benefits, such as welfare or
tenured public employment, when legitimately entitled to them.
See Board of Regents of State Colleges v. Roth, 408 U.S. 564,
576-77 (1972).  Entitlement requires more than a unilateral
expectation or abstract desire for the benefit, but it does not
mean that one is already in possession of the benefit (e.g.,
plaintiffs in Goldberg v. Kelly, 397 U.S. 254 (1970), grounded a
claim for entitlement to welfare payments in the statutory terms
of eligibility, even though they had yet to prove their
eligibility).  See id. at 577.

Under these standards, it reasonably can be said that
plaintiff has a cognizable property interest in its WBE status,

-18-

as a government benefit conferred to increase its opportunity to compete for federally-funded public works contracts.  <u>See</u> <u>Baja</u> <u>Contractors, Inc. v. City of Chicago</u>, 830 F.2d 667, 676 (7th Cir. 1987) ("Baja therefore has established a likelihood of showing that it has a protected property interest in MBE [minority business enterprise] certification . . . .").

With that said, Duxbury's due process claim must rest on a more limited set of facts than the complaint suggests.  The company formed during the spring of 1996, applied for WBE status on April 27, 1997, and received state certification on April 1, 1998.  It secured the bulk of its Big Dig contracts in 1996, before even applying for WBE status.  In fact, Duxbury entered only one written contract, the one on June 15, 1998, with Modern, after receiving WBE certification.  Making all inferences in favor of the plaintiff, I assess defendants' alleged violations at this stage with respect to all contracts, formal and informal, entered into with Modern after Duxbury attained WBE status.

But while *decertification* without due process might constitute a deprivation of Duxbury's property interest in its WBE status under the Fourteenth Amendment, Duxbury is not alleging that the MTA or the MHD decertified it (because they, in fact, never retracted Duxbury's WBE certification, nor would they

have had any power to do so).[10]  I have strained to comprehend
Duxbury's assertion that a property interest in its WBE status
somehow translated into a similarly cognizable interest in the
contracts acquired, or potentially acquired, by it.  Defendants
justifiably point out that, even if the plaintiff had contracted
directly with the government and the government had breached its
contract, "the Due Process Clause is invoked to protect something
more than an ordinary contractual right." S & D Maintenance Co.
v. Goldin, 844 F.2d 962, 966 (2d Cir. 1988).  That is,
"procedural protection is sought in connection with a state's
revocation of a *status*, an estate within the public sphere
characterized by a quality of either extreme dependence in the
case of welfare benefits, or permanence in the case of tenure, or
sometimes both, as frequently occurs in the case of social
security benefits."  Id.  Plaintiff fails to explain how its
contracts created a protected government interest when WBE status
does not ensure contract acquisition or viability.

     Nonetheless, a reasonable inference from the complaint is
that Duxbury claims to have become effectively decertified (i.e.,
lost its WBE status) when it lost its ability to operate, because
it could no longer maintain an advantaged position (or any
position at all) in the procurement process.  Moreover, it is not

_____

[10] Under a decertification claim, a plaintiff makes out a clear due
process deprivation (e.g., no hearing prior to decertification).  However,
under Duxbury's claim, the due process violation is more difficult to discern.

beyond doubt that there are no facts Duxbury could prove in support of such a claim. But, whereas with true decertification the state's role is apparent, the question here is: Were the state agencies' acts or omissions so causally linked with Duxbury's failure as to constitute a deprivation of its property interest in WBE status?

      **c.    Direct Causal Link Between Government's Conduct and Alleged Loss of Property Interest**

The MTA and the MHD argue that the causal connection between the state agencies' alleged acts and omissions and plaintiff's loss of business is too tenuous to constitute a deprivation for due process purposes. The definition of causation is far from clear-cut; even the Supreme Court has struggled with it in related contexts. See, e.g., City of Canton, Ohio v. Harris, 489 U.S. 378, 385 (1989) ("The inquiry [whether there is a direct causal link between a municipal policy/custom and the alleged constitutional deprivation] is a difficult one; one that has left this Court deeply divided . . . .").

Plaintiff is correct that the First Circuit has recognized a possible deprivation of property without due process when a business person loses property as a result of an unlawful government act. See Roy v. City of Augusta, 712 F.2d 1517, 1523 (1st Cir. 1983) (defendants were denied their motion to dismiss for failure to state a claim because a state court found that plaintiff was entitled to a license under state law, but

defendants issued a useless, expired license, and plaintiff lost his business). However, it fails to acknowledge the distinct differences between the circumstances in <u>Roy</u> and the facts at hand.

When one is refused license renewal, like the defendant in <u>Roy</u>, the causal link between the state's act and the deprivation of property is obvious. Even so, in <u>Roy</u>, Judge Campbell noted that, "the mere fact the individual defendants may have refused to renew Roy's permit for reasons untenable under Maine law gives rise to no federal right," as plaintiff "received minimal due process in the form of a hearing before the counsel; additionally the Maine courts were available to provide judicial review and redress." <u>Roy</u>, 712 F.2d at 1523. Judge Campbell ultimately declined to grant defendants' motion to dismiss, however, only because what "may give rise to a federal claim" is the fact that "the defendants simply flouted the mandate of the state court [to issue Roy a valid license], rendering the court's ruling in Roy's favor and the state's process a nullity."[11]   <u>Id.</u>

In this light, and at an even more fundamental level, there is no doubt that plaintiff will have an uphill battle proving its due process claim. Nonetheless, at this stage of the case, where

---

[11] Along these lines, as addressed <u>infra</u> in the context of plaintiff's claims against the federal defendants, to sustain a due process claim, Duxbury will have to be able to prove on the basis of the facts alleged, not only that the state's failures caused its de facto decertification, but also that the state caused this outcome with some degree of intent (at least reckless indifference).

the issues are complex but only preliminarily developed, I
decline to deprive plaintiff of the opportunity to try to prove a
causal link between defendants' alleged acts and omissions and
plaintiff's property loss.

One perspective on the facts of this case is that Duxbury
inappropriately seeks to have the state pay for its own poor
choices to voluntarily enter contracts (with a private company,
not even with the government) that proved unprofitable and
eventually forced it out of business.  A slightly more optimistic
rendition of plaintiff's claims, and one more appropriate for
review under Fed. R. Civ. P. 12(b)(6), goes as follows: 1) the
state agencies' failure to enforce the prevailing wage rate
enabled prime contractors to offer lower trucking rates; and 2)
this created a market in which Duxbury had no choice but to
accept a trucking rate too low to enable it to comply with state
law and simultaneously sustain its business.

Defendants suggest the latter framework places them under a
duty to generate a trucking market (and that they single-handedly
could have done so) that ensures Duxbury's profitable operation
and thereby its ability to continue to exercise its WBE status,
despite: 1) the effect of prime contractors' individual choices
to withhold and forge payroll records; and 2) the role of
Duxbury's free will in entering contracts and running its
business a certain way.  But they overstate the implications of

this framework at this stage of the proceedings.  Defendants may not have been obligated under state and federal law to *ensure* plaintiff's success in the face of so many intervening causes. At the same time, it is not "beyond doubt" that, despite intervening factors, plaintiff can prove no set of facts in support of its claim that defendants had a causal role in undermining Duxbury's efforts to maintain its WBE status.

An understanding of defendants' possible causal role comes from the exploration of their duties under state and federal law. While plaintiff contends that the state agencies had a duty to enforce the Prevailing Wage Law, defendants disclaimed such responsibility at the Hearing.  The truth may lie somewhere in-between.  Public officials/bodies in charge of constructing public works, like the state defendants, are expected to use the commissioner's schedule of prevailing wage rates to advertise for bids.[12]  See Mass. Gen. Laws ch. 149 § 27 (West 2005).  Moreover, "[e]very contractor and subcontractor required to keep [a payroll] record [is to] submit a copy of said record to the awarding authority [of the bid] directly on a weekly basis."

---

[12] Under Massachusetts law, the commissioner is to prepare a schedule of prevailing wage rates "for the use of such public officials or public bodies whose duty it shall be to cause public works to be constructed . . . ."  Mass. Gen. Laws ch. 149 § 27.  These rates ". . . shall apply to all persons engaged in transporting gravel or fill to the site of said public works or removing gravel or fill from such site, regardless of whether such persons are employed by a contractor or subcontractor."  Id.  The awarding official or public body is to "incorporate said schedule in the advertisement or call for bids . . . [and] [s]aid schedule shall be made a part of the contract for said works . . . ."  Id.

Mass. Gen. Laws ch. 149 § 27B (West 2005).  Though when it comes to actual enforcement of the law, the attorney general's office is called upon to act, <u>see</u> Mass. Gen. Laws ch. 149 § 27,[13] this does not absolve the MTA and the MHD of all responsibility in creating a fair trucking industry.  Theoretically, defendants' review of payroll records could have significantly influenced contractors' practices.

Thus, while defendants may be correct that they do not have the enforcement authority of the attorney general, they nonetheless had a certain responsibility to monitor compliance with the law and foster a business environment that enables WBEs to survive lawfully.  Although it is far from a certainty that such monitoring would have translated into a higher trucking rate

---

[13]            When an investigation by the attorney general's office reveals that a contractor or subcontractor has violated this section by failing to pay said rate or rates of wages . . ., the attorney general may, upon written notice to the contractor or subcontractor . . ., and after a hearing thereon, order work halted . . ., until the defaulting contractor or subcontractor has filed with the attorney general's office a bond . . . .

Any employee claiming to be aggrieved by a violation of this section may, at the expiration of ninety days after the filing of a complaint with the attorney general, or sooner if the attorney general assents in writing, and within three years of such violation, institute and prosecute in his own name and on his own behalf, . . . a civil action for injunctive relief and any damages incurred . . . .

Mass. Gen. Laws ch. 149 § 27.  Presumably, plaintiff did not take this route because it was not an employee being deprived of the prevailing wage rate.

-25-

for Duxbury and that a higher rate would have kept it in business, the litigation is still in its early stages. Duxbury is not obligated to prove its case yet.

Plaintiff also looks to the state defendants' obligations under the Uplift Agreement to establish their potential liability. Although this case is not about a contract dispute between the parties, the fact that defendants submitted to compliance monitoring obligations through the Uplift Agreement suggests that they understood themselves to have some responsibility in ensuring a fair business environment on the Big Dig.

Finally, plaintiff points to the state defendants' duty to review the effectiveness of Title VI program areas under federal regulation. Particularly applicable to this discussion is the set of DOT regulations in effect during the time frame at issue, requiring recipients of federal highway funds to implement an MBE program featuring the following components: 1) a policy statement expressing a commitment to use MBEs in all aspects of contracting to the maximum extent possible; 2) an MBE liaison officer and adequate staff; and 3) affirmative action techniques to facilitate MBE participation in contracting activities, including arranging solicitations, bids, and information programs, and providing financing and technical assistance. See 49 C.F.R. § 23.45. Again, it is clear that the state agencies had an

obligation to support the participation of MBEs (including WBEs) on the Big Dig. Failure to create an environment in which WBEs are not *dis*advantaged could plausibly contravene this duty.

One additional note: At first glance, the causal link between the state's omissions and Duxbury's business failure appears especially tenuous with respect to its contracts with Modern (the only relevant contracts under this analysis). Upon receiving the requisite $65/hour trucking rate under its Modern contracts, Duxbury opted to have $10/hour deducted through what the complaint suggests to be a loan repayment program established by the MHD. It now seeks to hold the state accountable for *its own* decision to take advantage of a program designed to enable it to reclaim its trucks. Nevertheless, it is still not "beyond doubt" that plaintiff cannot prove any set of facts supporting the claim that, after contributing to Duxbury's loss of trucks in the first place by failing to monitor compliance with the law, the state defendants set up a loan program that effectively circumvented the trucking rate requirement and was therefore instrumental in pushing Duxbury out of business for good. In fact, arguably, defendants' involvement in establishing the loan program impacted Duxbury's trucking rate even more directly than did its failure to monitor compliance with the prevailing wage rate law.

Accordingly, defendants' motion to dismiss the complaint on the basis of its failure to state a due process claim is **DENIED**.

### 2.    Stateᵊ Agencies Not "Persons" Under § 1983

The MHD correctly asserts that, even assuming that Duxbury's allegations are sufficient to make out a due process claim, a state agency is not a "person" subject to suit under § 1983.  See Brown v. Newberger, 291 F.3d 89, 92 (1st Cir. 2002).  However, in response, plaintiff has filed a motion to amend its complaint to include individual state officials, who it originally failed to name through "inadvertence and mistake" [docket entry # 26].

Specifically, plaintiff seeks to add the following officials to its complaint: 1) Patricia O'Brien ("O'Brien"), former Director of the Office of Civil Rights of the MHD; and 2) Lorenzo Parra ("Parra"), Director of the Office of Civil Rights of the MTA.  With respect to the due process claim, plaintiff seeks to amend the complaint to allege that defendants O'Brien and Parra deprived plaintiff of her constitutionally protected rights generally, and in particular, when they failed to ensure the effectiveness of the disadvantaged business enterprise program. I **GRANT** plaintiff's motion to amend with respect to these provisions, but **DENY** it with respect to the provisions pertaining to the sex discrimination claim.[14]        _____

---

[14] As noted below, see infra Part III.B.2.a., I also **GRANT** plaintiff's motion to amend with respect to the addition of a provision naming the federal defendants in their individual capacities only.

The MHD is correct to point out that, to the extent Duxbury sues O'Brien for money damages in her official capacity, any § 1983 claim against her is barred because, as a state official, she is not a "person" liable under § 1983.  See Will v. Michigan, 491 U.S. 58, 71 (1989).  However, this Court assumes that plaintiff is suing the state officials, like the federal officials, in their individual capacities only.

The MHD further suggests that any due process claim against O'Brien in her individual capacity is also barred because: 1) Duxbury fails to allege that she was *personally* involved in any due process violations and *respondeat superior* is insufficient to impose supervisor liability in § 1983 claims; and 2) any proposed procedural due process claim against O'Brien in her individual capacity is barred by the availability of adequate remedies in state law, such as an action in tort.

The case that the MHD cites for the first proposition specifically stated:

> A supervisor can be held liable if (1) the behavior of his subordinates results in a constitutional violation, and (2) the supervisor's action or inaction was affirmatively linked to that behavior in that it could be characterized as supervisory encouragement, condonation or acquiescence or gross negligence amounting to deliberate indifference.

Doe v. D'Agostino, 367 F. Supp. 2d 157, 170 (D. Mass. 2005) (internal quotations omitted).

Under the liberal pleading rules set out above, see supra p. 10, there is no reason plaintiff should have to prove, in its complaint, that it meets this standard. Moreover, it is certainly not beyond doubt that plaintiff cannot prove any set of facts that would meet the legal standard.

As for the MHD's second argument, it cites Cronin v. Town of Amesbury, 81 F.3d 257, 260 (1st Cir. 1996), which stated that the defendant "cannot succeed on his procedural due process claim unless he can show that the state failed to provide him with an adequate postdeprivation remedy." However, this emphasis on postdeprivation remedy has been limited by the Supreme Court to situations where "deprivations of property are effected through random and unauthorized conduct of a state employee, [such that] predeprivation procedures are simply 'impracticable' since the state cannot know when such deprivations will occur." Hudson v. Palmer, 468 U.S. 517, 533 (1984); see also Erwin Chemerinksy, Federal Jurisdiction § 8.9, at 563 (4th ed. 2003) [hereinafter "Chemerinksy"]. It is unclear at this point that the state officials' alleged deprivation of Duxbury's property right was the product of "random" conduct that could not have been predicted.

Thus, dismissal on these bases is **DENIED**.

### 3.    Statutes of Limitation and Equitable Estoppel

The MTA argues that each of plaintiff's claims should be dismissed because the applicable statutes of limitation have run. I address the issue only with respect to the due process claim, as the sex discrimination claim is dismissed for failure to state a claim. See supra Part III.A.1.a.  Though § 1983 does not contain a statute of limitations, the MTA argues on the basis of applicable jurisprudence that a three-year time limit applies. Plaintiff essentially concedes this point by justifying its delay and accordingly challenging dismissal on the grounds of equitable estoppel.

In essence, Duxbury asserts that, though it suffered the effects of discrimination and due process violations as early as 1996, the time period for filing its claims should have started running when it went out of business in 1999.  Though Duxbury then waited over three years -- until September 2004 -- to file its claims, it alleges that the claims should go forward under equitable principles because the company filed its complaint with the FHA in September 2000 and waited 33 months for a determination, while the FHA made assurances that a finding of discrimination was imminent.  In addition, Duxbury waited 42 months from the time of filing for its FOIA requests, which were necessary to support its claims of discrimination.

I accept May 28, 1999, when plaintiff ceased operations, as the appropriate reference point for the statute of limitations. The accrual period in a § 1983 case normally begins "when the plaintiff knows, or has reason to know, of the injury on which the action is based." Rivera-Muriente v. Agosto-Alicea, 959 F.2d 349, 353 (1st Cir. 1992). The MTA's assertion that Duxbury was aware of its alleged injuries as early as November 1996, when its contract with Great Northern Site Development lasted only a week, overlooks the fact that Duxbury had not even attained WBE status by that point and therefore did not yet have a property interest to protect from injury. After obtaining WBE status, Duxbury entered a series of contracts with Modern, which culminated in the loss of its business on May 28, 1999. I treat this business loss as the first tangible sign of injury after Duxbury secured WBE status.[15]

Assuming a starting point of May 28, 1999, Duxbury asks me to toll the statute of limitations during the pendency of the FHA complaint and FOIA request. I cannot do so on the existing record. A court will grant equitable estoppel when the following is true: 1) the defendant made representations that it knew or should have known could induce plaintiff to postpone bringing a

---

[15] Moreover, even if I adopt the defendants' perspective, I nonetheless conclude that the due process violations that allegedly began in 1996 continued until plaintiff lost her business in 1999. See Legoff v. Trustees of Boston University, 23 F. Supp. 2d 120,127-28 (D. Mass. 1998). Thus, either way, the statute of limitations clock would not have started ticking until 1999.

suit; 2) plaintiff in fact delayed bringing suit in reliance on those representations; and 3) plaintiff's reliance on those representations was reasonable.  <u>See</u> <u>Kozikowski v. Toll Brothers, Inc.</u>, 354 F.3d 16, 24 (1st Cir. 2003).  On its briefs, plaintiff fails to make a compelling argument regarding the first principle.  Duxbury points to representations made by the FHA, rather than by the state defendants, even though it asks this Court to grant equitable estoppel against the state defendants. Moreover, it makes no suggestion that the state defendants were somehow complicit in the FHA's alleged representations and that, therefore, the doctrine of equitable estoppel should apply against them.

However, during the Hearing, Duxbury asserted that its equitable estoppel argument should apply to all defendants:

> . . . because they're all in the same basket because they have all of the same responsibilities in terms of enforcing and monitoring the rules that we're talking about, and . . . the investigators spent considerable periods of time with the state defendants in this matter addressing the issues raised in the Complaint so that they were part and parcel of the investigation . . . . .

Hearing Tr. at 35:5.

Plaintiff also contended, "I don't have any documents at this point that suggest that the federal folks, when they came here to do their investigation, experienced delays in getting information

from the state, but I'm not willing to concede that that didn't
happen . . . ." <u>Id.</u> at 35:21-25.

Proof that the state defendants contributed to the delay of
the federal investigation, in and of itself, would likely be
inadequate to meet the first prong of the equitable estoppel
standard, which rests primarily on representations such as the
FHA's alleged assurances that a finding of discrimination was
forthcoming.  However, because plaintiff has alleged that the
state and federal defendants worked closely during the federal
investigation, this Court **GRANTS** plaintiff until **October 21,
2005,** to supplement the record for the purposes of making out a
claim that the state defendants were somehow complicit in the
FHA's allegedly misleading assurances to Duxbury, and that the
law recognizes the state's actions as warranting equitable
tolling of the statute of limitations on the due process claim.
<u>See</u> <u>Kozikowski</u>, 354 F.3d at 20 (at plaintiff's request, the lower
court granted 60 days for limited discovery and record
supplementation on the issue of equitable estoppel).  If
plaintiff is unable to make such a showing within the allotted
time frame, its due process claim against the state defendants
will be **DISMISSED** as time-barred.

In making its equitable estoppel showing, plaintiff must
also attend to the following questions: 1) Assuming that the
FHA's alleged assurances and delays should toll the statute of

-34-

limitations during the pendency of Duxbury's discrimination
complaint and FOIA request, why should the tolling apply to the
entire period when even the most efficient reviews take some
time?; 2) Why should the period during which Duxbury awaited
resolution of its motion for reconsideration apply when it
already had notice of an adverse determination?; and 3) Why
should tolling apply here at all when the FHA complaint was
grounded in claims of sex discrimination, while the only
remaining issue now is the alleged due process violation?

### B.    **The Federal Defendants**

With respect to the federal defendants, Duxbury alleges that
Morris' considerable delay in investigating the complaint, as
well as his promises that a finding of discrimination was
forthcoming, prejudiced plaintiff's legal claims so as to
constitute a deprivation of its property rights under the Due
Process Clause of the Fifth Amendment.  Furthermore, plaintiff
claims that all four federal defendants conspired by agreement to
deprive it of its property rights without due process.

The federal defendants argue, pursuant to Fed. R. Civ. P.
12(b)(6), that Duxbury's complaint must be dismissed because it
fails to state a claim on which relief can be granted.  In the
alternative, if this Court finds that plaintiff's claims may
proceed against the federal defendants in their individual
capacities, defendants request a more definite statement

regarding their conduct pursuant to Fed. R. Civ. P. 12(e), so that they may move to dismiss on the basis of qualified immunity.

Originally, the federal defendants also contended, pursuant to Fed. R. Civ. P. 12(b)(2), that this Court lacks personal jurisdiction over defendants Morris and the Armsteads. However, at the Hearing, they conceded that this Court has personal jurisdiction over all federal defendants. Accordingly, this issue will not be addressed any further.

### 1.   Failure to State a Claim

#### a.   Unsupported Conclusions

The federal defendants argue that, under Fed. R. Civ. P. 12(b)(6), Duxbury's complaint fails to state a claim upon which relief can be granted because it alleges that Morris, the Armsteads, and Gee somehow conspired against the company to deprive it of its due process rights under the Fifth Amendment, without offering any particulars on how they actually did so. See Fed. Defs.' Mem. at 4. However, not only does Duxbury provide certain specifics regarding its conspiracy claim, but it also brings a due process claim against Morris that stands apart from the conspiracy claim.

Duxbury makes a number of allegations about flaws in the FHA's review process, with particular reference to the actions of

Morris and G. Armstead.[16]  On the basis of these allegations,
Duxbury brings the following counts against the federal
defendants: 1) Morris, acting in his capacity as Associate
Administrator for Civil Rights of FHA, deprived the plaintiff of
a constitutionally protected property right in legal causes of
action against the MHD and the MTA without due process of law --
by taking over two years to announce his investigative findings,

---

[16]  Specifically, Duxbury makes the following allegations about the
federal defendants: 1) Duxbury's pro se complaint to the FHA, filed on
September 27, 2000, was assigned to defendant Morris, then Assistant
Administrator for Civil Rights; 2) the FHA generated an initial investigative
report substantiating plaintiff's allegations; 3) in September 2001, G.
Armstead contacted the plaintiff, acknowledging that it had been discriminated
against, offering his apologies for plaintiff's treatment in Boston, and
promising that plaintiff would see "dollar signs" if it remained patient; 4)
plaintiff received numerous communications from the federal defendants urging
it to take no action because a positive outcome was in the works with the FHA;
5) in December 2001, FHA representatives told plaintiff that the investigation
would be complete in a matter of weeks; 6) in January 2002, G. Armstead told
the plaintiff that there were just a few blanks to fill in the investigation
and that his wife, B. Armstead, would be making a trip to Boston to continue
the investigation; 7)in March 2002, G. Armstead told the plaintiff not to
worry about the time the investigation was taking and assured it that B.
Armstead had made a finding of discrimination; 8) in August 2002, Morris came
to Boston to re-interview plaintiff's principals, leaving behind the assigned
investigator; 9) in December 2002, G. Armstead contacted plaintiff to tell it
that a final decision would be issued within 30 days; 10) Morris denied
plaintiff's complaint in March 2003, seven months after his visit to Boston
(and 29 months after the filing of the complaint), despite representations
that he would conclude his investigation and issue a report quickly and only
after plaintiff had complained about the delay several times (August 1, 2002;
October 10, 2002; November 12, 2002; November 20, 2002; December 30, 2002);
11) despite regulatory requirements, Morris failed to prepare a final report
regarding the complaint; 12) during the course of the investigation, Morris
had told the plaintiff to "bear with" the process, indicating that a finding
of discrimination was forthcoming and promising to remedy violations of the
law both on an institutional level and with respect to plaintiff's complaint;
13) on June 23, 2003, after plaintiff's request for reconsideration was
denied, it filed a Freedom of Information Act ("FOIA") request with the FHA,
requesting all documents relating to the investigation; 14) on September 26,
2003, plaintiff received a letter from the FHA indicating that it intended to
produce the requested documents at a cost of $1,563; 15) after plaintiff
sought an explanation for this fee, the FHA modified the cost to $179.00, but
opted to provide only 1,890 pages out of the 2,255 pages generated during the
investigation; and 16) in late April 2004, plaintiff received documents in
response to its FOIA request that supplied facts critical to its legal claims.

despite his regulatory obligation to act promptly, and providing
verbal assurances to the plaintiff, in reliance on which
plaintiff did not pursue other avenues for relief; Morris'
"dilatory policies, practices, and procedures" resulted in
substantial prejudice to plaintiff's legal claims, as witnesses
have moved on from work on the Big Dig, documents have purged,
memories have faded, and statutes of limitation have run, and
therefore monetary damages are due; 2) Morris, Gee, B. Armstead,
and G. Armstead conspired by agreement to engage in a course of
conduct to deprive plaintiff of a right secured by the
Constitution -- by communicating with each other regarding
plaintiff's complaint and coordinating the FHA's inaction in
addressing the claims raised, even after an initial finding of
discrimination, ignoring repeated requests and regulatory
obligations to promptly investigate the matter, and making
misrepresentations to plaintiff regarding the status of the
investigation and the fact that a finding of discrimination was
forthcoming.

     Under the broad standards for dismissing a complaint
pursuant to Fed. R. Civ. P. 12(b)(6), see supra, surely
plaintiff's complaint adequately states a claim against Morris as
to his individual role in allegedly violating plaintiff's due
process rights.  However, the federal defendants introduce
greater subtlety into the analysis with respect to the conspiracy

-38-

claim.  They cite <u>Kadar Corp. v. Milbury</u>, 549 F.2d 230 (1st Cir.
1977), for the proposition that a plaintiff claiming *conspiracy*
must allege, with at least some degree of particularity, overt
acts of defendants that were reasonably related to the promotion
of the claimed conspiracy.  <u>See</u> <u>id.</u> at 233 (quoting <u>Powell v.
Workmen's Compensation Bd.</u>, 327 F.2d 131, 137 (2d Cir. 1964)).
The First Circuit's rationale was that, "[w]hile a complaint need
only set out 'a generalized statement of facts', there must be
enough information 'to outline the elements of the pleaders'
claim.'" <u>Id.</u> (quoting Wright & Miller, Fed. Prac. & Proc.: Civil
§ 1357).[17]

In <u>Kadar</u>, plaintiffs alleged under 42 U.S.C. §§ 1983,
1985(3) that defendants used their powers in bad faith to
influence town governmental bodies to prevent plaintiffs from
developing residential housing.  <u>See</u> <u>id.</u> at 232.  The First
Circuit affirmed the district court's dismissal of the complaint
against defendants who were named in the complaint as part of a
class alleged to have participated in a multi-faceted conspiracy,
but for whom the complaint did not provide "so much as a hint as
to what, specifically, any of the[m] [we]re supposed to have

---

[17] In particular, federal courts have found that district judges
considering a complaint's sufficiency are not bound by a pleading's legal or
unsupported conclusions.  <u>See</u> <u>Centro Medico Del Turabo, Inc. v. Feliciano de
Melecio</u>, __ F.3d __, 2005 WL 894583, at *2 (1st Cir. Apr. 19, 2005) ("In a
civil rights case, there is no heightened pleading standard.  . . . Still, []
a court is not bound to credit 'bald assertions, unsupportable conclusions,
periphrastic circumlocutions, and the like.'"); <u>see also</u> Wright & Miller §
1357.

done" in furtherance of the conspiracy.  Id. at 233.
Furthermore, the probable nature of their actions could not be
gleaned from the nature of the conspiracy because it was
described in sweeping and general terms.  See id.

However, the appellate court maintained the complaint
against one defendant, Blair Arsenault, who won a dismissal in
the lower court and was mentioned in the complaint as having
"aided and abetted" commissioners in certain described abuses and
as having "aided, abetted and participated knowingly, willfully
and with malice as a principal" in acts by members of the
Planning Board and Board of Health.  See id.  The First Circuit
concluded, "while it is true that we are not told Blair
Arsenault, Jr.'s purported role, he is linked to specific,
narrowly-defined conduct that, by its nature, gives some body to
the pleaders' claim against him" beyond general allegations of
participation in a broadly defined conspiracy.  Id. at 234.

Under the Kadar approach, the conspiracy count certainly
should not be dismissed against Morris or G. Armstead.  The
complaint specifically alleges that Morris and G. Armstead had
direct contact with Duxbury during which they made explicit
assurances about the future of the complaint.  See supra note 15.

The situation is somewhat less clear with respect to B. Armstead and Gee.  Their involvement in the conspiracy is described only in more general terms:[18]

> In their various roles with the FHA,
> defendants Edward Morris, Stanley Gee, Brenda
> Armstead and Gene Armstead conspired by
> agreement to engage in a course of conduct to
> deprive plaintiff of a right secured by the
> Constitution of the United States.
> Defendants communicated with each other
> regarding the plaintiff's Complaint to the
> FHA and coordinated the FHA's inaction in
> addressing the claims raised therein even
> after an initial FHA finding that the
> plaintiff was the victim of discrimination as
> a WBE/DBE.  . . . [T]he co-conspirators
> ignored repeated requests to promptly
> investigate the matter as well as their
> regulatory obligations to do so under 49
> C.F.R. § 29.11.  They further made
> misrepresentations to the plaintiff regarding
> the status of the investigation, the fact
> that a finding of discrimination was
> forthcoming, and urged plaintiff to be
> patient with the process.

See Complaint ¶ 82.

However, since these allegations seem no more general than the "aiding and abetting" allegations described in Kadar, and in light of the Supreme Court's reinforcement of the liberal pleading rule in Leatherman v. Tarrant County Narcotics

---

[18] While B. Armstead has more of a presence in the complaint than Gee, it is only to the extent that her husband, G. Armstead, told Duxbury that she would be investigating its complaint in Boston and that she made a finding of discrimination.

Intelligence and Coordination Unit, 507 U.S. 163 (1993),[19]

defendants' motion to dismiss the conspiracy count is **DENIED**.

### b.    Failure to Establish Improper Motive

Negligent conduct does not constitute a constitutional deprivation under the Fifth Amendment, even if it deprives a person of life, liberty, or property.  See Daniels v. Williams, 474 U.S. 327, 328 (1986).[20]  The federal defendants do not explicitly argue that Duxbury fails to put forth the requisite factual allegations to establish their improper motive, but they do cite to Coyne v. United States, 233 F. Supp. 2d 135, 143-44 (D. Mass. 2002), for the proposition that improper motive is necessary to a Fifth Amendment claim.  In Coyne, Judge Tauro dismissed a complaint against an FBI Special Agent because it failed to allege the agent's intent to interfere with plaintiff's right to liberty and due process of law.  See id. at 142-43.

However, the First Circuit has concluded that Daniels does not preclude finding "government officials [] liable for a

---

[19] The Supreme Court in Leatherman rejected the Fifth Circuit standard requiring that, in cases against government officials involving the likely defense of immunity, the plaintiff's complaint state with factual detail and particularity the basis for the claim, including why the defendant-official cannot successfully maintain the defense of immunity.  See 507 U.S. at 167.  Of course, it should be noted that, in finding the Federal Rules of Civil Procedure merely to require a short and plain statement of a claim that will give the defendant fair notice, the Leatherman Court specifically addressed municipal liability, not the liability of individual government officers.  See id. at 168.

[20] "Although Daniels . . . arose as [a] suit[] against state officers under the Fourteenth Amendment and 42 U.S.C. § 1983, there is no reason why the due process clause of the Fifth Amendment would have a different meaning in suits against federal officers."  Chemerinsky § 9.1.1, at 589.

deprivation of life, liberty, or property without due process if their conduct reflects a reckless or callous indifference to an individual's rights." Germany v. Vance, 868 F.2d 9, 17-18 (1st Cir. 1989).  Reckless or callous indifference, which falls short of intentional or willful conduct, is found "when it would be manifest to any reasonable official that his conduct was very likely to violate an individual's constitutional rights." Id. at 18.  Although negligent, reckless, and intentional conduct may be difficult to distinguish, the First Circuit laid out the following general rules: 1) if the person acts with the desire to cause harm or with the belief that harm is certain to result, the action is intentional; 2) if the actor has no such desire or belief, but acts unreasonably in light of the risks, his behavior is negligent; and 3) if the official believes (or reasonably should believe) that his conduct is very likely (but not certain) to result in such a violation, his conduct is reckless or callous indifference.  See id. at 18 n.10.

Some of the language in Duxbury's complaint -- "dilatory policies, practices, and procedures" -- could be read to assert mere negligence, but it is not beyond doubt that, if proven, these facts would fail to meet the reckless or callous indifference standard.  Moreover, the conspiracy allegations that litter the complaint implicitly suggest some degree of improper

motive.  Thus, the motion to dismiss the complaint on this basis is **DENIED**.

### 2.  Federal Officials' Immunity

#### a.  Official Versus Individual Capacity

The federal defendants argue that plaintiff's claims against Morris in his official capacity are barred by sovereign immunity. However, this point is moot, as plaintiff seeks to amend its complaint to bring suit against the defendants in their *individual* capacities only.  As indicated above, see supra note 13, the motion to amend is **GRANTED** in this respect.

A plaintiff brings suit against an official in his/her individual capacity when seeking money damages directly from the official, rather than from the governmental entity that employs him/her, for actions taken under color of law (as the case here). See Chemerinsky § 8.6.1, at 515.  When sued in his/her individual capacity, a government official can seek to invoke qualified immunity.  See id.

#### b.  Qualified Immunity

The federal defendants address the issue of qualified immunity in two ways: 1) they argue on the basis of the complaint alone that they are immune from suits brought against them in their individual capacities and arising from their official functions; and 2) in the event that this Court denies dismissal of the complaint, allowing plaintiff's claims to proceed against

the defendants in their individual capacities, defendants seek a
more definite statement regarding their conduct, pursuant to Fed.
R. Civ. P. 12(e), so that they can then move to dismiss based on
the doctrine of qualified immunity.

"[G]overnment officials performing discretionary functions
generally are shielded from liability for civil damages insofar
as their conduct does not violate clearly established statutory
or constitutional rights of which a reasonable person would have
known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982);[21] see
also Castro-Aponte v. Ligia-Rubero, 953 F.2d 1429, 1430 (1st Cir.
1992).  When determining whether the official's conduct violated
clearly established law, the court must assume the truth of the
plaintiff's allegations.  See Crawford-El v. Britton, 523 U.S.
574, 598 (1998).  Though counterintuitive given the information
called for by the immunity standard, "the district court should

---

[21]    If the law at the time was not clearly established, an
official could not reasonably be expected to
anticipate subsequent legal developments, nor could he
fairly be said to 'know' that the law forbade conduct
not previously identified as unlawful. . . . If the
law was clearly established, the immunity defense
ordinarily should fail, since a reasonably competent
public official should know the law governing his
conduct.  Nevertheless, if the official pleading the
defense claims extraordinary circumstances and can
prove that he neither knew nor should have known of
the relevant legal standard, the defense should be
sustained.  But again, the defense would turn
primarily on objective factors.

Harlow, 457 U.S. at 818-19.

resolve [the immunity] question before permitting discovery."
Id.

The Supreme Court in Anderson v. Creighton, 483 U.S. 635,
639-40 (1987), clarified that proper application of the immunity
standard requires consideration of the applicable law in a
particularized rather than overly generalized way:

> The operation of this [immunity] standard . .
> . depends substantially upon the level of
> generality at which the relevant 'legal rule'
> is to be identified.  For example, the right
> to due process of law is quite clearly
> established by the Due Process Clause, and
> thus there is a sense in which any action
> that violates that Clause (no matter how
> unclear it may be that the particular action
> is a violation) violates a clearly
> established right.  . . . But if the test of
> 'clearly established law' were to be applied
> at this level of generality, it would bear no
> relationship to the 'objective legal
> reasonableness' that is the touchstone of
> Harlow.  . . . It should not be surprising,
> therefore, that our cases establish that the
> right the official is alleged to have
> violated must have been 'clearly established'
> in a more particularized, and hence more
> relevant, sense: The contours of the right
> must be sufficiently clear that a reasonable
> official would understand that what he is
> doing violates that right.

As discussed infra, the administrative rules directing the
promptness of the FHA's actions provide a more particularized
point of reference than does the Due Process Clause.

Since immunities are a defense to liability, rather than an
element of the plaintiff's prima facie case, technically a
plaintiff's complaint need not include allegations necessary to

-46-

overcome immunities, despite defendants' assertions to the contrary. See Chemerinsky § 8.6.1, at 514. Accordingly, it would be inappropriate to grant the federal defendants qualified immunity simply due to deficiencies in the plaintiff's complaint. This notion is consistent with the Supreme Court's willingness to allow district judges to demand more specific allegations from plaintiffs, pursuant to Rule 12(e), before resolving the immunity issue.[22]  See Crawford-El, 523 U.S. at 598.

The pleading requirements for immunity are beside the point if the plaintiff is correct in asserting that the allegations in its complaint are specific enough to show that the defendants acted unlawfully. Plaintiff asserts that the Fifth Amendment right to due process was clearly established when the federal defendants' alleged violation occurred, and that a reasonable official would have known that "such delay and obfuscation by the Defendants would violate the Fifth Amendment." Pl.'s Opp. Mem. at 11. Furthermore, the administrative rules governing the complaint process clearly state that a report on the allegations of discrimination must be made "promptly." See 49 C.F.R. §

---

[22] Courts of Appeals are split as to whether there is a heightened pleading requirement and whether plaintiffs must plead specific facts of unconstitutional or illegal (as opposed to discretionary) conduct once a defendant raises a defense of qualified immunity. See Chemerinsky § 8.6.1, at 514-15. However, the Supreme Court's "strong reaffirmation of notice pleading [in Swierkiewicz v. Sorema N.A., 534 U.S. 506 (2002) would make heightened pleading in suits against individual officers highly questionable . . .[, though] there is nothing in Swierkiewicz that would preclude a court from requiring a responsive pleading from the plaintiff answering a defendant's claim of qualified immunity." Chemerinsky § 8.6.1, at 515.

21.11(c).  FOIA requests are to be addressed "promptly" as well.

See C.F.R. § 7.31.  Plaintiff therefore insists:

> Under an objective standard, any reasonable official
> would know that a report - and not the final report -
> produced 30 months after the complaint was filed, with
> numerous assurances that a finding was forthcoming and
> without explanation for the delay, does not meet the
> requirements as set out in the administrative rule for
> 'prompt' production of such a report.  Furthermore, a
> reasonable official would also know that a violation of
> rights would occur when there was an eight month delay
> in producing FOIA materials, despite the rules' call
> for production to occur 'as promptly as possible,' and
> again, without explanation of the delay or notification
> that the request must be modified, as required by the
> rules.

Pl.'s Opp. Mem. at 12.

Plaintiff's argument is persuasive under the applicable

standards.[23]  However, it is conceivable that the federal

defendants encountered obstacles during the investigation that

made delay objectively reasonable under the circumstances.  See

Anderson, 483 U.S. at 641 ("the determination whether [the

officials' conduct] was objectively legally reasonable . . . will

often require examination of the information possessed by the . .

. officials").  Defendants would have to produce such

information, but they fail to do so in their memorandum, instead

---

[23] However, "whether 'a reasonable official would [have] underst[oo]d
that what he is doing violates' that [clearly established] right . . .
unavoidably calls into question whether *any* violation of the right occurred."
Morales v. Ramirez, 906 F.2d 784, 787 (1st Cir. 1990) (quoting Anderson v.
Creighton, 483 U.S. 635, 640 (1987)).  Accordingly, before a court can
definitively deny the federal defendants immunity, it must determine whether
the plaintiff has made out a claim of constitutional breach at all, as I have
done here.  See supra Part III.B.1.b.

arguing only generally that the plaintiff failed to allege facts that would set aside the presumption of qualified immunity, or make out a constitutional violation.[24]

Without additional evidence from the defendants, I **DENY** their immunity defense because, "assuming the truth of plaintiff's allegations, the official[s'] conduct violated clearly established law." Crawford-El, 523 U.S. at 598. Defendants are invited to file additional information on this point, including an explanation of the necessity for a more definite statement from plaintiff, by **October 21, 2005.** Plaintiff is to reply by **November 4, 2005.**

IV.  <u>CONCLUSION</u>

In conclusion, the state agencies' motions to dismiss are **GRANTED** in part and **DENIED** in part.  First, defendants' motion to dismiss the sex discrimination claim is **GRANTED** because there is no private right of action under § 324/Title VI for disparate impact claims.  Second, for the moment, defendants' motion to dismiss the due process claim is **DENIED** because plaintiff does not fail to state a claim under the generous standards applicable at this stage.  However, the due process claim will also be

_____

[24] Defendants specifically allege that plaintiff fails to meet the necessary constitutional threshold -- that the officials' actions must _substantively_ shock the conscience under <u>Morales</u>.  However, <u>Morales</u> suggests a separate standard for procedural due process claims like the one at hand -- that the challenged behavior must "'deprive[] plaintiff of liberty by distortion and corruption of the processes of law.'" <u>Morales</u>, 906 F.2d at 788 (quoting <u>Torres v. Superintendent of Police</u>, 893 F.2d 404, 410 (1st Cir. 1990)).

-49-

dismissed, if plaintiff is unable to make a convincing equitable estoppel showing after further discovery and briefing (plaintiff's brief is due by **October 21, 2005**, and defendants' response is due by **November 4, 2005**).

The FHA's motion to dismiss is **DENIED** for the following reasons: 1) Duxbury's allegations are adequate to state a claim on the conspiracy count against FHA officials; 2) Duxbury's allegations are adequate to establish the requisite improper motive; and 3) defendants' immunity defense should not be granted at this point, as plaintiff makes out a prima facie case for defendants' unlawful behavior. The federal defendants' supplemental brief on immunity is to be filed by **October 21, 2005**, and plaintiff's response is due by **November 4, 2005**.


**SO ORDERED.**

**Dated: September 13, 2005**             <u>**s/NANCY GERTNER, U.S.D.J.**</u>