## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DUXBURY TRUCKING, INC.,      ) | |
|        ) | |
|       Plaintiff,   ) | |
|        ) | |
| V.        ) | |
|        ) | |
| MASSACHUSETTS HIGHWAY DEP'T;   ) | |
| MASSACHUSETTS TURNPIKE AUTH.;   ) | CA No. 04-12118-NG |
| EDWARD W. MORRIS, JR., FED. HIGHWAY) | |
| ADMIN. (FORMER) ASSOC. ADM'R FOR  ) | |
| CIVIL RIGHTS; BRENDA ARMSTEAD, FED.) | |
| HIGHWAY ADMIN., EQUAL OPPORTUNITY  ) | |
| SPECIALIST; ARTHUR "GENE" ARMSTEAD,) | |
| FED. HIGHWAY ADMIN., EASTERN RES.  ) | |
| CTR., CIVIL RIGHTS TEAM; STANLEY   ) | |
| GEE, FEDERAL HIGHWAY ADMIN., DIST. ) | |
| ADM'R,       ) | |
|        ) | |
|       Defendants.   ) | |

## FEDERAL DEFENDANTS' SUPPLEMENTAL MEMORANDUM
## IN SUPPORT OF MOTION TO DISMISS

The federal defendants[1] respectfully submit this Supplemental Memorandum in response to the Court's September 13, 2005 Order inviting the federal defendants to produce to the Court additional information supporting its qualified immunity defense. The federal defendants previously did not produce such information because they had moved to dismiss the claims against

---

[1] The federal defendants are Edward W. Morris, Jr., the former Federal Highway Administration Associate Administrator for Civil Rights; Stanley Gee, Federal Highway Administration District Administrator; Brenda Armstead, Federal Highway Administration Equal Opportunity Specialist; and Arthur Armstead, former Federal Highway Administration Director of Civil Rights for the Eastern Resource Center.

them pursuant to Fed. R. Civ. P. 12(b)(6),[2] and the Court could not consider such information. See, e.g., Gonzalez v. United States, 284 F.3d 281, 288 (1st Cir. 2002); Alternative Energy, Inc. v. St. Paul Fire & Marine Ins. Co., 267 F.3d 30, 33-34 (1st Cir. 2001).  Moreover, the First Circuit has held that it is the plaintiff's burden to produce evidence that a government official should not receive the protection of qualified immunity. See Castro-Aponte v. Ligia-Rubero, 953 F.2d 1429, 1430 (1st Cir. 1992).  This Court concluded, however, that "it would be inappropriate to grant the federal defendants qualified immunity simply due to deficiencies in the plaintiff's complaint." Accordingly, the Court invited the federal defendants to provide it with information explaining their "delay" in providing plaintiff with (i) a prompt report on plaintiff's allegations of discrimination and (ii) a prompt response to plaintiff's request under the Freedom of Information Act ("FOIA"), so that the Court could determine whether the federal defendants are immune from plaintiff's Bivens claims.  The federal defendants, respectfully, provide such information below.

---

[2]As noted by the Court, the Federal Defendants had also moved to dismiss for lack of personal jurisdiction but withdrew this argument at the motion hearing.

**FACTS**

I.    **FHWA-OCR'S INVESTIGATION OF PLAINTIFF'S COMPLAINT**

    **A.    Susan Martinsen's September 27, 2000 Complaint**

For the purposes of their motion, the federal defendants adopt the Relevant Facts section of the Court's Order, except for subsection B of that section.  On or about September 27, 2000, Susan Martinsen ("Mrs. Martinsen") filed a complaint with the United States Department of Transportation ("DOT"), claiming that her company, Duxbury Trucking, Inc. ("Duxbury"), was a victim of sex discrimination.  See Mrs. Martinsen's complaint, attached hereto as Exhibit 1.  Specifically, Mrs. Martinsen claimed that, because the Massachusetts Highway Department ("MHD") was failing to ensure that Big Dig contractors were complying with the Massachusetts prevailing wage laws and the Project Labor Agreement, her company had been prevented from working on the Big Dig.  Id.  Mrs. Martinsen's complaint did not explain how the MHD's purported failure to monitor the Big Dig contractors wage practices was due to sex discrimination.

The Federal Highway Administration ("FHWA") Office of Civil Rights ("OCR"), a sub-agency within the DOT, reviewed Mrs. Martinsen's complaint to determine whether the agency should accept it for investigation.  See Declaration of Brenda Armstead ("B. Armstead Decl.") at ¶3, attached hereto as Exhibit 2.  On November 15, 2000, the FHWA-OCR sent a letter to Mrs. Martinsen

3

acknowledging receipt of her complaint and advising her that it had assigned Brenda Armstead ("Mrs. Armstead"), then an investigator in the OCR, to investigate her complaint.  B. Armstead Decl. at ¶3.  At that time, Mrs. Armstead was the only investigator in the FHWA-OCR investigating complaints of Title VI of the Civil Rights Act of 1964 ("Title VI") violations.  B. Armstead Decl. at ¶3.  On average, the FHWA-OCR processes about 40 Title VI complaints per year and about 50 ADA complaints per year.  B. Armstead Decl. at ¶3.

### B.  The MHD's And MTA's Responsibilities Under Title VII And The Federal-Aid Highway Act

In 2001, the FHWA-OCR began its investigation of the MHD for possible violations of section 601 of Title VI,[3] and section 162 of the Federal-Aid Highway Act of 1973.[4]  The MHD is a recipient of federal-aid highway funds and was responsible for administering the Big Dig project - a federal-aid project - during the period when the alleged discrimination took place.  As

---

[3] Section 601 of Title VI provides that: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  42 U.S.C. § 2000d.

[4] Section 162 of the Federal-Aid Highway Act of 1973 states in relevant part:  "No person shall on the ground of sex be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal assistance under this title or carried on under this title."  23 U.S.C. § 324.

such, the MHD, its sub-recipients, agents, and contractors (regardless of tier) are subject to the anti-discrimination provisions of the Federal-Aid Highway Act, and the implementing regulations found at 49 C.F.R. § 21 and 23 C.F.R. § 200.  The Massachusetts Turnpike Authority ("MTA") manages the Big Dig with MHD and is also subject to provisions of Title VI and the Federal-Aid Highway Act.

### C.    The First Phase Of FHWA-OCR's Investigation

On February 21, 2001, Mrs. Armstead forwarded Mrs. Martinsen's complaint to the Eastern Resource Center Manager, Robert Callan, in Baltimore, Maryland for investigation.  B. Armstead Decl. at ¶4.  Within the FHWA, there are four resource centers located in various regions of the country that provide technical support and assistance to the 52 state level FHWA division offices that oversee the administration of the Federal-Aid Highway program by the state transportation departments.  B. Armstead Decl. at ¶4.

Mrs. Armstead forwarded Mrs. Martinsen's complaint to the Eastern Resource Center for several reasons: (1) Mrs. Armstead was managing a heavy caseload with little support; (2) she believed that the individuals in the Center's Civil Rights Unit possessed the knowledge, skills, and abilities needed to conduct a Title VI investigation; and (3) the activities of that Center covered states along the northeastern seaboard, which included

Massachusetts, where both Mrs. Martinsen and the MHD were located.  B. Armstead Decl. at ¶4.

Peter Silva, an investigator in the FHWA Eastern Resource Center, which provides technical support to division offices located in the states that comprise the northeastern region of the country, conducted the initial investigation of Martinsen's complaint.  See Declaration of Peter Silva ("Silva Decl.") at ¶2, attached hereto as Exhibit 3; Declaration of Edward Morris ("Morris Decl.") at ¶4, attached hereto as Exhibit 4; B. Armstead Decl. at ¶5.  Arthur Armstead ("Mr. Armstead"), then the Team Leader for the Civil Rights Team in the Eastern Resource Center of the FHWA, provided support to Silva, but never spoke directly with Mrs. Martinsen.  See Affidavit of Arthur Armstead ("A. Armstead Aff.") at ¶¶1, 1,4,8,9, attached hereto as Exhibit 5. Stanley Gee, the Division Administrator for the FHWA Division Office in Massachusetts, also provided logistical support for Silva's investigation, such as supplying Silva with files and permitting him use of the Division Office's facilities.  See Declaration of Stanley Gee ("Gee Decl.") at ¶4, attached hereto as Exhibit 6.  Gee, however, never discussed with Silva the substance of his investigation.  Gee Decl. at ¶¶4,5.

Over the course of Silva's investigation, Mrs. Martinsen's husband Roy ("Mr. Martinsen"), who was Duxbury's sole employee, spoke with Silva and Armstead on almost a daily basis.  A.

Armstead Aff. at ¶5.  Mr. Martinsen's conversation with Mr.
Armstead concerned primarily personal matters or current events.
A. Armstead Aff. at ¶5.  When Mr. Martinsen asked Mr. Armstead
questions concerning the investigation, Mr. Armstead referred Mr.
Martinsen to Silva.  A. Armstead Aff. at ¶5.  During the course
of Silva's investigation, Mr. Armstead never discussed the
substance or status of the investigation with Mr. Martinsen.  A.
Armstead Aff. at ¶5.  Moreover, Silva never discussed his
specific findings or recommendations with the Martinsens or their
agents.  Silva Decl. at ¶4.

When Silva completed his investigation, in September 2001,
he prepared a formal Report of Investigation with his findings.
Silva Decl. at ¶2; A. Armstead Aff. at ¶6.  Mr. Armstead reviewed
Silva's report for form.  A. Armstead Aff. at ¶6.  Thereafter,
Silva forwarded his report to Edward Morris, then the Associate
Administrator for Civil Rights of the FHWA, in Washington, D.C.,
for final action.  Silva Decl. at ¶2; A. Armstead Aff. at ¶¶6,7.

When Silva's report reached FHWA-OCR in Washington, D.C.,
Mrs. Armstead reviewed Silva's investigative file and report.  B.
Armstead Decl. at ¶6.  Mrs. Armstead was responsible for ensuring
that all of the information necessary for the agency to make a
decision was contained therein so that she could prepare a Letter
of Finding for Morris's signature.  B. Armstead Decl. at ¶6.
Based on her review, Mrs. Armstead concluded that Silva's

investigation did not adequately address the Title VI requirements for investigations. B. Armstead Decl. at ¶6. Specifically, Mrs. Armstead found that Silva failed to include comparative data in the investigative file. Armstead Decl. at ¶6. Therefore, Mrs. Armstead determined that a further investigation of Mrs. Martinsen's complaint was needed. B. Armstead Decl. at ¶6.

Morris was also dissatisfied with Silva's report. Morris Decl. at ¶10. Indeed, he found Silva's report to be deficient in several respects. Morris Decl. at ¶10. He found Silva's analysis to be disjointed and wholly inadequate. Morris Decl. at ¶10. Furthermore, Morris found the depth of Silva's investigation to be sorely lacking. Morris Decl. at ¶10. As a result, Morris met with Silva and Mr. Armstead together and Silva individually to discuss his concerns relating to the quality of the data and analysis contained in the report. Silva Decl. at ¶2; A. Armstead Aff. at ¶7. Subsequently, Morris ordered that FHWA-OCR conduct an entirely new investigation. Morris Decl. at ¶10.

**D.  The Second Phase Of FHWA-OCR's Investigation**

February 5 through 7, 2002, Mrs. Armstead conducted her own on-site investigation of Mrs. Martinsen's complaint. B. Armstead Decl. at ¶7; Morris Decl. at ¶4. Silva accompanied Mrs. Armstead during her investigation at the insistence of Mr. Martinsen. B.

8

Armstead Decl. at ¶7.  Gee provided logistical support for Mrs. Armstead's investigation, but never discussed with her the substance of her investigation.  Gee Decl. at ¶5.

Mrs. Armstead interviewed Mrs. Martinsen on February 6, 2002, and Massachusetts state representatives on February 7, 2002.  B. Armstead Decl. at ¶7.  Mrs. Armstead also obtained additional information from the MHD during her on-site visit.  B. Armstead Decl. at ¶7.  Based on her analysis of this information, in April 2002, Mrs. Armstead submitted to Morris a draft investigative report that concluded the evidence did not support a finding of discrimination under Title VI.  B. Armstead Decl. at ¶7.  Mrs. Armstead also recommended that the agency refer Mrs. Martinsen's complaint to other Federal agencies (e.g., the United States Department of Labor's Wage and Hour Division/Office and the United States Department of Justice's Antitrust Division) with responsibility for addressing some of the issues raised in the complaint.  B. Armstead Decl. at ¶7.  During the course of Mrs. Armstead's investigation, she never discussed her (or Silva's) findings with the Martinsens.  B. Armstead Decl. at ¶9.

**E.   The Third Phase Of FHWA-OCR's Investigation**

After Morris received Mrs. Armstead's draft report and recommendation based on her investigation, he began investigating Mrs. Martinsen's complaint sometime in July of 2002.  Morris Decl. at ¶5.  Morris became involved because he was not satisfied

that a thorough, comprehensive investigation and coherent analysis of the relevant Title VI issues had been conducted at that point.  Morris Decl. at ¶5.

In August 2002, Morris traveled to Boston and conducted a series of interviews that included state officials and local contractors who Silva and Mrs. Armstead previously had not interviewed.  Morris Decl. at ¶6.  Morris also interviewed Mrs. Martinsen and Mr. Martinsen separately because Mr. Martinsen continually was supplementing Mrs. Martinsen's initial complaint with additional allegations.  Morris Decl. at ¶6.  Mrs. Martinsen was represented by counsel during her interviews by Morris. Morris Decl. at ¶6.  At no time during these interviews did Morris commit to completing the investigation by a date certain. Morris Decl. at ¶6.  While in Boston, Morris met with Gee, because Gee provided him with logistical support, but they did not discuss the substance of Morris's investigation.  Morris Decl. at ¶7; Gee Decl. at ¶¶4,5.

Throughout the investigation Mr. Martinsen made frequent and regular contact with the FHWA-OCR.  Morris Decl. at ¶8.  On many occasions, Mr. Martinsen spoke with Morris - usually about his personal life.  Morris Decl. at ¶8.  However, on several occasions, Mr. Martinsen demanded that Morris make a finding of discrimination so that "he" could collect money he believed was owed him by the MHD.  Morris Decl. at ¶8.  Apparently, Mr.

Martinsen had obtained a copy of Silva's initial draft report and felt justified in his demands. Morris Decl. at ¶8.

Mr. Martinsen also indicated to Morris that he had retained counsel and was prepared to file a lawsuit against the FHWA. Morris Decl. at ¶9. Because Mr. Martinsen represented himself as the agent of Mrs. Martinsen, Morris understood the threat of litigation to come from both Martinsens. Morris Decl. at ¶9. At no time did Morris inform Mr. or Mrs. Martinsen that the FHWA-OCR would make a finding of discrimination. Morris Decl. at ¶9. Nor did Morris tell Mr. or Mrs. Martinsen to delay taking any legal action against the agency while FHWA-OCR's decision was pending. Morris Decl. at ¶9. Indeed, Morris informed Mr. Martinsen that when he was satisfied that he had obtained sufficient evidence upon which to make a decision regarding Mrs. Martinsen's complaint, only then would he do so. Morris Decl. at ¶9.

The FHWA-OCR understood Mrs. Martinsen's complaint to be that, because the trucking rate set by prime contractors on the Big Dig project was too low to cover her company's obligation to pay the prevailing wages and operating costs, she would have to violate state and federal prevailing wage laws in order to operate her company profitably. See Exhibit 7 attached hereto. Somehow, she claimed, this problem faced by her company was due to the company's disadvantaged business enterprise ("DBE") status. Id.

11

The FHWA-OCR issued its agency decision regarding Mrs. Martinsen's complaint on February 27, 2003, finding insufficient evidence of sex discrimination against Duxbury or discrimination against Duxbury on the basis of its DBE status.  See FHWA-OCR's February 27, 2003 decision, attached hereto as Exhibit 8; Morris Decl. at ¶10.  The FHWA-OCR did not doubt plaintiff's belief that she had no choice but to park her truck because of her inability to operate at a profit and pay prevailing wages.  See Exhibit 7. It also found that MHD's failures may have contributed to conditions that plaintiff considered in deciding to park her truck.  Id.  FHWA-OCR found, however, that there was insufficient evidence that MHD's inactions or failure (i) was motivated by an intent to discriminate against the plaintiff on the basis of her gender or the company's DBE status or (ii) had a disparate impact on DBEs as compared to non-DBEs.  Id.

Although the FHWA-OCR did not find sex discrimination at the Big Dig, it did discover numerous issues beyond those raised by the plaintiff and, accordingly, referred those issues to other federal and/or state agencies for further action.  Indeed, FHWA-OCR referred many of the issues it discovered to the Massachusetts Attorney General's Office, MHD, MTA, the Federal Bureau of Investigation, the Labor and Racketeering Section of the United States Department of Labor's Office of Inspector General, the United States Department of Transportation's Office

12

of Inspector General, the Anti-Trust Division of the United States Department of Justice, and the FHWA's Office of Chief Counsel. See Exhibit 7.

Mrs. Martinsen requested that FHWA-OCR reconsider it decision, but she did not provide the FHWA-OCR with any new information or analysis that warranted reversal of the decision. Thus, the FHWA-OCR affirmed its decision, which became final on June 18, 2003. See letter from FHWA-OCR dated June 18, 2003, attached hereto as Exhibit 9.

**F.   Reasons For FHWA-OCR's "Delay" In Issuing A Finding**

The time elapsed between Mrs. Martinsen's filing of her complaint on September 27, 2000, and the FHWA-OCR's decision on February 27, 2003, was due to several factors. Morris Decl. at ¶10. As stated above, Silva's initial investigation was inadequately conducted and his report concerning Mrs. Martinsen's complaint was incomplete. Morris Decl. at ¶10. As a result, the agency decided to conduct a new investigation. Morris Decl. at ¶10. Further, during the course of its investigation, FHWA-OCR became aware of additional concerns that required the agency to expand its investigation. See Exhibit 7. Finally, the investigation was somewhat hindered by agency staff members' large workload and small work force. Morris Decl. at ¶10; B. Armstead Decl. at ¶3; A. Armstead Aff. at ¶7. All of these factors caused the perceived delay in FHWA-OCR reaching a

13

decision on Mrs. Martinsen's complaint.

## II.  PLAINTIFF'S FOIA REQUESTS

On June 23, 2003, plaintiff's counsel wrote to the FHWA, requesting under FOIA "all documents in the possession of the United States [DOT, FHWA] concerning the investigation into [Duxbury's] September 27, 2000 Complaint against the [MHD] and [DOT's] subsequent investigation into [Duxbury's] request for reconsideration of [DOT's] findings dated April 1, 2003." See Exhibit 10.  Three days later on June 26, 2003, plaintiff's counsel wrote to the FHWA, requesting under FOIA "a copy of the Memorandum dated June 23, 2003 from the Cambridge Office of the [FHWA] addressed to Edward Morris, Jr., pertaining to the 'Big Dig' project trucking issue and payment issue related to same." See Exhibit 11.  On September 22, 2003, the FHWA responded to plaintiff's counsel's letter giving him an estimate the agency's cost in order to respond to plaintiff's FOIA request.  See Exhibit 12.  On October 3, 2003, plaintiff's counsel wrote to the FHWA challenging the agency's estimated cost of responding to plaintiff's FOIA request and further asked that certain meeting minutes and memoranda be produced.  Id.

The FHWA-OCR received plaintiff's June 23, 2003 FOIA request on October 7, 2003, and received plaintiff's June 26, 2003 FOIA request on July 3, 2003.  See Exhibit 13.  The FHWA-OCR received plaintiff's October 3, 2003 FOIA request by fax on October 3,

14

2003.  Id.

The FHWA responded to each of plaintiff's FOIA requests under the same cover on November 18, 2003.  See id.  Regarding plaintiff's June 23, 2003 FOIA request, FHWA-OCR located 2,255 responsive pages, of which 1,890 were appropriate for release. See id.  FHWA-OCR explained to plaintiff that it was withholding the 365 pages pursuant to the deliberative process privilege. See id.  FHWA-OCR provided the single document sought by plaintiff's June 26, 2003 FOIA request, but did not find any documents responsive to plaintiff's October 3, 2003 FOIA request. See id.  In its cover letter to its response to plaintiff's requests,  the FHWA-OCR apologized to plaintiff for the agency's delay in processing its response, stating that the delay "was caused by the need to consult with the FHWA Massachusetts Division Office and the FHWA Resource Center in Baltimore, Maryland, and [the FHWA's] office of Management Programs and Analysis on all three (3) of [plaintiff's] requests."  See id.

Over four months later, on March 29, 2004, plaintiff's counsel wrote to the FHWA claiming that the agency had failed to provide plaintiff with drafts of documents, investigative notes, and documents from Peter Silva's initial investigation.  See Exhibit 14.  The documents plaintiff claimed the FHWA failed to provide, however, are the same documents the agency identified as being protected by the deliberative process privilege.  See

15

Attachment 1 to Exhibit 13.

**ARGUMENT**

## I.  THE FEDERAL DEFENDANTS ARE IMMUNE FROM LIABILITY

Plaintiff alleges that the federal defendants' conspired against the company to deprive it of its property rights without due process by their unreasonable delay in rendering a decision on Mrs. Martinsen's complaint, and ultimately finding no discrimination after they previously told plaintiff that they would find in her favor.  Further, plaintiff claims that the federal defendants deprived it of its property rights without due process by their unreasonable delay in responding to its FOIA requests.

In its September 13, 2005, Order, the Court stated its answers to the requisite preliminary questions in its analysis of the federal defendants' qualified immunity defense in the affirmative.  See Riverdale Mills Corp. v. Pimpare, 392 F.3d 55, 60-61 (1st Cir. 2004); Abreu-Guzman v. Ford, 241 F.3d 69, 73 (1st Cir. 2001).[5]  Specifically, the Court, assuming the truth of plaintiff's allegations, concluded that the complaint alleged facts showing that the federal defendants' conduct violated his clearly established due process rights under the Fifth Amendment

_____

[5] "First, the court must 'determine whether the plaintiff has alleged the deprivation of an actual constitutional right.' Second, the court must "proceed to determine whether that right was clearly established at the time of the alleged violation." See Abreu, 241 F.3d at 73 (citations omitted).

16

and his statutory rights under the agency's administrative rules

and the FOIA, of which the federal defendants were aware.[6]

Therefore, the only question that remains is whether a reasonable

person similarly situated to the federal defendants, in

performing his/her discretionary functions, would have understood

his/her conduct violated plaintiff's clearly established

statutory or constitutional rights.  See Abreu-Guzman, 241 F.3d

at 73; see also Harlow v. Fitzgerald, 457 U.S. 800, 818-19

---

[6] The federal defendants respectfully disagree with the
Court's conclusions.  Violations of purely statutory rights, such
as those alleged here, do not create a Bivens remedy.  See Davis
v. Sherer, 468 U.S. 183, 194-195 & n.12 (1984) ("[o]fficials sued
for constitutional violations do not lose their qualified
immunity merely because their conduct violates some statutory or
administrative provision").
    Furthermore, the Court did not address the government's
argument, which it made during the motion hearing, that a Bivens
action should not proceed where a comprehensive statutory scheme
exists in which Congress has created an avenue for redressing the
harms claimed by the plaintiff.  See, e.g., Schweiker v.
Chilicky, 487 U.S. 412, 414 (1988); Bush v. Lucas, 462 U.S. 367
(1983).  Here, with regard to Mrs. Martinsen's September 27, 2000
complaint, plaintiff could have sought judicial review of the
FHWA's dismissal of the complaint.  Indeed, the FHWA has
promulgated a comprehensive regulatory scheme pursuant to the
Title VI that includes the right to judicial review under the
Administrative Procedure Act.  See 49 C.F.R. § 21.19; 42 U.S.C. §
2000d-2.  Plaintiff failed to exhaust this scheme.  Similarly,
Plaintiff could have sought judicial review of the FHWA's
purported delay in responding to its FOIA requests.  See 49
C.F.R. § 7.21(c); 5 U.S.C. § 552; see also Johnson v. Executive
Office for U.S. Attorneys, 310 F.3d 771, 777 (D.C. Cir. 2002)
(FOIA's comprehensive scheme precludes the creation of a Bivens
remedy).  The federal defendants respectfully are also unclear
how the Court can find that the plaintiff has alleged the
deprivation of an actual constitutional right (i.e., prejudiced
legal claims against the state agencies) and also find that the
plaintiff has no right of action against the state agencies.

(1982).

In answering this question the Court must determine whether the federal defendants' actions were objectively reasonable. <u>See</u> <u>Harlow</u>, 457 U.S. at 819; <u>Burns v. Loranger</u>, 907 F.2d 233, 235-36 (1st Cir. 1990). The standard provides "ample room for mistaken judgments," <u>Malley v. Briggs</u>, 475 U.S. 335, 343 (1986), by protecting "all but the plainly incompetent or those who knowingly violate the law." <u>Id.</u> at 341. Qualified immunity provides "an entitlement not to stand trial or face the other burdens of litigation." <u>Saucier v. Katz</u>, 533 U.S. 194, 200 (2001) (<u>quoting</u> <u>Mitchell v. Forsyth</u>, 472 U.S. 511, 526 (1985)). The federal defendants are entitled to such protection.

The undisputed facts show that a reasonable person similarly situated to the federal defendants (who is tasked with investigating plaintiff's complaint) would <u>not</u> understand that the time he took to carefully and conscientiously conduct his investigation violated some right held by plaintiff. In light of the circumstances above, the federal defendants' actions to ensure that the agency's investigation was thorough was objectively reasonable and, therefore, the federal defendants are entitled to qualified immunity. <u>See Riverdale Mills Corp.</u>, 392 F.3d at 61. Similarly, the undisputed facts demonstrate that while plaintiff did not receive a response to its FOIA requests as soon as it would have liked, Morris, when he finally received

18

all of plaintiff's requests, reviewed and produced to plaintiff almost two-thousand responsive documents in a reasonable amount of time.  His actions with regard to plaintiff's FOIA request were objectively reasonable and he also is entitled to qualified immunity as to this claim.  Indeed, even if the federal defendants' actions violated plaintiff's constitutional and statutory rights, they are entitled to qualified immunity so long as the validity of their actions were an "open question" at the time they occurred.  See Serrano v. Gonzalez, 909 F.2d 8, 13 (1st Cir. 1990).  Accordingly, the Court should dismiss the claims against the federal defendants.

## CONCLUSION

Accordingly, for the reasons articulated above, the Complaint should be dismissed against the federal defendants.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

By:    /s/ Damian W. Wilmot
       DAMIAN W. WILMOT
       Assistant U.S. Attorney
       Moakley Federal Courthouse
       One Courthouse Way, Suite 9200
       Boston, MA 02210
       (617) 748-3100

Dated: October 21, 2005

19