UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Duxbury Trucking, Inc., )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>Massachusetts Highway Department, et al., )<br>)<br>Defendants. )<br>) | Civil Action No. 04-12118-NG |

**PLAINTIFF DUXBURY TRUCKING'S RESPONSE TO
FEDERAL DEFENDANTS' SUPPLEMENTAL MEMORANDUM
IN SUPPORT OF MOTION TO DISMISS**

NOW COMES Duxbury Trucking, Inc. ("Plaintiff"), by and through counsel, Shaheen & Gordon, P.A., and in response to the federal Defendants' Supplemental Memorandum in Support of its Motion to Dismiss ("SM"), states the following:

**I.**

**Introduction**

The Court in its September 13, 2005 Memorandum and Order re: Motions to Dismiss ("Order") denied the federal defendants their immunity defense claim "because assuming the truth of the plaintiff's allegations, the official[s]' conduct violated clearly established law. [citation omitted]. Defendants are invited to file additional information on this point, including an explanation of the necessity for a more definitive statement from plaintiff...". (Order at 49).

The federal defendants filed a Supplemental memorandum in response to the Court's Order "inviting the federal defendants to produce to the Court additional

1

information supporting its qualified immunity defense" (SM at 1) on October 21, 2005. The SM has attached affidavits from the federal defendants as well as other documents.

On November 10, 2005, counsel for plaintiff received correspondence from Frederick Isler, Associate Administrator for Civil Rights, Federal Highway Administration in response to "FOIA request numbers 2004-0092." The FOIA request was originally filed by plaintiff's counsel on March 29, 2004. A copy of Mr. Isler's letter and all attachments are attached at Exhibit 1 with the documents bates numbered Isler 001 - 053.

What is noteworthy about the Isler correspondence, besides the timing of its arrival, are its attachments. First there are a series of e-mails that call into question the accuracy or veracity of certain of the declarations filed by the federal defendants in support of their SM. (See Isler 009 - 038). Perhaps more importantly, with regard to the claimed immunity defense, is a printed PowerPoint presentation entitled "Lessons Learned" with the subtitle "A Case-Study of the Potentially Awful Impacts of Misguided Good Intentions." (See Isler 040 - 053). A careful review of this document is all that is needed for the Court to deny the federal defendants' Motion to Dismiss which is premised on a claim of qualified immunity. This document, apparently prepared by defendant Morris on an undisclosed date, admits that Federal Highway Administration ("FHWA") staff "applied pressure to adopt the findings of the [Silva][1] report and issue a letter [in support] of finding." (See Isler at 046), and, most importantly regarding

---

[1] The Silva draft report, without attachments, is at Exhibit B to Plaintiff's April 14, 2005 Opposition to Defendant Massachusetts Highway Department's Motion to Dismiss. The Report calculates Plaintiff's damages to be at least $601,467 (See Ex. B, p. 50). Later, the Report calculates the Plaintiff's company damages to be $578,884 and Ms. Martinsen's individual damages to be $505,671 (See Ex. B, pps. 72 and 73), for a total of $1,084,555.

plaintiff's claim of denial of due process by the federal defendants, on the last page titled "NEXT STEPS," Mr. Morris states:

> In addition to bringing a trained and experienced cadre of investigators in line with FHWA's complaint investigation procedures, action sufficient to prevent a recurrence of the swamp surrounding the complaint at issue will have to be put into place and monitored. (Isler at 049).

Plaintiff agrees that the federal defendants created a "swamp surrounding the complaint at issue," are now legally stuck in that swamp, and their efforts, through incomplete and inaccurate declarations, will not allow this Court to pull them out.

## II.

### Plaintiff's Supplemental Declarations and Affidavits

The Court's Order fairly details the plaintiff's contentions with regard to its claims against the federal defendants. That detail begins on page 35 of the Order. The plaintiff now supplements the allegations contained in its verified federal complaint and its pleadings filed in response to the defendants various motions to dismiss with four declarations to include:

- The Declaration of Susan Martinsen (attached at Exhibit 2).
- The Declaration of Roy Martinsen (attached at Exhibit 3).
- The Affidavit of Linda Reed (attached at Exhibit 4).
- The Affidavit of Steven Troiano (attached at Exhibit 5).
- In addition, Duxbury adopts and includes as part of its filing the Supplemental Declaration of Peter Silva, (attached at Exhibit 6), an

3

employee of the FHWA whose October 20, 2005 Declaration was attached to the federal defendants' SM.

### III.

### Applicable Administrative Regulations

Ms. Martinsen filed her *pro se* complaint with the FHWA in September 2000. At that time the FHWA, which is part of the Federal Department of Transportation, had in place a regulation revised as of October 1, 1999 addressing "NON-DISCRIMINATION IN FEDERALLY-ASSISTED PROGRAMS OF THE DEPARTMENT OF TRANSPORTATION -- EFFECTUATION OF TITLE VI OF THE CIVIL RIGHTS ACT OF 1964. (Regulation is attached at Exhibit 7).

Section 21.11 of the regulation entitled "Conduct of Investigation" provides detail of how FHWA was to have conducted the investigation of Ms. Martinsen's complaint. Sec. 21.11(c) states the Secretary will make a prompt investigation whenever a compliance review, report, complaint or any other investigation indicates a possible failure to comply with this part." (emphasis added). Section (c) continues - "The investigation will conclude, where appropriate, review of the pertinent practices and policies of the recipient,[2] the circumstances under which the possible non-compliance with this part occurred, and other factors relevant to determination as to whether the recipient has failed to comply with this part." The regulation goes on to detail how matters are to be resolved by "informal means" when possible as well as the procedure for "affecting compliance."

---

[2] In this matter, the recipients are defendants Massachusetts Highway Department and Massachusetts Turnpike Authority as well as the private project manager, general contractor and first tier subcontractors and all other subcontractors.

4

What is clear from the October 1999 regulations is that FHWA had the authority and responsibility to promptly investigate Ms. Martinsen's complaint and take whatever corrective actions were necessary regarding any and all federal money recipients working on the Big Dig to provide a remedy, to include money damages, to Ms. Martinsen.

As the declarations by both Mr. and Ms. Martinsen as well as the federal defendants make clear, the federal officials understood the scope of their authority and responsibility, communicated that scope of authority and responsibility to the Martinsens, who in turn, reasonably relied on the federal defendants' representations, as detailed in the attached declarations, affidavits and documents, and so relied to their legal detriment.

The Court is also asked to take note that in the October 1999 regulation there is an Appendix C which provides "examples, without being exhaustive, [that] illustrate the application of the non-discrimination provisions of this part on projects receiving Federal financial assistance under the programs of certain departments of transportation operating administrations." Example at No. 2 from the Appalachia Regional Development Act of 1965, 40 U.S.C. App. 1 et seq. is for FHWA. That example is the substantive and process road map that the federal defendants, charged with the responsibility of insuring that recipients of federal dollars act in a lawful manner to include obeying all pertinent federal and state laws and regulations, should have been followed in the investigation of Ms. Martinsen's complaint.

## IV.

## "The Smoking Gun"

Plaintiff appreciates that there are significant conflicts in terms of facts and who said what to whom when one compares the federal defendants declarations with the declarations and affidavits of the plaintiff.

While the declarations and affidavits speak for themselves, the following points are noted for the Court.

- Declaration of Brenda Armstead – there was a three-month delay once the acknowledgement of receipt of Ms. Martinsen's Complaint made on November 15, 2000 to when the Complaint was forwarded, on February 21, 2001, to the Eastern Resource Center for investigation. (See ¶¶ 3 and 4.)
- Mr. Silva, the initial investigator, completed his investigation in September 2001. It was reviewed purportedly by Ms. Armstead who "decided to conduct my own on-site investigation of the complaint" in February 2002, an additional six month delay. (See ¶¶ 6 and 7.)
- In the Declaration of Peter Silva, Mr. Silva states that Mr. Morris determined a new investigation was required due to Mr. Morris' concerns with "aspects of my findings." (See ¶ 3.)
- Supplemental Declaration of Peter Silva – In March 2003 Mr. Silva was approached by his immediate supervisor, defendant Arthur Armstead, who asked Mr. Silva "to change my report to support the team." (See ¶ 2.)

- Declaration of Edward W. Morris, Jr. – Mr. Morris states that he became directly involved in the "actual investigation of the Martinsen complaint sometime in July 2002 after receipt of a draft report and recommendation from Ms. Armstead based on her investigation." (See ¶ 5). As stated in Ms. Armstead's Declaration, she submitted that report to Mr. Morris in April 2002. Consequently there was a three month delay before Mr. Morris "became directly involved in the actual investigation." Mr. Morris states that the initial investigation prepared by Mr. Silva was lacking in several respects to include "analysis was disjointed and wholly inadequate" and "the depth of the investigation was also sorely lacking." (See ¶ 10). The Court is directed to Exhibit B of Plaintiff's Opposition to Defendant Massachusetts Highway Department's Motion to Dismiss which contains the narrative of Mr. Silva's draft investigative report, without the attachments. It is beyond belief that a responsible review official would find Mr. Silva's report to be "disjointed and wholly inaccurate and the depth of the investigation is sorely lacking." A review of Exhibit B reveals either Mr. Morris did not read the draft report or he purposely misstates the reasons why he did not accept Mr. Silva's recommendation. Mr. Morris also states that he did not accept the recommendation of Ms. Armstead, the second investigator, because her recommendation "did not reflect a clear appreciation of the context in which the allegations of discrimination were raised." As the defendants have refused to provide plaintiff's counsel with a copy of Ms. Armstead's

7

draft, plaintiff is left only to speculate that if the contentions of Ms. Armstead that she was an experienced investigator and responsible for many investigations are credible, then Mr. Morris' explanations for his rejection due to "context" of the recommendations are, at minimum, suspect. (See ¶ 10).  Finally, Mr. Morris states that he completed a final report, and is unaware of the disposition of the report. (See ¶ 11).  It is very clear from Mr. Morris' Declaration that his February 2004 rejection of Ms. Martinsen's complaint is not his "final report."  In fact, the applicable regulations require a final report that is not simply a response to the complaint.  That report, which should be a matter of public record, has not been disclosed to plaintiff's counsel despite several requests. (See ¶ 11).  Mr. Morris states at ¶ 5 that at no time did he tell either Mr. or Ms. Martinsen that "a finding of discrimination would be made or that they should delay taking any or legal action they were threatening to take pending receipt of a decision by FHWA." (¶ 9).  That contention is disputed by the Declaration of Ms. Martinsen, (¶¶ 17, 18, 19 and 20), by the Declaration of Mr. Martinsen, (¶¶ 4, 13 and 15), by the Affidavit of Steven Troiano, ¶ 6, and by the Affidavit of Linda Reed, (¶¶ 5, 7, 11 and 13).

- Affidavit of Arthur Armstead – Mr. Armstead contends that he had never contacted Ms. Martinsen nor advised or discussed with Mr. Martinsen the substance of the contents of the Silva report nor follow up actions taken by the Office of Civil Rights. (See ¶¶ 4 and 5).  These contentions are directly

in conflict with the statements in the Declarations of Susan Martinsen (¶¶ 10 and 15) and of Roy Martinsen. (¶¶ 1, 3, 8, 9 and 14).  The Plaintiff also has made a contention of a possible conflict of interest between the Armsteads regarding their personal lives and professional responsibilities.  The Armstead Declarations do not address this issue.  The redacted emails attached to Mr. Isler's November 4, 2005 FOIA response correspondence reflects that in almost every instance both Armsteads were either communicating or being "cc."  The email spanned the time period 10/31/01 to 2/26/02 and have as their subject:  "Questions about Duxbury." (See Isler at 009 - 038).

- Declaration of Stan Gee – Mr. Gee contends that he did not discuss the results of Peter Silva's investigation. (¶ 5).  That statement is directly in contention.  Susan Martinsen states in her Declaration ¶¶ 7 and 8 that Mr. Silva told her that Mr. Gee, upon meeting Mr. Silva after he made a presentation of the result of his investigation of the Martinsen complaint to the Massachusetts Highway Department, stated to Mr. Silva "pack your bags, get out of here and don't come back.  There is no problem in Boston." (¶ 8).

The principal discrepancy is, however, the fact that Susan Martinsen and her husband came to rely on the representations of the federal defendants that they were investigating her complaint, that the complaint had merit, and that at the end of the day there would be an action taken by the federal defendants which would result in a monetary award to her.  Whether that monetary award came directly from FHWA or was

9

directed by the FHWA to be made by one of the "recipients" i.e., one of the Massachusetts public departments and/or one or more of the private contractors and subcontractors on the Big Dig project, was not specified. It is plaintiff's contention that Ms. Martinsen's reliance upon the statements of the federal defendants was reasonable under the circumstances.

It is beyond doubt that all of the federal defendants understood their established responsibility to Ms. Martinsen and Duxbury Trucking imposed upon them by federal law and regulations. Simply put, they failed to fulfill their legal mandates. As members of the FHWA "Office of Civil Rights" their charge was not to count trucks or measure the depth of tunnel retaining walls. They had one mission: enforce and monitor federal and state civil rights law and regulations to ensure compliance by all recipients of federal funds.

Further, what is troubling is that the initial investigator of Ms. Martinsen's *pro se* complaint, Mr. Silva, completed a detailed investigative report, that report attached as Exhibit B to Plaintiff's Opposition to Defendant Massachusetts Highway Department's Motion to Dismiss. A review of that exhibit makes clear the thoroughness of Mr. Silva's work. However, the federal defendant Mr. Morris, in his declaration states "Mrs. Armstead conducted a further investigation of the complaint in February 2002 because of unanswered questions raised by the report and recommendations submitted by Mr. Silva to me in September 2001 for review and action." (See ¶ 4, Morris Declaration, Exhibit 3 to Defendant's SM). Mr. Morris goes on to state in ¶5 of his Declaration that upon receipt of Ms. Armstead's draft report and recommendation "I was not satisfied that a

10

thorough, comprehensive investigation and coherent analysis of the relevant Title VI issues had been conducted at that point."

In addition to those statements by Mr. Morris being totally at odds with what the federal defendants, including Mr. Morris, were saying to Mr. and Ms. Martinsen as well as to Ms. Reed, the "Lessons Learned" PowerPoint presentation states at Isler 044, "The initial draft report was fatally flawed in a number of ways, including: the arrangements of exhibits; discussion of issues and conclusions drawn; and the absence of any affidavits or reports of interviews of witnesses."  The "Lessons Learned" PowerPoint goes on to say at Isler 046 - 047: "Two attempts were made by the RC [Regional Center] civil rights staff to make the report make sense; the first attempt was the repackaging of the initial report; the second attempt did not properly frame or analyze the issues;

- each attempt to wrap the matter up, cleanly, found new, more convoluted issues, some involving other agency's responsibilities.
- To address the broad array of issues uncovered, the effort was changed from an investigation to a review."

It is clear from the "Lessons Learned" document that the federal defendants were either incompetent to do an investigation or more charitably not properly trained, not properly guided, unschooled in the expectations of the FHWA regulations and had no appreciation of the significance of Ms. Martinsen's complaint.  Further, changing the process regarding Ms. Martinsen's complaint from a "investigation" to a "review," as Mr. Morris stated he did do, is significant.  An investigation looks at specific facts laid out in the complaint while a compliance review is simply that.  Administrators will "from time

11

to time review the policies of recipients to determine whether they are complying with this part." <u>See</u> Section 21.11 of the October 1999 Part 21 Regulation.

One of the significant complaints of Ms. Martinsen was that the federal and state officials charged with reviewing the compliance by the Big Dig private and public participants to ensure the recognition and enforcement of all applicable federal laws and regulations and state laws and regulations were, on a systemic basis, not conducting the required reviews. That was the graviment of her complaint. Mr. Silva's preliminary draft report makes that clear. Apparently Ms. Armstead's report made that clear. Mr. Morris, faced with the handwriting on the wall, changed the process from a complaint investigation into a review in an ill-conceived attempt to avoid that representations of a favorable finding he acknowledges his staff made to the Martinsens.

Ms. Martinsen was seeking relief for herself. As the plaintiff has made clear in its pleadings with this Court, Ms. Martinsen's complaint provided a catalyst for a wholesale review by federal and state agencies of the Big Dig because of its federal funding without compliance, by public and private agencies and participants, with all applicable state and federal laws.

The "Lessons Learned" PowerPoint in its initial several pages collaborates the plaintiff's contentions that they were led to believe by the federal defendants that relief to include money damages was on the way and that no court intervention was necessary: "the non-Civil Rights Staff of the RC (Regional Center) applied pressure to adopt the findings of the report[3] and issue a letter of findings." (Isler at 046.) The FHWA non-Civil Rights staff Regional Center obviously had read the Silva report, concluded that the plaintiff had been wronged and should be provided money damages as recommended by

---

[3] The "report" is the Silva Investigative report. <u>See</u> Footnote 1.

12

Mr. Silva. Further, it is likely that the RC non-Civil Rights staff recognized that despite Mr. Gee's protestation, there was a problem in Boston, and the problem, lack of compliance and enforcement by recipients with applicable federal and state laws and regulations, demanded immediate action by FHWA.

Mr. Morris acknowledges in his Declaration that his February determination was not a "Final Report," and while completing a final report is "unaware" of its disposition (Morris Declaration ¶ 11). That the disposition of the "Final Report," is unknown plaintiff contends is an accurate picture of the federal defendants' failure to act to insure that the "largest public works project in America's history" did not end up in a "swamp." It is and remains in a swamp despite Ms. Martinsen's brave act of filing a *pro se* complaint with the expectation, rightfully held, that the federal defendants would fulfill their job responsibilities and protect the DBEs and public from mismanagement, waste and abuse on the Big Dig project. Plaintiff contends, more forcefully now than ever, that there was never a completed investigative report in this matter, and that the "review," which included sending letters to other state and federal agencies, was a futile exercise if, in fact, completed. Plaintiff challenges the federal defendants to submit any follow up action taken with any state or federal agency as a result of their "review" of Ms. Martinsen's complaint.

The federal defendants claim in their declarations that they were short staffed and that was one of the reasons for the delay in responding to Ms. Martinsen's complaint. While Ms. Armstead said there were only two people available at the Eastern Regional Center to do an investigation of Ms. Martinsen's complaint, Ms. Armstead did it. What is not explained is, while the complaint was filed in September 2000, the investigation

13

did not begin until February 2001, Mr. Silva completed his investigation one year later, it took until February 2002 for Ms. Armstead to arrive in Boston to do the "reworking" of Mr. Silva's report, and then it took Mr. Morris another six months to find Boston to do a "reworking" of the Armstead draft investigative report. That timeline is not the result of being short staffed; it is at best not "prompt"; and, at worst incompetence.

## V.

## Applicable Law

The plaintiff has detailed in its Memorandum of Law in Support of its Objection to the federal defendants' Motion to Dismiss, filed on or about February 16, 2005, the applicable case law that governs this Court's review of this matter. That Memorandum is incorporated by reference herein.

The Court in its Order at 48 states: "However, it is conceivable that the federal defendants encountered obstacles during the investigation that made the delay objectively reasonable under the circumstances, citing Anderson v. Creighton, 482 U.S. 635, 641 (1987). What the declarations and affidavits filed by the plaintiff and federal defendants make clear is that the federal defendants' delay was the result of their submersion in a "swamp" of their making; the "obstacle" was of the federal defendants own making. The delay in this matter was not "objectively reasonable under the circumstances."

## VI.

## Conclusion

Upon review of the federal defendants' Supplemental Memorandum with attachments and Duxbury's response hereto with its attachments, the best that this Court can say is that there are significant factual issues whether or not the immunity defense is

available to the federal defendants such that the federal defendants' motion to dismiss must be denied. Another reading of the documents is that the federal defendants' immunity defense is unavailable as a matter of law given the facts of record.

Duxbury Trucking respectfully requests that the Court deny the federal defendants' Motion to Dismiss.

Respectfully submitted,

Duxbury Trucking, Inc.
By Its Attorneys:
SHAHEEN & GORDON, P.A.

DATED: November 18, 2005          /s/ Arpiar G. Saunders, Jr._____
                                  Arpiar G. Saunders, Jr.
                                  Bar No. 442860
                                  107 Storrs Street
                                  P.O. Box 2703
                                  Concord, NH 03302-2703
                                  (603) 225-7262
                                  asaunders@shaheengordon.com


CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served on November 18, 2005 by U.S. Mail, postage prepaid to Neil V. McKittrick, Esq., Peter N. Kochansky, Esq., Goulston & Storrs, PC, 400 Atlantic Avenue Boston, MA 02110; David B. Stanhill, Esq., Assistant Attorney General, One Ashburton Place, Room 1813, Boston, MA 02108; and Damian W. Wilmot, AUSA, U.S. Attorney's Office, John Joseph Moakley United States Courthouse, 1 Courthouse Way, Suite 9200, Boston, MA 02110

                                  /s/ Arpiar G. Saunders, Jr._____
                                  Arpiar G. Saunders, Jr.