UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Duxbury Trucking, Inc., )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>Massachusetts Highway Department, et al., )<br>)<br>Defendants. )<br>) | Civil Action No. 04-12118-NG |

## DECLARATION OF SUSAN MARTINSEN

I, Susan Martinsen, being duly sworn states as follows:

1. I, started Duxbury Trucking in 1996 before my marriage to Roy Martinsen. With the very first job, contract number Cl 1A1, problems surfaced regarding an expectation by my contact employer, a first tier subcontractor, to file fake or inaccurate "certificated" payroll records. I tried to contact officials on the Big Dig Project to find out how to work legally on the Big Dig. In July 1996, I went to Mass. Alliance and talked to Bruce Bolin, who said he would look into it with the Chairman of the Board of Directors, David Perini, and get back to me. Nine years later and I am still waiting for their answer.

2. I then went to Ken Paradise, labor relationship specialist on the Project, who told me "Women don't belong in this business. Go ask your husband. He'll explain it to you." He made me so mad that I did just that.

3. In starting up a new company, I wanted to do things legally. When given forms by my contractors regarding payroll records to sign and turn in stating that health and welfare benefits were "NA" when they were to be paid, that drivers were paid at a certain rate which

1

was not the actual rate, and then given blank prevailing wage sheets to just sign and turn in, I knew I needed an explanation. These requested actions were not legal or proper. I wouldn't sign them. I went looking for direction from the project officials. No one would give me an answer to my questions, they just stuffed me off like I was bothering them. "How do you work legally on this project?" I couldn't find anyone to answer this simple question.

4. At this point, I did ask my husband for an explanation. He couldn't explain it either. He then took the question and ran with it. You will hear this question over and over again, "How do you work legally on this project?"

5. I tried working my truck for different brokers on the project, trying to find one that was doing the job legally, but found just different wording on breaking the law--Mass Gravel, Great Northern, etc. They basically said, sign our forms as we tell you to or don't work. This attitude is basically what caused the truck to be parked and my business to go under.

6. In September 2000, I wrote out my Complaint and filed it with the Federal Highway Administration ("FHWA") as I came to understand that FHWA has the authority and responsibility to correct the problems that I confronted on the Project, to include directing the responsible State officials and private contractors to pay me for monetary losses I had suffered. In early 2001, I received a letter from Bob Callan, Eastern Resource Center stating the complaint was turned over to his department for investigation. I was contacted by FHWA official Peter Silva who set up a date to come to Boston for an interview. I went in and met with Mr. Silva for an extended interview in March 2001. I asked that Mr. Silva meet with my husband at the conclusion of our interview because Roy had taken my question to so many additional people himself. In addition, as a union member, he had a different slant on the problem than a company owner.

7. Mr. Silva proceeded to investigate the problems. From March 2001 till July 2001, Mr. Silva called the house numerous times to ask more questions and fill in blanks in the investigation. He called in August 2001 and asked Roy and me to come to Boston for a meeting. We met with Mr. Silva for what he called an exit interview. At that point, he pointed to a large notebook on the table and said it was done. He stated he would be going to Mass Highway Department the next day to try to negotiate a financial settlement for me. I asked him if he had found in my favor. He said that is not necessarily the case and that he could not divulge what is in the report but would call in after the Mass Highway meeting.

8. When I did not hear back from Mr. Silva, I called him in Baltimore a week later. He told me that he had gone to the officials of the Big Dig last week, expressed his concerns to the legal department of the Big Dig, they had said that they would look into it and would get back to him in an hour or two. They wanted to know where to reach him at that time and he said at the Cambridge FHWA office. Mr. Silva stated that upon exiting the elevator in Cambridge, Mr. Stanley Gee, the FHWA Regional Director for the Cambridge FHWA office, was standing at the elevator and told him to "Pack your bags, get out of here, and don't come back. There is no problem in Boston."

9. Mr. Silva told me that he would continue on and send his report to Washington in the middle of the next month.

10. In early to mid September 2001, an FHWA official named Arthur Armstead called my husband. In the middle of the conversation, Roy started smiling and asked him to please repeat that to my wife. I took the phone and Mr. Armstead stated: "I'm sorry for what happened to you in Boston. You were discriminated against. Wait just a little longer and you can envision a big time clock ticking that you can translate to cash." Another week went by and

I asked Roy to again call the FHWA Eastern Resource Center to find out what was going on. Mr. Armstead told him not to worry about it, "its discrimination."

11.    In December 2001, Roy contacted Bob Callan at FHWA Eastern Resource Center to ask when an answer might be forthcoming in the Duxbury investigation. He said he would look into it with Mr. Morris. The next day, Mr. Callan said that Mr. Morris told him there should be an answer by Christmas.

12.    The next day, Roy called Steve Troiano at the Mass AG's office. They had done a lot of work together by this time and were quite friendly. Roy turned bright red in the middle of the conversation and said: "I can't believe it Steve, but have a Merry Christmas." He then threw the phone. I asked him what was wrong. He said, Steve had told him that Mr. Morris had called him that morning and stated the FHWA had found for discrimination but he didn't know when it would go out. Mr. Morris was going on sick leave and wouldn't be back until February. Roy got on the phone and proceeded to make a long series of phone calls to try to find out just what was going on.

13.    Roy again called Bob Callan and updated him on what Steve Troiano had said. It was late on Friday afternoon Mr. Callan said he would check into it on Monday. Mr. Callan later reported that Mr. Morris denied saying these things to Mr. Troiano.

14.    Obviously, I did not receive the promised findings by Christmas.

15.    In January 2002, Mr. Armstead called to set up a meeting with his wife, Brenda Armstead another FHWA official. He told me not to worry about it. "It's still discrimination, there is not a problem." On February 6, 2002, I met with Mrs. Armstead, Peter Silva, and John Formosa from the Cambridge office of FHWA. Mrs. Armstead asked many questions, almost all of which had already been asked and answered in the interview with Mr. Silva. He explained

this to her, continually referring her to his report. At the conclusion of this meeting, John Formosa went to another meeting room where Roy was meeting with J. McGovern and T. Dimeoni of FHWA OIG and had them join us. More questions were asked and answered. Then something regarding DavisBacon Act was brought up. Mrs. Armstead asked, "What's that?" and it had to be explained to her by Mr. Formosa. It became very clear that Mrs. Armstead didn't know the subject she was supposed to be investigating.

16. The next week, I called Mr. Armstead to check on the status. He said that his wife had also found for discrimination, and that he and Mr. Silva had just sent her Emails on the topic.

17. In early March 2002, I called Mr. Morris to check on the status. I expressed my concerns about Mrs. Armstead and her lack of knowledge on the subject, i.e., DavisBacon. He told me I was a liar, that Mrs. Armstead did not say any such thing. I told him that there were plenty of witnesses he could check with. He hung up on me.

18. Mr. Morris called me a few times in April asking the same questions over and over. He said he wanted to get it straight in his mind because as he stated I had "gotten the short end of the stick and I was discriminated against."

19. Much to my surprise, he called in early August 2002 to say he was coming to Boston to fill in some blanks, stating "Not to worry, Honey. You're going to get taken care of."

20. By now, I felt he was a liar so I retained counsel. They came to the meeting with me. Mr. Morris asked the same questions that Mr. Silva and Mrs. Armstead had asked. Nothing new!

21. Mr. Morris said his boss, a Mr. Wright, had told him to clear his desk and finish Duxbury. I never heard from Mr. Morris again. Six more months passed, then we received a

5

letter from Mr. Morris finding no discrimination, completely the opposite of what he and/or Mr. Armstead represented numerous times to both my husband and me.

Dated: November 15th, 2005

_Susan Martinsen_
Susan Martinsen

STATE OF MASSACHUSETTS
COUNTY OF Plymouth

    Before me, on this 15th day of November, 2005, personally appeared the above-subscribed Susan Martinsen and made oath that the foregoing statements are true and accurate to the best of her knowledge, information and belief.

_____
Notary Public/Justice of the Peace

My Commission Expires:

6/1/2012

# The Commonwealth of Massachusetts

To all to whom these presents shall come, Greeting:

Know Ye, that We, confiding in the ability, discretion and integrity of Thomas M. Gillespie of Plympton in our County of Plymouth do hereby, by Our Governor, with the advice and consent of Our Council, assign, constitute and appoint the said

## Thomas M. Gillespie

to be One of Our Notaries Public, within and for the Commonwealth, for and during the term of Seven Years from the date of these Presents if said appointee shall so long behave well in said office.

And, we do hereby Authorize and Enjoin said appointee, to execute and perform all the Powers and Duties which, by Our Constitution and Laws, do or may appertain to the said office of Notary Public, so long as said appointee shall hold the same by virtue of these Presents.

Witness, His Excellency **Mitt Romney**, Our Governor, and our Great Seal hereunto affixed, at Boston this first day of June, in the year of Our Lord two thousand and five and of the Independence of the United States of America, the two hundred and twenty-ninth.



By His Excellency the Governor, with the advice and consent of the Council

WILLIAM FRANCIS GALVIN
Secretary of the Commonwealth