UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Duxbury Trucking, Inc., )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>Massachusetts Highway Department, et al., )<br>)<br>Defendants. )<br>) | Civil Action No. 04-12118-NG |

## DECLARATION OF ROY MARTINSEN

I, Roy Martinsen, being duly sworn states as follows:

1.  In the numerous phone conversations I had with the federal defendants in the <u>Duxbury Trucking</u> case, starting in the fall of 2001, I was lead to believe that my wife was in good hands and was going to receive a favorable finding. After many phone conversations with Mr. Arthur Armstead, a FHWA official, he called me in mid September 2001 and said it would only take a little bit longer for my wife to get a finding of discrimination. His exact statement was: "I am very sorry for what happened to your wife in Boston. She was discriminated against and it will only take a little bit longer but she can envision a big time clock ticking that she can translate into cash. Have a blessed day." I handed the phone to my wife and had him repeat himself.

2.  By now, Christmas was approaching and the Complaint was fifteen months old. The bills were mounting, the business my wife had started before we were even married was long since gone, and her frustration level was unbelievable. I called Bob Callan in the FHWA Eastern Resource Center and asked when we would be getting a report? He stated that it had

1

been a long time and my wife deserved an answer. He said he had no knowledge if it was pro or con but he would call to see what was going on.

3. The next day, I called him and he said that Mr. Morris stated we would have an answer by Christmas. I then spoke to Arthur Armstead. He told me about a notebook that he and Peter Silva, the FHWA investigator, were working on to better explain the case to Ed Morris. "Not to worry. It was still discrimination. The time clock was still ticking." I got off the phone and told my wife that Mr. Armstead said everything was going good. We're all set-- the finding is still discrimination.

4. Friday of that week--one week before Christmas, I called Steve Troiano, the then supervisor inspector of the Massachusetts Attorney General Fair Labor and Business Division to wish him a Merry Christmas and tell him the saga was coming to an end--we should have an answer by Christmas. At that point, Steve said: "I don't want to burst your bubble but a guy named Morris who said he was the head of Federal Highway Civil Rights called that morning and asked me a couple of questions." Mr. Troiano stated that Mr. Morris said to him that he hadn't looked at the report but it was probably discrimination, he was going on sick leave and wouldn't be back until February and may not even look at the Complaint and the investigative report until that time.

5. At that point, I called FHWA official Bob Callan and told him what Mr. Troiano had just told me. I believe that Callan was as surprised as I was. By now, it was too late on Friday afternoon to do anything. Mr. Callan said he would try to get to the bottom of this first thing Monday morning and he would give me a call, which he did. He stated that Mr. Morris told him he never told that to Mr. Troiano.

6. I let the week go by and Friday came and Sue paced the floor waiting for the mail, thinking all the time the promised finding of discrimination would be there. When it wasn't, Sue called Mr. Morris and he denied that he had promised a finding. I tried to reach Bob Callan. He was in meetings but I finally got him on his cell phone at 6:00 at night and told him what Mr. Morris had said to Sue. I believe he was as upset as Sue and I were.

7. The first week of 2002, I called the acting Director of Civil Rights of FHWA, Miss Brown, and pleaded Sue's case again. She said she'd look into it and to call her back in a couple of days. I also called Bob Callan who said he was doing what he could from his position but couldn't promise anything. I called Miss Brown back a few days later and she told me she had gotten a call from Mr. Morris in the hospital and was told to leave it alone. "It was his baby."

8. During the second week of January 2002, knowing Mr. Morris wouldn't be back till February, I called Mr. Armstead and told him my wife wants to get a lawyer involved. He told me there is no need. "The righteous shall prevail." Sue and I talked. We knew that Mr. Armstead's wife was in the Washington FHWA office and should know the inside story so we held off again since FHWA officials continued to state that they were going to finish the investigation and issue a report.

9. In late January 2002, Sue received a call from Mr. Armstead. He told her that his wife, Brenda Armstead, would be coming to Boston on February 5, 2002 to re-interview her. By then, I had gotten a copy of the first investigator's report from FHWA OIG in Boston and knew that Mr. Silva had a complete grasp of what the Big Dig situation was and he should be there. I called Mr. Callan and insisted that Mr. Silva be present. He agreed and said Mr. Silva would be there.

10. On February 5, 2002 I called the FHWA Cambridge office and learned only Mrs. Armstead was there. I called Mr. Silva's office. He answered the phone and told me that "both Armsteads" ordered him not to go to Boston. I hung up and called Mr. Callan. Again. I felt he was as surprised as we were but said he would get Mr. Silva to Boston for the 6th, which he did.

11. On February 6, 2002, my wife met with FHWA officials Mrs. Armstead, Mr. Silva, and John Formosa. I meet with J. McGovern and T. Dimeoni, FHWA OIG. When Sue and Mrs. Armstead were done, Mr. Formosa came and got the three of us from the office we were in and we joined them. After a few minutes, I asked Mrs. Armstead about DavisBacon. She said "What's that ?"

12. The next week I called Mr. Armstead and asked what was going on. He told me that his wife had found discrimination, as she had claimed.

13. A couple of weeks later I called Mr. Morris back. He told me FHWA were working on the investigative report and if I wanted it to be discrimination, I should leave it alone.

14. Later that week, I called Mr. Armstead back and I couldn't believe my ears. He said to me that he had never talked to his wife about Sue's Complaint and that they never discuss work at home. "I know nothing about your case." After reviewing his affidavit filed with the Court, I believe that it is not accurate. He states that he had no involvement nor did he look at Mr. Silva's report.

15. Sue concluded that she needed to find a lawyer to help her have her FHWA Complaint reviewed in a fair, prompt manner and the promised damages would be awarded and paid. She told Mr. Morris what she was doing. Mr. Morris then said that Mr. Silva didn't know how to do a report, See Attachment 1, Email from Director Isler pertaining to Peter Silva, and he

was coming to Boston to fill in some holes. I said to him Sue would love to be there and would definitely be there with her lawyer. He said, "For what? It's definitely looking like discrimination."

16. I want to comment on the affidavits submitted by the federal defendants. The Affidavit of Arthur Armstead says he had nothing to do with Mr. Silva's draft report. From Mr. Silva's Supplemental Declaration and the list of Emails noted in the FOIA list (Attached as Exhibit 2), there should be serious concern with the veracity of Mr. Armstead's Declaration. Please look at the Declaration of Ed Morris where he states he did not commit to completing the investigation by a date certain and Mr. Morris' undated "Investigation Plan," which notes that on at least 8/8/02 he was redrafting the revised report and expected to complete it "ASAP" after 8/26/02 (See Exhibit 3).

17. Finally, Mr. Morris' Declaration leads you to believe that he is referring to letters to the appropriate authorities. (See ¶ 11). Please note that email dated 8/14/84 sent by Joanne Robinson, Chief Counsel's Office FHWA concerning communication sent by Duxbury's counsel in 2003 regarding the failure of FHWA to address the specific as well as systemic problems brought to light by my wife's Complaint (Attached as Exhibit 4) and the fact that Mrs. Armstead finally posted the promised follow up letters to various administrative authorities in February 2004, almost a year after Mr. Morris' finding against Duxbury. See Exhibit 5.

18. The referenced documents underscore the representations made to my wife and myself by the federal defendants upon which we relied, and most of which, if not all, were unrealized.

Dated: November 15TH, 2005                    _____
                                                            Roy Martinsen

STATE OF MASSACHUSETTS
COUNTY OF Plymouth

    Before me, on this 15th day of November, 2005, personally appeared the above-subscribed Roy Martinsen and made oath that the foregoing statements are true and accurate to the best of his knowledge, information and belief.

_____
Notary Public/Justice of the Peace

My Commission Expires:

6/1/2012

6



# The Commonwealth of Massachusetts

To all to whom these presents shall come, Greeting:

*Know Ye,* that *We,* confiding in the ability, discretion and integrity of Thomas M. Gillespie of Plympton in our County of Plymouth do hereby, by Our Governor, with the advice and consent of Our Council, assign, constitute and appoint the said

## Thomas M. Gillespie

to be One of Our *Notaries Public,* within and for the Commonwealth, for and during the term of Seven Years from the date of these Presents if said appointee shall so long behave well in said office.

*And,* we do hereby *Authorize* and *Enjoin* said appointee, to execute and perform all the Powers and Duties which, by Our Constitution and Laws, do or may appertain to the said office of Notary Public, so long as said appointee shall hold the same by virtue of these Presents.

*Witness,* His Excellency **Mitt Romney,** Our Governor, and our Great Seal hereunto affixed, at Boston this first day of June, in the year of Our Lord two thousand and five and of the Independence of the United States of America, the two hundred and twenty-ninth.



By His Excellency the Governor, with the advice and consent of the Council

WILLIAM FRANCIS GALVIN
Secretary of the Commonwealth