UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____

| | |
|---|---|
| DUXBURY TRUCKING, INC., | ) |
|     Plaintiff, | ) |
| | ) |
|     v. | ) |
| | ) |
| MASSACHUSETTS HIGHWAY DEPARTMENT, | ) |
| MASSACHUSETTS TURNPIKE AUTHORITY, | ) |
| EDWARD W. MORRIS, JR., Federal | ) |
| Highway Administration, (Former) | ) |
| Associate Administrator for Civil | ) |
| Rights, BRENDA ARMSTEAD, Federal | ) |
| Highway Administration, Equal | ) |
| Opportunity Specialist, ARTHUR | ) |
| ("GENE") ARMSTEAD, Federal Highway | ) |
| Administration, Civil Rights Team, | ) |
| STANLEY GEE, Federal Highway | ) |
| Administration, District | ) |
| Administrator, COMMONWEALTH OF | ) |
| MASSACHUSETTS, FEDERAL HIGHWAY | ) |
| ADMINISTRATION, | ) |
|     Defendants. | ) |

C.A. No. 04-12118-NG

GERTNER, D.J.:

**MEMORANDUM & ORDER**
March 6, 2007

I.    **INTRODUCTION**

Businesses owned by women and minorities have long faced significant and unfair barriers to entry into the marketplace. In a 1996 Executive Order, then-Governor William Weld noted the history of discrimination against Massachusetts' women- and minority-owned businesses and emphasized the Commonwealth's "compelling interest in redressing the effects of past discrimination through the utilization of the available and qualified pool of minority and women owned businesses . . . ." Exec. Order No. 390 (1996).

To that end, both the state and federal governments have established programs to give certified women- and minority-owned corporations the chance to compete.  <u>See</u>, <u>e.g.</u>, MGL ch. 7, § 40N (discussing the percentage of capital facility projects reserved for Massachusetts' women- and minority-owned businesses); <u>see also</u> 23 CFR 230.203 (explaining the Federal Highway Administration's efforts "to promote increased participation of minority business enterprises in Federal-aid highway contracts").

Duxbury Trucking, Inc. was just such a business.  Owned by Susan Martinsen and certified as a Woman-Owned Business Enterprise ("WBE"), Duxbury Trucking provided hauling services on Boston's multi-billion dollar Central Artery/Tunnel Project (the "Big Dig").  In theory, Duxbury Trucking's WBE status should have enabled it to compete for bids and perform work on the same terms as any other trucking subcontractor.

In Martinsen's case, however, the reality of work on the Big Dig fell far short of what the WBE program seemed to promise.  According to Martinsen, the state agencies in charge of overseeing the Big Dig -- the Massachusetts Turnpike Authority ("MTA") and the Massachusetts Highway Department ("MHD") -- failed to enforce the regulations and agreements that governed the relationship between Big Dig prime contractors and subcontractors like Duxbury Trucking.  This failure allowed prime contractors to pay subcontractors at a rate below the legally and

contractually-mandated prevailing wage, which, in turn, made it impossible for subcontractors to pay their own employees the required prevailing wage.

As a result, Martinsen found herself in an impossible situation:  Should she comply with the law and pay her employees the prevailing wage at the cost of her company's financial stability?  Should she instead, as some prime contractors urged her, falsify her payroll records to create the appearance of compliance with prevailing wage requirements?  Martinsen chose to comply with the law, and, despite the deficit in prime contractors' payments to Duxbury Trucking, paid her own employees the required prevailing wage.

In 1996, Martinsen's situation became unsustainable, and Duxbury Trucking was forced to stop work on several contracts. In May 1997, in response to a demonstration by Big Dig truck drivers, the MTA and MHD finally took action, entering into an agreement with the Teamsters Local Union and other parties that would require prime contractors to pay the required wage rate to subcontractors.  Even after this "Uplift Agreement" was established, however, prime contractors continued to underpay Duxbury Trucking.

Ms. Martinsen did not suffer these wrongs silently.  She lodged a complaint with the Federal Highway Administration

("FHA"), reporting sex discrimination on the Big Dig.[1]  She also sought help from state agencies.  None of these efforts produced any change.  After reviewing Martinsen's complaint for a full thirty months, the FHA issued a finding of no discrimination. Likewise, Martinsen received little or no assistance from the state agencies to which she complained.

No longer able to service its debts, having exhausted its capital, and unable to meet its payroll, Duxbury Trucking ceased competing for Big Dig bids in 1999.  Today, the company is no longer in business.

It is clear to this Court that Ms. Martinsen was wronged, and that the wrong she suffered was uniquely governmental. Though the WBE program offered Martinsen an opportunity to compete, the inefficiency, inattention, and incompetence of the multiple layers of government tasked with overseeing the Big Dig made it impossible for Duxbury Trucking to become a true competitor.  When faced with the choice of staying in business or complying with her legal and contractual obligations, Martinsen had no option but to park her trucks.  She attempted to complain, but got nowhere.  The promise of the WBE program turned out to be empty.

---

[1] Specifically, Duxbury Trucking's complaint noted that WBEs were over-represented in the category of trucking subcontractors of which it was a part, a category being squeezed out of business by the MTA's and MHD's alleged non-enforcement of prevailing wage regulations and agreements.

Though it is clear that Martinsen and her company were wronged, the legal claims that Duxbury Trucking now seeks to assert against state and federal defendants have proven to be flawed.  Indeed, after multiple rounds of briefing and two sets of hearings, I have concluded that Duxbury Trucking's claims against the state defendants[2] are time-barred.  Accordingly, I **GRANT** the remaining state defendants' motion to dismiss [document #18].  I also **GRANT** the separate motion to dismiss filed by former Director of the Massachusetts Highway Department's Office of Civil Rights Patricia O'Brien [document #48].

With respect to Duxbury Trucking's due process claims against the federal defendants,[3] I request further briefing on the arguments raised by the federal defendants concerning the availability of a <u>Bivens</u> action in this circumstance.  I therefore **DEFER** making a final decision on the federal defendants' motion to dismiss [document #8].

## II.  <u>BACKGROUND FACTS</u>

Plaintiff Duxbury Trucking was a Massachusetts trucking corporation since 1996 and a certified WBE since April 1, 1998. In this lawsuit, Duxbury Trucking has claimed that, while it

___

[2] The remaining state defendants are the MTA and Lorenzo Parra, Director of the MTA Office of Civil Rights.  The MHD, in its capacity as a state agency, was terminated from the case by an Order dated September 27, 2005.

[3] The federal defendants are former FHA Associate Administrator for Civil Rights Edward Morris, FHA District Administrator Stanley Gee, FHA Equal Opportunity Specialist Brenda Armstead, and former FHA Director of Civil Rights for the Eastern Resources Center Arthur Armstead.

worked as a subcontractor on the Big Dig, the MHD and the MTA subjected it to sex discrimination in violation of Title VI of the Civil Rights Act of 1964 and deprived it of its Fourteenth Amendment property right (pursuant to its WBE status) to continue work on, and compete for, contracts on the Big Dig.  In addition, Duxbury Trucking has alleged that when it filed a complaint with the FHA against the MHD and the MTA, Edward Morris ("Morris"), former FHA Associate Administrator for Civil Rights, Stanley Gee ("Gee"), FHA District Administrator, Brenda Armstead ("B. Armstead"), FHA Equal Opportunity Specialist, and Gene Armstead ("G. Armstead"), former FHA Director of Civil Rights for the Eastern Resource Center, conspired to deprive it of its property rights without due process in violation of the Fifth Amendment.

A.   **The State Defendants**

The MTA managed the Big Dig through a Memorandum of Understanding ("Memorandum") with the MHD, which received Federal-Aid Highway Trust Funds for the project.  According to the Memorandum, the MTA was subject to the same obligations as the MHD.  The MTA entered into an agreement with Bechtel/Parsons-Brinkeroff ("B/PB"), transferring overall project management responsibilities to B/PB.  In November 1989, B/PB and the AFL-CIO entered into a Project Labor Agreement ("PLA"), and the MHD required all Big Dig contractors to be bound by the PLA.  In turn, the PLA required all contractors working on the Big Dig to

pay base hourly wage rates to their employees and to make
contributions to established employee benefit funds.  At the same
time, the Massachusetts Prevailing Wage Law ("Prevailing Wage
Law") indicated, "laborers in the construction of public works by
the commonwealth . . . shall not be [paid] less than the rate or
rates of wages to be determined by the commissioner."  Mass. Gen.
Laws ch. 149 § 26 (2005).

Duxbury Trucking contracted with prime contractors and
subcontractors on the Big Dig to haul sand and gravel as an "A,
B, and C Material Hauler."[4]  It acquired the bulk of its Big Dig
contracts in 1996.  Under a June 1996 contract with Willie Jones
Trucking ("Willie Jones"), a subcontractor of the prime
contractor, Perini Corporation ("Perini"), Duxbury Trucking was
paid $44/hour and was required to pay its employees a prevailing
wage rate of $20.17 and a benefits package of $8.  Neither Perini
nor Willie Jones submitted payroll forms to the MHD, though they
were required to do so under state law.  In the face of the same
wage rate and benefits requirements, Duxbury Trucking also
entered a July 1996 contract with Mass. Gravel, earning $50/hour,
and an August 1996 contract with Mary O'Donnell, earning
$45/hour.  Finally, Duxbury Trucking's November 1996 contract
with Great Northern Site Development was cut short after a week

---

[4] Duxbury Trucking asserts that there were more WBEs working as A, B,
and C Material Haulers than in any other trucking classification on the Big
Dig.

because plaintiff refused to sign a blank prevailing wage
certification form.

Plaintiff has alleged that the hourly rate ("trucking rate")
set by the Big Dig prime contractors was too low for it to pay
its employees the prevailing wage rate while covering operating
costs, that the prime contractors failed to deposit appropriate
funds for benefits, and that the state agencies did nothing about
this.  To conceal their inadequate pay rates, plaintiff contends
that the prime contractors chose not to collect certified payroll
records and/or directed WBEs to falsify payroll records so that
it would appear as though the parties had met their obligations
under Massachusetts law and their various contracts.  Refusing to
falsify its records, plaintiff was forced to "park her trucks"
and stop short of completing several contracts in 1996.

In May 1997, Duxbury Trucking participated in a truck
drivers' demonstration on these issues.  In response, the MHD,
B/PB, Department of Labor, Teamsters Local Union, and
representatives of the trucking industry attempted to address the
trucking rate problem by entering into an agreement ("Uplift
Agreement").  The Uplift Agreement was to improve the hourly
trucking rate, so that A, B, and C Material Haulers could pay
their employees the prevailing hourly wage rate, and force prime
contractors to pay into health and pension funds as provided by
the state prevailing wage statute.  It increased hourly trucking

rates from $40-45 to $60-65, and the MHD and B/PB agreed to monitor compliance with the Prevailing Wage Law. The B/PB had to ensure that prime contractors required subcontractors and brokers to comply with the prevailing wage standard. The MHD and the MTA had to oversee and objectively review the actions or inactions of B/PB and the extent to which prime contractors met their responsibilities. The Agreement was supplemented on September 24, 1997, to ensure employer contributions to benefits packages.

Nonetheless, the MHD and the MTA allegedly continued failing to oversee prevailing wage requirements. Duxbury Trucking entered several contracts with one prime contractor, Modern Continental, Inc. ("Modern"), after the Uplift Agreement took effect, continuing to earn less than the required hourly trucking rate, such that it could not both pay its employees the prevailing hourly wage rate and stay in business.

On September 16, 1997, plaintiff entered into a year-long contract with Modern, which paid $65/hour. At roughly the same time, Duxbury Trucking arranged to pay back to Modern $10 for each hour that it worked, in order to repay three loans set up by the MHD for lease payments on Duxbury Trucking's parked trucks. The payments were taken immediately out of invoices generated by Modern for completed work. In addition, Modern exacted 8% interest on the loan.

Duxbury Trucking's year-long relationship with Modern included several written contracts dated September 16, 1997, September 19, 1997, January 17, 1998, and June 15, 1998. The June 15 contract was the only one that Duxbury Trucking entered *after* receiving WBE certification from the Massachusetts State Office of Minority and Women Business Assistance on April 1, 1998; all other contracts preceded certification. As of June 15, 1998, Duxbury Trucking allegedly hauled materials for Modern on a regular basis until November 28, 1998. Plaintiff resumed hauling for Modern on April 10, 1999, and continued to do so until May 28, 1999, when it ceased operations. Though there appears to be no written contract for this second round of hauling, plaintiff allegedly completed projects for Modern totaling at least $56,800.55 between June 15, 1998, and May 28, 1999.

Duxbury Trucking claims that, though it had an excellent loan repayment record with Modern, it could not continue covering prevailing wage rates and benefits while effectively earning $55 per hour. As a result, plaintiff ran out of capital and lost her trucks in 1999.

B.    **The Federal Defendants**

Since the Big Dig received substantial federal funding, the federal government, through the FHA, was responsible for ensuring that these funds were used responsibly and lawfully. On or about September 27, 2000, Duxbury Trucking filed a complaint with the

-10-

FHA, alleging that the MHD and the MTA discriminated against it as a WBE.  Defendant Morris was assigned to handle the complaint and the ensuing investigation.  Defendants B. Armstead, G. Armstead, and Gee contributed to the FHA's response to Duxbury Trucking's complaint.  While the complaint was pending, "several of these individuals" allegedly told Duxbury Trucking to "bear with" the process because a finding of discrimination would be forthcoming and would translate into a monetary award.  The FHA even generated an initial report finding that Duxbury Trucking was the victim of discrimination as a WBE.  Nonetheless, on March 3, 2003, Morris denied the complaint and, on June 19, 2003, denied Duxbury Trucking's request for reconsideration.

Shortly thereafter, the plaintiff filed a Freedom of Information Act ("FOIA") request for the materials generated by the FHA during the investigation of its complaint.  The FHA produced some, but not all, of these documents in April 2004.

**C.   The Present Lawsuit**

Duxbury Trucking filed the present lawsuit in this Court on October 6, 2004, asserting Title VI sex discrimination, due process violations, and conspiracy against FHA officials, the MTA, and the MHD.

In 2005, the defendants moved to dismiss the case.  On September 13, 2005, this Court denied the federal defendants' motion to dismiss in its entirety and granted in part and denied

in part the state defendants' motion to dismiss.  The decision
terminated the Title VI sex discrimination claims,[5] but left
intact the due process allegations against both the federal and
state defendants.[6]  In addition, the decision allowed the
plaintiff to amend the Complaint to assert claims against
individual state officials.

With respect to the plaintiff's remaining due process
claims, the decision left open two specific questions, and
invited the parties to file supplemental briefs.  The Court
asked: 1) whether the doctrine of equitable tolling applies to
save the plaintiff's due process claims against the state
defendants, for which the statute of limitations had expired at
the time of this lawsuit's filing; and, 2) whether the federal
defendants are qualifiedly immune from the plaintiff's due
process claims.[7]

---

[5] The Court held that, under <u>Alexander v. Sandoval</u>, 532 U.S. 275 (2001),
the plaintiff has no private right of action to assert a Title VI disparate
impact claim.

[6] The due process claims against the two sets of defendants -- state and
federal -- are different.  The claims against the state defendants assert
that, when Duxbury Trucking was forced to cease operations due to the non-
enforcement of payment regulations, that deprived the plaintiff of a property
interest without due process of law.  The claims against the federal
defendants center on the delay in processing the plaintiff's FHA sex
discrimination complaint.

[7] Specifically, the Court's decision stated, at pp. 49-50:

In conclusion, the state agencies' motions to dismiss
are **GRANTED** in part and **DENIED** in part.  First,
defendants' motion to dismiss the sex discrimination
claim is **GRANTED** because there is no private right of
action under § 324/Title VI for disparate impact
claims.  Second, for the moment, defendants' motion to

After a series of extensions of time, the parties filed their supplemental briefs.[8]  In addition, one defendant -- former director of the Massachusetts Highway Department's Office of Civil Rights Patricia O'Brien -- has filed a separate motion to dismiss.

## III. **MOTIONS TO DISMISS**

### A.  **Legal Standard**

The parties' supplemental briefing and O'Brien's separate motion are to be analyzed through the lens of the Rule 12(b)(6) standard governing motions to dismiss.  A complaint is subject to dismissal under Fed. R. Civ. P. 12(b)(6) only if "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." Gorski v. New

---

dismiss the due process claim is **DENIED** because plaintiff does not fail to state a claim under the generous standards applicable at this stage.  However, the due process claim will also be dismissed, if plaintiff is unable to make a convincing equitable estoppel showing after further discovery and briefing (plaintiff's brief is due by **October 21, 2005**, and defendants' response is due by **November 4, 2005**).

The FHA's motion to dismiss is **DENIED** for the following reasons: 1) Duxbury's allegations are adequate to state a claim on the conspiracy count against FHA officials; 2) Duxbury's allegations are adequate to establish the requisite improper motive; and 3) defendants' immunity defense should not be granted at this point, as plaintiff makes out a prima facie case for defendants' unlawful behavior.  The federal defendants' supplemental brief on immunity is to be filed by **October 21, 2005**, and plaintiff's response is due by **November 4, 2005**.

[8] Though the Court also invited the federal defendants to brief the question of whether the plaintiff should supply a more definite statement as to the claims against them, no individual defendant has filed a brief on this issue.

Hampshire Dep't of Corrections, 290 F.3d 466, 473 (1st Cir. 2002)

(quoting Hishon v. King & Spaulding, 467 U.S. 69, 73 (1984)).

The allegations in the complaint should be accepted as true, and

all reasonable inferences must be drawn in favor of the

plaintiff.  Moss v. Camp Pemigewassett, Inc., 312 F.3d 503, 506

(1st Cir. 2002).

   **B.    Statute of Limitations**

     In their original motion, the state defendants argued for

dismissal of the plaintiff's due process claims because they were

filed after the expiration of the applicable three-year statute

of limitations period.  The plaintiff countered that the state

defendants should be equitably estopped from raising a statute of

limitations defense because Duxbury Trucking was delayed in

filing the present lawsuit by the FHA's thirty-month complaint

processing time.  Because the plaintiff's due process claims are

against the *state* defendants, however, and the delay was caused

by the *federal* defendants, I required supplemental briefing on

whether the state was "complicit" in the delay.  I also ordered

briefing on whether equitable principles apply to toll the

statute of limitations for the *due process* claims when the FHA's

delay was in processing the plaintiff's *sex discrimination*

complaint and FOIA request.[9]

---

     [9] My opinion on the motions to dismiss asked the following questions at
pp. 34-35:

1. **Analysis**

Before proceeding to a review of the three statute of limitations questions addressed in the parties' supplemental briefs, it is important to note the standards that govern equitable estoppel and equitable tolling, two doctrines relied on by the plaintiff to defeat the state defendants' statute of limitations argument.

Regarding equitable estoppel, this Court explained in its decision on the motions to dismiss that "[a] court will grant equitable estoppel when the following is true: 1) the defendant made representations that it knew or should have known could induce plaintiff to postpone bringing a suit; 2) plaintiff in fact delayed bringing suit in reliance on those representations; and 3) plaintiff's reliance on those representations was

---

In making its equitable estoppel showing, plaintiff must also attend to the following questions: 1) Assuming that the FHA's alleged assurances and delays should toll the statute of limitations during the pendency of Duxbury's discrimination complaint and FOIA request, why should the tolling apply to the entire period when even the most efficient reviews take some time?; 2) Why should the period during which Duxbury awaited resolution of its motion for reconsideration apply when it already had notice of an adverse determination?; and 3) Why should tolling apply here at all when the FHA complaint was grounded in claims of sex discrimination, while the only remaining issue now is the alleged due process violation?

I also requested briefing on how much time should be tolled, given that all complaint-processing takes some time, and asked Duxbury Trucking to justify its equitable estoppel argument, given that the plaintiff had notice of the FHA's ultimate adverse determination long before the filing of this lawsuit. Because, as I explain below, I conclude that the plaintiff may not make equitable tolling or equitable estoppel arguments, I do not reach the question of how much time should be tolled.

-15-

reasonable.  See Kozikowski v. Toll Brothers, Inc., 354 F.3d 16, 24 (1st Cir. 2003)."

The test for equitable tolling, in turn, requires the plaintiff to have been "excusably ignorant" of his or her filing obligations due to affirmatively misleading conduct by the defendant.  See Irwin v. Department of Veterans Affairs, 498 U.S. 89, 96, (1990); Andrews v. Arkwright Mut. Ins. Co., 673 N.E.2d 40 (Mass. 1996).

Though the two doctrines are distinct, Duxbury Trucking uses them interchangeably in its supplemental briefs.  While technically improper, this mingling of equitable tolling and equitable estoppel does not alter the Court's evaluation of the statute of limitations issue.  Both doctrines require some showing of misleading conduct by the party raising the statute of limitations defense, a showing that the plaintiff here has failed to make.  I now turn to an analysis of the three statute of limitations questions raised by the Court and addressed by the parties in their supplemental briefs.

### a.  State Defendants' Complicity

With respect to the first question -- the respective roles of the state and federal defendants in causing delay --  the plaintiff argues that the state was "complicit" in the FHA's complaint-processing delay because, during its investigation, the

-16-

FHA requested information from the MTA in-house counsel,[10] who took ten weeks to respond.  On that basis, the plaintiff contends that the state defendants should be estopped from raising a statute of limitations defense, as they were complicit in delaying the plaintiff's filing of the present lawsuit.

The state defendants respond that a ten-week processing period does not make them "complicit," as they worked diligently during that time to respond to the FHA.  Moreover, the state defendants assert that they never induced the plaintiff to delay filing a lawsuit in federal court.

Though this Court did not explain in its decision on the defendants' motion to dismiss what it would mean for the state defendants to be "complicit" for statute of limitations purposes, it is clear from the supplemental briefing that the ten weeks attributable to the state defendants does not amount to complicity.  If these ten weeks -- only one-twelfth of the FHA's total complaint-processing time -- slowed the FHA's evaluation of Duxbury Trucking's sex discrimination complaint, that delay was insignificant when compared to the delay attributable to the federal defendants.

In addition, the plaintiff has provided no evidence of the sort of misrepresentations or misleading conduct *on the part of*

---

[10] The plaintiff here names Lorenzo Parra, Director of the MTA Office of Civil Rights, and attorney Kialky.

*the state defendants* required for the application of equitable estoppel or equitable tolling.  Even if FHA investigators gave Martinsen false hope about the outcome of her sex discrimination complaint, there is no indication that state defendants did the same.

Thus, Duxbury Trucking has not established that the state defendants were "complicit" in the federal delay in processing Martinsen's sex discrimination complaint, and has not excused its failure to file the present lawsuit within the statute of limitations.

### b.  Due Process v. Sex Discrimination Claims

With respect to the second question -- whether Duxbury Trucking may make equitable estoppel or equitable tolling arguments as to its *due process* claim based on a delay in the FHA's processing of its *sex discrimination* claim -- the plaintiff argues that both claims stem from the same underlying set of facts.  Therefore, any circumstances that would toll the statute of limitations applicable to the now-dismissed sex discrimination claims would toll the due process claims' statute of limitations as well.

The defendants reply that, if an estoppel argument existed in this case, it would only have applied to the now-dismissed sex discrimination claims, and has no present application to the surviving due process claims.  The defendants cite <u>Johnson v.</u>

Railway Express Agency, Inc., 421 U.S. 454 (1975) in support of
this position.  In Johnson, the Court held that the statute of
limitations for a claim pursuant to 42 U.S.C. § 1981 was not
tolled by the Equal Employment Opportunity Commission's delay in
processing a Title VII claim, though the two claims arose from
the same set of facts.  As the Johnson court concluded, "Only
where there is complete identity of the causes of action" will an
administrative claim toll the statute of limitations on a legal
claim.  Id. at 468.

     Johnson thus provides an answer to the Court's question
about the relationship between the sex discrimination and due
process claims.  To the extent that the plaintiff attempts to use
the FHA's delay in processing its sex discrimination complaint to
stop the running of the due process claims' statute of
limitations, that attempt is barred by Johnson, for there is no
"complete identity of the [two] causes of action."  Id.; see also
International Union of Electrical v. Robbins & Myers, Inc., 429
U.S. 229 (U.S. 1976) (reaffirming the "complete identity" rule);
Stafford v. Muscogee County Bd. of Education, 688 F.2d 1383, 1389
(11th Cir. 1982) (characterizing Robbins & Myers as barring "the
assertion of any independent claim, even if it related to the
same factual circumstances"); Johnson v. Artim Transp. System,
Inc., 826 F.2d 538, 550 (7th Cir. 1987) (refusing to toll the

statute of limitations for a claim that was "independent of and separate from" a claim that did merit tolling).

Thus, I conclude that the time the FHA took to process the plaintiff's sex discrimination claim did not toll the running of the statute of limitations applicable to the plaintiff's due process claims.  Accordingly, I **GRANT** the state defendants' motion to dismiss and the separate motion to dismiss filed by Patricia O'Brien.[11]

C.    <u>**Qualified Immunity**</u>

The federal defendants have argued for dismissal of the plaintiff's due process claim against them on qualified immunity grounds.  The doctrine of qualified immunity shields government officials from "liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982).  To overcome a qualified immunity defense, a plaintiff "must show that his allegations, if true, establish a constitutional violation; that the right was clearly established; and that a reasonable official would have known that her actions violated

---

[11] O'Brien raises two arguments in her motion to dismiss.  First, she argues that she was never properly served in this action.  Second, she asserts that any claims against her are time-barred.  Because the second argument is dispositive, I do not address the issue of service in this Memorandum & Order. I adopt the reasoning explained above with regard to O'Brien's statute of limitations argument, and determine that the due process claims against her, like those against the other state defendants, should be dismissed as untimely filed.

the constitutional right at issue."  Mihos v. Swift, 358 F.3d 91,
98-99 (1st Cir. 2004).

In this Court's decision on the defendants' motions to
dismiss, I concluded that, though Duxbury Trucking did have a
clearly established right to the FHA's prompt processing of its
discrimination complaint and subsequent FOIA request, it was
unclear whether the FHA's delay was objectively unreasonable.  I
requested additional briefing on the question of whether the
delay was caused by the FHA itself or whether it was caused by
outside factors over which the FHA had no control, suggesting
that the delay would be reasonable and that qualified immunity
would apply.

   1.  **Analysis**

Though the parties' supplemental briefing addresses the
issues identified by the Court,[12] it does not, nor did the
initial briefing on the motions to dismiss, adequately address a

---

[12] The parties' supplemental briefing presents contradictory
explanations for the FHA's thirty month complaint processing time.  The
parties agree that the FHA conducted three separate investigations of Duxbury
Trucking's sex discrimination claim, and that the three investigations took a
significant amount of time.  They disagree, however, about the reason for the
multiple investigations.  The plaintiff, on the basis of affidavits from
Martinsen and her husband, argues that the FHA's lower-level investigators,
Brenda Armstead and Peter Silva, recommended a finding of sex discrimination,
and that their supervisor, Edward Morris, rejected this recommendation and
ordered the investigation to be redone twice.  According to the plaintiff,
this was, at worst, a cover-up designed to produce a finding of no
discrimination, or, at best, the result of extreme incompetence.

The federal defendants contend, on the basis of affidavits from the
investigators, that the senior investigator, Morris, was dissatisfied with the
completeness of the initial investigations and, in an attempt to conduct a
thorough investigative process and reach a reliable conclusion, ordered the
investigation to be redone.

threshold question highlighted by the federal defendants at oral argument: whether Duxbury Trucking may even pursue a <u>Bivens</u>[13] remedy in this case, or whether it is confined to the remedies contained in the "comprehensive statutory scheme" that governs the FHA's processing of discrimination complaints and FOIA requests.  <u>See</u>, <u>e.g.</u>, <u>Schweiker v. Chilicky</u>, 487 U.S. 412 (1988) (holding that a <u>Bivens</u> remedy was foreclosed by the existence of a comprehensive statutory scheme).

The parties are therefore **ORDERED** to submit short supplemental briefs on the issues raised by the federal defendants at oral argument and addressed at footnote six of the federal defendants' supplemental brief [document #37].  In addition, the parties are to address the inquiry the Court raised at oral argument:  Does the <u>Schweiker</u> line of cases foreclose <u>Bivens</u> actions when it appears that the remedies dictated by the comprehensive statutory scheme would fall far short of addressing the wrong suffered by the plaintiff?

Finally, the parties are to brief the question of damages in this case.  If Duxbury Trucking were to prevail on its due process claims against the federal defendants, for what harm would it recover?  How would the amount of that recovery be calculated?

---

[13] <u>Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics</u>, 403 U.S. 388 (1971) allowed plaintiffs to bring "constitutional torts" against federal defendants.

The federal defendants' brief is due **March 20, 2007**.  The plaintiff's brief is due **March 30, 2007**.

IV.  <u>CONCLUSION</u>

For the reasons explained above, I hereby **GRANT** the remaining state defendants' motion to dismiss in its entirety [document #18].  I also **GRANT** the separate motion to dismiss filed by former Director of the Massachusetts Highway Department's Office of Civil Rights Patricia O'Brien [document #48].

With respect to Duxbury Trucking's due process claims against the federal defendants, I request further briefing on the availability of a <u>Bivens</u> action.  I therefore **DEFER** making a final decision on the federal defendants' motion to dismiss [document #8].  The federal defendants are **ORDERED** to brief the <u>Bivens</u> question, as well as the question of damages, **by March 20, 2007**.  The plaintiff's responsive brief is due **March 30, 2007**.


SO ORDERED.

Date:  March 6, 2007            /s/ Nancy Gertner
                                **NANCY GERTNER, U.S.D.C.**