UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Duxbury Trucking, Inc., <br><br> Plaintiff, <br><br> v. <br><br> Massachusetts Highway Department, et al., <br><br> Defendants. | Civil Action No. 04-12118-NG |

**PLAINTIFF DUXBURY TRUCKING INC.'S SUPPLEMENTAL MEMORANDUM IN SUPPORT OF PROCEEDING WITH BIVENS CLAIMS AGAINST INDIVIDUAL FEDERAL DEFENDANTS**

NOW COMES Duxbury Trucking, Inc. ("Plaintiff") by and through counsel, Shaheen & Gordon, P.A., and in accord with the Court's March 6, 2007 MEMORANDUM AND ORDER ("Order") submits this memorandum answering the question posed by the Court[1] and in support of its claims that the Bivens actions should be allowed to proceed against the individual federal defendants.

**I.
INTRODUCTION**

The Court in its March 6, 2007 Order instructed the parties at p. 22 to file a short supplemental brief addressing the following question: "Does the Schweiker line of cases foreclose Bivens actions when it appears that the remedies dictated by the comprehensive statutory scheme would fall far short of addressing the wrong suffered by the plaintiff?"

---

[1] See Order at p. 22.

1

The short answer is no. The Supreme Court's denial of a <u>Bivens</u> action in both <u>Schweiker v Chilicky</u> and <u>Bush v. Lucas</u> were predicated on the existence of a comprehensive and **effective** statutory scheme existing to remedy the violation and provide redress for the plaintiff. In the case at bar, the remedies "fall far short of addressing the wrong suffered by the plaintiff," and under the same rational do not bar a <u>Bivens</u> action.

## II.
## ANALYSIS

The existence of a right to pursue civil monetary damages from federal employees whose action deprived an individual of his constitutional rights was recognized in <u>Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics</u>, 403 US 388 (1971). Though the <u>Bivens</u> Court addressed a Fourth Amendment violation, later decisions showed the broad applicability of the rational employed to allow money damages against federal officers for Fifth Amendment Due Process Clause violations, <u>Davis v. Passman</u>, 442 U.S. 228 (1979), and the Eight Amendment Cruel and Unusual Punishments Clause violations, <u>Caarlson v. Green</u>, 446 U.S. 14 (1980). The specific issue later arose whether the Court created <u>Bivens</u> remedy was the appropriate redress for violations of citizens' rights by federal agents when there were complex and comprehensive schemes already in place in the agency involved for dealing with such violations.  The two landmark Supreme Court cases that address this issue are <u>Bush v. Lucas,</u> 462 U.S. 367 (1983) and <u>Schweiker v. Chilicky</u>, 487 U.S. 412 (1988).

A.    *<u>Bush v. Lucas</u>*

In <u>Bush</u>, a federal civil service employee sought a <u>Bivens</u> remedy, claiming that a federal official had demoted him in retaliation for exercising his First Amendment right of free speech.

The Court stated that this was not a normal Bivens claim, but a special situation that had "compelling" "reasons for deferring to congressional policy." Lucas, 462 US at 380. "Here a complex of relations between federal agencies and their staffs is involved." Id. (quoting US v. Gilman, 347 US 507). Because of these special "relations between the US and its employees," and the "myriad of problems with which the Congress has dealt," the Court was exceedingly cautious to step in and tell the other branches how to manage their employees. Id. at 379-380. "[T]he ultimate question on the merits in this case may appropriately be characterized as one of federal personnel policy." Id. at 380-381.

Mindful of this special relationship, the Court still performed a detailed analysis of the law and remedies a federal employee would have in a situation such as the plaintiff. After outlining the comprehensive process due to an aggrieved federal employee, the Court stated,

> If the employee prevailed in the administrative process or upon judicial review, he was entitled to reinstatement with retroactive seniority. § 752.402. He also had a right to full back pay, including credit for periodic within-grade or step increases and general pay raises during the relevant period, allowances, differentials, and accumulated leave. § 550.803. Congress intended that these remedies would put the employee "*in the same position he would have been in had the unjustified or erroneous personnel action not taken place.*"

Id., at 388 (emphasis added) (quoting S.Rep. No. 1062, 89th Cong., 2d Sess. 1 (1966), U.S.Code Cong. & Admin.News 1966, p. 2097.)

The language the Court quotes about the statutory scheme intended to "put the employee in the same position" as if the "action [had] not taken place" is a clear reference to the standard that guides civil courts in awarding monetary damages. See Justice Marshall's concurring opinion, Id. at 390-392.

This level and sufficiency of process was noted by the Court when it stated, "Given…the comprehensive nature of the remedies currently available…[t]he question is not what remedy the

3

Court should provide for a wrong that would otherwise go unreddresed," it is what sufficient system of redress to employ. Id.

This last point is underscored by Justice Marshall's concurring opinion. "I write separately only to emphasize that in my view a different case would be presented if Congress had not created a comprehensive scheme that was specifically designed to provide full compensation to civil service employees who are discharged or disciplined in violation of their First Amendment rights, and *that affords a remedy that is substantially as effective as a damage action*." Id. at 390 (citations removed, emphasis added). Marshall's observation is key, because in the instant case, Duxbury Trucking was faced with a remedy that was not a scheme "substantially as effective as a damage action" that "put the [victim] in the same position he would have been in had the unjustified or erroneous personnel action not taken place," but instead the Agency remedies offered to Duxbury Trucking "fall far short of addressing the wrong suffered by the plaintiff." Order at 22. The thrust of the Court's opinion and concurrence are that in Bush a Bivens remedy would be redundant and "unnecessary." Id. at 392. That redundancy of redress is not presented in this case.

B.      *Schweiker v. Chilicky*

The other landmark case to deal with this issue is Schweiker. In this case an estimated 200,000 individuals' social security benefits were improperly discontinued under a new "continued disability review" (CDR) program Congress had enacted and the Department of Health and Human Services Agency implemented in 1981. Schweiker, 487 U.S. at 416. Under the CDR, Congress required most disability determinations to be reviewed at least once every three years, and placed the burden on the claimant to prove continued disability. Because of the

4

sheer size of Social Security program, even with small error rates, the broad re-evaluation requirement would have resulted in thousands of claimants improperly cut off from benefits. Claimants could appeal the terminations to administrative law judges, and about half did, and if the appeals were successful, which about two thirds were, the CDR would reinstate and provide retroactive benefits for those wrongly cut off. Id. at 416-417 ("an amazing two-thirds of those who appealed were being reinstated").

When Congress was made aware of the true impact of their new program, as exposed through dozens of hearings, they did not wait for the Courts to straighten it out. Instead, Congress passed emergency legislation in 1983, and more permanent overhauling legislation the next year, the "1984 Reform Act" to deal specifically with the "terrible effects" of the CDR. Id. at 415-416. In neither of Congress' bills correcting the CDR did they make allowances for recovery for the ancillary harms they learned their program caused.[2] Congress' failure to provide this relief, especially for "emotional distress," was the subject of the plaintiffs' suit in Schweiker. Id. at 419.

In analyzing this case, the Court declined to create a Bivens remedy because Congress already provided "meaningful remedies for the rights of persons situated as respondents were," Id. at 425, and Congress, fully aware of the scope of the problem faced by the respondents, offered what it considered appropriate relief in its reform legislation. **Neither of these situations face this Court in the case at bar.**

A key passage in Schweiker was the Court's observations that the Social Security Agency's process for providing redress is "an ***unusually protective*** [multi]-step process for the review and adjudication of disputed claims." Id. at 424 (emphasis added). Indeed, the Court

---

[2] "[t]he human dimension of this crisis – the unnecessary suffering, anxiety, and turmoil – has been graphically exposed by dozens of congressional hearings…" Id. at 471.

5

noted that, "The administrative structure and procedures of the Social Security system, which affects virtually every American, are of a size and extent difficult to comprehend." Id. (internal quotations removed). When further characterizing the level of protection provided citizens interacting with this Agency, the Court stated "Indeed, the system for protecting [respondents'] rights is, if anything, ***considerably more elaborate than the civil service system considered in Bush***." Id. at 425.  It is because the Agency provided such an "unusually protective" and "considerably more elaborate" system of redress that the Court refrained from creating its own solution to a problem the Congress recently and explicitly acted on when passing the 1983 and 1984 emergency and overhauling legislation.

Moreover, the Court made it clear that the petitioners had meaningful relief for the wrongful acts committed by the Agency. Through extensive analysis of Congress' attention to the very problem complained of by the respondents, the Court concluded that "Congress, however, has not failed to provide *meaningful safeguards or remedies* for the rights of persons situated as respondents were." Id.  (emphasis added). Thus, the Court underscored that the *quality* of the remedy offered by statute was an important fact in determining whether to provide the Bivens action for the respondents.


C.     *Minimum Standard*

When Schweiker and Bush are read together, a minimum standard of redress appears, upon which a court will hold its hand. If the system for redress in place in Schweiker is "considerably" better than that in place in Bush, then the Court is arguably suggesting that the quality and level of redress in Bush must be a minimum standard.  As the Court in Bush stated

6

above, that standard is one that "affords a remedy that is substantially as effective as a damage action." Bush, 462 at 390. That level of effectiveness does not appear in the case at bar.

Other Courts have stated that subsequent to Schweiker, a court must still analyze the level of protection afforded by an agency's redress scheme.[3] "However, when the procedural safeguards of an administrative scheme are inadequate protectors of constitutional rights, Courts should not readily assume that a Bivens claim is precluded." Bagola v. Kindt, 131 F.3d 632, 644 (7th Cir. 1991). In Bagola, the Seventh Circuit ruled that a Bivens claim was available for an inmate injured in a prison work program, holding that because the afforded statutory remedy "does not provide procedural safeguards that **adequately** protect Bagola's Eight Amendment rights, we hold that the district court properly assumed jurisdiction over Bagola's Bivens claim." Id at 647. (emphasis added); see also Vaccaro v. Dobre, 81 F.3d 854, 857 (9th Cir. 1996) (overturning District Court dismissal of a Bivens action and explaining "Demko establishes that 18 U.S.C. § 4126 is the exclusive remedy against the Government. Vaccaro's Bivens action is not against the government. An individual may not maintain a Bivens action for monetary damages against the United States. Also, the theories as well as the defendants in § 4126 claims and in Bivens actions are different. No violation of constitutional rights is required for a §4126 claim, and no prison work related injury is necessary for a Bivens claim.") (internal citations omitted).

---

[3] It is true that "these cases are commonly cited for the general proposition that courts must always defer to remedies crafted by the legislature, even in constitutional cases. But this assumption fails to appreciate the analytical steps [the Supreme Court took] leading to the conclusion that the legislative remedy in these cases trumps the judicial constitutional remedy…it is important to note that in the Bivens special factor cases, the Court has not *blindly followed* the remedies chosen by the legislature, but rather has insisted that the legislative remedy be an *adequate substitute*." Tracy A. Thomas, Congress' Section 5 Power and Remedial Rights, 34 U.C. Davis L. Rev. 673, 754 (2001) (emphasis added).

7

Neither has this Court been reluctant to provide <u>Bivens</u> remedies for constitutional violations within the Department of Transportation. See <u>Capozzi v. DOT</u>, 135 F. Supp. 2d 87, (D. Mass. 2001).[4] The language of Judge Saris in <u>Capozzi</u> is instructive:

> The government argues that this Court does not have jurisdiction because the cause of action is precluded by 49 U.S.C. § 46110 [the remedy statute]… Essentially, the government argues that this Bivens action is an end-run around the statutory procedure for challenging the FAA's regulatory orders… [But m]any of the allegations in the complaint do not fit neatly under § 46110. For example, the complaint alleges that a former paramour regulator and her friends retaliated against a company subject to her authority by unnecessarily asking for books and records in a burdensome way, ***unduly delaying agency actions***, making untoward comments to a company customer and a pilot employed by the company, and the like. Other allegations may well involve a collateral challenge to an agency "order" over which this Court has no jurisdiction, but a more expanded record is necessary to make that determination. For instance, there is an allegation that Capozzi was not renewed as an accident prevention counselor and that the FAA stopped a sponsorship of Plaintiff's seminar. These may well be instances of ***agency inaction***, rather than "orders."

<u>Id.</u> at 94-95 (emphasis added).

Similar to <u>Capozzi</u>, delay and inaction are key facts in the wrong perpetrated by the FWHA agents on the plaintiff. As noted in earlier filings on this matter,[5] the defendants' own admissions in a PowerPoint presentation describe the delay and inaction of the agents as a "swamp." But this swamp was of their own making.

Therefore, this Court, like <u>Bagola</u> advises, should not "assume that a <u>Bivens</u> claim is precluded," but should apply the Supreme Court standard mandated in <u>Bush</u> through <u>Schweiker</u>. Plaintiff is confident that this Court will find the "safeguards" of the FHWA's administrative

---

[4] Defendant's case cite of <u>Kostka v. Hogg</u>, 560 f.2d 37 (1st Cir. 1977) is no longer good law. It has been *criticized* and *distinguished* by a number of courts, see e.g. <u>Jacobson v. Tahoe Regional Planning Agency</u>, 566 F.2d 1353, (9th Cir. Cal. 1977); <u>Rhodes v. Wichita</u>, 516 F. Supp. 501 (D. Kan. 1981), and was *disapproved* by <u>Gomez v. Toledo</u>, 446 US 635, 638 n. 4 (1980).

[5] See, e.g. <u>Plaintiff Duxbury Trucking's Response To Federal Defendants' Supplemental Memorandum In Support Of Motion To Dismiss</u>

scheme inadequate as it does not provide a system for redress at least as good as "that in place in Bush," and that this Court will, like in Bagola, allow plaintiff's Bivens action to proceed, providing the plaintiff a forum for its rights to be effectively redressed.

D.      *Administrative Procedure Act ("APA")*

Plaintiff's issue is not merely with the FHWA agents' failure to act, but rather with the agents' concerted effort to shield and cover-up corruption, and to conspire to deny plaintiff judicial relief through repeated and strenuous requests for plaintiff not to file suit, but instead look to the Agency for relief, which was just around the corner, and was going to be in the millions of dollars.

Declaration of Roy Martinsen:

- [Mr. Arthur Armstead's] exact statement was: "I am very sorry for what happened to your wife in Boston. She was discriminated against and it will only take a little bit longer but she can envision a big time clock ticking that she can translate into cash. Have a blessed day." I handed the phone to my wife and had him repeat himself. At ¶1
- [Mr. Armstead] told me about a notebook that he and Peter Silva, the FHWA investigator, were working on to better explain the case to Ed Morris. "Not to worry. It was still discrimination. The time clock was still ticking."
- During the second week of January 2002, knowing Mr. Morris wouldn't be back till February, I called Mr. Armstead and told him my wife wants to get a lawyer involved. He told me *there is no need*. "The righteous shall prevail." At ¶8.
- The next week I called Mr. Armstead and asked what was going on. He told me that his wife had found discrimination, as she had claimed. At ¶12.
- A couple of weeks later I called Mr. Morris back. He told me FHWA were working on the investigative report and if I wanted it to be discrimination, *I should leave it alone*. At ¶13.
- Sue concluded that she needed to find a lawyer to help her have her FHWA Complaint reviewed in a fair, prompt manner and the promised damages would be awarded and paid...[Mr. Morris] said, "For what? It's definitely looking like discrimination." At ¶15.

Declaration of Sue Martinsen

- [Mr. Silva] told me that he had gone to the officials of the Big Dig last week, expressed his concerns to the legal department of the Big Dig, they had said that they would look

9

- into it and would get back to him in an hour or two…Mr. Silva stated that upon exiting the elevator in Cambridge, Mr. Stanley Gee, the FHWA Regional Director for the Cambridge FHWA office, was standing at the elevator and told him to "Pack your bags, get out of here, and don't come back. There is no problem in Boston." At ¶8.
- I took the phone and Mr. Armstead stated: "I'm sorry for what happened to you in Boston. You were discriminated against. Wait just a little longer and you can envision a big time clock ticking that you can translate to cash." At ¶10.
- [Later] Mr. Armstead told [Roy Martinsen] not to worry about it, "its discrimination." At ¶10.
- Steve [Troiano at the Mass AG's office] had told [Roy Martinsen] that Mr. Morris had called him that morning and stated the FHWA had found for discrimination but he didn't know when it would go out. At ¶12.
- [Mr. Armstead] told me not to worry about it. "It's still discrimination, there is not a problem." At ¶15.
- The next week, I called Mr. Armstead to check on the status. He said that his wife had also found for discrimination, and that he and Mr. Silva had just sent her Emails on the topic. At ¶16.
- Mr. Morris called me a few times in April asking the same questions over and over. He said he wanted to get it straight in his mind because as he stated I had "gotten the short end of the stick and I was discriminated against." At ¶18.
- [Mr. Morris] called in early August 2002 to say he was coming to Boston to fill in some blanks, stating "Not to worry, Honey. You're going to get taken care of." At ¶19.
- "Mr. Morris said his boss, a Mr. Wright, had told him to clear his desk and finish Duxbury. I never heard from Mr. Morris again." At ¶21.

Supplemental Declaration of Peter Silva

- "In fact, in March 2003, approximately eighteen (18) months after I sent my report to the Civil Rights Office in Washington and after that Office issued a letter of finding to the complainant, my immediate supervisor, Mr. Armstead approached me and *asked me to change my report to support the team*. However, I objected to the request and sought assistance from the Director of the Eastern Resource Center, Mr. Robert Callan. … I never changed the report …" At ¶2 (emphasis added).

Plaintiff was carefully strung along with numerous assurances of imminent findings, and admonitions not to consult counsel, while the statue of limitations silently ticked in the background. The result of the agents' deception and manipulation has time-barred relief from the Commonwealth of Massachusetts and the individual state defendants. This type of wrong, these overt acts, though conducted by federal agents, do not relate to a final agency action and is

not contemplated by the APA. Conversely, these actions are exactly what Bivens was designed to address. See Robbins v. Wilkie, 300 F.3d 1208 (10th Cir. 2002) (collecting cases).

In Robbins, the plaintiff, Robbins, purchased land on which, unbeknownst to Robbins, the Bureau of Land Management (BLM) held a non-exclusive easement that it had failed to record. Thus, when Robbins recorded the title to the land he purchased, the BLM's easement was extinguished. In attempting to regain the easement for the BLM, BLM agents indulged in various forms of extortion, conspired to bring meritless criminal charges, and threatened to cancel Robbins' established right of way across BLM land. The district court, relying on Chilickly, dismissed Robbins' Bivens claim, stating it was precluded by the APA.

The Robbins Court reversed the district court's ruling stating, "However, the APA contains no remedy whatsoever for constitutional violations committed by individual federal employees unrelated to final agency action. Because Appellant cannot hold Defendants personally liable for allegedly violating his constitutional rights under the APA, the APA is an ineffective remedy. In this case, the APA does not preclude Appellant's Bivens claim. The district court's reliance on Chilicky, supra, is unfounded." Id. at 1212.  As in Robbins, in the case at bar, the APA does not remedy the constitutional violations committed by the FHWA agents, and does not bar the appropriate Bivens actions against these FHWA agents.

### III.
### DAMAGES

Lastly, the Court in its Order instructed the parties at p. 22 to brief the issue of damages, and address the questions: "If Duxbury Trucking were to prevail on its due process claims against the federal defendants, for what harm would it recover? How would the amount of that

11

recovery be calculated?" If Duxbury Trucking prevailed, it would recover an amount in the area of $4,989,035.10. The computation and explanation are as follows.[6,7]

Plaintiff used as a basis for the damages amount the calculations that are in Investigator Silva's Report, especially page 72. Investigator Silva was a specially trained federal agent who spent a great many months researching the situation, developing his report and arriving at his numbers. The Report is attached as Exhibit B to <u>Duxbury Trucking's Opposition to Defendant Massachusetts Highway Department's Motion to Dismiss</u>, said Opposition filed on April 14, 2005. The Report was completed in September 2001. Plaintiff has updated and expanded Investigator Silva's damage calculations to address the Court's specific question in its Order.

A. *Duxbury Trucking, Inc.*

More specifically with regard to page 72 of the Silva Report, which calculates the damages suffered by Duxbury Trucking, Inc., Plaintiff has made the following additions:

- The lost company profits, which Mr. Silva calculated at $45,000 per year, has been increased an additional five years equaling $225,000.

- What is not listed in Mr. Silva's damage calculation are workman compensation insurance premium payments of $10.61 per $100 of wages. The total paid while Duxbury was in operation is $18,400.

- What is not reflected in Mr. Silva's Report nor his damage calculation is the fact that Duxbury Trucking was also involved in seasonal snowplowing, and as a consequence of the loss of the business equipment in 1999 was unable to continue its snowplowing operations. The inability to continue snowplowing resulted in the following loss of income:

    - Average hours of snowplowing – 300 hours per year
    - Sander: $100 per hour = $30,000 per year x 7 years = $210,000
    - Truck plow: 200 hours/year x $60/hr = $12,000 x 7 yrs = $84,000

---

[6] Much of what follows is taken from a September 13, 2006 letter drafted in a proposed settlement offer, pursuant to the Court's earlier recommendations.

[7] Defendants' continued obfuscations were displayed by their unwillingness to comply with the Court's request to address the issue of damages.

- Private sanding jobs: $4,000/yr. X 7 yrs = $28,000

Snow Plowing Damage Total: $322,000

The total additional damages to Duxbury Trucking, Inc. are $565,400 plus interest.

Investigator Silva's original computation for company damages was $578,884. Adding to that calculation the additional damages of $565,400 results in a total of: $1,144,284, plus interest. Investigator Silva's calculation for interest is at 6.5%. The interest calculation totals $74,378.43 calculated by taking the $1,144,284 divided by seven, times 6.5% interest for each of the claimed seven years.

Total Duxbury Trucking, Inc. damages including interest is: **$1,218,662.43**.

B.   *Punitive Damages:*

Under Bivens, based on the reckless conduct at issue, a complainant may ask for punitive damages. In this instance Plaintiff includes a punitive damage claim of three times the damages suffered by Plaintiff. Therefore, the punitive damage claim totals (Duxbury Trucking damages times 3) **$3,655,987.29**.

C.   *Attorneys Fees:*

Based on the facts of record, Plaintiff also makes a claim under Fed. R. Civ. P. 54(d) and 28 U.S.C. § 2412 (a) and (b) for attorney's fees and costs totaling to date: **$114,385.38**.[8]

D.   *Total Damages Calculated:*

- Duxbury Trucking, Inc.:   $1,218,662.43

---

[8] It is acknowledged that this number would grow substantially if this case were tried in court.

- Punitive Damages:  $3,655,987.29
- Attorneys' Fees & Costs:  $   114,385.38

**Total:**  **$4,989,035.10** [9]

## IV.
## CONCLUSION

Plaintiff respectfully requests that this Court allow the <u>Bivens</u> claims against the individual federal defendants to proceed.

Respectfully submitted,

Duxbury Trucking, Inc.
By Its Attorneys:
SHAHEEN & GORDON, P.A.

DATED:  March 30, 2007

/s/ Arpiar G. Saunders, Jr._____
Arpiar G. Saunders, Jr.
Bar No. 442860
107 Storrs Street
P.O. Box 2703
Concord, NH 03302-2703
(603) 225-7262
asaunders@shaheengordon.com

---

[9] Mr. Martinsen, who was the employee of Plaintiff, sustained separate damages from the actions of the defendants, some of which are enumerated in the Silva report, p. 73.  Notably, Mr. Martinsen suffered a heart attack approximately one year ago and is now totally disabled.  If Duxbury Trucking had remained in business, Mr. Martinsen, as a member of the Teamsters Union, after five years would have been vested and receiving disability insurance payments.  The prognosis for Mr. Martinsen is not favorable.  Of all of the losses sustained by Duxbury Trucking, the ability of Mr. Martinsen to access disability benefits is probably the most significant.  But for being forced to park its trucks and cease operations, Mr. Martinsen would have such benefits.

CERTIFICATE OF SERVICE

I hereby certify that the foregoing Plaintiff Duxbury Trucking Inc.'s Supplemental Memorandum in Support of Proceeding with <u>Bivens</u> Claims Against Individual Federal Defendants filed through the ECF System will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on March 30, 2007.

/s/ Arpiar G. Saunders, Jr.\_\_\_\_\_
Arpiar G. Saunders, Jr.

*G:\clients\Duxbury Trucking Company, Inc\Duxbury's Supplemental Memo re Scweiker and Bivens.doc*