OIG Investigation
04IH3693001

# Exhibit 5

Department
of Transportation

**Federal Highway
Administration**

400 Seventh St., S.W.
Washington, D.C. 20590

MAY 7 2004

Refer to: HCR

Mr. Arpiar G. Saunders, Jr., Esq.
Shaheen & Gordon, P.A.
Two Capital Plaza
P.O. Box 2703
Concord, NH 03302-2703

RECEIVED

MAY 14 2004

Dear Mr. Saunders:

This letter is in reference to your letter dated January 27, 2004, asking that the Office of Civil Rights in the Federal Highway Administration (FHWA), to re-examine its disposition of the discrimination complaint filed by Mrs. Susan Martinsen against the Massachusetts Highway Department (MHD). The complaint was investigated and a Letter of Finding (LOF) was issued on February 27, 2003.

As indicated in the LOF, the FHWA's review of the situation in Massachusetts is continuing regarding the MHD's administration of the Disadvantaged Business Enterprise program and its implementation of Title VI of the Civil Rights Act of 1964. We have made appropriate referrals to the U.S. Department of Labor, the U.S. Department of Justice, and the U.S. Department of Transportation's Office of the Inspector General of those matters raised by Mrs. Martinsen (i.e., allegations of falsification of records, continuing prevailing wage violations, and anti-trust infractions) that may warrant further action by those agencies. We intend to make a similar referral to the Massachusetts Office of the Attorney General. We have forwarded to the referral agencies a copy of the enclosed, Report of the Review of the Trucking Situation in Boston.

Mrs. Martinsen's discrimination complaint was investigated fully and a final decision was reached based on the investigation. We have not identified any basis for reconsidering our decision.

Sincerely,

Charles Klemstine
Acting Associate Administrator for Civil Rights

Enclosure



OIG-030

# Federal Highway Administration

## Office of Civil Rights

## Report

## On Its
## Review of the
## Trucking Situation in Boston

OIG-031

REPORT

OIG-032

# FHWA Office of Civil Rights
# Report on its Review of the Trucking Situation in Boston

## INTRODUCTION

In response to a complaint of discrimination, the Federal Highway Administration (FHWA) Office of Civil Rights (HCR) conducted an investigation of Massachusetts Highway Department's (MHD) compliance with Title VI of the Civil Rights Act of 1964 (hereafter referred to as "Title VI"), 42 USC § 2000d, and section 162 of the Federal-Aid Highway Act of 1973, 23 USC § 324. Section 601 of Title VI provides that "[n]o person in the United States shall, on the ground of race, color or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." Similarly, 23 USC § 324 provides that "[n]o person shall on the ground of sex be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal assistance under this title [Highways] or carried on under this title."

The complainant, a woman, who owned a trucking firm, claimed that she was a victim of discrimination because of her sex. Specifically, complainant alleged that because of "a failure of the [Massachusetts Highway Department] to make sure that [its] contractors were complying with the Prevailing Wage laws and the Project Labor Agreement, there was no opportunity to work in trucking on the Big Dig legally." See **Attachment 1**. The complainant alleged, further, that she "was discriminated against as a law-abiding female certified WBE/DBE by being unable to work on the Big Dig legally. She claimed as a result of [Massachusetts] Highway/Big Dig allowing this (the absence of effective monitoring and oversight) to go on ...(she)... lost her equipment because ...(she)... had to park it." The complainant was certified as a disadvantaged business enterprise (DBE)[1] on April 8, 1998. The complaint was filed September 27, 2000.

The respondent, MHD, is a recipient of Federal-aid highway funds and was responsible for administering the Central Artery/Third Harbor Tunnel (CA/T) project (also known as the Big Dig), a Federal-aid project, during the period when the alleged discrimination took place. As such, the MHD, its sub-recipients, agents, and contractors (regardless of tier) are subject to the anti-discrimination provisions of 23 USC § 324, Title VI, and the implementing regulations at 49 CFR § 21 and 23 CFR § 200. The complainant ceased operating her truck on the CA/T project and other MHD projects in July 1996 because she believed project working conditions, including prevailing wage rate practices, would require her to violate State and Federal prevailing wage laws in order to operate her firm profitably. In other words, according to the complainant, because the trucking rate set by prime contractors on the CA/T project was and continues to be

---

[1] A DBE under the USDOT program is a for-profit small business concern owned and controlled by individuals who are socially and economically disadvantaged. Individuals in certain racial and ethnic groups (Black Americans, Hispanic Americans, Native Americans, Asian-Pacific Americans, Subcontinent Asian Americans, and women) are rebuttably presumed to be socially disadvantaged. See 49 CFR Part 26.

1

too low to cover both payment of prevailing wages and operating costs, the complainant claims she would have to not comply with the law to stay in business by not paying prevailing wages or falsifying required documents. In both instances, complainant would subject herself to civil and criminal prosecution by State and/or Federal authorities.

The final agency decision on the complaint was issued February 27, 2003, finding insufficient evidence of sex discrimination or discrimination on the basis of complainant's DBE status.[2] See **Attachment 2**. The initial decision was reconsidered at the request of the complainant. No new information or analysis was offered by the complainant, except references to equal employment opportunity sections of FHWA's implementing regulations, which do not apply to the treatment of subcontractors. Thus, the initial decision was not changed, and it became final June 18, 2003. See **Attachment 3**. The legal standards relied upon to reach the initial decision and to sustain it upon reconsideration are set forth in **Attachment 4**.

This report sets forth in more detail the reasons for HCR's findings on the discrimination complaint and on MHD's compliance with its Title VI assurances. In the course of the investigation, several issues were brought to HCR's attention that may warrant further action by other Federal/State agencies or other responsible program offices within FHWA. Those issues are also discussed in the report, and this report, together with any supporting documentation in our possession, will be provided to those other federal or state agencies to which referrals have already been made.

## PROCESS

**Jurisdiction** – Provisions of 23 U.S.C. § 324 and Title VI (and the implementing regulations) apply to federally funded programs and activities. The respondent, MHD, is a recipient of Federal-aid Highway Trust funds. The Massachusetts Turnpike Authority (MTA), an independent State agency, manages the CA/T project through an MOU with MHD and is also subject to the obligations of MHD. MHD and MTA, each with respect to their joint responsibility for the CA/T Project, are subject to Title VI.

**Timeliness** – The complaint was not initially filed with HCR within the prescribed 180 days of the alleged violation. See 49 CFR § 21.11. The complainant and her husband sought assistance and relief from a number of State and Federal agencies and were oblivious to the possible discriminatory implications of the situation they described until it was brought to their attention by a Federal employee with whom they were working. The complaint was filed within 60 days of the complainant becoming aware of possible discrimination. Because of these factors and due to allegations of continuing violations and in the interest of justice, the complaint was accepted for investigation.

---

[2] We have liberally construed this allegation as a claim of discrimination based on race, national origin, or sex since DBEs generally are owned by members of minority groups or women.

**Methodology** - The investigation that commenced in 2001, while initially focusing on the basic allegations made by complainant, was modified to a more comprehensive review of the Federal-aid programs involved due to (a) the systemic nature of ancillary allegations made after the initial complaint, (b) other information which came to light as part of the initial and subsequent field fact-findings through interviews and data requests, and (c) program management concerns.

## BACKGROUND

### The Trucking Industry

The nature of the trucking industry in the Boston Metropolitan Area is marked by informality, with prime contractors having the option of (1) owning trucks and hiring drivers directly, (2) dealing directly with small trucking subcontractors or owner-operators when more trucks than the prime contractor owns are needed to complete work, or (3) working through brokers (who may or may not own trucks themselves). The brokers either accept offers for services from fleet owners, small trucking subcontractors, or owner-operators or solicit their services for work on projects.

When brokers are used, prime contractors pay the brokers and the brokers pay the trucking subcontractors and owner-operators based on invoices or weight tickets submitted to the brokers by the trucking subcontractors and owner-operators. The brokers retain fees for each hour worked by each truck working with and through them for a prime contractor. Formal subcontracts, purchase orders or service agreements are seldom relied upon in the relationships between brokers and trucking subcontractors or owner-operators, raising questions about compliance with Federal and State requirements. See 23 CFR 635.116(b), the Massachusetts Contract Administration Manual (the "Blue Book"), and CA/T procedural guidelines.

Although truckers are paid for invoiced or weight-ticketed work and are provided IRS Form 1099s as evidence of earnings, their standing as employees or as independent businesses is the purported source of confusion in dealing with the prevailing wage rate issue on the CA/T project. They work day-to-day and may be discharged or replaced at the whim of the broker or a contractor's job-site superintendent, or not be used if they are perceived as having caused problems or not otherwise be in favor. Their standing as businesses is undermined by this treatment as supervised employees.

How truckers are viewed by the industry can best be understood by the comments of some individuals interviewed and by statements provided to the press.

- A small fleet and quarry owner, described trucking in Boston as "a race to the bottom of the barrel." An official with the Construction Industries of Massachusetts (CIM) and the Perini Corporation, in describing trucking in Boston, explained that truckers establish relationships with prime contractors or brokers, "...but truckers are at the bottom of the food chain."

3

OIG-035

- An official in the MTA stated that "...wage rate reviews were conducted on the (CA/T) project prior to [a truckers job action – described later], but none were conducted on trucking operations because <u>truckers were not considered employees</u>." (Emphasis added.)

- The MHD manager on Route 3, North, stated that "Owner-operators are not considered second-tier subcontractors." Although MHD representatives indicated that under Massachusetts law second-tier subcontracting is not allowed, they stated that they did not consider providers of trucking services working through brokers as second-tier subcontractors.

The status of owner operators as "employees" or independent contractors and the application of Federal or State prevailing wage requirements to "on site" and "off site" hauling or to owner operators was the source of confusion as early as 1993. See **Attachment 5**. This confusion contributed to the perception that the State was not adequately enforcing the prevailing wage requirements.

**Prevailing Wage Requirements**

For purposes of prevailing wage rate determinations in Massachusetts and this report, Massachusetts' law governs the applicable prevailing wage requirements. The Massachusetts General Law at Chapter 149, Section 27, provides that prevailing wage rates apply to all persons engaged in transporting gravel or fill to the site of said public works or removing gravel or fill from such site, regardless of whether such persons are employed by a contractor or subcontractor or are independent contractors or owner-operators. The Massachusetts Office of the Attorney General (MOAG) opined that this language is clear and unequivocal in its application: the prevailing wage requirement applies to prime contractors, subcontractors, and owner operators without exception. See **Attachment 6**. A 1994 advisory issued by the MOAG set forth the responsibilities of awarding authorities to maintain and review certified weekly payrolls submitted by prime contractors to ensure compliance with the prevailing wage law. See **Attachment 7**. This responsibility fell to MHD as the awarding authority for the CA/T project.

CA/T project officials received complaints from truckers of prevailing wage violations sometime in 1996. The complaints were twofold: (1) truckers were not being paid the prevailing wage for work on the project, and (2) the trucking rate paid by prime contractors to independent contractors and owner operators was insufficient to cover prevailing wages and operating costs.

A CA/T truckers' job action in May of 1997 resulted in the execution of the CA/T Memorandum of Agreement on Trucking Issues (the Uplift Agreement) on August 1, 1997 "settling all issues related to the trucking rates for work remaining on then existing CA/T contracts." See **Attachment 8**. The Uplift Agreement increased the relevant hourly trucking rates from $40-$45 to $60-$65, settled a grievance by the local Teamsters union under the project labor agreement (PLA) regarding back payment of fringe benefits, established a dispute resolution process to continue discussions on unresolved issues, clarified enforcement issues, and described future compliance efforts.

All of the matters addressed in the Uplift Agreement were the responsibility of the involved prime contractors to ensure their subcontractors and brokers complied. Similarly under the PLA, the project management company, Bechtel/Parsons Brinckerhoff (BPB),[3] was to ensure prime contractors complied with their responsibilities to implement corrective measures outlined in the Uplift Agreement.

Finally and most importantly, it was the responsibility of MHD and MTA to oversee and objectively review the actions or inactions of the project management firm and the extent to which prime contractors met their responsibilities.

After the truckers' job action the State put in place processes to ensure prevailing wages were paid and monitored the effort to such an extent that the MOAG prosecuted and convicted employers (small truckers) on the project who had not been paying their employees prevailing wages.

On September 24, 1997, the Uplift Agreement was supplemented by the "Memorandum of Understanding as to Teamster Benefits (MOU) in accordance with the Central Artery/Tunnel Memorandum of Agreement on Trucking Issues," which clarified the provisions of the Uplift Agreement that dealt with fringe benefits. See **Attachment 9**.

In October 1997, five months after the CA/T Truckers job action, the Massachusetts House of Representatives Bureau of Post Audit and Oversight ("State Audit and Oversight Bureau") issued a report on its "Review of Prevailing Wage issues on the CA/T and Public Construction Projects." See **Attachment 10**. That report resulted in 7 major findings, and 11 recommendations, to which MHD responded on October 20, 1997. See **Attachment 11**. The State Audit and Oversight Bureau found, among other things, that:

- Reports of contractors violating the Commonwealth's prevailing wage statute have been an ongoing concern for state contracting authorities on public construction contracts.

- Some truck owner-operators on the CA/T Project received net pay that was less than the prevailing wage because of disparities in equipment maintenance and operational costs that were not factored into contract rates for trucking services.

- MHD and CA/T project officials have recognized the need to be more aggressive in requiring compliance with prevailing wage provisions, and the project has taken more expansive steps to improve compliance.

- The complex contractual arrangements for trucking on the CA/T project make prevailing wage enforcement extremely difficult, if not impossible, under the existing state statutory scheme.

---

[3] Bechtel/Parsons Brinckerhoff (BPB) is the engineering firm retained as a project management consultant to the CA/T project

OIG-037

The report also noted:

> "...the current wage problem faced by truck owner-operators on the CA/T Project was in part attributable to the use of brokers. Prime contractors on the CA/T Project are required to pay prevailing wages for trucking services. In many cases, prime contractors have secured trucking services they require through brokers. Once an order is placed by a prime, the broker subsequently contacts truck owner-operators to provide the trucking service needed by the prime. Some truck owner-operators have indicated that after the broker takes a profit from the prime contractor payment, there is not enough money to pay the truck owner-operators prevailing wages. As a result, these truck owner-operators claim they are forced to work for wages below the statutory minimum if they want to work on the CA/T Project."

It is not known whether the State Audit and Oversight Bureau was aware that not all who provided trucking services, either directly for primes or through brokers, were "owner-operators". Some providers are fleet owners and others are small trucking subcontractors, some are certified as DBEs and others are not. Several trucking company owners were indicted and fined subsequent to the job action as part of a stepped up enforcement effort on the part of the State.

MHD noted in its response to the findings of the State Audit and Oversight Bureau that:

> "MHD has taken steps to contractually hold contractors accountable for the payment of prevailing wages to truck owner-operators and employees of subcontractors of any tier. For example, MHD has issued deficiency reports to, and withheld progress payments from, contractors who have failed to provide acceptable certified payroll records within reasonable cure periods. The notion of imposing vicarious liability among prime contractors for the failure of subs to pay appropriate wages to employees, however, should only be considered with a host of safeguards built in to such a provision."

In August of 1998, the CA/T project modified part of the "Contractor Activities" section of its procedural manual at Section 202 to ensure contractor compliance with, among others thing, project minimum wage rates and "any other applicable federal and local laws, regulations and requirements specified in the contract." See **Attachment 12**. The monitoring process is simple and systematic, but there is no outline of the process to be followed in the event of non-compliance with any of the cited provisions.

**Project Labor Agreement**

A project labor agreement (PLA) covering the CA/T project was executed November 28, 1989 between BPB and the Building and Construction Trades Department of AFL-CIO. See **Attachment 13**. Contractors interested in working on the CA/T project are required by MHD to agree to be bound by the PLA. Under the PLA, BPB is required to monitor compliance by all contractors and subcontractors.

Like most PLAs, the CA/T project PLA is a collective bargaining agreement negotiated to meet the specific labor needs of the project. The PLA binds all contractors and subcontractors to a variety of terms and conditions such as standard work rules, hours, and dispute resolution procedures and wages and benefits. The CA/T project PLA, like others, is a means of promoting labor-management peace and stability on a large construction project with substantial financial considerations and long-term construction implications. PLAs are also used to obtain the cooperation of organized labor in retaining the workers needed for the construction project. Requiring the use of a PLA on a federally funded highway construction project in a bid specification subjects the PLA to FHWA approval.

## ALLEGATIONS

As indicated earlier, the complainant alleged that the MHD failed to ensure that its contractors complied with the Massachusetts prevailing wage law and the PLA and that these failures resulted in conditions that forced her to "park her truck" and not get work on the CA/T project. The complainant also alleged that she was discriminated against as a certified DBE by being unable to work on the Big Dig legally. In a series of phone calls and interviews, the complainant and/or her husband further alleged that the trucking rate paid by prime contractors on the CA/T project was insufficient to allow the trucks to be operated, maintained, fueled, permitted, and insured and pay the required prevailing wage rates; that prime contractors were forced to establish the Uplift Agreement to compensate drivers who had been shortchanged by the prime contractors' earlier business practices; that prime contractors were responsible for paying the fringe benefits of all truckers on the job to the union pension and other funds, but they had not done so and were not adequately monitored by MHD; and that payroll forms were routinely falsified. Complainant's concerns were communicated to MOAG, MHD, MTA, project management, the Federal Bureau of Investigation (FBI), the Labor and Racketeering Section of the U.S. Department of Labor's (DOL) Office of the Inspector General (OIG), the U.S. Department of Transportation's (DOT) OIG, and FHWA's Office of Chief Counsel. See **Attachment 14.**

The complainant established her firm in 1996 to capitalize on opportunities on the CA/T project. The complainant's firm obtained 5 jobs on the Big Dig of varying lengths, with one of the jobs commencing at least one year after complainant first "parked her trucks."*

| When | Length | With whom | Trucking Hourly Rate | Hourly Prevailing Wages Fringes and Benefits |
|---|---|---|---|---|
| June '96 | 30 days | W. Jones | $40.00 | $20.17 + $8.00 |
| July '96 | 2 weeks | Mass Gravel | $50.00 | $20.17 + $8.00 |
| August '96 | 1 week | O'Donnel | $45.00 | $20.17 + $8.00 |
| November '96 | 1 week | Great Northern | N/A | $20.17 + $8.00 |
| July '97 | app. 1 year | Modern Continental | $65.00 | $20.17 + $8.00 |

*Source **Attachment 15** and interviews of the complainant and her husband.

7

OIG-039

Complainant did not obtain certification as a DBE until April 1, 1998, shortly before she again "parked her trucks." See **Attachment 16**.

In the course of the investigation, a second complainant submitted an affidavit in which she outlined concerns mirroring those of the first complainant. The State Office of Minority and Women Business Assistance (SOMWBA) denied the second complainant certification as a DBE because the complainant was unable to demonstrate she controlled the business as required by the DBE program regulations. The second complainant claimed that she also opted to park her trucks rather than risk being found in violation of State and Federal laws.

## POSITION STATEMENT OF RECIPIENT

The MHD response to the complainant's allegation was addressed by the MTA Chief Counsel for the CA/T project in its response to an inquiry made by a senior FHWA attorney. See **Attachment 5**. According to the response, the claims of the complainant's firm were reviewed by the Project and it was concluded "it [the complainant's firm] has no legally cognizable claim."

MTA's position is premised on the following:

1. As a lower tier subcontractor, the complainant's firm had no contractual or legal relationship with MHD as it neither bid nor was awarded MHD contracts. Its contractual relationship was with the prime contractor, and its claim, if any, would have to be pursued against its contractors, not MHD.

2. The complainant's firm, as an entity working on a Massachusetts public works project, was obligated to follow the Massachusetts prevailing wage law, which obligated her to pay her truck driver the prevailing wage rate and to submit certified payrolls to MHD. There is no statutory obligation imposed on MHD to collect certified payrolls and the responsibility for enforcing the prevailing wage law lies with the MOAG.

3. The trucking rate paid for the work being performed by complainant's firm was the result of forces driving the market, not a rate that could be or was dictated by MHD. The trucking rate Uplift Agreement funded by MHD was not an obligation of MHD, but rather a good faith effort to resolve a job action on a go-forward basis. The trucking rates set were considered reasonable estimates of the rates needed from the trucking industry standpoint to pay prevailing wages and meet operating expenses. The uplift rate that was agreed to was not intended to guarantee future rates or guarantee that individual companies (for example those with higher operating costs versus those with lower operating costs) could work on the project – that is a factor of the marketplace for trucking services that the project cannot control or be responsible for.

OIG-040

With respect to complainant's contention that her firm was not afforded the opportunity to compete for and perform CA/T work, MHD disagreed, citing a report of 16 first tier DBE subcontractors who collectively performed $23 million worth of trucking/transporting work on various mainline contracts."

## DISCRIMINATION CLAIMS

### ISSUE 1

Whether the MHD failed to ensure contractor compliance with Massachusetts prevailing wage laws and the PLA and whether these failures resulted in discriminatory conditions that forced the complainants to park their trucks and not get work on the "Big Dig" project, in violation of 23 U.S.C. 324 and 42 U.S.C. 2000d.

**Analysis**

The record is replete with evidence that MHD did not do its part to ensure that contractors complied with the prevailing wage law (e.g., paid prevailing wage rates to employees of trucking firms) before the adoption of the Uplift Agreement. It is clear from statements made by the MOAG that it was the responsibility of MHD to collect and maintain certified payrolls and to make appropriate referrals to MOAG for prosecution.

By the admissions of MHD staff, the findings of the State Audit and Oversight Bureau, and the terms of the Uplift Agreement, it is clear that - as regards truckers - the MHD failed to ensure that contractors complied with Massachusetts prevailing wage law and the PLA before the May, 1997 truckers job action. The level of monitoring by MHD was haphazard at best. Although there was evidence of efforts to identify wage rate problems before the truckers job action, no attention was directed toward the concerns of truck drivers regarding the submission of certified payrolls because the MTA/BPB staff did not consider them to be employees and there is no evidence that efforts employed were sufficient to stop the infractions identified or to prevent recurrence. The continuing confusion regarding the status and pay of truckers, both drivers and their employers, resulted in no effective remedy.

Based on her husband's earlier experience with penalties for failure to pay prevailing wages, the complainant opted to park her truck in July 1996. The second complainant took similar action. Both complainants were aware of the penalties which could be assessed against employers (1) who did not pay prevailing wages, (2) who submitted false certified payrolls, or (3) who submitted blank certified payrolls as the complainants indicated they were directed to do by the office managers of now defunct firms, or (4) who ignore prevailing wage requirements because the sites from and to which they were hauling were claimed by brokers to not be related to the Big Dig and, therefore, not subject to prevailing wages, when they were, in actuality, part of the project.

OIG-041

We do not doubt complainants' belief that they had no choice but to park their trucks because of their inability to operate at a profit and pay prevailing wages. While the failings of MHD may have contributed to conditions that were considered by the complainants in deciding to park their trucks, HCR's investigation produced insufficient evidence that MHD's inaction was motivated by an intent to discriminate against complainants on the basis of gender or DBE status or that MHD's inaction had a disparate impact on DBEs as compared to non-DBEs. The investigative record contains no evidence that different trucking rates existed for DBEs versus non-DBEs, or for women owned trucking companies versus male owned trucking companies, or that the trucking rate impacted DBEs more harshly than comparable non-DBEs. The fact that many of the trucking companies working on the CA/T project as subcontractors or owner-operators may have been DBEs is not enough to demonstrate discrimination under a disparate impact theory of liability.

The same reasoning applies to the allegations of non-compliance with the terms and conditions of the PLA respecting benefit payments. While complainants may have a contractual claim under the PLA, our investigation produced insufficient evidence of discrimination. Complainants claim that they did not get work on the "Big Dig" project for fear of making themselves vulnerable to prosecution for doing what others on the project were doing as a matter of course. We have no basis for concluding that all (or a substantial number) of the trucking companies working on the CA/T project, faced with the same conditions as complainants, are choosing to violate Federal or State law. If that is the case, it is a matter for the Federal and State law enforcement officials who have been apprised of complainant's allegations. Moreover, our investigation does not clearly establish that the failure of MHD and others forced the complainants (and thus caused complainants) to make the choices they made and that those choices were not driven by other factors.

**Recommendations**

While there is insufficient evidence of discrimination, it is recommended that the FHWA's Massachusetts Division Office provide to the MHD staff and the staffs of its agents, MTA and BPB, training in their responsibilities regarding compliance with and enforcement of prevailing wage requirements. The roles, relationships, and responsibilities of all of the parties need to be accurately described, and adhered-to as was previously recommended for an effective scheme to be put in place. Ensuring that required posters are prominently displayed at the job sites can help with self-policing the issue. Also, truckers need to be advised and assured access to the CA/T Project's Trucking Liaison person for resolving wage rate and other wage issues as they arise.

## ISSUE 2

Whether the complainants were discriminated against as certified DBEs by being unable to work on the Big Dig legally.

OIG-042

Analysis

The prevailing wage issue was faced by all of the contractors and subcontractors on the project, including small trucking subs, fleet owners and owner-operators. Unless they were brokers and taking an hourly cut for each truck they brought to the job, all of the truckers were paid approximately the same hourly trucking rates, based on the type(s) of equipment they owned or leased. All of them were faced with the same indifference to prevailing wage enforcement, whether they paid or received the prevailing wage as an owner-operator or whether they were fleet owners or small trucking subcontractors with one or more trucks and the responsibility to pay one or more drivers the prevailing wage. Thus, for reasons provided in the analysis of issue 1 above, there is insufficient evidence from the investigation to conclude that there was discrimination against DBEs.

More specifically the complainant was not certified as a DBE during the relevant time periods when she claimed discrimination based on her status as a DBE; this fact gravitates against her claim that her "certified DBE" status was the basis for any mistreatment. Similarly, the second complainant was denied DBE certification because she did not qualify. That said, there is insufficient evidence to conclude that the decision to not work on the Big Dig was forced on complainants because of gender or DBE discrimination.

**Recommendation**

None

## ISSUE 3

Whether MHD was responsible for ensuring compliance with nondiscrimination and equal opportunity requirements.

Analysis

Representatives of MHD signed equal opportunity and nondiscrimination assurances as a basis for continued receipt of Federal-aid highway funds. As the primary recipient of Federal-aid highway funds for the State, MHD is obligated to not discriminate "directly or through contractual or other arrangements" and to ensure its sub-recipients and contractors are aware of and comply with the nondiscrimination provisions of Federal law. The MHD was obligated to have in-place and implement a compliance review program sufficient to ascertain the compliance of contractors with the non-discrimination and equal opportunity requirements as they relate to all terms and conditions of employment, including wage rates. The MHD last conducted a compliance review 5 or 6 years ago to assist the CA/T, and, except for a DBE program process review involving FHWA personnel, MHD has completed no compliance reviews of contractors (interview with the former MHD Civil Rights Director). While this issue should not take away from the compliance reviews performed by the CA/T Project staff, the facts strongly suggest MHD has failed to carry out its compliance responsibilities in these areas.

OIG-043

There was some confusion on the part of MHD staff regarding the responsibilities of MHD and MTA to monitor the activities of the CA/T project. That confusion was complicated by the Massachusetts statute establishing MTA, which states that the MTA, "while within the executive office of transportation and construction, shall not be subject to the supervision or regulation of said executive office or any other department, commission, board, bureau, or agency except as specifically provided in any general or special law to the contrary." Massachusetts law notwithstanding, MTA is subject to the same obligations as MHD and as such both MHD and MTA, each with respect to joint responsibility for the CA/T Project, must comply with Title VI.

The previously mentioned process review of the CA/T DBE program was conducted by a joint FHWA/MHD team and recommended specific actions be implemented by MHD to improve the program, including:

1. Developing a plan, which defines roles and responsibilities of all parties involved with DBE contract compliance (MTA, MHD, CA/T), to ensure all required and necessary compliance functions are performed.

2. In accordance with the established DBE contract compliance procedures, MHD should ensure the "on-site" and formal compliance reviews are conducted on a regular basis."

The MHD asserted that action had been taken or was underway to address each recommendation, but the interviews that were part of this review indicated that those earlier assertions did not accurately reflect the state of redefinition of roles and responsibilities essential to ensure proper management and oversight of the DBE program.

There also is no evidence in the record indicating that MHD conducted any investigation or review of the claims made by the complainant, about which it was aware through project management, or of similar complaints on prevailing wage and PLA violations that preceded the complaints made by complainants to determine whether there was any evidence of possible discrimination.

**Recommendation**

Since this review was initiated, there have been some personnel changes at MHD. It is recommended that the FHWA Massachusetts Division Office engage the responsible MHD staff to determine the current state of program development and implementation. To the extent weaknesses other than those identified here are discovered, training and technical assistance sufficient to adequately address each identified deficiency needs to be scheduled and progress routinely measured. Closer monitoring and oversight by FHWA are necessary in the near term to prevent assertions of compliance from being made, as was done previously, with no substantive effort having been completed to actually meet the earlier FHWA review recommendations.

OIG-044

OTHER IDENTIFIED CONCERNS

The above referenced issues are specific to the issues raised in the complainant's allegations and as presented there was an insufficient finding of fact in support of the allegations raised by the complainant. However as previously mentioned information gathered during the investigation raises concerns that go far beyond the initial allegations in the complaint and which fall outside the purview of Title VI and the authority of FHWA's Office of Civil Rights. The following is a list of those concerns:

ISSUE 1

Whether trucking subcontractors on the CA/T submitted falsified payroll records and, if so, whether prime contractors or brokers participated in the falsification of such records.

Analysis

The complainant indicated that she became aware of prevailing wage rate issues 6 weeks after she began working on the CA/T. After she sought assistance from MTA staff and was rebuffed, she contacted the MOAG and was made aware of the requirements and penalties for violations in a letter from the MOAG to her husband (**Attachment 6**).

This information, coupled with her husband's prior experience that cost him his trucking company and other assets, persuaded her that signing and submitting a pre-printed form such as that provided as either a model or a requirement by Mass Gravel (**Attachment 17**) would be tantamount to falsifying documents, subjecting her to possible prosecution. Mass Gravel's instructions for payment required the submission of this form with all invoices and the pre-printed payroll form with the notation "Central Artery" at the top suggesting it was a required project document, showed payment of fringes and benefits were "NA."

Complainant stated that she had also been directed to sign blank certified payrolls by other named contractors. Her claim was given credence by the statement of the second complainant who said a named contractor requested that she sign a blank payroll and hand it over to be completed by the contractor "because most people don't know how to fill them out."

Recommendation

A copy of this report will be provided to the DOT OIG for review and appropriate action concerning the allegation of possible criminal misconduct. The FHWA Massachusetts Division Office needs to work with the State to ensure the appropriate staff members know, understand, and implement their responsibilities regarding the submission of each contractor's completed certified payrolls and reporting allegations of fraud.

OIG-045