ISSUE 2

Whether prime contractors and brokers on the CA/T project paid small business owners a trucking rate sufficient to allow the trucks to be operated, maintained, fueled and insured and to pay the required prevailing wage rates.

Analysis

During the negotiations of the Uplift Agreement several calculations were done and are contained in **Attachment 18**. As early as May 16, 1997, MHD Central Artery office was aware of the costs associated with operating a truck and paying prevailing wages (**Attachment 19**). The record reflects that some prime contractors were aware of and had calculated hourly trucking rates above those being paid during June and July of 1997 (**Attachment 20**). For example, Modern Continental, one of the prime contractors for whom complainant worked, paid $45.00 an hour for a 10 wheel dump truck, similar to what complainant operated. The Greater Boston Materials Haulers (formed by complainant's husband and others), an organization of truckers who halted work until their demands were heard, estimated that the hourly pay, fringe benefits and other costs associated with employing a driver amounted to $34.79 - $35.29. A prime contractor estimated the cost at $30.55. BPB estimated a driver's hourly wages and fringes at $27.25. The prime contractor's estimate did not include payment for workers compensation or holiday/vacation pay. It is unknown what the BPB estimate included and omitted. The hourly rate paid to truckers by prime contractors and brokers did not vary over $5.00 per hour, and the $45.00 standard rate at issue in 1997 had not changed in a decade, while costs of equipment, parts, labor and fuels had escalated significantly.

That new, small firms, whether DBEs or not, cannot obtain volume discounts and, with newer equipment, can be expected to have higher out-of-pocket costs is axiomatic. The costs of fuel and lubricants, insurance, permits, tags, repairs, and other costs of doing business have DBEs encountering higher unit costs than older, more established firms. Although MHD takes the position that complainant was a victim of market forces, the absence of competition in the process by which trucks are employed on public works projects (e.g., small trucking firms do not submit quotes or bids to compete for hauling services) and the control prime contractors and brokers appear to exert in setting and holding trucking rates for services rendered raises questions that may warrant the attention of other responsible officials.

MHD stated that the trucking rate reflected in the Uplift Agreement "...was a good faith effort to resolve the issue on a go-forward basis. The rates set were reasonable estimates of the rates needed from a trucking industry standpoint to pay prevailing wages and meet operating expenses..." However, MHD was under no obligation to set trucking rates. If the conclusions that compelled the parties to establish the Uplift Agreement are valid, then some small business owners may have been unable to successfully operate viable trucking firms and paying prevailing wages.

Recommendation

A copy of this report will be provided to the Anti-Trust Division of the U.S Department of Justice for review and appropriate action concerning the question of whether processes employed

OIG-046

to set and maintain the hourly trucking rates violate any anti-trust statutes. A copy of this report is also being provided to the MOAG so that that office can review the report for possible violations of state law.

## ISSUE 3

Whether prime contractors were responsible for paying the benefits of all truckers on the job to the union pension and other funds and whether they were adequately monitored by the State.

### Analysis

Complainant charged that the prime contractors were obligated by the PLA (page 24) to pay the fringe benefits for the employees of subcontractors. The PLA states in pertinent part: "(T)he Contractor agrees to pay contributions to the established employee benefit funds ...". The agreement defines "contractor" as "all contractors and subcontractors of whatever tier..." Complainant stated that she had attempted to pay the union for fringes and benefits and was told that she could not.

The PLA attempted to address working conditions for crafts-persons and truck drivers on the project. Although the drivers who worked directly for primes had their fringe benefits payments made for them, the admitted uncertainty of the MTA and MHD regarding the status of truckers, as "employees" was one factor affecting implementation. The union not notifying primes to initiate the payment of fringe benefits for employees of subcontractors, as required in their agreement, and the fact that only employers signatory to the union agreement could pay into the funds (complainant's company was not a signatory) all affected benefits that may have accrued to truck drivers who were employees of second-tier trucking subcontractors.

### Recommendation

The implementation of the PLA is a State matter absent evidence that action taken pursuant thereto violate Federal requirements. In the absence of that claim, no further action is considered necessary.

## ISSUE 4

Whether more DBEs were certified as small businesses (fleet owners) or owner-operators.

### Analysis

The records of SOMWBA describe certified truckers as either "truckers" or "haulers." In the space where the type of business could be indicated, the standard notation is "entrepreneur" not sole proprietorship, partnership, corporation, LLC, fleet owner, owner-operator, or small trucking subcontractors, which would have been much more useful information for an analysis. Neither MHD, MTA, nor BPB maintained records on the race or ethnicity of truckers, although whether a firm was certified as a DBE was noted.

Whether a firm was an owner-operator, small subcontracting business, or fleet owner was not indicated in any of the lists in the record or later obtained.

### Recommendation

The FHWA Massachusetts Division Office should complete a review of SOMWBA's implementation of the State's approved DBE plan, focusing on its certification processes and the files of firms certified to work on U.S. DOT funded work. The review of firms' certifications should include prioritized reviews of the firms whose certifications were questioned by several of those interviewed and whose concerns are taken as "third party challenges."

## ISSUE 5

Whether the SOMWBA certification process meets the requirements of 49 CFR 26.

### Analysis

SOWMBA has a "fast-tracking" certification process, which seemed to be designed to ease the way toward certifications for firms with personal or political connections. Allegations of fronts overwhelming the industry appear to be common. With a staff of only three, there is also the question of whether the unit is suitably staffed to perform basic certification functions. In addition to certifications for MHD, under a proposed UCP, SOMWBA would increase its responsibilities for USDOT funded recipients in addition to its economic development outreach and certifications.

### Recommendation

It is recommended that the FHWA Massachusetts Division Office, with support from Headquarters and the Resource Center, and — if necessary — other Divisions, schedule and conduct a review of SOMWBA's implementation of the States approved DBE plan, focused on the validity of certifications, including a review of all files of firms certified as DBEs. The oversight of SOMWBA's operations by MHD needs to be clearly outlined, as confusion appears to exist in both agencies. The credibility of the program depends on an effective certification process that allows only certifiable firms to take part in it. Allowing wrongly certified firms to participate in the program undermines its integrity and robs legitimate DBEs of opportunities. The review needs to consider what MHD has received from SOMWBA in terms of quantity and quality of services and whether SOMWBA's economic development responsibilities have caused a dilution of the pool of properly certified DBEs. The files and operations of specific firms should be those first reviewed since third party challenges to their certifications were raised during interviews of witnesses in the initial complaint. We will provide that information to the Division Office.

## ISSUE 6

Whether prime contractors were "advertising for owner operators" to the exclusion of small trucking firms on the Route 3 project.

Analysis

The second complainant provided a copy of an advertisement (Attachment 21) in which the broker for Modern Continental, the prime on the Route 3 project, advertised for owner-operators. The project is an advance construction job, in which the State incurs the cost of the project without obligating Federal funds apportioned to the State. Advance construction projects are required to meet "... the same requirements and be processed in the same manner as a regular Federal-aid project. " See 23 CFR 630.705(a). The project can be converted to a regular Federal-aid project when there are sufficient funds and obligation authority. The requirements of contractors to meet nondiscrimination, equal opportunity and DBE program requirements are the same on advance construction projects as regular Federal-aid projects. That the prime contractor's broker advertised for "owner-operators" to the exclusion of small trucking firms and fleet owners needs to be reviewed.

Other than the newspaper advertisement, no other evidence was obtained sufficient to support a determination of discrimination on the basis of race, color, national origin, or sex.

Recommendation

It is recommended that the FHWA Massachusetts Division Office obtain information from the MHD regarding the extent to which they are aware of the conditions on the Route 3 project and the extent to which they have reviewed, are reviewing, or plan to review the activities of the prime contractor and its brokers on that project. Coupled with this review and to allow a reliable analysis of the impacts of the complained-of practice, the results of the previously recommended review of SOWMBA, and/or a survey of certified DBE trucking firms to ascertain their status as owner-operators, small independent trucking firms or fleet owners needs to be considered to determine the real impacts of the practice. The DOT's OIG needs to be contacted to coordinate review efforts and to share information.

## ISSUE 7

Several drivers raised the matter of the disposition of fringe benefit funds paid to Teamsters Local 379 for drivers who did not meet the 600-hour minimum to qualify for hospitalization.

Discussion

Although the Uplift Agreement paid into the fringe benefits funds for upwards of 80 drivers, many drivers, who had paid $400 initiation and $40 per month dues had funds put into their fringe benefits accounts in their names, but never qualified for hospitalization benefits because they never worked the required 600-hour minimum.

17

OIG-049

The disposition of the funds was questioned and it is not known (1) whether the local union is required to or ought to pay the invested funds back to those who did not make the minimum number of hours and who can least afford to absorb the costs of medicines and hospitalization, or (2) whether the "overage" is used to fund the needs of qualifying members.

### Recommendation

A copy of this report will be provided to the U.S Department of Labor for review and appropriate action..

### ISSUE 8

Whether MHD is in compliance with 23 CFR635.117 (b).

### Analysis

The provisions of §27E of the Massachusetts General Law requires "at least seventy five per cent (sic) of the persons employed by the department of highways to work in connection with the construction, reconstruction, alteration, or repair of any public works, in positions other than those subject to civil service laws and rules and regulation... be residents of the highway district...in which the work is done." (Emphasis added.) FHWA regulations at 23 CFR 635.117 (b) provide that "...no procedures or requirements shall be imposed by any state which will operate to discriminate against the employment of labor from any other state...".

### Recommendation

The FHWA Massachusetts Division Office should determine the extent to which the MHD is implementing the above-noted Massachusetts statutory provision on Federal-aid projects so that FHWA's Chief Counsel can provide an opinion on whether the applicable Federal regulation overrides the State statute.

OIG-050

# ATTACHMENTS

1. Complaint to USDOT dated September 27, 2000
2. HCR Letter of Findings
3. HCR reply to request for reconsideration
4. Legal Theories and Elements of Proof
5. MTA response to FHWA regarding the complaint
6. Letter to Roy Martinsen from Helen A. Moreschi, Chief, Fair Labor & Business Practices Division, Office of the Attorney General for the Commonwealth of Massachusetts
7. Office of the Attorney General Scott Harshburger, Division of Fair Labor and Business Practices Criminal Bureau, Advisory, dated April 8, 1994
8. The Central Artery/Tunnel Memorandum of Agreement on Trucking Issues (the "Uplift Agreement")
9. The Memorandum of Understanding as to Teamsters Benefits (MOU) in accordance with the Central Artery/Tunnel Project Memorandum of Agreement on Trucking Issues
10. The Massachusetts House of Representatives Post Audit and Oversight Bureau's report of its "Review of Prevailing Wage Issues on the CA/T and Public Construction Projects"
11. The Massachusetts Highway Department's response to the House Post Audit and Oversight Bureau's report
12. Section 203, Labor standards Interview and Labor Check Report – guidelines in the CA/T procedural manual
13. Central Artery (I-93)/Tunnel (I-90) Project, Project Labor Agreement
14. May 3, 2000 note from complainant to MTA
15. Memo from FHWA to MTA re prevailing wage rate request for response
16. Letter from State Office of Minority and Women Business Assistance to complainant dated April 1, 1998
17. Mass Gravel's required certified payroll form
18. Calculations circulated during negotiations of the Uplift Agreement
19. Note from MHD, re: costs associated with operating trucks
20. Calculations by primes of hourly operating costs of trucks
21. Advertisement for owner-operators

OIG-051

**___4___ Page(s) Withheld**

**Pursuant to
5 U.S.C. § 552(b)(5)**

OIG-052

OIG Investigation
04IH3693001

# Exhibit 7

THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

04-12118 NG

DUXBURY TRUCKING, INC., )
)
Plaintiff, )
)
v. )
)
MASSACHUSETTS )
HIGHWAY DEPARTMENT; )
MASSACHUSETTS TURNPIKE )
AUTHORITY; EDWARD W. )
MORRIS, JR., FEDERAL HIGHWAY )
ADMINSTRATION, (FORMER) )
ASSOCIATE ADMINISTRATOR FOR )
CIVIL RIGHTS; BRENDA ARMSTEAD, )
FEDERAL HIGHWAY )
ADMINISTRATION, EQUAL )
OPPORTUNITY SPECIALIST; ARTHUR )
"GENE" ARMSTEAD, FEDERAL )
HIGHWAY ADMINISTRATION, )
EASTERN RESOURCE CENTER, CIVIL )
RIGHTS TEAM; STANLEY GEE, )
FEDERAL HIGHWAY )
ADMINISTRATION, DISTRICT )
ADMINISTRATOR, )
)
Defendants. )

MAGISTRATE JUDGE

Civil Action No.:

RECEIPT #
AMOUNT $
SUMMONS ISSUED
LOCAL RULE 4.1
WAIVER FORM
MCF ISSUED
BY DPTY CLK
DATE

FILED
IN CLERK'S OFFICE
2004 OCT -6 A 9:24
U.S. DISTRICT COURT
DISTRICT OF MASS.

## COMPLAINT FOR DAMAGES

NOW COMES the plaintiff, Duxbury Trucking, Inc., by and through its attorneys, Shaheen & Gordon, P.A., and complains against the defendants as follows:

## PRELIMINARY STATEMENT

1. Duxbury Trucking (the "plaintiff"), a Certified Woman Owned Business Enterprise (WBE/DBE), files this action for damages arising out of discrimination it suffered at the hands of the Massachusetts Highway Department (the "MHD") and the

Massachusetts Turnpike Authority (the "MTA") when it was a subcontractor on the Central Artery/Tunnel Project (the "CA/T"). Specifically, MHD and MTA failed to ensure that CA/T Prime Contractors complied with CA/T Contract Provisions; the CA/T Labor Agreement; the Teamsters Union Agreement; and Massachusetts Prevailing Rate Law in their dealings with A, B, and C Material Haulers, the trucking classification that covers the plaintiff. There are more WBE/DBEs working as A, B, and C Material Haulers than in any other trucking classification on the CA/T. As a consequence of MHD and MTA's failure to enforce these laws, the only way for the plaintiff to continue work on the CA/T was to fall short of obeying prevailing wage laws and paying its employees the Prevailing Hourly Pay Rate, Health Insurance Hourly Account Payments and Pension Hourly Account Payments.

    2.    To hide this shortcoming, CA/T contractors knowingly did not collect certified payroll records and/or directed WBE/DBEs, like the plaintiff, to falsify payroll records to make it appear as though the parties had met their obligations under Massachusetts law and the various contracts to pay prevailing wages and benefits. The plaintiff refused to falsify payroll records for fear that it would expose it to State and Federal criminal liability. Without breaking the law, the plaintiff was forced to "park her trucks," and stop short of completing work on several contracts in 1996.

    3.    MHA and MTA attempted to correct this problem by entering into an agreement with the Teamsters Local Union and representatives of the Trucking Industry known as the "Uplift Agreement." The agreement aimed, in part, to improve the trucking rate so that A, B, and C material haulers could sufficiently meet their obligations to pay employees the prevailing hourly wage rate, and forced the general contractors to pay into

2

health and pensions funds as provided by the State prevailing wage statute. However, even after this agreement, the MHA and MTA failed to properly oversee prevailing wage requirements. As a consequence, the plaintiff continued to be paid below the required hourly trucking rate such that it could not pay its employees the prevailing hourly wage rate and stay in business. By 1999, the plaintiff had exhausted its capital, driven its business in the ground and was forced out of competition for available CA/T contracts.

4. MTA and MHD's failure to enforce Massachusetts Prevailing Rate Law and their various contractual obligations -- a failure that forced the plaintiff's woman owned enterprise out of competition for CA/T contracts — violated 23 U.S.C. § 324, the prohibition on sex discrimination in any highway projects receiving federal assistance and violated various agency regulations, violations that are enforceable through Title VI of the Civil Rights Act of 1964. Additionally, MTA and MHD violated 42 U.S.C. § 1983 and the Due Process Clause of the Fourteenth Amendment by depriving the plaintiff of its property right to continue work on existing CA/T contracts and to compete for more contracts as a WBE/DBE, a deprivation that occurred without due process of law. These violations came at a considerable cost to the plaintiff's business.

5. Based on this conduct, on or about September 27, 2000, the plaintiff filed a Complaint with the Federal Highway Administration (FHA) alleging that it was discriminated against as a WBE/DBE. Defendant Edward W. Morris, Jr. was assigned to handle the Complaint and the ensuing investigation. Defendants Brenda Armstead, the FHA's Equal Opportunity Specialist, Stanley Gee, in Division Administration, and Gene Armstead from the Eastern Resource Center, Civil Rights Team, all contributed to the FHA's response to the Complaint. While the Complaint was pending, the plaintiff was

OIG-056

told by several of these individuals to "bear with" the process, a finding of discrimination would be forthcoming and that finding would translate into a monetary award for the plaintiff. In fact, the FHA generated an initial report finding that the plaintiff was the victim of discrimination as a WBE/DBE. Throughout the course of the investigation, the plaintiff repeatedly contacted these individuals requesting the prompt resolution of its Complaint. Despite the statements of these individuals and the finding of the preliminary report, defendant Morris denied the Complaint on March 3, 2003. On June 19, 2003, defendant Morris denied plaintiff's request to reconsider. Soon thereafter, the plaintiff filed a Freedom of Information Act request for the materials generated by the FHA during the investigation of its Complaint. In April of 2004, the FHA finally produced certain, but not all of the requested documents -- documents that shed new light on the plaintiff's Title VI discrimination claims. Defendants have yet to produce and provide a final report as required by applicable regulations to plaintiff.

6.  Defendant Morris' considerable delay in investigating the plaintiff's Complaint as well as his promises that a finding of discrimination was forthcoming, caused actual prejudice to the plaintiff's legal claims sufficient to establish a deprivation of the plaintiff's property right under the Due Process Clause of the Fifth Amendment. Further, defendants Edward Morris, Stanley Gee, Brenda Armstead, and Gene Armstead conspired by agreement to deprive the plaintiff of its property rights without Due Process of law in violation of the Fifth Amendment of the United States Constitution. The plaintiff suffered monetary damages as a consequence of these deprivations.

## PARTIES

7. The plaintiff, Duxbury Trucking, is a Massachusetts corporation with its principal place of business at 83 Blodgett Avenue, Duxbury, Massachusetts 02332.

8. The defendant, the Massachusetts Highway Department, is a state agency created by statute, M.G.L.A. ch.16 §1, and located at 10 Park Plaza, Boston, Massachusetts 02116.

9. The defendant, the Massachusetts Turnpike Authority, is a State Agency created by statute, M.G.L.A. ch. 81A § 1, located at 10 Park Plaza, Suite 4160, Boston, Massachusetts 02116.

10. The defendant, Edward W. Morris, Jr., is the former Associate Administrator for Civil Rights with the U.S. Department of Transportation, Federal Highway Administration, residing at 717 59th Avenue, Fairmont Heights, Maryland 20743.

11. The defendant, Brenda Armstead, is the Equal Opportunity Specialist for the Federal Highway Administration, residing at 7809 Big Buck Drive, Baltimore, Maryland 21244.

12. The defendant, Stanley Gee, is the Division Administrator, Federal Highway Administration, residing at 717 Atlantic Avenue, Unit 3B, Boston, MA 02111.

13. The defendant, Arthur "Gene" Armstead, works in Civil Rights Office at the Federal Highway Administration Baltimore Resources Center, and resides at 7809 Big Buck Drive, Baltimore, Maryland 21244.

OIG-058

## JURISDICTION AND VENUE

14. This Court has subject matter jurisdiction over this case based on the presence of federal questions pursuant to 28 U.S.C. § 1331. Specifically, this Complaint alleges violations of 23 U.S.C. § 324 -- the statute prohibiting discrimination based on sex under any highway programs or activities receiving federal assistance and stating that such violations are enforced under Title VI of the Civil Rights Act of 1964. Enforcement actions under Title VI at law and in equity may be brought in federal court. See Alexander v. Sandoval, 532 U.S. 275, 280 (2001) (recognizing that Congress expressly abrogated States' sovereign immunity against suits brought in federal court to enforce Title VI).

15. Additionally, this Complaint alleges deprivation of property rights without due process of law in violation of 42 U.S.C. § 1983 and the Fourteenth Amendment to the United States Constitution, claims that are actionable before this Court. See Rumford Pharmacy, Inc. v. City of East Providence, et al., 970 F.2d 996, 998-99 (1st Cir. 1992).

16. Finally, this Complaint alleges violations of the Due Process Clause of the Fifth Amendment actionable against officers of a federal agency, violations that are also enforceable before this Court. See Schweitzer v. Dept. of Veterans Affairs, Michael Serniak, et al., No. 01-6067, 2001 U.S. App. LEXIS 25383, *5 (2d Cir. 2001).

17. Venue is proper in this district because a substantial part of the events or omissions giving rise to the claim occurred in the District of Massachusetts. See 23 U.S.C. § 1391(b).

6

OIG-059