18.    As a federal question case, this Court has personal jurisdiction over each of the defendants because they each have adequate contacts with the United States as a whole.  See United States v. Swiss American Bank, Ltd., et al., 274 F.3d 610 (1st Cir. 2001).

## ALLEGATIONS COMMON TO ALL COUNTS

19.    The CA/T project is a multi-billion dollar interstate highway project involving connections and improvements of the I-93 (Central Artery) and the eastern leg of the I-90 (Ted Williams Tunnel).  The goal of the project is to replace the elevated highway that runs through downtown Boston with an underground highway.

20.    The CA/T project receives substantial federal and state funding.  As a consequence, the Federal government, through the FHA is responsible for ensuring that federal funds are used responsibly and lawfully; it pro forms a compliance function.  The FHA also evaluates State's programs involved in the Project and provides technical assistance as needed.

21.    MHD is a recipient of Federal-Aid Highway Trust Funds.  The MTA manages the CA/T project through a Memorandum of Understanding with MHD and is also subject to the obligations of MHD.  As recipients of federal funds, the MHD, the MTA, its sub-recipients, agents, and contractors are subject to the anti-discrimination provisions of 23 USC § 324, Title VI, and the implementing regulations at 49 CFR § 21 and 23 CFR § 200.  Title 49 C.F.R. part 21 requires assurances from States that no person in the United States shall, on the grounds of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be otherwise subject to discrimination under any program or activity for which the recipient receives federal assistance from the

7

OIG-060

Department of Transportation, including the Federal Highway Administration. Section 324, Title 23 U.S.C. requires that there be no discrimination on the ground of sex.

22.    The implementing regulations relating to Supportive Services for Minority, Disadvantage, and Woman Business Enterprises require that State highway agency contracts include "[a] statement that a primary purpose of the supportive services is to increase the total number of the minority firms participating in the Federal-Aid Highway Program and to contribute to the growth and eventual self-sufficiency of minority firms." Civil Rights, Part 230 External Programs, Subpart B Supportive Services for Minority, Disadvantage, and Women Business Enterprises, 230.204.

23.    The implementing regulations further require the State highway agency to oversee compliance with these anti-discrimination provisions, stating "[t]he State program area officials and Title VI specialist shall conduct annual reviews of all pertinent program areas to determine the effectiveness of program area activities at all levels." See 19 CFR Part 23 Subchapter C. Civil Rights, Part 200 Title VI Program and Related Statues – Implementation and Review Procedures, 200.9.

24.    The then-existing Prevailing Wage Law, M.G.L. ch. 149 § 26-27 set out the framework for determining required hourly wage rates for truckers engaged in the transportation of gravel. The contractor, a subcontractor of any tier, or the broker has the primary role with respect to paying the Prevailing Wage Rate. In turn, they are required to submit certified payroll forms to the MHD, demonstrating that they are paying the required hourly rates. These hourly wage rates are incorporated into each CA/T prime contract and include health and welfare plans, pension plans, and supplementary unemployment benefits where they apply. Contractors and owner/operators are

OIG-061

responsible for paying truckers Prevailing Wage Rates. MHD is responsible for maintaining and reviewing the weekly certified payroll records in order to prevent violations of the law. Willful violations of the law were subject to a fine of up to $10,000 and/or by imprisonment for not more than six months for a first offense and a fine of not more than $25,000 and/or by imprisonment for not more than one year for a subsequent offense under M.G.L. c. 149 §27C. Additionally, M.G.L. ch. § 147 provided a mechanism for an employee aggrieved by violations of the law to institute a civil action against his employer. However, a review conducted by the Commonwealth of Massachusetts House Post Audit and Oversight Bureau in October of 1997 specifically found that these statutory provisions were not sufficient to ensure substantial compliance with prevailing wage laws. Specifically, the review found that "[t]he current system of prevailing wage enforcement is burdensome and in large part unenforceable." It went on to find that "[u]nder the current scheme, enforcement is especially difficult where large construction contractors and multiple contracting entities are involved."

25.     The MTA entered into an agreement with Bechtel/Parsons-Brinkeroff (B/PB) to be responsible for the overall management of the project. On November 28, 1989, BPB and the AFL-CIO entered into a Project Labor Agreement (PLA) to meet the specific labor needs of the project. MHD requires all contractors that work on the CA/T project to be bound by the PLA. The PLA requires contractors to pay base hourly wage rates and make contributions to established employee benefit funds.

26.     The PLA prohibits contractors from discriminating on the basis of race, color, religion, sex, national origin or age in any manner prohibited by law or regulation.

27.    There is a concentration of WBE/DBEs working as trucking sub-contractors on the CA/T. This concentration is specifically pronounced among those sub-contractors engaged in the "hauling of A, B and C materials" -- the category that includes the plaintiff. As of 1997, 17.6% of all contractors working as A, B and C Material Haulers were businesses owned by women, a higher percentage than in any other classification of truckers working on the CA/T.

28.    In the Spring of 1996, the plaintiff Susan Martinsen formed Duxbury Trucking, Inc. and on April 27, 1997 she applied for status as a WBE/DBE. Nearly a year later, on April 1, 1998, the Commonwealth of Massachusetts, State Office of Minority and Women Business Assistance certified the company as a company as a WBE/DBE.

29.    Initially, the plaintiff secured several CA/T Project Service Agreements to haul sand and gravel. In June of 1996, the plaintiff secured a contract with Willie Jones Trucking, a subcontractor of the prime contractor, Perini Corporation. The contract paid the plaintiff $44 an hour. It required the plaintiff to pay its employees a prevailing wage rate of $20.17 and a benefits package of $8. The contract lasted approximately 30 days. Neither the subcontractor nor the prime contractor provided certified payroll forms or prevailing wage rate certifications to MHD during the time of the contract.

30.    In July of 1996, the plaintiff secured a contract with Mass. Gravel. The contract paid the plaintiff an hourly trucking rate of $50 an hour and required payment to employees of a prevailing wage rate of $20.17 and hour and $8 benefits. The contract lasted approximately two weeks.

OIG-063

31.    In August of 1996, the plaintiff secured a contract with Mary O'Donnell. The contract paid the plaintiff an hourly trucking rate of $45 an hour.

32.    In November 1996, the plaintiff secured a contract with Great Northern Site Development. This contracted lasted only one week and was cut short when the plaintiff was requested to sign a blank prevailing wage sheet certification form and refused to do so.

33.    Under all of these contracts, it was impossible for the plaintiff to pay the prevailing wage rate to its employees because the trucking rate set by the prime contractors was too low to cover both payment of prevailing wages and operating costs.

34.    Under all of these contracts, the prime contractors failed to deposit appropriate funds in the benefits package pursuant to the PLA and Massachusetts law.

35.    Under all of the contracts, the prime contractors failed to properly execute certifications (or required false certifications), demonstrating compliance with the prevailing hourly pay rate, health insurance hourly account payments, and pension hourly account payments.

36.    Under all of these contracts, the MHD and MTA failed to maintain and review certified weekly payroll forms submitted by prime contractors to ensure compliance with the prevailing wage law and the project labor agreement.

37.    Unable to meet prevailing wage standards and unwilling to falsify payroll records, the plaintiff could not legally continue work on the CA/T and "parked her trucks" in 1996.

38.    On May 1997, the plaintiff took part in a CA/T truck driver's demonstration protesting these very issues. In response, MHD, B/PB, the Department of

11

OIG-064

Labor, the Teamsters Local Union and representatives of the Trucking Industry entered into an agreement known as the "Uplift Agreement." The Uplift Agreement increased the relevant hourly trucking rates from $40-45 to $60-$65, settled a grievance by the local Teamsters Union under the PLA regarding back payment of certain fringe benefits, established a dispute resolution process to continue discussions on unresolved issues, clarified enforcement issues, and described future compliance issues.

39.    Specifically, under the Uplift Agreement, both MHD and B/PB agreed to monitor the compliance with the Prevailing Minimum Wage Law. It was their responsibility to ensure that prime contractors required subcontractors and brokers to comply with the new prevailing wage standard. Through the PLA, B/PB was to ensure that the prime contractors complied with their responsibilities under the Uplift Agreement. Finally, it was the responsibility of the MHD and MTA to oversee and objectively review the actions or inactions of B/PB and the extent to which prime contracts met their responsibilities.

40.    On September 24, 1997, the Uplift Agreement was supplemented by a "Memorandum of Understanding as to Teamster Benefits" which clarified the provisions of the Uplift Agreement dealing with fringe benefits. It required employer contributions to the Construction Treamsters' Health and Welfare Fund and the New England Teamsters' Trucking Industry Pension Fund. Under this supplemental agreement, B/PB and MHA were given the specific responsibility for ensuring that these contributions were made.

41.    Subsequent to the Uplift Agreement, the plaintiff secured a contract with Modern Continental, Inc. on September 16, 1997. The contract was to last for

☑014

approximately one year and paid an hourly trucking rate of $65.00 an hour. At roughly the same time, the plaintiff entered into an agreement with Modern Continental so that it could pay back three loans set up by MHD, in order to pay back lease payments on its parked trucks. The agreement required that the plaintiff pay back to Modern Continental $10.00 for each hour that it worked. This translated into a 15.4% reduction in the plaintiff's earning power. The payments were taken immediately out of invoices generated by Modern Continental for completed work. Additionally, Modern Continental exacted 8.0% interest on the loan. The plaintiff's year long relationship with Modern Continental included several contracts dated September 16, 1997, September 19, 1997, January 17, 1998 and June 15, 1998. During this time, the plaintiff had an excellent pay back record, making payments of over $18,000 to Modern Continental. However, the plaintiff could not sustain the $10 an hour draw down, a deduction from payments due plaintiff, of the hourly trucking rate and continue to cover prevailing wage rates and benefits. Despite its payback record and the fact that there was work available, the plaintiff ran out of capital and lost her trucks in 1999 because she could not meet prevailing wage rates.

    42.    On or about September 27, 2000, the plaintiff filed a *pro se* Complaint with the FHA alleging that it was discriminated against as a WBE/DBE. The FHA accepted the Complaint as timely filed because it alleged on-going violations. The Complaint was assigned to defendant Edward W. Morris, the then Assistant Administrator for Civil Rights with the FHA.

OIG-066

43.    The FHA generated an initial investigative report substantiating the plaintiff's allegations. Specifically, it found that the MHD failed to comply with their FHA Contract Assurances, the Disadvantaged Business Enterprise Program, Participation by Disadvantaged Business Enterprises in Department of Transportation Programs, and Title VI of the 1964 Civil Rights Act; the MHD failed to comply with their Federal Funds Recipient Responsibility from 1991 to 1997; CA/T Prime Contractors engaged in policies, practices and operating procedures that exploited the Trucking Industry in ways that violated their CA/T Non-discrimination Contract Provisions and the CA/T Labor Agreement; the CA/T Project systematically discriminated against WBE/MBE/DME Contractors who had entered into "good-faith" contractual partnerships with CA/T Prime Contractors; and that these failures continued even after the MHD took allegedly "corrective action" to remedy the "trucking problem" in 1997. This initial finding was confirmed by communications from others at FHA to the plaintiff.

44.    In September 2001, defendant Gene Armstead contacted the plaintiff, offered his apologies for her treatment in Boston, acknowledged that the plaintiff had been discriminated against, and promised that she would see "dollar signs" if she was patient. Thereafter, plaintiff received numerous communications from the federal defendants which, in sum, urged defendant to take no action as a response, a positive one was in the works with FHWA.

45.    In January of 2002, defendant Armstead told the plaintiff that there was just a few blanks to fill in the investigation and that his wife, defendant Brenda Armstead, would be making a trip to Boston to continue the investigation. In March of 2002, the plaintiff spoke again with defendant Armstead. Defendant assured the plaintiff not to

14

worry about the time that the investigation was taking, and stated that defendant Brenda Armstead had made a finding that discrimination had occurred. In August 2002, defendant Morris came to Boston to reinterview plaintiff's principals, leaving behind the assigned investigator. Despite representations, defendant Morris did not quickly conclude his investigation and issue a report. The denial of the Complaint was received in March 2003, 7 months after defendant Morris' Boston site visit. In December 2002, defendant Armstead contacted the plaintiff to tell her that a final decision would be issued within thirty days.

46.    Despite this initial finding and the repeated representations by the federal defendants that a favorable response would be issued in the very near future, it was many months before defendant Morris came to a determination with respect to the violations alleged in plaintiff's Complaint. In hopes of expediting the process, plaintiff made repeated inquiries to defendant Morris regarding the status of the Complaint. In December of 2001, FHA representatives told plaintiff that the investigation of its Complaint would be complete within a matter of weeks. The plaintiff complained about the delay to the FHA on August 1, 2002. In a letter dated October 10, 2002, plaintiff demanded that the FHA complete its review by the end of that month. Its request was ignored.

47.    On November 12, 2002, the plaintiff again issued a written request to defendant Morris urging him to complete the investigation. When there was no reply, the plaintiff sent another written request on November 20, 2002 to the FHA requesting the speedy resolution of its Complaint. The plaintiff did not receive a response to these requests and drafted a letter to the FHA on December 30, 2002 pointing out the failure of

OIG-068

the FHA to respond. Only then did the FHA promise that the review would be complete by the end of January, 2003. During the course of this investigation, defendant Morris told the plaintiff to "bear with" the process, indicated that a finding of discrimination was forthcoming, and promised to remedy violations of the law on an institutional level as well as with respect to the plaintiff's Complaint.

48.    Despite this initial Investigative Report finding widespread discrimination and breach of contract and the assurances of defendant Morris and defendant Armstead that a finding of discrimination was imminent, the plaintiff received a letter from defendant Morris on March 3, 2003 -- 29 months *after* it filed its discrimination Complaint -- announcing that there was insufficient evidence to support a finding of discrimination against the plaintiff based on her gender or by virtue of her business' WBE/DBE status. Defendant Morris' finding failed to address several of the claims raised by the plaintiff. However, defendant Morris did identify several other improprieties that he uncovered during the investigation relating to the CA/T. He referred those concerns to other agencies. He found irregularities in trucking rates, the falsification of payroll records, noncompliance with fringe and benefit funds, noncompliance with certain residency requirements for workers on the project, and the failure to require written contracts and inform subcontractors about their civil rights. And, finally, defendant Morris, despite regulatory requirements, did not prepare a "final" report regarding the Complaint.

49.    On April 1, 2003, the plaintiff filed a request for defendant Morris to reconsider his finding and raised several factual issues relevant to its discrimination claim that were overlooked in his analysis. The plaintiff sent a letter seeking information about

OIG-069

the status of its request for reconsideration on May 30, 2003. On June 19, 2003, the plaintiff received a letter from defendant Morris denying its request for reconsideration.

50.     After the plaintiff learned that its request for reconsideration was denied, it filed a Freedom of Information Act request with the FHA on June 23, 2003 requesting all documents relating to the investigation that FHA conducted of the plaintiff's Complaint. It filed a second request for a specific memorandum on June 26, 2003.[1] Not receiving any response, the plaintiff sent a letter to the FHA on July 10, 2003 seeking information about the status of its requests for information. The plaintiff sent another such letter on July 22, 2003. On July 28, 2003, the plaintiff received a letter from the FHA indicating that it had received the requests for information and had forwarded them to the "appropriate office." On August 25, 2003, September 10, 2003, and September 22, 2003, the plaintiff sent additional letters to the FHA requesting a status update on its requests for information and pointing out that the FHA had yet to provide the requested information.

51.     On September 26, 2003, the plaintiff received a letter from the FHA indicating that it intended to provide the requested documents and assessing a cost for the production of $1,563. In light of this exorbitant copying cost, the plaintiff requested an explanation for the fee on October 3, 2003. The FHA then modified the price for the production of the Freedom of Information Act materials to $179.00, but decided to provide only 1,890 pages out of the 2,255 pages of material that were generated as part of its investigation.

52.     Finally, in late April of 2004 -- *approximately 42 months after it filed its original Complaint* -- the plaintiff received documents responsive to its Freedom of

---

[1] Plaintiff has yet to receive, despite repeated inquires, a response to this FOIA request.

OIG-070

Information Act request. The information provided pursuant to this document request supplied the plaintiff with certain facts critical to its legal claims. The materials included detailed factual timelines proving that MHD and prime contractors were placed on notice of irregularities with respect to trucker wage rates and payroll requirements prior to the plaintiff's work on the CA/T. The materials also point to certain correspondence to BPB indicating that despite directives to the contrary, prime contractors intended to ignore directives and continue conducting "business as usual."

**COUNT I**

**DISCRIMINATION ON THE BASIS OF SEX IN VIOLATION OF
23 U.S.C. § 324 AS ENFORCEABLE THROUGH TITLE VI OF THE
CIVIL RIGHTS ACT OF 1964 [42 U.S.C. §§ 2000d]
(CLAIMED AGAINST MHA AND MTA)**

53. The plaintiff realleges and reincorporates each of the preceding paragraphs of this Complaint as if repled herein.

54. As set out in paragraphs 14 and 15 above, state action exists in this case in that MHD is a recipient of Federal-Aid Highway Trust Funds and the MTA manages the CA/T project through an MOU with MHD.

55. The defendants violated agency regulations that prohibit actions that have the effect of treating people of different genders differently. Specifically, the defendants violated 49 CFR Part 123, Subchapter C when they failed to conduct reviews to determine effectiveness of Title VI program areas. MHA and MTA failed to execute required policies, practices and operating procedures to ensure contractor compliance with CA/T Contract Provisions, the CA/T Labor Agreement, the Teamsters Union Agreement, and Massachusetts Prevailing Rate Law.

18

OIG-071

10/07/2004 10:00 FAX 6177489096    US DIST COURT    ☒020

56.    With regard to contracts secured by the plaintiff from Willie Jones Trucking, Mass. Gravel, Mary O'Donnell, Inc., and Great Northern Site Development, between June of 1996 and November of 1996, MHD and MTA failed to ensure that prime contractors deposited appropriate funds in the benefits package pursuant to the PLA. MHD and MTA also failed to maintain and review certified weekly payroll forms submitted by prime contractors to ensure compliance with the prevailing wage law and the PLA as well as certifications to ensure compliance with health insurance hourly account payments and pension hourly account payments.

57.    Because of MHD and MTA's failures, the trucking rate set by the prime contractors was too low for the plaintiff to cover both payment of prevailing wages and operating costs.  Unable to meet prevailing wage standards and unwilling to falsify payroll records, the plaintiff could not legally continue to work on the CA/T and parked her trucks in 1996. In this way, the MHA and MTA violated, 23 U.S.C. § 324 and 49 CFR part 21 by excluding the plaintiff as a WBE/DBE from participation in the CA/T, a program that receives federal funds.

58.    Even after attempting to take corrective action by entering into the Uplift Agreement in 1997, MHD and MTA continued to violate 49 CFR Part 123, Subchapter C when they failed to conduct reviews to determine effectiveness of Title VI program areas. Specifically, the MHD and MTA failed to ensure compliance with the prevailing hourly wage rate and to ensure that prime contractors were depositing appropriate funds in the benefits package pursuant to the PLA.

59.    Without any oversight by MHD and MTA, Modern Continental paid the plaintiff an effective hourly trucking rate of $55 per hour, a rate substantially below the

OIG-072

$65 required hourly trucking rate for A, B, C Material Hauling truckers. This conduct spanned the course of several contracts from September 16, 1997 through June 15, 1998. Without payment of the full hourly trucking rate, the plaintiff was unable to pay its employees the prevailing hourly wage rates as required by Massachusetts law. Over the course of that year, the plaintiff exhausted its capital and was forced out of competition for CA/T projects. In this way, the MHA and MTA violated, 23 U.S.C. § 324 and 49 CFR part 21 by excluding the plaintiff as a WBE/DBE from participation in on the CA/T, a program that receives federal funds.

60.    These regulatory violations, described in paragraphs 57 through 59 and occurring between June of 1996 and June of 1998, had a disproportionate effect on women owned businesses, including the plaintiff's business. The failure to ensure that A, B, and C Material Hauling truckers were receiving hourly trucking rates that enabled them to pay their employees the prevailing hourly wage and make required benefit contributions had a specific impact on women owned businesses. Indeed, more WBE/DBE contractors worked as A, B, and C Material Haulers than in any other trucking classification on the CA/T.

61.    As a consequence of the defendants' failure, the plaintiff suffered compensatory damages, including the loss of equipment and equipment lease options, the loss of cash related to business start up, losses related to administrative processes to bring the matter to closure, loss of corporate income, loss of income due to below market rate hourly pricing, the loss of interest, and the loss of loan payment credit.

OIG-073