# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

————

Argued May 9, 2008                    Decided August 12, 2008

No. 07-5257

VALERIE PLAME WILSON AND JOSEPH C. WILSON, IV,
APPELLANTS

v.

I. LEWIS LIBBY, ET AL.,
APPELLEES

————

Appeal from the United States District Court
for the District of Columbia
(No. 06cv01258)

————

*Erwin Chemerinsky* argued the cause for appellants. With
him on the briefs were *Anne L. Weismann* and *Melanie T. Sloan*.

*Jeffrey S. Bucholtz*, Acting Assistant Attorney General, U.S.
Department of Justice, argued the cause for appellees. With him
on the brief were *Jeffrey A. Taylor*, U.S. Attorney, *Mark B. Stern*
and *Charles W. Scarborough*, Attorneys, *Michael L. Waldman*,
*John G. Kester*, *Terrence O'Donnell*, *Robert D. Luskin*, *William
H. Jeffress Jr.*, and *Alex J. Bourelly*. *Richard Montague*,
Attorney, U.S. Department of Justice, *R. Craig Lawrence*,
Assistant U.S. Attorney, and *Jeffrey A. Lamken*, entered
appearances.

2

*John G. Kester* and *Terrence O'Donnell* were on the brief for appellee Vice President Richard B. Cheney.

Before: SENTELLE, *Chief Judge*, HENDERSON and ROGERS, *Circuit Judges*.

Opinion for the Court filed by *Chief Judge* SENTELLE.

Opinion concurring in part and dissenting in part filed by *Circuit Judge* ROGERS.

SENTELLE, *Chief Judge*:  In his 2003 State of the Union address, President George W. Bush reported that "[t]he British government has learned that Saddam Hussein recently sought significant quantities of uranium from Africa."[1]  Those sixteen words set off a series of events which resulted in the disclosure of Valerie Plame Wilson's previously covert status at the Central Intelligence Agency.  Valerie Plame Wilson and her husband, Joseph C. Wilson IV, have filed this action for damages to remedy the injuries they allege they suffered because of that disclosure.  Defendants are the United States and four Executive Branch officials — Vice President Richard B. Cheney, former Senior Advisor to the President Karl C. Rove, former Assistant to the President and Chief of Staff to the Vice President I. Lewis "Scooter" Libby, Jr., and former Deputy Secretary of State Richard L. Armitage.  On motions to dismiss, the district court dismissed all claims.  We affirm.

---

[1]  George W. Bush, U.S. President, State of the Union, Address Before the Nation (Jan. 23, 2003) (transcript available at http://www.whitehouse.gov/news/releases/2003/01/20030128-19.html).

3

## I. BACKGROUND

We accept the factual allegations in the Amended Complaint as true for purposes of this appeal. *See Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 164 (1993).

During the spring of 2003, after President George W. Bush informed the Nation that "[t]he British government has learned that Saddam Hussein recently sought significant quantities of uranium from Africa," there was much speculation in the press about whether the uranium allegation was credible and whether individuals at the White House were aware of questions about its credibility when the State of the Union address was given. On May 6, 2003, *The New York Times* published the first article questioning the veracity of the claim. That article by Nicholas Kristof cited as its source a "former ambassador" who had traveled to Niger in early 2002 and reported back to the Central Intelligence Agency ("CIA") and the State Department that the uranium "allegations were unequivocally wrong and based on forged documents." Am. Compl. ¶ 19b.

The Vice President's Chief of Staff, I. Lewis "Scooter" Libby, Jr., contacted the State Department and asked for information about the Niger trip reported in *The New York Times*. The State Department's Bureau of Intelligence and Research was directed to prepare a report about the travel and an Under Secretary kept Libby updated about its progress. The Under Secretary informed Libby that the former ambassador was Joseph Wilson. In June 2003, Libby was further advised by the Under Secretary and by a senior official at the CIA that Valerie Plame Wilson was Joseph Wilson's wife, that she worked at the CIA, and that some thought that she helped plan Joseph Wilson's trip to Niger. Vice President Cheney also told

4

Libby that Valerie Plame Wilson worked at the CIA in the Counterproliferation Division.

On June 12, 2003, *The Washington Post* published an article critical of the uranium claim based on the report of a retired ambassador who had traveled to Niger. Another article was published on June 19, 2003, in *The New Republic*. Entitled "The First Casualty: The Selling of the Iraq War," the article alleged that the Vice President's office had prompted the former ambassador's trip to Niger and that, after the trip, administration officials "'knew the Niger story was a flat-out lie.'" Am. Compl. ¶ 19k (quoting Spencer Ackerman & John B. Judis, The First Casualty: The Selling of the Iraq War, NEW REPUBLIC, June 30, 2003, at 14). Several news outlets carried the story on July 6, 2003. *The New York Times* published an Op-Ed by Joseph Wilson entitled "What I Didn't Find in Africa;" *The Washington Post* published an article based on an interview with Joseph Wilson; and the *Meet the Press* television show included Joseph Wilson as a guest. Wilson confirmed the prior reports of his travel to Niger in 2002 and his doubts about the uranium claims and said that he had told the administration of his doubts upon his return from Niger.

The administration commenced an effort to rebut the Wilson allegations. In July, Libby talked to Judith Miller of *The New York Times* and to Matthew Cooper of *Time* magazine; Karl Rove talked to Matthew Cooper of *Time* magazine and to Chris Matthews, host of MSNBC's "Hardball;" and Deputy Secretary of State Richard Armitage met with reporter Robert Novak. Armitage, who had learned of Valerie Wilson's CIA employment from a State Department memo, told Novak that Valerie Wilson worked at the CIA on issues relating to weapons of mass destruction. Novak then wrote an article that was published in several newspapers, including *The Washington Post* and the *Chicago Sun Times*, on July 14, 2003. In the article, he

5

wrote that "Wilson never worked for the CIA, but his wife, Valerie Plame, is an Agency operative on weapons of mass destruction." Am. Compl. ¶ 14. That article, Valerie Wilson contends, "destroyed her cover as a classified CIA employee." *Id.*

The Wilsons filed a complaint in district court seeking money damages from Vice President Cheney, Libby, and Rove for injuries allegedly suffered because of the disclosure of Valerie Wilson's employment at the CIA. They amended their complaint on September 13, 2006, to add Armitage as a defendant. The Wilsons seek damages for constitutional violations under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), and for the invasion of their privacy under District of Columbia tort law.

The district court dismissed all of their claims. *Wilson v. Libby*, 498 F. Supp. 2d 74 (D.D.C. 2007). The court held that the Wilsons failed to state a *Bivens* claim upon which relief could be granted because special factors counsel against creating a *Bivens* remedy in this case. The Wilsons' *Bivens* claims were based on alleged violations of their Fifth Amendment rights to equal protection of the laws, of Joseph Wilson's First Amendment right to freedom of speech, and of Valerie Wilson's Fifth Amendment rights to privacy and property, with each claim based on the disclosure of personal information covered by the Privacy Act, 5 U.S.C. § 552a. Because this Court has held that the Privacy Act is a comprehensive remedial scheme, *Chung v. U.S. Dep't of Justice*, 333 F.3d 273, 274 (D.C. Cir. 2003), *aff'g in relevant part* No. 00-1912 (D.D.C. Sept. 20, 2001), and because the Supreme Court has held that the existence of a comprehensive remedial scheme precludes implication of *Bivens* remedies even where the scheme does not provide full relief, *Wilkie v. Robbins*, 127 S. Ct. 2588, 2600-01, 2604-05 (2007); *Schweiker v. Chilicky*, 487 U.S. 412, 421-22

6

(1988); *Bush v. Lucas*, 462 U.S. 367, 388 (1983), the district court concluded that it could not imply a *Bivens* remedy here. The court further concluded that creating a *Bivens* remedy in this case would be inappropriate because, if litigated, the case would inevitably require the disclosure of sensitive intelligence information.

The district court held that the invasion of privacy claim also required dismissal. The United States had intervened in the lawsuit with respect to the tort claim and had filed a certification pursuant to the Westfall Act, 28 U.S.C. § 2679(d)(2), that, "at the time of the conduct alleged in the amended complaint the individual federal defendants . . . were each acting within the scope of their employment as employees of the United States." The court found that the Westfall Act certification was proper, meaning that the case must proceed solely against the United States under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2671–80. Because the Wilsons had not exhausted administrative remedies as required by the FTCA, the court dismissed the claim for lack of jurisdiction. The Wilsons appealed.

## II. JURISDICTION

The "first and fundamental question" that we are "bound to ask and answer" is whether we have jurisdiction to decide this appeal. *Bancoult v. McNamara*, 445 F.3d 427, 432 (D.C. Cir. 2006) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998)) (internal quotation marks omitted). "'The requirement that jurisdiction be established as a threshold matter "springs from the nature and limits of the judicial power of the United States" and is "inflexible and without exception."'" *Id.* (quoting *Steel Co.*, 523 U.S. at 94–95 (quoting *Mansfield, C. & L.M. Ry. v. Swan*, 111 U.S. 379, 382 (1884))). Therefore, we must "'address questions pertaining to [our] jurisdiction before

7

proceeding to the merits.'"  *Id.* (quoting *Tenet v. Doe*, 544 U.S. 1, 6 n.4 (2005)).

The Vice President argues that we do not have jurisdiction under the political question doctrine because this case involves the identity of a covert agent and thereby implicates foreign-policy and national-security decisions that are reserved to the Executive Branch.  We conclude that the allegations do not implicate the political question doctrine.

The political question doctrine "'excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch.'"  *Bancoult*, 445 F.3d at 432 (quoting *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986)).  The doctrine applies where, "[p]rominent on the surface" of the case is:

> [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Baker v. Carr*, 369 U.S. 186, 217 (1962).  "'[U]nless one of these formulations is inextricable from the case at bar,' we may not dismiss the claims as nonjusticiable under the political

8

question doctrine."  *Bancoult*, 445 F.3d at 432–33 (quoting *Baker*, 369 U.S. at 217).

The doctrine does not apply here.  While "decision-making in the fields of foreign policy and national security is textually committed to the political branches of government," *Schneider v. Kissinger*, 412 F.3d 190, 194 (D.C. Cir. 2005), the Wilsons have not challenged any foreign policy or national security decisions entrusted to the Executive Branch.  They have instead challenged disclosures made by high-level executive branch officials when speaking with the press.  The disclosures may have implicated national security by identifying a previously covert agent, but the lawsuit itself is not about national security in a manner requiring application of the political question doctrine.  We therefore will proceed to the merits of the Wilsons' claims.

### III. ANALYSIS

The Wilsons argue that the district court erred in holding that special factors preclude implication of a *Bivens* claim and that the Government's Westfall Act certification was proper.  On each legal issue, our review is *de novo*.  *See Rasul v. Myers*, 512 F.3d 644, 654 (D.C. Cir. 2008).

### A. *Constitutional Claims*

The Wilsons first contest the district court's ruling that *Bivens* remedies are not available for their injuries.  We agree with the district court that we cannot create a *Bivens* remedy because the comprehensive Privacy Act and the sensitive intelligence information concerns affiliated with this case preclude us from doing so.

9

1.

We have discretion in some circumstances to create a remedy against federal officials for constitutional violations, but we must decline to exercise that discretion where "special factors counsel[] hesitation" in doing so. *See Bivens*, 403 U.S. at 396; *Spagnola v. Mathis*, 859 F.2d 223, 226 (D.C. Cir. 1988) (en banc). In *Bivens*, the Court implied a remedy where there were no "'special factors counselling hesitation in the absence of affirmative action by Congress'" that required "the judiciary [to] decline to exercise its discretion in favor of creating damages remedies against federal officials." *Spagnola*, 859 F.2d at 226 (quoting *Bivens*, 403 U.S. at 396). Since *Bivens*, the Supreme Court has "recognized two more nonstatutory damages remedies, the first for employment discrimination in violation of the Due Process Clause, *Davis v. Passman*, 442 U.S. 228 (1979), and the second for an Eighth Amendment violation by prison officials, *Carlson v. Green*, 446 U.S. 14 (1980)," but "in most instances[, the Court has] found a *Bivens* remedy unjustified." *Wilke v. Robbins*, 127 S. Ct. 2588, 2597 (2007). Indeed, in its "more recent decisions[, the Supreme Court has] responded cautiously to suggestions that *Bivens* remedies be extended into new contexts." *Chilicky*, 487 U.S. at 421.

One "special factor" that precludes creation of a *Bivens* remedy is the existence of a comprehensive remedial scheme. In *Bush v. Lucas*, 462 U.S. 367 (1983), the Court held that the federal civil service laws were a "special factor" that precluded additional *Bivens* remedies because they constituted "an elaborate remedial system that ha[d] been constructed step by step, with careful attention to conflicting policy considerations" and thereby reflected Congressional judgment about the type and magnitude of relief available. *Id.* at 388–90. The scheme did not provide "complete relief" to the plaintiff, but the Court held that the special factors inquiry does "not concern the merits

10

of the particular remedy that was sought" or its completeness. *Id.* at 380, 388.  Rather, the doctrine "relate[s] to the question of who should decide whether such a remedy should be provided." *Id.* at 380.  "[C]onvinced that Congress is in a better position to decide whether or not the public interest would be served" by the addition of legal liability, the Court refused to create new remedies under *Bivens* for the plaintiff in *Bush*.  *Id.* at 390.

The Supreme Court reiterated that a remedial statute need not provide full relief to the plaintiff to qualify as a "special factor" in *Schweiker v. Chilicky*, 487 U.S. 412 (1988).  In *Chilicky*, "exactly as in *Bush*, Congress ha[d] failed to provide for 'complete relief':  respondents ha[d] not been given a remedy in damages for emotional distress or for other hardships suffered because of delays in their receipt of Social Security benefits."  *Chilicky*, 487 U.S. at 425.  But, the Court noted, "[t]he absence of statutory relief for a constitutional violation . . . does not by any means necessarily imply that courts should award money damages against the officers responsible for the violation."  *Id.* at 421–22.  Rather, "the concept of 'special factors counselling hesitation in the absence of affirmative action by Congress' . . . include[s] an appropriate judicial deference to indications that congressional inaction has not been inadvertent."  *Id.* at 423.  Therefore, "[w]hen the design of a Government program suggests that Congress has provided what it considers adequate remedial mechanisms for constitutional violations that may occur in the course of its administration," courts should not "create[] additional *Bivens* remedies."  *Id.* Because "Congress is the body charged with making the inevitable compromises required in the design of a massive and complex welfare benefits program," the Court refused to question the legislative decision to exclude certain remedies from that program.  *Id.* at 429.

11

Most recently, in *Wilkie v. Robbins*, 127 S. Ct. 2588 (2007), the Court again held that the creation of a *Bivens* remedy is not required solely because there is no alternative statutory remedy. In *Wilkie*, there was no comprehensive scheme demonstrating "that Congress expected the Judiciary to stay its *Bivens* hand," but the Court declined to imply a *Bivens* remedy nonetheless. *Id.* at 2600. The Court held that a remedy for allegedly harassing conduct of government officials would "come better, if at all, through legislation [because] 'Congress is in a far better position than a court to evaluate the impact of a new species of litigation' against those who act on the public's behalf." *Id.* at 2604–05 (quoting *Bush*, 462 U.S. at 389). The Court's "point . . . is not to deny that Government employees sometimes overreach, for of course they do, and they may have done so here if all the allegations are true." *Id.* at 2604. Instead, "[t]he point is the reasonable fear that a general *Bivens* cure would be worse than the disease." *Id.* The Court concluded that authority to create a remedy should remain with Congress because Congress can "tailor any remedy to the problem perceived, thus lessening the risk of raising a tide of suits threatening legitimate initiative on the part of the Government's employees." *Id.* at 2605. Thus, the Court again made clear that there is no "automatic entitlement" to a *Bivens* remedy regardless of "what other means there may be to vindicate a protected interest." *Id.* at 2597.

Consistent with *Bush*, *Chilicky*, and *Wilkie*, our Court sitting en banc has held that the availability of *Bivens* remedies does not turn on the completeness of the available statutory relief. In *Spagnola v. Mathis*, 859 F.2d 223 (D.C. Cir. 1988), we interpreted *Bush* and *Chilicky* as "ma[king] clear that it is the comprehensiveness of the statutory scheme involved, not the 'adequacy' of specific remedies extended thereunder, that counsels judicial abstention." *Id.* at 227. We held that "courts must withhold their power to fashion damages remedies when

12

Congress has put in place a comprehensive system to administer public rights, has 'not inadvertently' omitted damages remedies for certain claimants, and has not plainly expressed an intention that the courts preserve *Bivens* remedies." *Id.* at 228. Quoting *Chilicky*, we explained that, "[i]n these circumstances, it is not for the judiciary to question whether Congress' 'response [was] the best response, [for] Congress is the body charged with making the inevitable compromises required in the design of a massive and complex . . . program.'" *Id.* (quoting *Chilicky*, 487 U.S. at 429).

Our *Spagnola* decision involved the comprehensive scheme established by the Civil Service Reform Act. 859 F.2d at 230. We have also found comprehensive remedial schemes in Title VII of the Civil Rights Act of 1964, *see Ethnic Employees of Library of Congress v. Boorstin*, 751 F.2d 1405, 1414–16 (D.C. Cir. 1985), the Freedom of Information Act, *see Johnson v. Executive Office for U.S. Attorneys*, 310 F.3d 771, 777 (D.C. Cir. 2002), the Veterans' Judicial Review Act, *see Thomas v. Principi*, 394 F.3d 970, 975–76 (D.C. Cir. 2005), and the Privacy Act, *see Chung v. U.S. Dep't of Justice*, 333 F.3d 273, 274 (D.C. Cir. 2003), *aff'g in relevant part* No. 00-1912 (D.D.C. Sept. 20, 2001).

2.

The Wilsons concede that this Court has held that the Privacy Act, 5 U.S.C. § 552a, is a "special factor" that counsels hesitation in implying *Bivens* remedies. Appellants' Br. at 17–18 (citing *Chung*, 333 F.3d at 274); *accord Downie v. City of Middleburg Heights*, 301 F.3d 688, 698 (6th Cir. 2002) (finding Privacy Act is a "comprehensive legislative scheme" that precludes additional *Bivens* remedies). But they contend that the Privacy Act should not be found "comprehensive" and preclusive of *Bivens* remedies here because three defendants in

13

this case are exempted from its terms. The failure of the Privacy Act to provide complete relief to the Wilsons, however, does not undermine its status as a "comprehensive scheme" that stops us from providing additional remedies under *Bivens*.

The Privacy Act regulates the "'collection, maintenance, use, and dissemination of information'" about individuals by federal agencies. *Doe v. Chao*, 540 U.S. 614, 618 (2004) (quoting Privacy Act of 1974 § 2(a)(5), 88 Stat. 1896). It "authorizes civil suits by individuals . . . whose Privacy Act rights are infringed," *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1123 (D.C. Cir. 2007), and provides for criminal penalties against federal officials who willfully disclose a record in violation of the Act, 5 U.S.C. § 552a(i)(1).

The claims asserted by the Wilsons are all claims alleging harm from the improper disclosure of information subject to the Privacy Act's protections. The Privacy Act applies to information that is "about an individual," that is stored in a system of records "under the control of any agency," and that is "retrieved by the name of the individual or by some identifying number, symbol, or other identifying particular assigned to the individual." 5 U.S.C. § 552a(a)(4), (5). The amended complaint premises the Wilsons' damages on the publication of Valerie Plame Wilson's CIA employment in the Novak column. Am. Compl. ¶ 40. The publication was the result of a disclosure by Deputy Secretary of State Armitage of information about an individual contained in State Department records. *Id.* at ¶ 14.

Each claim in the Wilson complaint is based on this disclosure of Privacy Act protected information. In Count One, the Wilsons allege that Joseph Wilson's First Amendment right to free speech was violated when the information was disclosed in retaliation for his speech. Count Two alleges that Valerie and Joseph Wilson's Fifth Amendment rights to equal protection of

14

the laws were violated by the disclosure of information because that disclosure treated them differently from others. Count Three alleges that Valerie Wilson's Fifth Amendment right to privacy was violated when her personal information was publicly disclosed. Count Four alleges that Valerie Wilson's Fifth Amendment right to property was violated when the information was disclosed because the disclosure eliminated the secrecy of her position which was essential to her employment. Thus, each Constitutional claim, whether pled in terms of privacy, property, due process, or the First Amendment, is a claim alleging damages from the improper disclosure of information covered by the Privacy Act.

It is true that the Wilsons cannot obtain complete relief under the Privacy Act because the Act exempts the Offices of the President and Vice President from its coverage. *See* 5 U.S.C. § 552a(b) (applying Privacy Act requirements to agencies); *id.* § 552a(a)(1) (adopting definition of "agency" from the Freedom of Information Act (FOIA)); *Kissinger v. Reporters Committee for Freedom of the Press*, 445 U.S. 136, 156 (1980) (Office of the President is not an "agency" under FOIA); *Judicial Watch, Inc. v. National Energy Policy Development Group*, 219 F. Supp. 2d 20, 55 (D.D.C. 2002). Thus, even if the Wilsons can prove their allegations against Vice President Cheney, Rove, and Libby, they will not be remunerated for them. Nonetheless, our precedent is plain that the Wilsons are still not entitled to *Bivens* relief as to Vice President Cheney, Rove, or Libby, provided their omission from the remedial scheme was not inadvertent. *See Spagnola*, 859 F.2d at 228.

Congress did not inadvertently omit the Offices of the President and Vice President from the Privacy Act's disclosure requirements. The Privacy Act explicitly defines "agency" by reference to FOIA, 5 U.S.C. § 552a(a)(1), which the Supreme

15

Court has held, based on "unambiguous" legislative history, does not extend to the Office of the President, *Kissinger*, 445 U.S. at 156 (citing H.R. Rep. No. 93-1380 at 15 (1974)); *see also Judicial Watch*, 219 F. Supp. 2d at 55 (concluding that the Vice President and his staff are not "agencies" for purposes of the FOIA). "There is every indication from the legislative history that the drafters of the Privacy Act, in choosing to apply the FOIA definition of 'agency' to the Privacy Act, were cognizant of the Conference Committee Report prepared in connection with the 1974 FOIA Amendments, which specifically provided that 'the term [agency] is not to be interpreted as including the President's immediate personal staff or units in the Executive Office whose sole function is to advise and assist the President.'" *Jones v. Executive Office of the President*, 167 F. Supp. 2d 10, 19 (D.D.C. 2001) (quoting H.R. Rep. No. 93-1380, at 15). This intentional omission of the Presidential and Vice Presidential offices from the comprehensive coverage of the Privacy Act requires us to deny the additional remedies to the Wilsons which they seek.

3.

The Wilsons make two principal arguments in attempting to distinguish their case from precedent. First, they rely on the Supreme Court's decision in *Carlson*. In *Carlson* the Supreme Court stated that the right of victims of a constitutional violation to a *Bivens* remedy "may be defeated . . . in two situations." The Court defined the first as "when defendants demonstrate 'special factors counseling hesitation in the absence of affirmative action by Congress.'" 446 U.S. at 18. The Supreme Court described the second as "when defendants show that Congress has provided an alternative remedy which it explicitly declared to be a *substitute* for recovery directly under the Constitution and viewed as equally effective." *Id.* at 18-19. The Wilsons argue that the *Bivens* claim cannot be defeated here because there is no

16

"equally effective alternative remedy."  Were we to look at *Carlson* standing alone, this argument might carry much weight.  However, subsequent to *Carlson*, the Court clarified that there does not need to be an equally effective alternate remedy.  Instead, "the decision whether to recognize a *Bivens* remedy may require two steps."  *Wilkie*, 127 S. Ct. at 2598.  First, if there is an "alternative, existing process for protecting the interest," then that is "a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages."  *Id.*  Even if there is no equally effective alternative remedy, the decision of whether to create "a *Bivens* remedy is a subject of judgment" that requires the court to "'make the kind of remedial determination that is appropriate for a common-law tribunal, paying particular heed, however, to any special factors counseling hesitation before authorizing a new kind of federal litigation.'"  *Id.* (quoting *Bush*, 462 U.S. at 378).  In other words, an equally effective statutory remedy is a sufficient, but not essential, reason for us to abstain from creating *Bivens* remedies.  The presence of a comprehensive remedial scheme is also a sufficient reason for us to stay our hand.

Second, the Wilsons argue that other remedies have been available to the plaintiffs in cases where the Court denied a *Bivens* remedy.  In *Bush*, the Court referred to the "comprehensive nature of the remedies currently available" under the civil service laws, 462 U.S. at 388; in *Chilicky*, the Court described the Social Security Act as a "comprehensive statutory scheme," 487 U.S. at 428; and in *Wilkie*, the Court noted that the plaintiff could avail himself of a "patchwork" of remedies for some of his injuries, 127 S. Ct. at 2600.  Here, in contrast, the Wilsons assert that they will never be able to obtain any remuneration for injuries allegedly suffered because of the actions of Vice President Cheney, Rove, and Libby if they cannot proceed under *Bivens*.  Thus, they argue, they are like the

17

plaintiffs in *Davis* and *Bivens* who were given a *Bivens* remedy because they had no other avenue of relief available to them. *See Davis*, 442 U.S. at 245 ("There are available no other alternative forms of judicial relief."); *Bivens*, 403 U.S. at 410 (Harlan, J., concurring in the judgment) ("For people in Bivens' shoes, it is damages or nothing.").

The first problem with this argument is that the Wilsons, unlike the plaintiffs in *Davis* and *Bivens*, can seek at least some remedy under the Privacy Act. At the least, as they concede, Valerie Wilson has a possible claim based on the disclosure by Deputy Secretary of State Armitage because the information disclosed about her and the agency involved in the disclosure are subject to the Privacy Act's restrictions. Appellants' Br. at 18 n.3. So, while the Privacy Act may not provide the Wilsons with full relief regarding the alleged disclosures, and provides Mr. Wilson with no relief, the Wilsons cannot contend that there is no possibility of relief at all under the statute for the disclosure of Privacy Act protected information.

The more significant flaw in the Wilsons' argument is its focus on the necessity of a remedy at all. The special factors analysis does not turn on whether the statute provides a remedy to the particular plaintiff for the particular claim he or she wishes to pursue. In *Spagnola*, we held that a comprehensive statutory scheme precludes a *Bivens* remedy even when the scheme provides the plaintiff with "no remedy whatsoever." 859 F.2d at 228 (quoting *Chilicky*, 487 U.S. at 423). And the Supreme Court, in its most recent consideration of the issue, did not create a remedy even though there was no cause of action that the plaintiff could pursue to remedy injuries that resulted from a prolonged "course of dealing as a whole." *Wilkie*, 127 S. Ct. at 2600-01, 2604-05. The pertinent inquiry is "the question of who should decide whether such a remedy should be provided," *Bush*, 462 U.S. at 380, not whether there is a remedy.

18

Indeed, it is where Congress has intentionally withheld a remedy that we must most refrain from providing one because it is in those situations that "appropriate judicial deference" is especially due to the considered judgment of Congress that certain remedies are not warranted. *See Chilicky*, 487 U.S. at 423. That deference must be given whether Congress has chosen to exclude a remedy for particular claims, as in *Bush* and *Chilicky*, or from particular defendants, as here. Provided "Congress has put in place a comprehensive system to administer public rights, has 'not inadvertently' omitted damages remedies for certain claimants, and has not plainly expressed an intention that the courts preserve *Bivens* remedies," *Spagnola*, 859 F.2d at 228, we cannot create additional remedies.

Therefore, because Congress created a comprehensive Privacy Act scheme that did not inadvertently exclude a remedy for the claims brought against these defendants, we will not supplement the scheme with *Bivens* remedies.

4.

We also cannot ignore that, if we were to create a *Bivens* remedy, the litigation of the allegations in the amended complaint would inevitably require judicial intrusion into matters of national security and sensitive intelligence information. The decision of whether to create a *Bivens* remedy involves our judgment and "weighing [of] reasons for and against the creation of a new cause of action, the way common law judges have always done." *Wilkie*, 127 S. Ct. at 2600. Pertinent to that judgment are the difficulties associated with subjecting allegations involving CIA operations and covert operatives to judicial and public scrutiny.

19

There is no dispute on appeal that a *Bivens* remedy in this case is not precluded by the Intelligence Identities Protection Act of 1982 ("IIPA"), 50 U.S.C. §§ 421–26, or by the justiciability doctrine of *Totten v. United States*, 92 U.S. 105 (1875). The IIPA is not a "comprehensive remedial scheme" for purposes of the special factors analysis because it is a purely criminal statute that only authorizes criminal prosecution of those who intentionally disclose the identity of a covert agent. *See* 50 U.S.C. § 421. And the doctrine of *Totten*, which precludes suits "against the Government based on covert espionage agreements," *Tenet v. Doe*, 544 U.S. 1, 3 (2005), does not apply where the suit is "brought by an acknowledged (though covert) employee of the CIA," *id.* at 10. Nonetheless, the concerns that underlie the protective restrictions of the IIPA and the *Totten* doctrine are valid considerations in the *Bivens* analysis and weigh against creating a remedy in this case. As the Supreme Court has recognized, "'[e]ven a small chance that some court will order disclosure of a source's identity could well impair intelligence gathering and cause sources to "close up like a clam."'" *Id.* at 11 (quoting *CIA v. Sims*, 471 U.S. 159, 175 (1985)). We will not create a cause of action that provides that opportunity.

Litigation of the Wilsons' allegations would inevitably require an inquiry into "classified information that may undermine ongoing covert operations." *See Tenet*, 544 U.S. at 11. The amended complaint alleges that the disclosure of Valerie Plame Wilson's identity "impaired . . . her ability to carry out her duties at the CIA," Am. Compl. ¶ 43, increased the risk of violence to her and her family, *id.* at ¶ 42, and subjected her to treatment different from that given other similarly situated agents, *id.* at ¶¶ 51–52. We certainly must hesitate before we allow a judicial inquiry into these allegations that implicate the job risks and responsibilities of covert CIA agents. In cases involving covert espionage agreements, "[t]he state secrets

20

privilege and the more frequent use of *in camera* judicial proceedings simply cannot provide the absolute protection [the Court] found necessary in enunciating the *Totten* rule." *Tenet*, 544 U.S. at 11. Here, although *Totten* does not bar the suit, the concerns justifying the *Totten* doctrine provide further support for our decision that a *Bivens* cause of action is not warranted.

For all the above-stated reasons, we will not imply a *Bivens* remedy. The district court's decision in this regard is affirmed.

## B. *Tort Claim*

The Wilsons also contest the district court's dismissal of their tort claim. With respect to the tort claim, the United States made a certification pursuant to the Federal Employees Liability Reform and Tort Compensation Act of 1988 (the "Westfall Act"), 28 U.S.C. § 2679, that "at the time of the conduct alleged in the amended complaint the individual defendants . . . were acting within the scope of their employment as employees of the United States." The certification carries a rebuttable presumption that the employee has absolute immunity from the lawsuit and that the United States is to be substituted as the defendant. *Id.* § 2679(d); *Osborn v. Haley*, 127 S. Ct. 881, 887–88 (2007); *Council on Am. Islamic Relations* (*CAIR*) *v. Ballenger*, 444 F.3d 659, 662 (D.C. Cir. 2006). If the presumption is not rebutted in this case, the case must be dismissed because the Wilsons have not exhausted their administrative remedies as required to pursue a claim against the United States pursuant to the Federal Tort Claims Act. *See* 28 U.S.C. § 2675(a).

The Wilsons seek to rebut the certification's claim that the defendants were working within their scope of employment when the disclosures were made. To determine whether an employee was acting within the scope of employment under the

21

Westfall Act, we apply the respondeat superior law in the state in which the alleged tort occurred. *CAIR*, 444 F.3d at 663. District of Columbia law, which applies in this case, defines the scope of employment in accordance with the Restatement (Second) of Agency (1958) ("Restatement"). *Id.* (citing *Moseley v. Second New St. Paul Baptist Church*, 534 A.2d 346, 348 n.4 (D.C. 1987). The Restatement provides, in pertinent part, that:

> Conduct of a servant is within the scope of employment if, but only if:
>
> (a) it is of the kind he is employed to perform;
> (b) it occurs substantially within the authorized time and space limits;
> (c) it is actuated, at least in part, by a purpose to serve the master, and
> (d) if force is intentionally used by the servant against another, the use of force is not unexpectable by the master.

Restatement § 228(1); *see CAIR*, 444 F.3d at 663. "'[T]he test for scope of employment is an objective one, based on all the facts and circumstances.'" *Id.* (quoting *Weinberg v. Johnson*, 518 A.2d 985, 991 (D.C. 1986)). "Although scope of employment is generally a question for the jury, it 'becomes a question of law for the court, however, if there is not sufficient evidence from which a reasonable juror could conclude that the action was within the scope of the employment.'" *Id.* (quoting *Boykin v. District of Columbia*, 484 A.2d 560, 562 (D.C. 1984)).

The Wilsons argue that the disclosure of a covert agent's identity cannot fall within an employee's scope of employment with the United States because the disclosure is unlawful and threatens the security of the nation, its covert agents, and its intelligence-gathering functions. But, as we explained in *CAIR*,

22

"[t]his argument rests on a misunderstanding of D.C. scope-of-employment law (not to mention the plain text of the Westfall Act), which directs courts to look beyond alleged intentional torts themselves" to the underlying conduct in determining whether that conduct was within the scope of employment. 444 F.3d at 664. As a result, an employee's scope of employment "'is broad enough to embrace any intentional tort arising out of a dispute that was originally undertaken on the employer's behalf.'" *Id.* (quoting *Weinberg*, 518 A.2d at 992). We noted in *CAIR* that D.C. courts have concluded that "a reasonable juror could find that a laundromat employee acted within scope of employment when he shot a customer during a dispute over missing shirts," *id.* (citing *Johnson v. Weinberg*, 434 A.2d 404, 409 (D.C. 1981)), and that a "jury reasonably found that a mattress deliveryman acted within [the] scope of employment when he assaulted and raped a customer following a delivery-related dispute," *id.* (citing *Lyon v. Carey*, 533 F.2d 649, 652 (D.C. Cir. 1976)).

We have since held, under D.C. scope of employment law, that the alleged "authorization, implementation and supervision of torture" was within the scope of employment of military officers who interrogated detainees at the United States Naval Base at Guantanamo Bay, Cuba. *Rasul v. Myers*, 512 F.3d 644, 656–60 (D.C. Cir. 2008). In *Rasul*, the allegation that employees had engaged in "serious criminality" while interrogating detainees did not change the result because "the detention and interrogation of suspected enemy combatants [was] a central part of the [employees'] duties as military officers charged with winning the war on terror." *Id.* at 658–60. Because "the detention and interrogation of suspected enemy combatants [was] the type of conduct the defendants were employed to engage in," *id.* at 658, the "alleged tortious conduct was incidental to the defendants' legitimate employment duties," *id.* at 659, and "allegations of serious criminality d[id] not alter

23

our conclusion that the defendants' conduct was incidental to authorized conduct," *id.* at 660.

Even more to the point for purposes of this case, we held in *CAIR* that a congressman's allegedly defamatory statement made during a press interview was within the scope of his employment because "[s]peaking to the press during regular work hours in response to a reporter's inquiry falls within the scope of a congressman's 'authorized duties.'" *Id.* A congressman's "ability to do his job as a legislator effectively is tied, as in this case, to the Member's relationship with the public and in particular his constituents and colleagues in the Congress." *Id.* at 665. Thus, we held that the congressman's statement to the press was "of the kind he is employed to perform" and "actuated, at least in part, by a purpose to serve the master." *Id.* at 664–66 (quoting Restatement § 228(1)).

Here, the Wilsons allege that the defendants spoke to the press in order to diffuse Joseph Wilson's criticism of the Executive's handling of pre-war intelligence. Am. Compl. ¶¶ 2–3. It can hardly be disputed that such discussions were of the type that the defendants were employed to perform. Even the Wilsons agree that "[o]f course, the defendants may discredit public critics of the Executive Branch." Appellants' Br. at 33. The conduct, then, was in the defendants' scope of employment regardless of whether it was unlawful or contrary to the national security of the United States. Therefore, we agree with the district court that the Wilsons' arguments about the illegality and impropriety of the alleged conduct are misplaced. The government's scope-of-employment certification is proper, and the district court's dismissal of the tort claim is affirmed.[2]

_____

[2]   We further agree with the district court that further discovery is not warranted to determine precise times and locations of the defendants' conversations with the press. Even if some

24

## IV. Conclusion

Because the Wilsons have failed to state constitutional *Bivens* claims for which relief may be granted and have failed to exhaust their administrative remedies as required to pursue a tort claim against the United States, we affirm the judgment of the district court dismissing the Wilsons' amended complaint in its entirety.[3]

---

conversations took place on Sunday or occurred off White House property as the Wilsons contend and seek to discover, the conversations would still have occurred within the "time and space" of employment of the high-level Executive Branch employees sued here. Neither the Vice President, his chief of staff, nor a close advisor to the President punches out of work at the end of the day or when he leaves White House property.

[3] Because our decision, based on the grounds considered by the district court, results in the dismissal of all claims against the Vice President of the United States, we need not, and do not, consider his alternate claim for absolute Vice-Presidential immunity.

ROGERS, *Circuit Judge*, concurring in part and dissenting in part:  In holding that the Privacy Act is a comprehensive remedial scheme that precludes creation of a *Bivens* remedy for any of the Wilsons' constitutional claims, Op. at 18, the court assigns to the Privacy Act a burden that it was never intended to bear.  Aimed at protecting "one of our most fundamental civil liberties — the right to privacy,"[1] the Privacy Act established certain enforceable rights, such as the right to have access to and notice of one's agency records, to limit the government's collection of certain information, and to consent to its release. 5 U.S.C. §§ 552a(b)-(f).  The Act balanced these individual protections against the government's legitimate need for information and information systems,[2] but did not eliminate other protections under the Constitution.  The issue presented is thus not whether any individual may obtain some relief regarding information that is protected under the Act, but whether the Wilsons are to be afforded an opportunity to obtain relief for alleged constitutional violations against which the Act provides no protection.  Nothing in Congress's decision to limit remedies under the Act to individuals with agency records or to exempt the offices of the President and Vice President shows an intention to deny a cause of action for violations of the First and Fifth Amendments to the Constitution, as the legislative history makes clear, *see, e.g.*, S. REP. NO. 93-1183, at 15 (1974), *reprinted in* JOINT COMM. ON GOV'T OPERATIONS, 94TH CONG., LEGISLATIVE HISTORY OF THE PRIVACY ACT OF 1974: SOURCE BOOK ON PRIVACY at 3 (1976).  Furthermore, the court's invocation of other special factors is based on unfounded and premature speculation about a risk of disclosure of secret or

---

[1]  120 CONG. REC. 12,646 (1974) (statement of Sen. Ervin).

[2]  H.R. REP. NO. 93-1416, at 4 (1974), *reprinted in* JOINT COMM. ON GOV'T OPERATIONS, 94TH CONG., LEGISLATIVE HISTORY OF THE PRIVACY ACT OF 1974: SOURCE BOOK ON PRIVACY at 297 (1976).

2

sensitive information, Op. at 19.  The Wilsons' claims, as alleged, do not rely on such information but on information already in the public domain, *see, e.g.*, *United States v. Libby*, 498 F. Supp. 2d 1 (D.D.C. 2007).  The United States has not invoked the state secrets privilege.  Besides, district courts are well-situated to protect against unwarranted disclosures, and any concern here about the disclosure of sensitive information in lawsuits against the President's close advisors can be resolved by evidentiary rules and the defense of immunity, which the district court has yet to address.

## I.

A brief overview of *Bivens* precedent reveals how far this court strays.  For a plaintiff alleging the violation of a constitutional right by a federal government official, the analysis of whether a court should imply a cause of action under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), involves two primary steps after a determination that a "constitutionally recognized interest" is at stake, *Wilkie v. Robbins*, 127 S. Ct. 2588, 2598 (2007).  First, the court must determine "whether any alternative, existing process for protecting the interest amounts to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages."  *Id.*  When it is "hard to infer that Congress expected the Judiciary to stay its *Bivens* hand, but equally hard to extract any clear lesson that *Bivens* ought to spawn a new claim," *id.* at 2600 (citing *Schweiker v. Chilicky*, 487 U.S. 412, 426 (1988); *Bush v. Lucas*, 462 U.S. 367, 388 (1983); *Bivens*, 403 U.S. at 397), step two of the analysis directs the court to "make the kind of remedial determination that is appropriate for a common-law tribunal, paying particular heed, however, to any special factors counselling hesitation before authorizing a new kind of federal litigation," *id.* at 2598 (citation and internal quotation marks omitted).

3

Under step one, the Supreme Court has rejected the notion that state tort law of privacy could adequately protect a victim's "absolute right" under the Fourth Amendment, *Bivens*, 403 U.S. at 392, observing that tort law may be inconsistent or hostile to Fourth Amendment guarantees, *id.* at 394, such that it was appropriate to imply a constitutional damages remedy against individual law enforcement officers as "the ordinary remedy for an invasion of personal interests in liberty," *id.* at 395. Similarly, in *Carlson v. Green*, 446 U.S. 14 (1980), the Supreme Court rejected the notion that a damages remedy against the United States pursuant to the Federal Tort Claims Act could sufficiently protect a prisoner's Eighth Amendment rights as would preclude a damages action against individual prison officials, *id.* at 23. In each instance, the Supreme Court implied a *Bivens* action as "complementary" to an existing remedial scheme. *Id.* at 20. Additionally, in *Davis v. Passman*, 442 U.S. 228 (1979), the Supreme Court held — despite Congress's exemption of its Members from liability under Title VII of the Civil Rights Act — that the plaintiff had a cause of action under the Fifth Amendment for damages arising from her dismissal from employment by a Congressman on the alleged basis of her gender, because the exemption did not "foreclose the judicial remedies of those expressly unprotected by the statute," *id.* at 247. Recently, the Supreme Court held that federal officials who use their power to retaliate against an individual through criminal prosecution for the exercise of First Amendment rights are "subject to an action for damages on the authority of *Bivens*," without discussing any alternative remedies that may exist. *Hartman v. Moore*, 547 U.S. 250, 256 (2006).

Notably, except possibly in a military context,[3] neither the

_____

[3] Under step two of the *Bivens* analysis, the Supreme Court concluded in view of the "specificity" and "insistence" of the "explicit constitutional authorization for *Congress* '[t]o make Rules for the

4

Supreme Court nor this court has denied a *Bivens* remedy where a plaintiff had no alternative remedy at all. For example in *Bush*, the Supreme Court stated that there was no need to reach the question whether the absence of any remedy could imply that courts should stay their hands, 462 U.S. at 378 n.14, because the plaintiff's claim of retaliatory demotion was addressed by the Civil Service Reform Act, which provided a partial remedy, *id.* at 386. Similarly, in *Chilicky*, 487 U.S. at 421, because the plaintiff's denial of disability benefits was covered by the Social Security Act, *id.* at 428, the Supreme Court determined that "Congress . . . ha[d] not failed to provide meaningful safeguards or remedies for the rights of persons situated as [were the plaintiffs]," *id.* at 425. In each instance a remedial scheme clearly encompassed the grievance underlying the plaintiff's alleged constitutional violation. So, too, in *Correctional Services Corp. v. Malesko*, 534 U.S. 61 (2001), the Supreme Court did not extend *Bivens* liability to corporations, a new category of defendant, *id.* at 68-71, as the plaintiff had not only a *Bivens* action under the Eighth Amendment against an individual official but also "alternative remedies [that] [were] at least as great, and in many respects greater, than anything that could be had under *Bivens*," *id.* at 72. More recently in *Wilkie*, 127 S. Ct. at 2600-01, although the patchwork of remedies was not "an elaborate remedial scheme," *id.* at 2600 (quoting *Bush*,

---

Government and Regulation of the land and naval Forces,' U.S. Const., Art. I, § 8, cl.14," *United States v. Stanley*, 483 U.S. 669, 681-82 (1987), and "the unique disciplinary structure of the Military Establishment and Congress' activity in the field" regarding the military justice system, *id.* at 683 (quoting *Chappell v. Wallace*, 462 U.S. 296, 304 (1983)), that it would be inappropriate to provide a *Bivens* action against a military official for injuries incident to military service, even though the plaintiff appeared to have no statutory remedy, *id.* at 683-84 (citing *Feres v. United States*, 340 U.S. 135 (1950)).

5

462 U.S. at 388), sufficient to indicate that "Congress expected the Judiciary to stay its *Bivens* hand," *id.*, the Supreme Court denied a *Bivens* action in part because "[f]or each charge" the plaintiff "had some procedure to defend and make good on his position," including "the means to be heard," *id.* at 2599, through "an administrative, and ultimately a judicial, process for vindicating virtually all of his complaints," *id.* at 2600; *see also id.* at 2604.

Consistent with this precedent, where nothing "suggests that Congress intended to prevent [suits] . . . for constitutional violations against which [the statute] provides no protection at all," even where the statute provided remedies for other employment-based injuries, this court has entertained a *Bivens* remedy. *Ethnic Employees of Library of Cong. v. Boorstin*, 751 F.2d 1405, 1415 (D.C. Cir. 1985). Even when denying a *Bivens* remedy in *Spagnola v. Mathis*, 859 F.2d 223 (D.C. Cir. 1988); *see* Op. at 11, 17, the en banc court emphasized that although the plaintiffs' claims did not receive the full protection under the Civil Service Reform Act, there could be "little doubt" that "Congress ha[d] brought [the plaintiffs'] claims . . . within [the statute's] ambit" as it "affirmatively sp[oke] to claims such as [the plaintiffs']" and "technically accommodate[d] [their] constitutional challenges," *id.* at 229.

Under step two, the Supreme Court has described the type of "special factors counselling hesitation." *Wilkie*, 127 S. Ct. at 2598 (citation and internal quotation marks omitted). Where the Constitution itself vests unique responsibility in Congress for the military, *see Stanley*, 483 U.S. at 681-84, or where a constitutional claim depends upon a government-created interest such as federal employment, benefits, or the availability of government information as in FOIA, the Supreme Court has considered whether "Congress is in a better position to decide" whether to create a particular damages remedy, *Chilicky*, 487

6

U.S. at 427 (quoting *Bush*, 462 U.S. at 390); *Bivens*, 403 U.S. at 396-97; *see Thomas v. Principi*, 394 F.3d 970, 975-76 (D.C. Cir. 2005); *Johnson v. Exec. Ofc. for U.S. Attys.*, 310 F.3d 771, 777 (D.C. Cir. 2002); *Spagnola*, 859 F.2d at 226-28. The Supreme Court also has considered the judicial manageability of "devising a workable cause of action," *Wilkie*, 127 S. Ct. at 2604; *see Davis*, 442 U.S. at 245.

## II.

Applying the *Bivens* analysis demonstrates that reversal is required for Mr. Wilson's claims against all appellees and for one of Ms. Wilson's claims against three of the appellees.

### A.

Mr. Wilson alleges that, in violation of the First Amendment, appellees intentionally retaliated against him for his constitutionally protected statements about the President's State of the Union Address by disclosing to various members of the press his wife's identity as an undercover agent with the Central Intelligence Agency ("CIA"), and thereby harming him and his family. Am. Compl. ¶¶ 19-49. In addition, he alleges that, in violation of the Fifth Amendment's equal protection requirement, appellees intentionally targeted him for unfavorable treatment different from those similarly situated without a legitimate basis. *Id.* ¶¶ 50-54.

At step one, the Privacy Act is not an alternative remedial scheme for Mr. Wilson's constitutional claims because he has no cause of action under the Act, *see Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1123 (D.C. Cir. 2007), but even assuming he could somehow obtain relief through his wife's Privacy Act claim as the court suggests, Op. at 13-14, 17, the statute would provide none for the harm allegedly caused by three appellees not employed by an "agency." First, the Act creates a civil

7

damages remedy "[w]henever any agency . . . fails to comply with any other provision of this section . . . in such a way as to have *an adverse effect on an individual*," 5 U.S.C. § 552a(g)(1)(D) (emphasis added), such as by violating the prohibition on the disclosure of an individual's "record which is contained in a system of records," *id.* § 552a(b). These provisions do not cover Mr. Wilson's claims due to the disclosure of information about his wife that is retrievable from agency records under her name, because the term "adverse effect" includes "*only* . . . a person whose records are actually disclosed." *Sussman*, 494 F.3d at 1123; 5 U.S.C. § 552a(4). Thus, the Privacy Act suggests nothing about the legal rights of an individual without an agency record who is harmed through the disclosure of someone else's agency record, *i.e.*, someone "expressly unprotected" by the statute, *Davis*, 442 U.S. at 247; *see Ethnic Employees*, 751 F.2d at 1415. The Act neither "affirmatively speaks to" nor "accommodates . . . [the] constitutional challenges," *Spagnola*, 859 F.2d at 229, brought by Mr. Wilson. *See also Dunbar Corp. v. Lindsey*, 905 F.2d 754, 762 (4th Cir. 1990).

The court's conclusion, therefore, that "[t]he presence of a comprehensive remedial scheme is . . . a sufficient reason for us to stay our hand" on *Bivens*, Op. at 16, is, at best, incomplete. A statutory scheme may be insufficient when it is comprehensive for some claims but not for others or for the plaintiff alleging a harm that the statute does not purport to address. When a statute omits remedies for government officials' harm, its mere existence is an unconvincing reason to deny a *Bivens* remedy, as was the Civil Rights Act in *Davis*, 442 U.S. at 247, and the Federal Tort Claims Act in *Carlson*, 446 U.S. at 23. *See also Wilkie*, 127 S. Ct. at 2600 (quoting *Davis*, 442 U.S. at 245 (quoting *Bivens*, at 410 (Harlan, J., concurring in judgment))). An exception would occur where "the design [of the statute] . . . suggests that Congress has provided what it considers adequate

8

remedial mechanisms for constitutional violations," *Chilicky*, 487 U.S. at 423. *Bivens* embraces the notion that a constitutional claim and a statutory claim may be complementary, *see Carlson*, 446 U.S. at 20; *see also Bagola v. Kindt*, 131 F.3d 632, 642-44 (7th Cir. 1997). But an omission in the statute can mean that Congress either decided not to provide a damages remedy or did not contemplate much less decide "'what it considers adequate remedial mechanisms for constitutional violations that may occur,'" Op. at 10 (quoting *Chilicky*, 487 U.S. at 423), in a certain way or to a certain class of individuals. In sum, the comprehensiveness of a statute for some plaintiffs begs the key question of whether Congress has "not inadvertently omitted damages remedies for certain claimants," *Spagnola*, 859 F.2d at 228 (citation and internal quotation marks omitted); *see Wilkie*, 127 S. Ct. at 2598.

Second, in suggesting that Mr. Wilson could obtain some relief through his wife's potential claim under the Privacy Act, Op. at 13-14, 17, and thus that it is a comprehensive remedial scheme as to him, the court appears to assume that a statutory exemption of certain offices must mean that Congress has not inadvertently denied a remedy, *id*. at 14-15, 17-18. But such an approach glosses over the question whether the Privacy Act in this case "amounts to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages," *Wilkie*, 127 S. Ct. at 2598. In four instances involving a congressional exemption of a category of defendant, the Supreme Court has proceeded to analyze whether it would be appropriate to imply a *Bivens* action. *See Malesko*, 534 U.S. at 70-74; *FDIC v. Meyer*, 510 U.S. 471, 484-86 (1994); *Carlson*, 446 U.S. at 19-23; *id.* at 28 (Powell, J., concurring in judgment); *Davis*, 442 U.S. at 245-48. For example, although Congress had exempted its Members from liability under Title VII of the Civil Rights Act, the Supreme Court concluded in *Davis* that this did not demonstrate Congress's intention to deny a *Bivens* remedy.

9

*See* 442 U.S. at 247. Acknowledging that a suit against a Member of Congress "for putatively unconstitutional actions taken in the course of his official conduct [did] raise special concerns," *id.* at 246, the Supreme Court concluded that "these concerns [were] coextensive with the protections afforded by the Speech or Debate Clause," *id.*, and left to the lower court to determine in the first instance whether the defendant's conduct was shielded by immunity, *id.* at 249. In so doing, the Supreme Court observed that "[o]ur system of jurisprudence rests on the assumption that all individuals, whatever their position in government, are subject to federal law." *Id.* at 246 (quoting *Butz v. Economou*, 438 U.S. 478, 506 (1978) (quoting *United States v. Lee*, 106 U.S. 196, 220 (1882))).

In the Privacy Act, 5 U.S.C. § 552a(a)(1), Congress adopted the definition of "agency" in the Freedom of Information Act ("FOIA"), *id.* § 552(f), without explanation. The legislative history of FOIA, *see* Op. at 15, makes clear that the exemption of the President and his close advisors[4] was simply designed to avoid a challenge that Congress lacked authority to force disclosure of the President's papers and communications with close advisors. *See* H.R. Rep. No. 93-1380 at 15 (1974) (Conf. Rep.), *reprinted in* H. Comm. on Gov't Operations, S. Comm. on the Judiciary, 94th Cong., Freedom of Information Act

---

[4] In *Kissinger v. Reporters Committee for Freedom of the Press*, 445 U.S. 136 (1980), the Supreme Court held that the Office of the President is not an "agency," *id.* at 156 (citing H.R. Rep. No. 93-1380, at 15 (1974) (Conf. Rep.)). In *Schwarz v. U.S. Department of Treasury*, No. 00-5453, 2001 WL 674636, at *1 (D.C. Cir. May 10, 2001), this court summarily affirmed the district court's holding that the Vice President's office is not an "agency," *see Schwarz v. U.S. Dep't of Treas.*, 131 F. Supp. 2d 142, 147-48 (D.D.C. 2000); *see also* Op. at 14, although the Vice President's participation in an Executive Branch entity does not automatically exempt it from the definition, *see Meyer v. Bush*, 981 F.2d 1288, 1295 n.7 (D.C. Cir. 1993).

10

AND AMENDMENTS OF 1974, SOURCE BOOK II, at 231-32 (1975); *Soucie v. David*, 448 F.2d 1067, 1071-72 & nn. 9-12 (D.C. Cir. 1971).[5] This is a far cry from indicating that Congress considered and decided to deny a *Bivens* remedy in the context at issue. The myriad procedural duties imposed on an "agency" by FOIA and the Privacy Act, *see, e.g.*, 5 U.S.C. §§ 552(a), (e), (g), (i)-(l); *id.* §§ 552a(b)-(f), reveal that the considerations relevant to the exemption of an office, *see, e.g.*, *Meyer*, 981 F.2d at 1291-93, are different from those relevant to whether a cause of action should be created for an individual who alleges First and Fifth Amendment violations by employees of the exempted offices.

In any event, the legislative history demonstrates that the Privacy Act was designed to add protection, not to eliminate existing remedies or those that might be developed by the courts. *See, e.g.*, S. REP. NO. 93-1183, at 2-3, 16, SOURCE BOOK ON PRIVACY at 155-56, 169; H.R. REP. NO. 93-1416 at 3 (1974), SOURCE BOOK ON PRIVACY at 296; 120 CONG. REC. 40,410 (1974) (statement of Sen. Muskie). Most significantly, the Senate Report states that the Privacy Act "*should not be*

---

[5] The Conference Report accompanying the 1974 Amendments to FOIA stated:

> With respect to the meaning of the term "Executive Office of the President" [in 5 U.S.C. § 552(f)] the conferees intend the result reached in *Soucie v. David*, 448 F.2d 1067 (C.A.D.C. 1971). The term is not to be interpreted as including the President's immediate personal staff or units in the Executive Office whose sole function is to advise and assist the President.

H.R. REP. NO. 93-1380, at 15, FOIA SOURCE BOOK II at 232; *see Meyer*, 981 F.2d at 1292 & n.1.

11

*construed as a final statement by Congress on the right of privacy and other related rights as they may be developed or interpreted by the courts.*"  S. REP. NO. 93-1183, at 15, SOURCE BOOK ON PRIVACY at 168 (emphasis added).  The legislative history satisfies any "clear expression" requirement, *see Spagnola*, 859 F.2d at 229 (citing *Chilicky*, 487 U.S. at 423), as it makes manifest that Congress did not intend the Privacy Act to be a final or exclusive remedy but contemplated a continuing role for the courts.   The court therefore errs in treating Congress's decision to exempt certain Executive offices from the Privacy Act as a "convincing" reason to refrain from implying a *Bivens* remedy, *Wilkie*, 127 S. Ct. at 2598.

To the extent the court relies on *Chung v. Dep't of Justice*, 333 F.3d 273, 274 (D.C. Cir. 2003), for the proposition that the Privacy Act is a *per se* comprehensive statute for *Bivens* purposes, Op. at 5, 12, its reliance is misplaced.  *Chung* does not apply because Mr. Wilson has no cause of action or remedy against any appellee under the Act.  In *Chung*, the plaintiff alleged the violation of his First and Fifth Amendment rights by agency officials (unnamed defendants) and pled a Privacy Act claim against their employer agency when his investigative cooperation was leaked.  *See Chung v. Dep't of Justice*, No. Civ. 00-1912, 2001 WL 34360430, at *1-2 (D.D.C. 2001).  This court affirmed the dismissal of his constitutional claims, adopting the district court's view that they were "encompassed within the remedial scheme of the Privacy Act," 333 F.3d at 274.  This court provided no independent analysis, and the district court's holding that the Privacy Act was comprehensive because the plaintiff's claims stemmed from an agency disclosure of his records, 2001 WL 34360430, at *12, was limited to a circumstance where the plaintiff, unlike Mr. Wilson, had a cause of action under the Act.  Neither this court nor the district court addressed the legislative history discussed above.  The other case cited by the court, Op. at 12; *see Downie v. City of Middleburg*

12

*Heights*, 301 F.3d 688, 699 (6th Cir. 2002), also involved plaintiffs who had "a meaningful remedy" under the Privacy Act.

In sum, where courts have declined to imply a *Bivens* remedy notwithstanding omission of a damages remedy or exemption of a defendant category, there was an indication that Congress had considered "the rights of persons situated as [were the plaintiffs]," *Chilicky*, 487 U.S. at 425; *see Malesko*, 534 U.S. at 72; *Spagnola*, 859 F.2d at 229. No evidence here suggests that Congress meant the Privacy Act "to foreclose alternative remedies available to those not covered by the statute," *Davis*, 442 U.S. at 247. As our sister circuit has observed, where it "seems plain . . . that Congress never has given a moment's thought to the question of what sort of remedies should be available," *Krueger v. Lyng*, 927 F.2d 1050, 1057 (8th Cir. 1991), to an injured plaintiff such as Mr. Wilson, "Congress's failure to provide a remedy for constitutional wrongs suffered by [such a plaintiff] has been inadvertent" and the plaintiff "may proceed with his *Bivens* action." *See also Bagola*, 131 F.3d at 642; *Dunbar Corp.*, 905 F.2d at 762; *Ethnic Employees*, 751 F.2d at 1415. Given the text of the Privacy Act and the evidence of congressional intent, it is incongruous to apply a statute designed to protect the privacy of an individual's agency records to preclude congressionally unforeseen constitutional claims by a stranger to the Act, *see Sussman*, 494 F.3d at 1123. Because Mr. Wilson is a person for whom Congress has "inadvertently omitted damages remedies," *Spagnola*, 859 F.2d at 228 (citation and internal quotation marks omitted), the Privacy Act is not a comprehensive remedial scheme as to him and implying a *Bivens* action for his claims would comport with precedent. *See Wilkie*, 127 S. Ct. at 2600; *Malesko*, 534 U.S. at 73-74; *Davis*, 442 U.S. 245; *Bivens*, 403 U.S. at 410 (Harlan, J., concurring in judgment); *Ethnic Employees*, 751 F.2d at 1414-15; *see also Munsell v. Dep't of Agric.*, 509 F.3d 572, 591 (D.C. Cir. 2007). To avoid this result, the court lumps the Wilsons' claims

13

together, describing Mr. Wilson's claims as seeking damages for unconstitutional action taken in regard to information that once was covered by the Privacy Act. Op. at 13-14, 17. But the Constitution protects individual rights, not information, and whether Ms. Wilson might have a Privacy Act remedy is irrelevant to Mr. Wilson's independent claims based on public disclosures that were steps removed from internal government transfers, *see, e.g.*, 5 U.S.C. § 552a(b). The days when husband and wife were considered as one at law are long past. *See, e.g.*, *Rousey v. Rousey*, 528 A.2d 416, 417 & n.1 (D.C. 1987) (en banc).

At step two, the court acknowledges that neither the Intelligence Identities Protection Act of 1982 ("IIPA"), 50 U.S.C. §§ 421-26, which imposes criminal penalties for intentional disclosure of a covert agent's identity to an unauthorized source in certain circumstances, nor the *Totten* doctrine,[6] which bars litigation of a claim involving an unacknowledged CIA agent's employment, applies. Op. at 18-19. That is, because the IIPA provides no civil remedies it is irrelevant to assessing whether Congress has created a comprehensive remedial scheme that it deems an adequate alternative to suits directly under the Constitution. Rather, a *Bivens* action would supplement the criminal scheme by imposing civil damages. And because the United States has acknowledged Ms. Wilson's prior covert CIA identity, there is no *Totten* problem. The court nonetheless, in a novel analysis, extends the disclosure concerns underlying the IIPA and the *Totten* doctrine, treating them as "valid considerations" weighing against implying a *Bivens* remedy, *id.* at 19, even though all of the cases the court cites are inapposite. The cat is out of the bag as Ms. Wilson's cover has already been compromised, *see Tenet*,

---

[6] *Totten v. United States*, 92 U.S. 105 (1875); *see Tenet v. Doe*, 544 U.S. 1, 8 (2005).

14

544 U.S. at 10, and these claims, as pled, do not depend upon the "forced disclosure of the identities of [the CIA's] intelligence sources," *CIA v. Sims*, 471 U.S. 159, 175 (1985). Besides, courts regularly entertain cases involving CIA agents, confidential information, and even matters relating to national security. *See, e.g.*, *Tenet*, 544 U.S. at 10; *Webster v. Doe*, 486 U.S. 592, 604 (1988); *In re Sealed Case*, 494 F.3d 139 (D.C. Cir. 2007).

Likewise, the court's speculation that this litigation "would inevitably require judicial intrusion into matters of national security and sensitive intelligence information," Op. at 18, is unfounded and at best premature. It is unfounded because any concern about possible disclosure of secret or sensitive information has not prompted the United States to assert the state secrets privilege, *see United States v. Reynolds*, 345 U.S. 1, 7-8 (1953); *In re Sealed Case*, 494 F.3d at 142. At this stage of the proceedings this is hardly surprising inasmuch as the United States successfully prosecuted related obstruction-of-justice, perjury, and false-statements charges to a jury verdict, *see Libby*, 498 F. Supp. 2d at 2; *see also* Am. Compl. ¶¶ 20-22, 33-34. In any event, district courts are well-suited to protect secrets from unwarranted disclosures. *See, e.g.*, *Boumediene v. Bush*, 128 S. Ct. 2229, 2276 (2008); *Webster*, 486 U.S. at 604; *In re Sealed Case*, 494 F.3d at 153. It is premature because "[t]here has been neither discovery nor any presentation to the district court of how [the Wilsons] will try to prove their claims." Appellants' Reply Br. at 2. As alleged, the claims depend upon the intent and effect of appellees' exposure of Ms. Wilson's covert identity to the press, relying on information already in the public domain. Concern regarding the disclosure of sensitive information in lawsuits against close Presidential advisors can be resolved under evidentiary rules, *see, e.g.*, *In re Sealed Case*, 494 F.3d 139, and the defense of immunity. As to the latter, the Supreme Court has instructed that "[t]he danger that high federal officials will disregard constitutional rights in their zeal to protect the national

15

security is sufficiently real to counsel against affording [these] officials [such as the Attorney General] an absolute immunity," *Mitchell v. Forsyth*, 472 U.S. 511, 523 (1985), and so immunity questions should be addressed on their own merit rather than imported into the *Bivens* analysis. Hence, the court's disclosure concerns cannot serve as a special factor to "modify litigants' substantive rights as to either constitutional or statutory matters," *In re Sealed Case*, 494 F.3d at 143. Neither can the court's broad holding rely, Op. at 12, 17, on the limited concession that the Privacy Act is a special factor for Ms. Wilson's privacy claim against former Deputy Secretary of State Armitage, *see* Appellants' Br. at 18 n.3.

For these reasons the underlying rationale of *Bivens* and its progeny — "'[t]he very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury,'" *Bivens*, 403 U.S. at 397 (quoting *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 163 (1803)), unless Congress has acted to the contrary in a "convincing" way or there are "special factors counselling hesitation," *Wilkie*, 127 S. Ct. at 2598 — instructs that the dismissal of Mr. Wilson's constitutional claims was erroneous. He has no alternative remedy and no special factors counsel caution against creating a cause of action for him. There is nothing novel about a *Bivens* remedy for a First Amendment retaliation claim against federal officials. *See, e.g.*, *Hartman*, 547 U.S. at 256; *Nat'l Commodity & Barter Ass'n v. Gibbs*, 886 F.2d 1240, 1248 (10th Cir. 1989); *Gibson v. United States*, 781 F.2d 1334, 1342 (9th Cir. 1986); *Ethnic Employees*, 751 F.2d at 1415; *Dellums v. Powell*, 566 F.2d 167, 194-95 (D.C. Cir. 1977). A claim of denial of equal protection for a class of one has long been recognized, *see 3883 Conn. LLC v. Dist. of Columbia*, 336 F.3d 1068, 1075 (D.C. Cir. 2003) (citing *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)), and the Supreme Court's recent decision in *Engquist v. Oregon Department of*

16

*Agriculture*, 128 S. Ct. 2146 (2008), does not affect Mr. Wilson as he was not a public employee when the alleged constitutional violations occurred.  Mr. Wilson's claims, then, are the type for which *Bivens* contemplated a compensatory cause of action to deter government officials' violations of the Constitution, *see Malesko*, 534 U.S. at 70-71, 74; *FDIC*, 510 U.S. at 485; *Carlson*, 446 U.S. at 21-22; *Bivens*, 403 U.S. at 395-96; *id.* at 403, 408 (Harlan, J., concurring in judgment); *see also Wilkie*, 127 S. Ct. at 2600; *Hartman*, 547 U.S. at 256, and which the Privacy Act did not foreclose, *see, e.g.*, S. REP. NO. 93-1183, at 15, SOURCE BOOK ON PRIVACY at 168.

**B.**

Ms. Wilson alleges that in disclosing her covert identity appellees violated her Fifth Amendment rights to equal protection, privacy, and property.  Am. Compl. ¶¶ 50-64.

For the claims that are inseparable from her public employment, Ms. Wilson has no "constitutionally recognized interest" at stake, *Wilkie*, 127 S. Ct. at 2598; *see Davis*, 442 U.S. at 236-38; *see also Dunbar Corp.*, 905 F.2d at 759.  Under *Engquist*, because of the "unique considerations applicable when the government acts as employer as opposed to sovereign, . . . the class-of-one theory of equal protection does not apply in the public employment context," 128 S. Ct. at 2151.  She also has no due process protection for a non-existent property interest in her continued CIA employment.  *See Doe v. Gates*, 981 F.2d 1316, 1320-21 (D.C. Cir. 1993); *cf. Doe v. Cheney*, 885 F.2d 898, 909 (D.C. Cir. 1989).

However, the district court acknowledged that Ms. Wilson alleges a violation of a constitutional right to privacy under the Due Process Clause where public disclosure of information constituted a state-created danger, *see Butera v. Dist. of Columbia*, 235 F.3d 637, 651-52 (D.C. Cir. 2001); *Kallstrom v.*

17

*City of Columbus*, 136 F.3d 1055, 1064 (6th Cir. 1998); Am. Compl. ¶¶ 1, 21, 40-42, 55-58; *cf. Am. Fed. of Gov't Employees, AFL-CIO v. Dep't of Housing & Urban Devel.*, 118 F.3d 786, 791-93 (D.C. Cir. 1997).[7]  In view of the design of the Privacy Act and Congress's intention in enacting it, and the absence of special factors counselling against a *Bivens* remedy, *see supra* Part II.A, I would remand this claim to the district court, except as to appellee Armitage for whose disclosure Ms. Wilson has a potential cause of action under the Privacy Act, 5 U.S.C. § 552a(g)(1), against his former agency, *see Ethnic Employees*, 751 F.2d at 1415.  Except as to this appellee *Chung* is not dispositive, 333 F.3d at 274, for although Ms. Wilson's records are protected in some respects under the Privacy Act, three of the appellees are not covered by the Act and, as the legislative history shows, the exemption of the offices in which they work was unrelated to and reveals no consideration of the type of harm on which her endangerment claim is based.  The Privacy Act thus cannot be said to adequately protect her constitutional privacy interest or to reveal a congressional intent to bar this set of claims.

In conclusion, the court's decision is not the product of the application of the *Bivens* doctrine to appellants' claims as *Wilkie* directs, 127 S. Ct. at 2598.  It is rather the result of the refusal to acknowledge precedent that *Bivens* is a remedial doctrine and absent special factors applies where Congress created statutory protection for some persons in some circumstances but did not address the type of constitutional claims alleged by Mr. Wilson and in part by Ms. Wilson.  The disclosure concerns identified by the court as counselling hesitation are either unfounded or premature because there has been no discovery or presentation by the Wilsons to the district court of how they will attempt to

---

[7] *See generally Totten*, 92 U.S. at 106; *Haig v. Agee*, 453 U.S. 280, 285 & n.7 (1981).

18

prove their claims.  Contrary to separation of powers, then, the court effectively cedes to Congress the judiciary's defined role to decide issues arising under the Constitution, despite the fact that the Privacy Act neither is nor purports to be a universal bar to all constitutional relief related to the release of agency records. Accordingly, I concur in Parts II and III.B of the court's opinion, and in the judgment regarding Ms. Wilson's equal protection and due process property claims, but I respectfully dissent from the affirmance of the dismissal of Mr. Wilson's First and Fifth Amendment claims against each appellee and Ms. Wilson's due process state-endangerment claims (except against appellee Armitage), and would leave to the district court to address in the first instance appellees' defenses of immunity, *see, e.g.*, *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Davis*, 442 U.S. at 249; *Butera*, 235 F.3d at 646.